**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ERIC LEE and CHASE WILLIAMS, individually
and on behalf of all others similarly situated,

                 Plaintiffs,

                 v.

BINANCE, CHANGPENG ZHAO, YI HE, and
ROGER WANG,

                 Defendants.

---

No. _____

**JURY DEMANDED**

## CLASS ACTION COMPLAINT

Individually and on behalf of all others similarly situated, Plaintiffs Eric Lee and Chase Williams bring this action against Defendants Binance, Changpeng Zhao, Yi He, and Roger Wang. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of whitepapers of the digital tokens at issue, press releases, media reports, and other publicly disclosed reports and information about Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiffs hereby allege as follows:

## I.   <u>INTRODUCTION</u>

1.     On behalf of a class of investors who purchased twelve digital tokens that Binance has sold through its online exchange since July 1, 2017 (the "Class"), without registering under applicable federal and state securities laws as an exchange or broker-dealer, and without a registration statement in effect for the securities it was selling, Plaintiffs and members of the Class seek to recover the consideration paid for the tokens and the fees they paid to Binance in connection with their purchases of EOS, BNT, SNT, QSP, KNC, TRX, FUN, ICX, OMG, LEND, ELF, and CVC (together, the "Tokens").

2.     A digital token is a type of digital asset that exists on a "blockchain," which is essentially a decentralized digital ledger that records transactions. Various digital assets can reside on blockchains, including cryptocurrencies, such as Bitcoin and Ethereum (both discussed in greater detail below), as well as so-called "smart contracts" that operate under a set of predetermined conditions agreed on by users. When those conditions are met, the terms of the contract are automatically carried out by the software underlying the digital tokens (which, as relevant here, are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain).

3.      Certain of these digital tokens are classified as "utility tokens."  Their primary purpose is to allow the holder to use or access a particular project.  For example, one private-jet company issues utility tokens to participants in its membership program, who can then use them to charter flights on the company's planes.  A utility token presumes a functional network on which the token can be used.

4.      Other tokens are more speculative, and are referred to as "security tokens," and like a traditional security essentially represent one's investment in a project.  Although the tokens take value from the startup behind the project, they do not give the holder actual ownership in that startup.  Rather, investors purchase these tokens with the idea that their value will increase in the future as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project.  Because such "security tokens" are properly classified as securities under federal and state law, the issuers of these Tokens (the "Issuers") were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC"), and Binance was required to register itself as an exchange with the SEC.  Neither the Issuers nor Binance filed any such registration statements.  Instead, Binance and the Issuers entered into contracts to list these Tokens for sale on the Binance exchange in violation of federal and state law.  As a result, Binance and the Issuers reaped billions of dollars in profits.

5.      The scheme worked as follows:  working to capitalize on the enthusiasm for cryptocurrencies like bitcoin, an Issuer would announce a revolutionary digital token.  This token would typically be billed as "better," "faster," "cheaper," "more connected," "more trustworthy," and "more secure."  The Issuer would then sell some of its tokens in an initial coin offering ("ICO") to a small group of investors and then turn to Binance to list the new token, at which point Binance would undertake its own efforts to promote sales, and to solicit and encourage purchases, by a

wide universe of investors.  The Issuers would thereby raise hundreds of millions, even billions, of dollars from purchasers of the tokens.  Binance would profit handsomely as well by receiving a percentage of each trade and by receiving substantial payments from Issuers to have their tokens listed.

6.      The Issuers were generally careful to describe these tokens both as providing some specific utility and as something other than "securities."  But the vast majority of these new tokens turned out to be empty promises.  They were not "better," "faster," "cheaper," "more connected," "more trustworthy," or "more secure" than what existed in the marketplace.  In reality, they often had no utility at all.  The promises of new products and markets went unfulfilled, with the networks never fully developed, while investors were left holding the bag when these tokens crashed. Indeed, all of the Tokens are now trading at a tiny fraction of their 2017–2018 highs.  One of the Tokens at issue, TRX, is down more than 95 percent from its 2018 high.  Another token, BNT, is down 98.4 percent from its January 2018 high.  QSP was trading at around 72 cents in January 2018; today, it trades at around 0.7 cents.  After their ICOs, the prices of OMG and ELF tokens skyrocketed to more than $25 and $2.50 per token, respectively; today, they trade at around $0.56 and $0.06 per token.  The EOS token reached a high of $22.89.  Today, it is worth only $2.22.

7.      Investors were provided with scant information when deciding whether to purchase a token.  In fact, often the only offering materials available to investors were "whitepapers" that would describe, in highly technical terms, the supposed utility of a token.  These whitepapers would often omit, however, the robust disclosures that the securities laws and the SEC have long codified as essential to investor protections in initial public offerings, including use of "plain English" to describe the offering; a required list of key risk factors; a description of key information

4

and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow. Instead, these ICOs were the "Wild West"—with investors left to fend for themselves. Without the mandatory disclosures that would have been required had these ICOs been properly registered with the SEC, investors could not reliably assess the representations made or the risks of their investments.

8.     In 2017 and 2018, at the height of this frenzy of activity, hundreds of ICOs raised nearly $20 billion with virtually no regulatory oversight or guidance to investors. Issuers and exchanges like Binance, preying on the public's lack of familiarity with the technology underpinning these tokens, characterized these tokens as "utility tokens," even though they were in effect bets that a particular project would develop into a successful venture. In truth, these tokens were securities under federal and state securities laws.

9.     On April 3, 2019, in a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework"), the SEC clarified that the Tokens are "investment contracts" and therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1), and Section 3 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 77c(a)(10).[1] Prior to that time, a reasonable investor would not have believed that these Tokens were securities that should have been registered with the SEC. But the Tokens are in fact securities. For example, on September 30, 2019—nearly six months after releasing its Framework, and more than two years after the relevant ICO began—the SEC completed an investigation and found that one Issuer, Block.one, had violated the Securities Act by selling the digital token EOS,

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

an unregistered security, to the public. As a result of this SEC enforcement action, Block.one was required to pay a $24 million fine.[2] The SEC's determination that EOS was an unregistered security applies with equal force to the other Tokens.

10. Binance and the Issuers wrongfully engaged in millions of transactions—including the solicitation, offer, and sale of securities—without registering the Tokens as securities, and without Binance registering with the SEC as an exchange or broker-dealer. As a result, investors were not informed of the significant risks inherent in these investments, as federal and state securities laws require.

11. Binance participated in illegal solicitations and sales of securities for which no registration statement was in effect, and as to which no exemption from registration was available. Each ICO was a generalized solicitation made using statements posted on the Internet and distributed throughout the world, including throughout the United States, and the securities were offered and sold to Plaintiffs and the general public in the United States. Because these sales, as well as Binance's underlying contracts with the Issuers that facilitated these sales, violated both the Securities Act and the Exchange Act, Plaintiffs and the Class are entitled to recover the consideration paid for the Tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase, as well as the fees they paid Binance on such purchases.

12. In addition, numerous Class members resided, and were present at the time they traded in the Tokens, in States that provide their own "Blue Sky" protections for investors,

---

[2] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

including the State of Texas.[3]  These States generally provide that the investors in these States who purchased these unregistered tokens are entitled to rescission or damages, as well as interest thereon, attorneys' fees, and costs.

## II.   PARTIES

### A.   Plaintiffs

13.   Plaintiff Eric Lee is a resident of Ithaca, New York.  Lee and members of the Class purchased Tokens on Binance and pursuant to contracts with Binance, from New York during the Class Period.

14.   Plaintiff Chase Williams is a resident of Houston, Texas.  Williams and members of the Class purchased Tokens on Binance and pursuant to contracts with Binance, from Texas during the Class Period.

### B.   Defendants

15.   Defendant Binance launched in July 2017.  By January 2018, it had become, and remains, the largest cryptocurrency exchange in the world, with a market capitalization of $1.3 billion and the highest trading volume of any such exchange.  Binance facilitates trades in digital assets, including the Tokens, by providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for Binance taking a fee for every transaction it facilitates.

16.   Binance's CEO, defendant Changpeng Zhao, founded Binance in China but shortly thereafter moved Binance's headquarters to Japan, in advance of the Chinese government's ban

---

[3] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky."  *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted).  Like the federal securities laws, Texas defines "securities" to include "investment contracts," which has been interpreted by Texas courts at least as broadly as the standard set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

on cryptocurrency trading.  In March 2018, as a result of increasing regulatory scrutiny in Japan, Binance moved its headquarters to Malta.

17.     On February 21, 2020, the Malta Financial Services Authority ("MFSA") issued a statement responding to media reports referring to Binance as a "Malta-based cryptocurrency" company.  The statement said that Binance "is not authorized by the MFSA to operate in the cryptocurrency sphere and is therefore not subject to regulatory oversight by the MFSA."

18.     Zhao stated the same day that "Binance.com is not headquartered or operated in Malta . . . There are misconceptions some people have on how the world must work a certain way, you must have offices, HQ, etc.  But there is a new world with blockchain now . . . Binance.com has always operated in a decentralized manner as we reach out to our users across more than 180 nations worldwide."

19.     Although it is thus unclear where Binance is physically headquartered, it is clear that since its founding Binance has regularly and intentionally engaged in numerous online securities transactions inside the United States, with United States residents, without complying with U.S. laws.  In addition, Binance has promoted, inside the United States, the sale of digital assets on its exchange.

20.     On information and belief, Zhao resides in Taiwan.

21.     Defendant Yi He is the Chief Marketing Officer ("CMO") of Binance and co-founded Binance along with Zhao and Wang.  In her role as CMO, she oversees "all marketing efforts" and has touted that she increased "Binance's global influence to become a top cryptocurrency exchange."  On information and belief, she resides in Malta.

22.     Defendant Roger Wang is the CTO of Binance and co-founded Binance with Zhao and He.  On information and belief, he resides in Malta.

### III.   <u>JURISDICTION AND VENUE</u>

23.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331 because the Complaint asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

24.     Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1), 20, and 29(b), 15 U.S.C. §§ 77e,  78o(a)(1), 78t,  78cc(b).

25.     This Court has jurisdiction over the statutory claims of violations under Tex. Rev. Civ. Stat. art. 581-33 pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

26.     This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in or aimed at the State of New York in connection with Defendants' offer or sale of unregistered securities and failure to register with the SEC as an exchange or broker-dealer.

27.     Venue is proper pursuant to each of 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa(a) in that this is a district wherein one or more defendants is found or is an inhabitant or transacts business, or in the district where offers or sales at issue took place.  For example, a Binance representative promoted Binance at a leading blockchain conference, Consensus, which was held in New York City.  Binance has also sought and received approval from the New York State Department of Financial Services for its U.S. Dollar-pegged stablecoin—the "BUSD."

IV.     **FACTUAL ALLEGATIONS**

A.      **The First Cryptocurrency: Bitcoin**

28.     A cryptocurrency is a digital asset designed to work as a medium of exchange or a store of value or both.  Cryptocurrencies leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

29.     Bitcoin was the world's first decentralized cryptocurrency.  It is also the largest and most popular cryptocurrency, with a market capitalization of approximately $126 billion.  Bitcoin spawned a market of other cryptocurrencies that, together with bitcoin, have a current market capitalization of approximately $192 billion.  (The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

30.     At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the blockchain.

31.     Blockchains act as the central technical commonality across most cryptocurrencies. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

32.     Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network.  In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure.  For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with

newly minted bitcoin.  This process is colloquially referred to as "mining."  Mining is one method by which an individual can acquire cryptocurrencies like Bitcoin.  A second and more common manner is to obtain cryptocurrencies from someone else.  This is often accomplished by acquiring it through an online "cryptocurrency exchange."

33.     Online cryptocurrency exchanges are one place to purchase bitcoin and other cryptocurrencies.  These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

34.     In April 2013, there were only seven cryptocurrencies listed on coinmartketcap.com, a popular website that tracks the cryptocurrency markets.  As of this filing, the site monitors more than 2,000 cryptocurrencies.

35.     For a time, bitcoin was the only cryptocurrency available on exchanges.  As cryptocurrencies grew in popularity, exchanges began listing other cryptocurrencies as well, and trading volumes expanded.  In early 2013, daily bitcoin trading volumes hovered between $1 million and $25 million.  By the end of 2017, daily bitcoin trading volumes ranged between $200 million and $3.8 billion.

**B.     Ethereum**

36.     Ethereum is the second-most popular cryptocurrency, with a market capitalization of approximately $16 billion.  The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network.  Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether.  (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem," i.e., the overall network of individuals using Ethereum or participating in the development of its network.  This distinction is thus similar to the "Bitcoin" versus "bitcoin" distinction noted above.)

11

37.     Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality.   A smart contract is a program that verifies and enforces the negotiation or performance of a contract.   Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

38.     As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract.   They each put up $1,000 worth of ether.   They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether.   The rest of the ether may or may not be worth more than it was at the beginning of the month.

39.     A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action.   The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met.

40.     In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the box smart contracts called Ethereum Request for Comments ("ERCs").

41.     An ERC is an application standard for a smart contract.   Anyone can create an ERC and then seek support for that standard.   Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes.   This is because it allows individuals who are less technically proficient to make use of smart contract functionality.   The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

### C. ERC-20 Tokens

42.     ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015.  ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain.  These tokens are known as "ERC-20 tokens."

43.     ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it.  Accordingly, ERC-20 tokens are functionally different than cryptocurrencies like Bitcoin and Ethereum because they do not operate on an independent blockchain.

44.     ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard.  Some properties related to ERC-20 tokens are customizable, such as the total supply of tokens, the token's ticker symbol, and the token's name.  All ERC-20 tokens transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

45.     ERC-20 tokens are simple and easy to deploy.  Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then distribute and make available for purchase.  Even people without any technical expertise can have their own ERC-20 token created for them, which can then be marketed to investors.

### D. The Advent Of The "ICO"

46.     Between 2014 and 2016, bitcoin's price fluctuated between $200 and $800.  During this same time frame, ether's price fluctuated between roughly $1 and $10.

47.     By the end of 2016, interest in cryptocurrencies began to accelerate, with prices growing at a rate historically unprecedented for any asset class.  Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000.  Ethereum's growth was even more startling.  On January 1, 2017, Ethereum was trading at approximately

$8 per ether.  Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

48.     Seeking to capitalize on the growing enthusiasm for cryptocurrencies, many entrepreneurs sought to raise funds through initial coin offerings, or ICOs, including ICOs for newly created ERC-20 tokens, such as the Tokens.  Many of these issuers improperly chose not to register their securities offerings with the SEC in order to save money and not "open their books" to the SEC, even though investors thereby were denied access to critical information they would have received from an SEC-registered offering.  As a result investors, including investors in digital tokens, were denied access to important information before making their investment decision.

49.     Potential purchasers were reached through various cryptocurrency exchanges and social media sites that published active and upcoming ICOs.

50.     Between 2017 and 2018, nearly $20 billion was raised through ICOs.  None of these ICOs was registered with the SEC.  Of the approximately 800 ICOs launched between 2017 and 2018, the vast majority were issued using the ERC-20 protocol.

51.     ERC-20 ICOs were typically announced and promoted through public online channels.  Issuers typically released a "whitepaper" describing the project and terms of the ICO, and promoted the sale of the tokens.  They typically advertised the creation of a "new blockchain architecture."

52.     The whitepapers contained vastly less information than would have been included in an SEC registration statement.  For example, whitepapers typically did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking

statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

53.     As a result of the lack of information, trading of tokens on exchanges such as Binance was rife for manipulation.  In fact, as Aries Wanlin Wang, the founder of a rival exchange, admitted, "the secondary market [for digital assets] can be rigged by manipulators.  If you put major currencies such as Bitcoin and Ethereum aside, many of the tokens you'll find issued through ICOs are there to be manipulated.  These tokens are similar to penny stocks.  And everyone wants to believe they've discovered the next Bitcoin and Ethereum."  Mr. Wang further conceded that "[t]he problems facing the secondary market in crypto are similar to the problems that were faced by American stock exchanges 100 years ago.  When a market lacks certain regulations and oversights, predictable things happen.  Pump and dumps are very common in the secondary market of cryptocurrency, just as they were on the US stock exchange so many years ago."

54.     The Issuers declined to register the Tokens with the SEC, and Binance declined to register itself as an exchange or broker-dealer, which registrations would have provided crucial risk disclosure to investors, including members of the Class.

### E.     Binance Solicited And Sold ERC-20 Tokens

55.     Binance solicited the buying and selling of ERC-20 tokens on its unregistered exchange and reaped extraordinary profits as a result.

56.     In fact, Binance recently boasted on its website that, in 2019 alone, it averaged more than $2.8 billion in daily trading volume, had more than 15 million users world-wide, and listed 184 tokens.  Public reporting shows that, in 2018 alone, Binance brought in $446 million in *profit*.

57.     How did a company that was barely a year old generate such extraordinary profits?  By building a platform that solicited the buying and selling of unregistered securities on a historically unprecedented scale.  Defendants did this by taking advantage of the market's lack of

sophistication with digital tokens, particularly ERC-20 tokens, and the general market excitement for Bitcoin and Ethereum more generally.

58.     Shortly after an issuer launched an ICO, the issuer would quickly seek to have its tokens listed on cryptocurrency exchanges like Binance, in order to give the issuer access to millions of retail investors to whom they could market the tokens.

59.     On July 11, 2018, in an interview with CNBC, Zhao stated that there are three key fundamentals Binance considers before it lists a token:  the whitepaper, the team, and the users. Zhao explained:

> If a project has a concept, that's good.  But, Binance is presently too
> big to list concept coins.  They advise that if you just have a concept,
> it is better to list on smaller exchanges first, and Binance can monitor
> the performance of the business.

60.     Zhao noted that the team behind a particular token is a fundamental factor to the success of a project:  *"It's kind of hard to tell if they're going to do the right thing or the wrong thing.  But a team with a good history tends to carry on."*  Zhao explained that "if you have a good project, we will list it."

61.     In discussing Binance's role in cryptocurrency, Zhao stated:  "As the exchange, we are the liquidity provider.  If you think about cryptocurrency as the blood of the economy, we are the heart, we are pumping the blood.  Right, so we are making everything circulate."

62.     Shortly after Binance agreed to list a new token on its cryptocurrency exchange, it would advertise that listing to its user base, such as per the below:



63.     In announcing a new token available for trading, Binance would sometimes run promotions to "celebrate the launch" of the token.  On September 26, 2017, for example, when launching FUN token (an ERC-20 token), Binance "committed a total of 3,000,000 FUN tokens to reward customers worldwide."



**Fellow Binancians,**

Binance will add FUN/BTC and FUN/ETH trading pairs on 2017/09/28, 04:00 AM (UTC). You can start depositing FUN here now.

To celebrate the launch, Binance and FunFair have committed a total of 3,000,000 FUN to reward customers worldwide. The reward program will be made available as part of the listing of FUN on Binance, according to the following structure:

**Top FUN Holding Leaderboard Reward Program**

1. Bounty 1 (6 spots) -

| 1st Place | 300,000 FUN Token |
| 2nd Place | 200,000 FUN Token |
| 3rd Place | 200,000 FUN Token |
| 4th Place | 100,000 FUN Token |
| 5th Place | 100,000 FUN Token |
| 6th Place | 100,000 FUN Token |

2. Bounty 2 (200 spots) -

10,000 FUN tokens per user for the 7th to 206th users with the highest FUN balance at end of program .

3. Program Period:

Program ends  2017/10/01 04:00 AM (UTC).

64.    Just a few months after this announcement, the price of FUN token went from about 2 cents per token up to 20 cents per token, a 10X increase in trading value.  By January 2019, the price of a FUN token had collapsed to less than half a cent per token:



65.     Each of the Tokens was listed on Binance, pursuant to agreements with the Issuers, and each was traded by members of the Class.

66.     Binance profited handsomely from listing of new tokens on its platform.   In addition to receiving fees for each transaction performed on its exchange, Binance received large cash payments from Issuers seeking to get their tokens listed.   These fees often exceeded $1 million per listing.

**F.     Investors Would Not Reasonably Have Understood Prior To April 3, 2019, At The Earliest, That The Tokens Were Securities**

67.     In connection with the ICOs, from 2017 until early 2019, the Issuers and Binance made statements that reasonably led Plaintiffs and Class members to conclude that the Tokens were not securities.

68.     <u>Issuers</u>.  Issuers of ERC-20 tokens repeatedly asserted that their tokens were "utility tokens," rather than "security tokens" (which would be securities that would have to be registered with the SEC).  As an initial matter, Issuers refused to register the Tokens with the SEC, thus signaling to investors that these were not securities.

69.     Issuers in fact declared that the Tokens were not securities.  For example, the EOS Purchase Agreement stated:

> As mentioned above, the EOS Tokens do not have any rights, uses, purpose, attributes, functionalities or features, expressed or implied. Although EOS Tokens may be tradable, they are not an investment, currency, security, commodity, a swap on a currency, security, or commodity or any kind of financial instrument.

70.     Similarly, the TRON whitepaper stated that it "is not a security, and owning

> TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/or policy-making right regarding the TRON platform.   As an encrypted token used in TRON, TRX does not belong to any of the following categories: (a) currency of any type; (b) securities; (c) stock rights of a legal

entity;  (d) stocks, bonds, bills, warrants, certificates, investment contract, or other instruments affording similar rights.

71.     The TRON whitepaper also misleadingly compared TRX to Bitcoin, which is a commodity.  The TRON whitepaper asserted, for example, that its "distributed user registration mechanism is *as secure as Bitcoin*"; "the number of blocks generated per hour is automatically set by the system, which is *similar to the Bitcoin network*"; and "[s]imilar to Bitcoin, [t]he [TRON] market is based on blockchain and trade in virtual currency."

72.     At the time of the TRX ICO, TRON took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  In the face of promises that TRX would be "similar to Bitcoin," and considering the new technology at issue and TRON's other statements, many investors were understandably unaware that TRX tokens had fundamentally different features than other cryptocurrencies, which the SEC has determined are not securities.  Many of the other Tokens likewise misleadingly compared themselves to Bitcoin or Ethereum, which are not required to be registered as securities.  The EOS whitepaper, for example, argued that EOS would replace Bitcoin and Ethereum.  The ELF whitepaper discussed, at length, how governance structures for cryptocurrencies like Bitcoin were "not well defined when [they were] created."  ELF insisted that its governance structure represented an improvement over cryptocurrencies like Bitcoin and Ethereum.  The OMG whitepaper discussed "Bitcoin and Bitcoin-like systems" and how OMG would serve as a "clearinghouse" for these type of assets. The ICON whitepaper asserted that the ICON network was comprised of different "communities," just like "governments, schools, e-commerce platform, healthcare, Bitcoin, and Ethereum."

73.     Accordingly, it was not apparent to a reasonable investor, at issuance, that the Tokens were securities under the law, and a reasonable investor would not have believed they were securities.

74.    <u>Binance</u>.  Binance routinely touted and continues to tout its offerings of tokens as not requiring registration with the SEC because they did not constitute securities.  In promoting the Telegram Open Network ICO, for example, Binance Research stated:  "As the fundraising of TON was covered via an SEC exemption and Grams have similar use cases as Ether, Grams are thus likely to be classified as crypto assets."  And as part of the vetting that Binance claimed to do when soliciting sales of tokens, Zhao has claimed that Binance requires projects to obtain legal opinions that their tokens do not qualify as securities.

75.    Even today, after the SEC's April 2019 guidance, Binance allows only that "*some* ICOs might qualify as securities."  Only *after* the SEC had issued its "Framework" in April 2019 for analyzing if a digital asset is an investment contract and whether offers and sales are securities transactions (discussed below) did Binance acknowledge on its website the possibility that some tokens might qualify as securities.  Specifically, the statement appears to have been added to Binance's website only in July 2019.

76.    <u>SEC</u>.  Prior to its April 2019 pronouncement, the SEC too left uncertain whether tokens, such as the Tokens at issue in the Complaint, are securities.  In fact, it was not until six months after the Framework issued in April 2019, and more than two years after the relevant ICO began, that the SEC entered into a settlement with Block.one (the issuer of ERC-20 token EOS), concluding in September 2019 that EOS's $4.1 billion issuance constituted an unlawful unregistered offering.

77.    Prior to that time, the SEC had not determined that ERC-20 tokens were securities.  On June 14, 2018, the Director of the Corporation Finance Division, William H. Hinman, explained that "the ICOs I am seeing, strictly speaking, the token—or coin or whatever the digital information packet is called—all by itself is not a security."  On May 2, 2018, Commissioner

Hester Peirce similarly expressed her view that not "all ICOs must be deemed securities offerings." Critically, Commissioner Peirce identified numerous open questions that Issuers emphasized when arguing ERC-20 tokens are not securities, such as the utility of the token in an incomplete or partially complete network.

78.  <u>Other Commentary</u>.  Other thought leaders in the space, such as the lawfully registered broker-dealer Coinbase, opined in late 2016 that "we have considered the question of whether issuance of a Blockchain Token prior to the existence of a system would constitute a security.  We have not found conclusive law on the subject, but believe that the better view is that a non-security Blockchain Token does not become a security merely because the system as to which it has rights has not yet been created or completed."

79.  In sum, before the SEC issued its Framework in April 2019, a reasonable investor would not have concluded that ERC-20 tokens were generally securities subject to the securities laws.  On the contrary, they were confronted with representations both from issuers and from cryptocurrency discussions that would have led them reasonably to believe they were not investing in securities.

### G.  The Tokens Are Securities

80.  Within the last year, the SEC has clarified, with the benefit of labor-intensive research and investigations, that the Tokens were securities.  On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

81.  Among the most significant statements in the Framework is its description of how to analyze the various facts surrounding ICOs in making the determination of whether a given

digital asset (including an ERC-20 token) is a security.   Under application of the Framework, the Tokens were securities at issuance.

82.     In the Framework, the SEC cautioned potential issuers:  "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply."  The SEC explained the fundamentals of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities.  The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales).  Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

Investors who bought the Tokens invested money or other valuable consideration, such as bitcoin and ether, in a common enterprise—the Issuers.  Investors had a reasonable expectation of profit based upon the efforts of the Issuers, including, among other things, the Issuers obtaining listing of their ERC-20 tokens on cryptocurrency exchanges such as Binance.

### a.     ERC-20 Investors Invested Money

83.     Investors in ERC-20 tokens made an investment of money or other valuable consideration for purposes of *Howey*.  The SEC Framework states:  "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

84.     Investors invested traditional and other digital currencies, such as bitcoin and ether, to purchase the Tokens.  The Tokens were listed on Binance, and Binance permitted investors to purchase ICOs with bitcoin and ether.

**b.      ERC-20 Investors Participated In A Common Enterprise**

85.     The SEC Framework states:  "In evaluating digital assets, we have found that a 'common enterprise' typically exists."  This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

86.     The Tokens are no different.  Investors were passive participants in the Tokens' ICOs and the profits of each investor were intertwined with those of the Issuers and of other investors.  Issuers typically conceded in their whitepapers that they sold Tokens in order to fund their operations and promote their networks and thereby increase the value of the issued ERC-20 tokens.  Issuers typically were responsible for supporting the Tokens, pooled investors' assets, and controlled those assets.  Issuers would also typically hold a significant stake in the Tokens, and thus shared in the profits and risk of the project.

87.     For example, promoters of the Bancor token, BNT, explained the objectives of their "crowdsale" (*i.e.*, their ICO) as follows:  "A portion of the funds will be used to develop, promote, and support the open-sourced, blockchain-agnostic, Bancor protocol implementations and support related technologies and applications such as an open-source, user-friendly web service (desktop and mobile) to provide wallet, marketplace, token-conversion, new smart token creation and crowdsale solutions."

88.     Similarly, promoters of the EOS token described the proceeds of their ICO as "revenue" they would use to "offer[] developers and entrepreneurs the funding they need to create community driven business leveraging EOSIO software."  That money, in return, "will be returned

value for the network."  For the other Tokens as well, investors participated in a common enterprise by purchasing the Tokens.

    **c.**   **Investors Purchased The Tokens With A Reasonable Expectation Of Profit From Owning Them**

  89.  As to "reasonable expectation of profits," the SEC Framework states:  "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

  90.  Investors in the Tokens, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits.  The Tokens were sold to investors prior to a network or "ecosystem" being fully developed on which they could be used.  For pre-functional tokens, such as the Tokens at issue in the Complaint, the primary purpose for purchasing such Tokens was to make a profit, rather than to utilize the Tokens themselves for a task.

  91.  Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise"), the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security.  In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets, thereby satisfy the *Howey* test:

> The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:
>
> - The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
>
>   o  The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that

25

enables digital asset holders to resell their digital assets and realize gains.

- o This also can be the case where the digital asset gives the holder rights to dividends or distributions.

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

- o The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

- o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

o   The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

o   The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

o   The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

o   The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

o   The ready transferability of the digital asset is a key selling feature.

o   The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

o   The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

92.     The SEC Framework clarifies that investors purchased the Tokens with a reasonable expectation of profits.

93.     For example, the "ready transferability of the" Tokens was promoted by Issuers as a "key selling feature."  The Status Network, for instance, told investors the SNT tokens "will be transferrable 7 days after the end of the Contribution Period."

94.     The Tokens also "emphasized" the "potential appreciation in the value of the digital asset" in their marketing materials. The Issuer of the Bancor token, BNT, explained that the widespread adoption of BNT "establishes network dynamics where increased demand for any of the network's smart tokens increases demand for the common BNT, benefiting all other smart tokens holding it in reserve."

95.     The Tokens were not described as "delivering currently available goods or services for use on an existing network," but rather explained as raising capital necessary "to build a business or operation."  The whitepaper for the aelf Token, for example, promised to bring about "the next phase" and a "new paradigm" of blockchain technology, and acknowledged that "[b]uilding an ecosystem requires a large amount of capital," including "the funds raised during the Token sale."  The Issuers of BNT, the Bancor Token, likewise explained they would use the funds raised "to develop, promote and support the open-sourced, blockchain-agnostic, Bancor protocol."  Under the SEC's April 2019 Framework, the Tokens were securities under federal and state securities laws.

### d.      Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers

96.     The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:  Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

97.     Investors' profits in the Tokens were to be derived from the managerial efforts of others—specifically the Issuers, their co-founders, and their development teams.   ERC-20 investors relied on the managerial and entrepreneurial efforts of the Issuers and their executive and development teams to manage and develop the projects funded by the Tokens' ICOs.

98.     Issuers' executive teams typically held themselves out to investors as experts in the blockchain and crypto field.  Investors in the Tokens reasonably expected the Issuers' development teams to provide significant managerial efforts after the Tokens' launch.

99.     On July 11, 2018, for example, Zhao explained that the team behind a particular token is a fundamental factor to the success of a project and that Binance actually considers the team in determining which coins to list:  "It's kind of hard to tell if they're going to do the right thing or the wrong thing.  But a team with a good history tends to carry on."

100.    The SEC explained in its April 2019 Framework, further underlining the depth of study the agency had devoted to the matter over the years and the complexity of such legal analysis from the perspective of a reasonable investor, that the more of the following characteristics that are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.
  - Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).  This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset.  In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o Determining whether and where the digital asset will trade.  For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

  o Determining who will receive additional digital assets and under what conditions.

  o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

  o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

  o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

  o The AP has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

  o The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market.  To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

  o The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

  o The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

101.     Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further:

Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network.  For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  o   This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

  o   If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services.  Relevant factors may include:

  o   There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

- o  The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

- o  An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

102.    Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments.   The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.   Each of the Tokens was a security at issuance because profit from the Tokens would be derived primarily from the managerial efforts of the Issuer teams developing the associated networks on which the Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

103.    This dependency, however, on the managerial efforts of the Issuer was not apparent at issuance to a reasonable investor.   Considering the limited available information about how these Tokens were designed and intended to operate, if such an investor were even able to interpret

the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the tokens she had acquired were securities.  It was only after the passage of some significant amount of time, and only with more information about the Issuer's intent, process of management, and lack of success in allowing decentralization to arise, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

104.    The EOS Token is a prime example.  At the time of the EOS ICO, EOS had no functional software product available—instead, EOS told its investors it would use the proceeds of the ICO to develop the promised software, which would in turn make the Tokens more valuable to investors.

105.    The Issuers of the Status SNT Tokens likewise wrote in its whitepaper it had only an "alpha" build of its product, but with the funds raised through its ICO, it hoped its technology would "reach[] widespread mobile use."  The whitepaper continued:  "Funds raised during the Contribution Period will be used solely for the development and benefit of the Status Network."

106.    Another Issuer offered Bancor Network Tokens ("BNT"), which it touted to investors as "The First Smart Token."  The Bancor whitepaper advertised BNT as a way for others to create "user-generated smart tokens," and claimed that "increased demand for *any* of the network's smart tokens increases demand for the common BNT."

107.    However complex the resolution of the issue would strike a reasonable investor, the Tokens satisfy most if not all of the factors the SEC described in the Framework as relevant to its determination that a digital asset is a security.

### H.       Each Token Is A Security

#### a.       EOS

108.     The EOS ICO has been widely reported as the largest ICO to date, having raised over $4 billion assets from the sale of unregistered EOS tokens from June 2017 through July 2018. EOS tokens have been listed on Binance since at least April 2018.

109.     EOS tokens were advertised as being an improvement on Bitcoin, Ethereum, and other cryptocurrencies.   In addition to claiming EOS's technical superiority over other cryptocurrencies, EOS's issuer, Block.one, publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

110.     In the EOS Token Purchase Agreement, the issuers of EOS tokens made the following representations concerning the development of EOSIO:

- MATTERS RELATING TO EOS.IO SOFTWARE AND EOS PLATFORM:

  1. block.one is developing the EOS.IO software (the "EOS.IO Software") as further described in the EOS.IO Technical White Paper (as it may be amended from time to time) (the "White Paper");

  2. at the end of its development stage, block.one will be releasing the EOS.IO Software it has developed under an open source software license;

111.     At the time of the EOS ICO, Block.one took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.   With promises that EOS would be better than other cryptocurrencies, many individuals were unaware that EOS tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.   One of these primary differences is that all EOS tokens were issued by Block.one at creation at very little economic cost—and enormous potential upside—to the Block.one founders.

112.    The creation of EOS tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that EOS was something other than a security, when it was a security.

113.    Investors purchased EOS tokens with the reasonable expectation that they would make a profit.

114.    EOS token holders stood to share in potential profits from the successful launch of the EOS token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the EOS ecosystem.

115.    EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.  The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer."

116.    Investors' profits were to be derived from the managerial efforts of others— Block.one, its co-founders, and the Block.one development team.  Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software.

117.    Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch.

118.    The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds.  Investors had little choice but to rely on their

expertise.   The EOS protocol and governance structure were predetermined before the ICO was launched.

119.    Accordingly, under the SEC's Framework, the EOS token was a security.

120.    Indeed, on September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors.   Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws."

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC.   The SEC enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

121.    The SEC's September 30, 2019, settlement with Block.one reflected the SEC's "Framework" for analyzing whether digital assets, and in particular ERC-20 tokens, constitute securities.   Consistent with that Framework, the SEC determined that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register them.

122.    The SEC's determination that EOS was and is a security applies not only to EOS, but also to each of the other digital tokens discussed below.

### b.    Bancor (BNT)

123.    Bancor Network Tokens ("BNT") were issued by the Bprotocol Foundation ("Bancor").  The BNT ICO raised $153 million in assets from the sale of unregistered BNT tokens in just three hours on June 12, 2017.  A press release from Bancor celebrated what was at the time "the largest crowdsale in history."

124.    After being distributed through the ICO, BNT have been listed on Binance since at least October 17, 2017:



125.    In the months following the Binance listing, the price of the BNT Token skyrocketed from less than $3 to more than $10 per token:



126.    As of 10 a.m. today, the BNT token trades for less than $0.20.

127.    In its whitepaper, BNT was advertised as being "The First Smart Token," which Bancor said would "enabl[e] asynchronous price discovery and continuous liquidity for cryptocurrencies using constant ratios of reserve tokens held through smart contracts, acting as automated market makers."  Bancor claimed "BNT will be used to establish the first decentralized interconnected currency exchange system which does not rely on matching bid and ask orders, thus remaining liquid irrespective of its trading volume."

128.    Bancor publicly stated that it would use the funds raised through the ICO to enhance the Bancor software and support the growth of its platform, telling investors that "a portion of the funds" raised would "be used to develop, promote and support the open-sourced, blockchain-agnostic, Bancor protocol implementations, and support related technologies and applications[.]"

129.    At the time of the BNT ICO, Bancor took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that BNT had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all BNT

were issued by Bancor at creation at very little economic cost—and enormous potential upside—to the Bancor founders.

130.    The creation of BNT tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which BNT tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that BNT was something other than a security, when it was a security.

131.    Investors purchased BNT with the reasonable expectation that they would make a profit in what Bancor called "The Bancor Protocol Ecosystem."

132.    BNT holders stood to share in potential profits from the successful launch of BNT. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the BNT ecosystem.

133.    Bancor told investors that "BNT establishes network dynamics where increased demand for any of the network's smart tokens increases demand for the common BNT, benefitting all other smart tokens holding it in reserve."  A reasonable investor would have understood that its holdings of BNT would appreciate in value as BNT became more widely adopted.

134.    Investors' profits were to be derived from the managerial efforts of others—Bancor, its co-founders, and the Bancor development team.  Bancor held itself out as having "[t]he A-Team of visionaries and advisors," including two co-founders who "have each founded and exited a startup."  Bancor further touted outside advisors including "venture capitalist Tim Draper,

Founders Fund partner Brian Singerman, governance visionary John Clippinger, founder of Asana Justin Rosenstein and more."

135.     BNT investors relied on the managerial and entrepreneurial efforts of Bancor and its executive and development team to manage and develop the BNT software.

136.     Investors in BNT reasonably expected Bancor and Bancor's development team to provide significant managerial efforts after BNT's launch.

137.     The expertise of its issuer was critical in monitoring the operation of BNT, promoting BNT, and deploying investor funds.   Investors had little choice but to rely on their expertise.   The BNT protocol and governance structure were predetermined before the ICO was launched.

138.     Accordingly, under the SEC's Framework, BNT was and is a security.

   **c.      Status (SNT)**

139.     Status Network's ("Status") SNT token ICO has been widely reported as one of the largest ICOs to date, having raised over $100 million in assets from the sale of unregistered SNT tokens over a 24-hour period from June 20 to June 21, 2017.

140.     After being distributed through the ICO, SNT tokens have been listed on Binance since at least July 2017.



141.   In the months following the Binance listing, the price of the SNT token skyrocketed from less than 10 cents to more than 60 cents per token:



142.   As of 10 a.m. today, the SNT token trades for less than 2 cents.

143.   Status made statements suggesting that SNT tokens were similar to Bitcoin, Ethereum, and other cryptocurrencies.  For example, the SNT whitepaper asserted that SNT was

41

"[i]nspired by one of Satoshi Nakamoto's original suggested use cases for Bitcoin"; "organized around smart contracts running on Ethereum"; "the first ever mobile Ethereum client," which "connects directly to the Ethereum network"; and that "Status and Ethereum provide the foundation necessary to give all stakeholders in a socioeconomic network equal footing."   In addition, the SNT whitepaper asserted that "the Status mobile Ethereum client" was "well suited for mass adoption," and that the "core team and the Status community are committed to ensuring that the SNT token adds value to the platform and drives network effects."

144.   At the time of the SNT ICO, Status took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  With representations that SNT would be similar to other cryptocurrencies, many individuals were unaware that SNT tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all SNT tokens were issued by Status at creation at very little economic cost—and enormous potential upside—to the Status founders, Jarrad Hope and Carl Bennetts.

145.   The creation of SNT tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which SNT tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that SNT was something other than a security, when it was a security.

42

146.    Investors purchased SNT tokens with the reasonable expectation that they would make a profit.

147.    SNT token holders stood to share in potential profits from the successful launch of the SNT token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the SNT ecosystem.

148.    Investors' profits were to be derived from the managerial efforts of others—Status, its co-founders, Hope and Bennetts, and the Status development team.  Investors in SNT relied on the managerial and entrepreneurial efforts of Status and its executive and development team to manage and develop the SNT software.  Indeed, both Hope's and Bennett's biographies were featured in the Status whitepaper and were held out to be integral parts of the success of SNT.  The whitepaper emphasized that "Carl and Jarrad, the co-founders of Status, have had a working relationship for 6 years on various projects, and 3 of those years were spent operating a software distribution network, driving over 20 million installs to various software offerings, the profits of which were used to fund Status and our team of 10 until this point.  During the operation of this business we were uniquely positioned to see firsthand how personal data on the internet is bought and sold and how users are acquired and retained."

149.    Investors in SNT thus reasonably expected Status, co-founders Hope and Bennetts, and Status's development team to provide significant managerial efforts after SNT's launch.

150.    The expertise of the issuers was critical in monitoring the operation of SNT, promoting SNT, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The SNT protocol and governance structure were predetermined before the ICO was launched.

151.    Accordingly, under the SEC's Framework, the SNT token was and is a security.

### d.   Quantstamp (QSP)

152.   The QSP ICO raised over $31 million in assets from the sale of unregistered QSP tokens over a period of time that extended from November 17 to November 19, 2017.

153.   After being distributed through the ICO, the issuer of QSP, Quantstamp, listed QSP tokens on Binance since at least November 21, 2017.

## Binance Lists QSP


**Binance**
2 years ago

**Fellow Binancians,**

QSP/BNB, QSP/BTC and QSP/ETH trading pairs are now available on Binance. You can start depositing and trading QSP now.

Details:

1. About Quantstamp (QSP)
2. Fees
3. Rules

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make best efforts to choose high quality coins, but will not be responsible for your investment losses.

Thanks for your support!

Binance Team

2017/11/21

154.   In the months following the Binance listing, the price of the QSP Token skyrocketed from less than 20 cents to more than 76 cents per token:



155.    As of 10 a.m. today, the QSP token trades for less than 1 cent.

156.    Quantstamp's stated "goal is to create a permissionless and decentralized network much like Ethereum and Bitcoin."  And Quantstamp's co-founder Steven Stewart has compared QSP tokens to other cryptocurrencies:  "Ether is used for fueling token transfers and other state changes.  We are committed to exclusively using QSP to fuel our protocol."  Indeed, in the QSP whitepaper, Quantstamp represented to investors that "we are extending Ethereum with technology designed to ensure the security of smart contracts."

157.    In addition to comparing QSP tokens to other cryptocurrencies and characterizing Quantstamp as "extending Ethereum," Quantstamp publicly stated that it would use the funds raised through the ICO to continue to develop the Quantstamp protocol software.

158.    At the time of the QSP ICO, Quantstamp took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  With comparisons to other cryptocurrencies, many individuals were unaware that QSP tokens had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all QSP tokens were issued by Quantstamp at

creation at very little economic cost—and enormous potential upside—to the Quantstamp founders.

159.     The creation of QSP tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which QSP tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that QSP was something other than a security, when it was a security.

160.     And the QSP whitepaper explicitly stated that the QSP tokens were "not intended to constitute securities in any jurisdiction"—investors thus reasonably understood that QSP was not subject, at issuance, to U.S. securities laws.

161.     Investors purchased QSP tokens with the reasonable expectation that they would make a profit.

162.     QSP token holders stood to share in potential profits from the successful launch of the QSP token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the Quantstamp ecosystem.

163.     The QSP whitepaper speculated that Quantstamp expected "every Ethereum smart contract to use the Quantstamp protocol to perform a security audit because security is essential." Quantstamp represented that since contract creators would "pay QSP tokens to get their smart contract verified," then as "the number of smart contracts grows exponentially, we expect demand from Contract Creators to grow commensurately."  Quantstamp's statements fueled speculation

that "[t]here is a very large potential for [Quantstamp co-founder] Richard [Ma] to lead the product to a 9 or 10 figure value in a very short time frame . . . .  The ICO valuation offers outstanding value given the massive and probable growth they have planned."  And investors were participating in a common enterprise with Quantstamp, since any profits were intertwined with the success of Quantstamp and other investors.

164.    Investors' profits were to be derived from the managerial efforts of others—Quantstamp, its co-founders, and the Quantstamp development team.  The QSP whitepaper advertises on its cover page that the Quantstamp "team is made of [sic] up of software testing experts who collectively have over 500 Google Scholar citations."  Investors in QSP relied on the managerial and entrepreneurial efforts of Quantstamp and its executive and development team to manage and develop the Quantstamp protocol software.

165.    Investors in QSP reasonably expected Quantstamp and Quantstamp's development team to provide significant managerial efforts after QSP's launch.

166.    The expertise of the issuers was critical in monitoring the operation of QSP, promoting QSP, and deploying investor funds.  Investors had little choice but to rely on their expertise.

167.    Accordingly, under the SEC's Framework, the QSP token was and is a security.

   e.    **Kyber Network (KNC)**

168.    The KNC ICO raised approximately $52 million from the sale of unregistered KNC tokens in September 2017.

169.    After being distributed through the ICO, KNC tokens have been listed on Binance since at least September 26, 2017.

170.    In the months following the Binance listing, the price of the KNC token skyrocketed from less than $2 to more than $5.40 per token:



171.    As of 10 a.m. today, the KNC token trades for less than 50 cents.

172.    KNC tokens were advertised as being an improvement on Bitcoin, Ethereum, and other cryptocurrencies.  KNC's issuer, Kyber Network, publicly stated that KNC would "be the FIRST deflationary token with a staking mechanism" and that an upgrade to the Kyber Network protocol would result in "ultimately enhancing liquidity for the ecosystem, Kyber Network growth, and KNC value creation."

173.    In the KNC whitepaper, for example, the issuers of KNC tokens made the following representation:  "The collected KNC tokens from the fees, after paying for the operation expenses and to the supporting partners, will be ***burned***, i.e. taken out of circulation.  The burning of tokens could potentially increase the appreciation of the remaining KNC tokens as the total supply in circulation reduces."

174.    At the time of the KNC ICO, Kyber Network took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  With promises that KNC would be better than other cryptocurrencies, many individuals were unaware that KNC tokens had fundamentally different features than other cryptocurrencies, including being more

48

centralized than Bitcoin or Ethereum.  One of these primary differences is that all KNC tokens were issued by Kyber Network at creation at very little economic cost—and enormous potential upside—to the Kyber Network founders.  Approximately 39 percent of the KNC tokens minted into circulated were reserved for the company and its founders and advisors.

175.    The creation of KNC tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which KNC tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that KNC was something other than a security, when it was a security.

176.    Investors purchased KNC tokens with the reasonable expectation that they would make a profit.

177.    KNC token holders stood to share in potential profits from the successful launch of the KNC token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the KNC ecosystem.

178.    KNC tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.

179.    Investors' profits were to be derived from the managerial efforts of others—Kyber Network, its co-founders, and the Kyber Network development team.  Investors in KNC relied on

the managerial and entrepreneurial efforts of Kyber Network and its executive and development team to manage and develop the KNC software.

180.    Investors in KNC reasonably expected Kyber Network and Kyber Network's development team to provide significant managerial efforts after KNC's launch.

181.    The expertise of the issuers was critical in monitoring the operation of KNC, promoting KNC, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The KNC protocol and governance structure were predetermined before the ICO was launched.

182.    Accordingly, under the SEC's Framework, the KNC token was and is a security.

      **f.    TRON (TRX)**

183.    The TRX ICO was offered and promoted on Binance starting on August 24, 2017, and 35 percent of unregistered TRX tokens were sold through the ICO, raising $70 million over a three-day period.

184.    On August 24, 2017, TRX's issuer, TRON promoted the TRX ICO on Binance:

## Binance Will Launch 1.9 Billion TRX ICO Today (BTC and ETH Session)


Binance
3 years ago

**Dear community,**

We will launch 1.9 billion TRX ICO ( BTC and ETH session) on Binance exchange at 8PM. Aug 24, 2017 (Beijing Time).

**The details for TRX ICO session:**

1. Token name: TRX;
2. ICO ammount of BNB session: 1,900,000,000 TRX;
3. Support market: BTC(1 billion), ETH (900 million);
4. Exchange rate: 1 TRX = 0.00000038 BTC; 1 TRX ≈ 0.00000488 ETH;
5. ICO time: 8PM. 2017/08/24 - 8PM. 2017/08/31 (Beijing Time);
6. Sale type: first come first served basis. at the Bitcoin Price and Ethereum Price stated on page at the time.

185.   In the months following the Binance listing, the price of the TRX token skyrocketed from less than 5 cents to more than 20 cents per token:



186.   As of 10 a.m. today, the TRX token trades for less than 2 cents.

187.   In June 2017, TRON published the first version of the "TRON whitepaper." Casting the TRON protocol as an attempt to "heal the Internet," the whitepaper described the protocol as "the blockchain's entertainment system of free content, in which TRX, TRON's coin, is circulated."  The whitepaper asserted that, through TRX, content providers would no longer need to pay high fees to centralized platforms such as Google Play and Apple's App Store.

188.   The TRON whitepaper stated that "TRX is not a security" and that "owning TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/or policy-making right regarding the TRON platform."  The whitepaper identified potential "risks after supervisory regulations are formed."  This disclaimer merely contemplated potential *future* regulations that could impact the status of the TRX offering, indicating the regulations did not apply at the time:

Risks after supervisory regulations are formed: It cannot be denied that in the near future, supervisory regulations will be formed to restrain the fields of blockchain and electronic tokens. If supervisory and regulatory bodies perform a standard management over these fields, the electronic tokens purchased during the ICO period may be affected. The impacts include, but are not limited to, price and stability fluctuations and restraints.

On this basis, and the others described below, investors reasonably understood that TRX was not subject, at issuance, to U.S. securities laws.

189.    TRON promoted TRX as being similar to Bitcoin. The TRON whitepaper asserted, as examples, that its "distributed user registration mechanism is *as secure as Bitcoin*"; "the number of blocks generated per hour is automatically set by the system, which is *similar to the Bitcoin network*"; and "[s]imilar to Bitcoin," "[t]he [TRON] market is based on blockchain and trade in virtual currency." By contrast, TRON issued nearly all of the TRX tokens up front, at very little economic cost—and enormous potential upside—to TRON's founders.

190.    The creation of TRX tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which TRX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that TRX was something other than a security, when it was a security.

191.    Investors purchased TRX tokens with the reasonable expectation that they would make a profit.

192.    TRX token holders stood to share in potential profits from the successful launch of the TRX token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the TRX ecosystem.

193.    Investors' profits were to be derived from the managerial efforts of others—the TRON Foundation, its co-founders, and the development team.  Investors in TRX relied on the managerial and entrepreneurial efforts of the TRON Foundation and its executive and development team to manage and develop the TRX software.

194.    Investors in TRX reasonably expected the TRON Foundation and the TRON Foundation's development team to provide significant managerial efforts after TRX's launch.

195.    The expertise of the TRON Foundation was critical in monitoring the operation of TRX, promoting TRX, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The TRX protocol and governance structure were predetermined before the ICO was launched.

196.    Accordingly, under the SEC's Framework, the TRX token was and is a security.

**g.    FunFair (FUN)**

197.    The FunFair team sold approximately 33 percent of its unregistered FUN tokens to investors through its ICO beginning on September 26, 2017, raising $20 million over a two-day period.

198.    In June 2017, the "FunFair Team" published the "FunFair whitepaper."   The FunFair team promoted itself as "revolutionizing the gaming industry by harnessing the power of the blockchain in the online gaming market."   In its whitepaper, the FunFair Team announced that "FunFair's token, FUN, is the coin of the realm on the FunFair platform.   It is the fundamental method of interacting with FunFair smart contracts:   players make wagers, game makers and affiliates get paid and operators will receive profits, all in FUN."

199.    The FunFair whitepaper was silent as to the regulatory nature of FUN tokens. Instead, in its disclaimer, the FunFair whitepaper merely contemplated future regulatory action that could impact the tokens:

> The token economy is exciting and also incredibly innovative. Any tokens could be impacted by regulatory action, including restrictions on ownership, use or possession. Regulators or other circumstances may demand that the FUN mechanics be altered, in all or part. Therefore, we may revise mechanics to comply with regulatory requirements or other governmental or business obligations. Nevertheless, we believe our planned mechanics to be proper and likely in final version.

200.    In the same disclaimer, the FunFair Team wrote that "FUN tokens have no known potential uses outside of the FunFair platform ecosystem and are not permitted to be sold or otherwise traded on third-party exchanges."

201.   Notwithstanding the above, the FUN token ICO was offered and promoted on Binance:

## Binance Lists FUN

 **Binance**
3 years ago

**Fellow Binancians,**

Binance will add FUN/BTC and FUN/ETH trading pairs on 2017/09/28, 04:00 AM (UTC). You can start depositing FUN here now.

To celebrate the launch, Binance and FunFair have committed a total of 3,000,000 FUN to reward customers worldwide. The reward program will be made available as part of the listing of FUN on Binance, according to the following structure:

**Top FUN Holding Leaderboard Reward Program**

1. Bounty 1 (6 spots) -

| | |
|---|---|
| 1st Place | 300,000 FUN Token |
| 2nd Place | 200,000 FUN Token |
| 3rd Place | 200,000 FUN Token |
| 4th Place | 100,000 FUN Token |
| 5th Place | 100,000 FUN Token |
| 6th Place | 100,000 FUN Token |

2. Bounty 2 (200 spots) -

10,000 FUN tokens per user for the 7th to 206th users with the highest FUN balance at end of program .

3. Program Period:

Program ends  2017/10/01 04:00 AM (UTC).

All FUN tokens from this reward program will be distributed to your account on 2017/10/01 10:00 AM (UTC)

202.    In the months following the Binance listing, the price of the FUN token skyrocketed from less than 4 cents to more than 17 cents per token:



203.    As of 10 a.m. today, the FUN token trades for less than two tenths of a cent.

204.    At the time of the FUN ICO, FunFair took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that FUN had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all FUN were issued by FunFair at creation at very little economic cost—and enormous potential upside—to the FunFair founders.

205.    The creation of FUN tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which FUN tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise

that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that FUN was something other than a security, when it was a security.

206.    Investors purchased FUN tokens with the reasonable expectation that they would make a profit.

207.    FUN token holders stood to share in potential profits from the successful launch of the FUN token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the FUN ecosystem.

208.    Investors' profits were to be derived from the managerial efforts of others—the FunFair Team, its co-founders, and its development team.  Investors in FUN relied on the managerial and entrepreneurial efforts of the FunFair Team and its executive and development team to manage and develop the FUN software.

209.    Investors in FUN reasonably expected the FunFair Team and its development team to provide significant managerial efforts after FUN's launch.

210.    The expertise of the FunFair Team was critical in monitoring the operation of FUN, promoting FUN, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The FUN protocol and governance structure were predetermined before the ICO was launched.

211.    Accordingly, under the SEC's Framework, the FUN token was and is a security.

### h.   ICON (ICX)

212.   The ICON Foundation sold approximately 50 percent of its unregistered ICX Tokens to investors through its ICO, raising $42.7 million over a one-day period:



6.2.  Allocation

- Expected allocation of the ICX Token are Token Sale 50%, Foundation 14%, Community Group & Strategy Partners 10%, Team, Advisors & Early Contributors 10%, and Reserve 16%.

213.   In August 2017, the ICON Foundation published the "ICON whitepaper."  The whitepaper outlined the "vision and philosophy of the ICON Project," which was to "to introduce the new era of decentralization by redefining the meaning of communities and creating a new world by connecting such communities."  The whitepaper elaborated that "ICON is not limited to the real world, but it directly connects and communicates with the crypto world creating the most robust network that can scale without limits."  As part of this system, the ICON Foundation announced the "ICT Token," which it described as "a loopchain-based smart contract digital protocol that facilitates, verifies, and enacts a negotiated agreement between consenting parties within ICON."

214.   The ICON whitepaper was silent as to the regulatory nature of ICX tokens.  Instead, the whitepaper asserted that the ICON network was comprised of different "communities," just

like "governments, schools, e-commerce platform, healthcare, Bitcoin, and Ethereum."  Investors

thus reasonably understood that ICX was not subject, at issuance, to U.S. securities laws.

215.    On December 18, 2017, Binance listed the ICX token:



216.    Less than a month after the Binance listing, the price of the ICX Token skyrocketed

from less than $2 to more than $12 per token:



217.    As of 10 a.m. today, the ICX token trades for less than 25 cents.

218.    At the time of the ICX ICO, ICON took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that ICX had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all ICX were issued by ICON at creation at very little economic cost—and enormous potential upside—to the ICON founders.

219.    The creation of ICX tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which ICX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that ICX was something other than a security, when it was a security.

220.    Investors purchased ICX tokens with the reasonable expectation that they would make a profit.

221.    ICX token holders stood to share in potential profits from the successful launch of the ICX token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the ICX ecosystem.

222.    Investors' profits were to be derived from the managerial efforts of others—the ICON Foundation, its co-founders, and the ICON development team.  Investors in ICX relied on the managerial and entrepreneurial efforts of the ICON Foundation and its executive and development team to manage and develop the ICX software.

223.    Investors in ICX reasonably expected the ICON Foundation and its development team to provide significant managerial efforts after ICX's launch.

224.    The expertise of the ICON Foundation was critical in monitoring the operation of ICX, promoting ICX, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The ICX protocol and governance structure were predetermined before the ICO was launched.

225.    Accordingly, under the SEC's Framework, the ICX token was and is a security.

i.     **OmiseGo (OMG)**

226.    OmiseGO sold approximately 65 percent of its unregistered OMG Tokens to investors through its ICO on September 9, 2017, raising $25 million over a one-day period.

227.    In June 2017, OmiseGO published the "OmiseGO whitepaper."  The OMG whitepaper asserted that OmiseGO was building a "decentralized exchange, liquidity provider mechanism, clearinghouse messaging network, and asset-backed blockchain gateway."  As part of this system, OmiseGO announced the OMG token.  According to the whitepaper, "[o]wning OMG tokens buys the right to validate this blockchain, within its consensus rules."

228.    The OMG whitepaper was silent as to the regulatory nature of OMG tokens. Instead, the whitepaper discussed, at length, "Bitcoin and Bitcoin-like systems" and how OMG would serve as a "clearinghouse" for these type of assets.  The whitepaper provided an example of this use case where "Alice sells [bitcoin] for [ether] and Bob buys [bitcoin] for [ether], the trade is now cleared on the OMG chain."

229.   On September 9, 2017, Binance listed the OMG token:



230.   In the months following the Binance listing, the price of the OMG Token skyrocketed from less than $10 to more than $25 per token:



231.   As of 10 a.m. today, the OMG token trades at approximately 56 cents.

232.   At the time of the OMG ICO, OmiseGO took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that OMG had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all OMG were issued by OmiseGO at creation at very little economic cost—and enormous potential upside—to the OmiseGO founders.

233.   The creation of OMG tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which OMG tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that OMG was something other than a security, when it was a security.

234.   Investors purchased OMG tokens with the reasonable expectation that they would make a profit.

235.   OmiseGO token holders stood to share in potential profits from the successful launch of the OMG token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the OMG ecosystem.

236.   Investors' profits were to be derived from the managerial efforts of others— OmiseGO, its co-founders, and OmiseGO development team.  Investors in OMG relied on the

managerial and entrepreneurial efforts of OmiseGO and its executive and development team to manage and develop the OMG software.

237.    Investors in OMG reasonably expected OmiseGO and its development team to provide significant managerial efforts after OMG's launch.

238.    The expertise of OmiseGO was critical in monitoring the operation of OMG, promoting OMG, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The OMG protocol and governance structure were predetermined before OMG was launched.

239.    Accordingly, under the SEC's Framework, the OMG token was and is a security.

    **j.    ETHLend (LEND)**

240.    The LEND ICO raised approximately $17 million from the sale of unregistered securities in November 2017.

241.    On December 12, 2017, Binance listed the LEND token:

## Binance Lists December Community Coin - ETHLend (LEND)


Binance
2 years ago

**Fellow Binancians,**

The fourth session of "Community Coin per Month" has now concluded. We have weighed all factors in the voting/retweeting process and have also applied a consistent methodology across all candidate votes to filter for oddities.

We would like to congratulate the winner - ETHLend (LEND)!

As promised, LEND has been awarded with a free listing placement on Binance.

LEND/BTC and LEND/ETH trading pairs are now available on Binance. You can start depositing and trading LEND now.

Details:

1. About ETHLend (LEND)
2. Fees
3. Rules

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make best efforts to choose high quality coins, but will not be responsible for your investment losses.

Thank you for your patience and support!

Binance Team

2017/12/12

242.    In the months following the Binance listing, the price of LEND skyrocketed from less than 8 cents to more than 37 cents per token:



243.    As of 10 a.m. today, the LEND token trades for less than 3 cents.

244.    The LEND whitepaper, released by a company called ETHLend, stated that the LEND platform "provides secured lending with the use of ERC-20 compatible tokens as a collateral.  For example, users with a token portfolio are not required to sell the tokens to receive liquidity."  ETHLend promoted the LEND token as enabling individuals to "borrow[] Ether to participate in different ICOs, buy[] dips (bear market movements) and purchas[e] tokens from the exchange for investment strategies without the need to sell tokens."

245.    The LEND whitepaper was silent as to the regulatory nature of LEND tokens. Instead, the whitepaper discussed how LEND would be used "as the medium of exchange" and "the main utility that is used for lending and borrowing within the Ethereum network."  It asserted that this would "allow all ETH and ERC20 token holders the ability to unlock billions of dollars' worth of liquidity" and that it would "do the same with Bitcoin in the near future."  Given its supposed relationship to Ethereum and Bitcoin, investors reasonably understood that LEND was not subject, at issuance, to U.S. securities laws.

246.    At the time of the LEND ICO, ETHLend took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that LEND had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all LEND were issued by ETHLend at creation at very little economic cost—and enormous potential upside—to the ETHLend founders.

247.    The creation of LEND tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process

by which LEND tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that LEND was something other than a security, when it was a security.

248.    Investors purchased LEND tokens with the reasonable expectation that they would make a profit.

249.    LEND token holders stood to share in potential profits from the successful launch of the LEND token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the LEND ecosystem.

250.    Investors' profits were to be derived from the managerial efforts of others— ETHLend, its co-founders, and the ETHLend development team.  Investors in LEND relied on the managerial and entrepreneurial efforts of LEND and its executive and development team to manage and develop the LEND software.

251.    Investors in LEND reasonably expected ETHLend and the ETHLend development team to provide significant managerial efforts after LEND's launch.

252.    The expertise of ETHLend was critical in monitoring the operation of LEND, promoting LEND, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The LEND protocol and governance structure were predetermined before the ICO was launched.

253.    Accordingly, under the SEC's Framework, the LEND token was and is a security.

### k.    aelf (ELF)

254.    In December 2017, aelf sold 25 percent of its unregistered ELF tokens to investors through private placement, raising $25 million.

255.    In November 2017, aelf published the "aelf whitepaper."   The whitepaper "envision[ed] aelf as a highly efficient and customizable OS and [that would] l become the 'Linux system' in [the] Blockchain community."   As part of this system, aelf announced the ELF token. According to the whitepaper, "[ELF] Token holders have the greatest right in the future of aelf, and token holders' interests are linked with the destiny of aelf, in particular those with long-term locked-in tokens in particular."

256.    The aelf whitepaper was silent as to the regulatory nature of ELF tokens.  Instead, the whitepaper discussed, at length, how governance structures for cryptocurrencies like Bitcoin were "not well defined when [they were] created."   aelf insisted that its governance structure represented an improvement over cryptocurrencies like Bitcoin and Ethereum because "vital decisions [in aelf] will be carried out through a mechanism that resembles **representative democracy**."  (Emphasis added.)

257.    On December 21, 2017, Binance listed the ELF token:

# Binance Lists ælf (ELF)

 **Binance**
2 years ago

**Fellow Binancians,**

ELF/BTC and ELF/ETH trading pairs are now available on Binance for trading. You can start depositing and trading ELF now.

Details:

1. About ælf (ELF)
2. Fees
3. Rules

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make best efforts to choose high quality coins, but will not be responsible for your investment losses.

Thanks for your support!

Binance Team

2017/12/21

258.    In the month following the Binance listing, the price of the ELF Token skyrocketed from less than $1 to more than $2.50 per token:



259.    As of 10 a.m. today, the ELF token trades at approximately 6 cents.

260.    At the time of the ELF ICO, aelf took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that ELF had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all ELF were issued by aelf at creation at very little economic cost—and enormous potential upside—to the aelf founders.

261.    The creation of ELF tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which ELF tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that ELF was something other than a security, when it was a security.

262.    Investors purchased ELF tokens with the reasonable expectation that they would make a profit.

263.    The aelf token holders stood to share in potential profits from the successful launch of the ELF token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the ELF ecosystem.

264.    Investors' profits were to be derived from the managerial efforts of others—aelf, its co-founders, and aelf's development team.  Investors in ELF relied on the managerial and entrepreneurial efforts of aelf and its executive and development team to manage and develop the ELF software.

265.     Investors in ELF reasonably expected aelf and its development team to provide significant managerial efforts after ELF's launch.

266.     The expertise of aelf was critical in monitoring the operation of ELF, promoting ELF, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The ELF protocol and governance structure were predetermined before ELF was launched.

267.     Accordingly, under the SEC's Framework, the ELF token was and is a security.

### l.     Civic (CVC)

268.     Over its two-day ICO, from June 20-21, 2017, Civic raised approximately $33 million in proceeds from the sale of 33 percent of CVC tokens.  Civic retained 33 percent of those tokens and allocated an additional 33 percent "for distribution to incentivize participation in the ecosystem."



269.     In June 2017, Civic published the first version of the "Civic whitepaper."  In its whitepaper, Civic stated that it was "building an ecosystem that is designed to facilitate on-demand, secure and low-cost access to identity verification ('IDV') services via the blockchain, such that background and personal information verification checks will no longer need to be

undertaken from the ground up every time."  It also introduced, for the first time, the CVC token "that participants in the ecosystem will use to transact in IDV-related services."

270.    After CVC tokens were distributed through the ICO, CVC tokens have been listed on Binance since at least May 2018.

271.    The Civic Purchase Agreement stated that "[CVC] Tokens are not intended to be a digital currency, security, commodity, or any kind of financial instrument" and that "[CVC] Tokens do not represent or confer any ownership right or stake, share, security, or equivalent rights, or any right to receive future revenue shares, intellectual property rights or any other form of participation in or relating to the Ecosystem and/or Company and its corporate affiliates."

272.    Investors thus reasonably understood that CVC was not subject, at issuance, to U.S. securities laws.

273.    At the time of the CVC ICO, Civic took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  Many individuals were unaware that CVC had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all CVC were issued by Civic at creation at very little economic cost—and enormous potential upside—to the Civic founders.

274.    The creation of CVC tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which CVC tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise

that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that CVC was something other than a security, when it was a security.

275.   Investors purchased CVC tokens with the reasonable expectation that they would make a profit.

276.   CVC token holders stood to share in potential profits from the successful launch of the CVC token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the CVC ecosystem.

277.   Investors' profits were to be derived from the managerial efforts of others—Civic, its co-founders, and the CVC development team.  Investors in CVC relied on the managerial and entrepreneurial efforts of Civic and its executive and development team to manage and develop the CVC software.

278.   Investors in CVC reasonably expected Civic and its development team to provide significant managerial efforts after CVC launch.

279.   The expertise of Civic was critical in monitoring the operation of CVC, promoting CVC, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The CVC protocol and governance structure were predetermined before the ICO was launched.

280.   Accordingly, under the SEC's Framework, the CVC token was and is a security.

**I.       The Class Has Suffered Significant Damages From Defendants' Actions**

281.   As a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiffs and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the Tokens—have suffered significant damages in an amount to be proven at trial.

282.   The Tokens today are worth far less than the price Plaintiffs and the Class paid for them.

283.   To the extent Plaintiffs still hold any Tokens, they hereby demand rescission and make any necessary tender of the Tokens.

## V.   <u>CLASS ALLEGATIONS</u>

284.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the following two sub-classes (together, the "Class"):

- Sub-Class 1:  All persons who purchased any of the following tokens on Binance: EOS, BNT, SNT, QSP, KNC, TRX, FUN, ICX, OMG, LEND, ELF, and CVC, between April 1, 2017 and Binance's imposition of an arbitration clause (which appears to have occurred on or about February 20, 2019).

- Sub-Class 2:  All persons who purchased any of the following tokens on Binance: EOS, BNT, SNT, QSP, KNC, TRX, FUN, ICX, OMG, LEND, ELF, and CVC, between Binance's imposition of an arbitration clause (which appears to have occurred on or about February 20, 2019) and the present.

Accordingly, the Class Period is April 1, 2017 through the present.

285.   Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

286.   Plaintiffs reserve the right to amend the Class definition if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

287.   The members of the Class are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

288.    Members of the Class are readily ascertainable and identifiable.  Members of the Class may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or its agents.  They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

289.    Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiffs do not have any interest that is in conflict with the interests of the members of the Class.

290.    Plaintiffs and members of the Class sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

291.    Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

292.    Plaintiffs seek declaratory relief for themselves and the Class, asking the Court to declare their purchase agreements with Binance void, such that prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Binance; and Binance has acted on grounds that apply generally to the Class, so that the declaratory relief is appropriate respecting the class as a whole.

293.    Common questions and answers of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including but not limited to the following:

- Whether the Tokens are securities under federal and state law;

- Whether Binance operated as an unregistered exchange;

- Whether Binance operated as an unregistered broker-dealer;

- Whether Binance offered or sold the Tokens to members of the Class;

- Whether the members of the Class suffered damages as a result of Defendants' conduct in violation of federal and state law; and

- Whether the Class members are entitled to void their purchase agreements with Binance and to recover the monies they paid thereunder.

294.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

295.   There will be no difficulty in the management of this action as a class action.

### FIRST CAUSE OF ACTION
**Unregistered Offer and Sale of Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Binance)**

296.   Plaintiffs reallege the allegations above.

297.   Section 5(a) of the Securities Act states:  "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of

transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

298.   Section 5(c) of the Securities Act states:   "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id*. § 77e(c).

299.   When issued, the Tokens are securities within the meaning of Section 2(a)(1) of the Securities Act. *Id*. § 77b(a)(1).   Binance promoted, solicited or sold purchases of the Tokens from Plaintiffs and members of the Class.   Binance thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.   No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

300.   Section 12(a)(1) of the Securities Act provides in relevant part:   "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id*. § 77*l*(a)(1).

301.    Accordingly, Binance has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id*. §§ 77e(a), 77e(c), and 77*l*(a)(1).

302.    Plaintiffs and the Class seek rescissory damages with respect to purchases of Tokens on Binance within the last three years and within one year from when an investor could adequately plead that a Token is a security.  *Id*. § 77m.

**SECOND CAUSE OF ACTION**
**Contracts With an Unregistered Exchange**
**Sections 5 and 29(b) of the Exchange Act**
**(Binance)**

303.    Plaintiffs reallege the allegations above.

304.    In relevant part, section 5 of the Exchange Act makes it unlawful "for any . . . exchange, directly or indirectly, to make use of . . . any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security . . . unless such exchange (1) is registered as national securities exchange under section 78f of this title, or (2) is exempted from such registration."  15 U.S.C. § 78e.  An "exchange" is any entity that "constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities."  17 C.F.R. § 240.3b-16.

305.    Binance has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and subject to the jurisdiction of the United States throughout the Class Period, including because Binance has operated as an exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

306.   Binance has thus made use of such means and instrumentality without being registered as national securities exchange under section 78f and without any exemption from such registration requirement.

307.   In the course of planning to operate and as operating as an unregistered exchange within the United States, Binance has entered into contracts with issuers of digital tokens whereby the parties to those contracts agreed that, operating as an unregistered exchange within the United States, Binance would make available for sale the issuers' digital tokens.  The parties to these contracts thus reached an agreement whereby and pursuant to which Binance would operate in violation of section 5 of the Exchange Act.

308.   In the course of operating as an unregistered exchange within and subject to the jurisdiction of the United States, in the performance of its contracts with the issuers of digital tokens, which is a contract for listing a security on an exchange, and pursuant to and consistent with its Terms of Use, Binance has entered into contracts with the members of the Class pursuant to which the members purchased digital tokens through Binance and paid Binance fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which Binance was operating in violation of section 5 of the Exchange Act, and whereby and pursuant to which these parties were continuing a practice in violation of section 5 of the Exchange Act.

309.   The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because Binance entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the

contracts reached agreements whereby and pursuant to which Binance would be and was operating in violation of section 5.

310.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract."  15 U.S.C. § 78cc.

311.    Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void their purchase agreements with Binance and to recover, as rescissory damages, the fees they have paid under those contracts.

312.    Plaintiffs and the Class seek to void contracts and recover damages with respect to purchases of Tokens on Binance within the last three years and within one year from when an investor could adequately plead that a Token is a security.  *Id*. § 78cc(b).

## THIRD CAUSE OF ACTION
### Unregistered Broker and Dealer
### Sections 15(a)(1) and 29(b) of the Exchange Act
### (Binance)

313.    Plaintiffs reallege the allegations above.

314.    In relevant part, with respect to a broker or dealer who is engaged in interstate commerce in using the facility of an exchange, section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer . . . to make use of . . . any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section."  15 U.S.C. § 78o(a)(1).

315.    As a broker-dealer engaged in interstate commerce using the facility of an exchange, and without being registered in accordance with subsection (b) of section 15 of the Exchange Act, throughout the Class Period, Binance has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities.

316.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id*. § 78(a)(4)(A).  In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering.  Binance has operated as a broker during the Class Period by facilitating the sale of digital assets as part of other entities' ICOs, including by marketing the digital assets, accepting investors' orders, accepting payment for orders, and working with issuers to transfer digital assets to investors after payment.

317.    A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that person's "regular business."  Binance has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by having a regular turnover inventory of securities, by purchasing digital assets for accounts in Binance's name (often at a discount to the ICO price), and by then selling the digital assets to investors for profit immediately or at a later time after being held in inventory.

318.    In the course of planning to operate and as operating as an unregistered broker-dealer, Binance has entered into contracts with issuers of digital tokens whereby the parties to those contracts agreed that, operating as an unregistered broker-dealer within the United States,

Binance would make available for sale the issuers' digital tokens.  The parties to these contracts thus reached an agreement whereby and pursuant to which Binance would operate in violation of section 15(a)(1) of the Exchange Act.

319.    In the course of operating as an unregistered broker-dealer, in the performance of its contracts with the issuers of digital tokens, and pursuant to and consistent with its Terms of Use, Binance has entered into contracts with the members of the Class pursuant to which the members purchased digital tokens through Binance and paid Binance fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which Binance was operating in violation of section 15(a)(1) of the Exchange Act.

320.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because Binance entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which Binance would be and was operating in violation of section 5.

321.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of such contract."  *Id*. § 78cc.

322.    Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void their purchase agreements with Binance and to recover, as rescissory damages, the fees they have paid under those contracts.

323.    Plaintiffs and the Class seek to void contracts and recover damages with respect to purchases of Tokens on Binance within the last three years and within one year from when an investor could adequately plead that a Token is a security.  *Id*. § 78cc(b).

**FOURTH CAUSE OF ACTION**
**Control Person Liability for Violations of**
**Section 20 of the Exchange Act**
**(Changpeng Zhao, Yi He, and Roger Wang)**

324.    Plaintiffs reallege the allegations above.

325.    This Count is asserted against Changpeng Zhao, Yi He, and Roger Wang ("the Individual Defendants") for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

326.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of securities on an unregistered exchange as described herein.

327.    The Individual Defendants have the power to direct or cause the direction of the management and policies of Binance.

328.    The Individual Defendants, separately or together, have sufficient influence to have either caused Binance to register as an exchange or prevented Binance from effecting transactions of securities as an unregistered exchange.

329.     The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Binance's failure to register as an exchange and Binance's offer of securities on an unregistered exchange.

330.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

**FIFTH CAUSE OF ACTION**
**Control Person Liability for Violations of**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Changpeng Zhao, Yi He, and Roger Wang)**

331.     Plaintiffs reallege the allegations above.

332.     This Count is asserted against Binance and the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

333.     Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful solicitation of various ERC-20 tokens as described herein.

334.     The Individual Defendants have the power to direct or cause the direction of the management and policies of Binance.

335.     The Individual Defendants, separately or together, have sufficient influence to have caused Binance to solicit transactions of securities.

336.     The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Binance's solicitation of securities.

337.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

### SIXTH CAUSE OF ACTION
**Unregistered Offer and Sale of Securities**
**Tex. Rev. Civ. Stat. art. 581-33**
**(Binance)**

338.    Plaintiffs reallege the allegations above.

339.    The Texas Securities Act forbids the offer or sale of unregistered securities.  Tex. Rev. Civ. Stat. art. 581-7(A)(1).   Any person who unlawfully offers or sells an unregistered security "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security."  *Id.* art. 581-33(A)(1).

340.    When issued, the Tokens were securities within the meaning of Tex. Rev. Civ. Stat. art. 581-4(A).  Binance sold or solicited purchases of the Tokens to Plaintiffs and members of the Class.  The Tokens were neither registered as required under the Texas Securities Act nor subject to any exemption from registration.

341.    The Tokens were offered or sold in the State of Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

342.    Accordingly, Binance has violated the Texas Securities Act through Binance's sale of unregistered securities.

343.    Neither Plaintiffs nor any Class members have received a rescission offer to refund the consideration paid for the Tokens that also meets the requirements of Tex. Rev. Civ. Stat. Ann. art. 581-33(I).

344.    Plaintiffs and Class members who own Tokens hereby make any necessary tender and seek the consideration paid for any Tokens purchased on Binance in the last three years plus interest thereon at the legal rate from the date of payment, less the amount of any income received on the Tokens, costs, and reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances; together with all other remedies available to them.

345.    Plaintiffs and Class members who no longer own Tokens seek damages for purchases of Tokens on Binance within the last three years, in the amount of the consideration the buyer paid for the Tokens plus interest thereon at the legal rate from the date of payment by the buyer, less the greater of: (i) the value of the Tokens at the time the buyer disposed of them plus the amount of any income the buyer received on the Tokens; or (ii) the actual consideration received for the Tokens at the time the buyer disposed of them plus the amount of any income the buyer received on the Tokens; together with costs, reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances, and all other remedies available to them.

## SEVENTH CAUSE OF ACTION
### Control Person Liability for Unregistered Offer and Sale of Securities
### Tex. Rev. Civ. Stat. art. 581-33
### (Changpeng Zhao, Yi He, and Roger Wang)

346.    Plaintiffs reallege the allegations above.

347.    Every person who directly or indirectly controls a seller liable under the Texas Securities Act for unlawfully selling unregistered securities is jointly and severally liable with and to the same extent as the seller, unless the controlling person "sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Tex. Rev. Civ. Stat. art. 581-33(F).

348.    When issued, the Tokens were securities within the meaning of Tex. Rev. Civ. Stat. art. 581-4(A). Binance sold or solicited purchases of the Tokens to Plaintiffs and members of the

Class.  The Tokens were neither registered as required under the Texas Securities Act nor subject to any exemption from registration.

349.    The Tokens were offered or sold in the State of Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

350.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of unregistered securities as described herein.

351.    Accordingly, the Individual Defendants, as persons who indirectly or directly controlled Binance, have violated the Texas Securities Act through Binance's sale of unregistered securities.

352.    Neither Plaintiffs nor any Class members have received a rescission offer to refund the consideration paid for the Tokens that also meets the requirements of Tex. Rev. Civ. Stat. Ann. art. 581-33(I).

353.    Plaintiffs and Class members who own Tokens hereby make any necessary tender and seek the consideration paid for any Tokens purchased on Binance in the last three years plus interest thereon at the legal rate from the date of payment, less the amount of any income received on the Tokens, costs, and reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances; together with all other remedies available to them.

354.    Plaintiffs and Class members who no longer own Tokens seek damages for purchases of Tokens on Binance within the last three years, in the amount of the consideration the

buyer paid for the Tokens plus interest thereon at the legal rate from the date of payment by the buyer, less the greater of: (i) the value of the Tokens at the time the buyer disposed of them plus the amount of any income the buyer received on the Tokens; or (ii) the actual consideration received for the Tokens at the time the buyer disposed of them plus the amount of any income the buyer received on the Tokens; together with costs, reasonable attorneys' fees if the Court finds that the recovery would be equitable in the circumstances, and all other remedies available to them.

## **PRAYER FOR RELIEF**

355.   On behalf of themselves and the Class, Plaintiffs request relief as follows:

(a) That the Court determines that this action may be maintained as a class action, that Plaintiffs be named as Class Representatives of the Class, that the undersigned be named as Lead Class Counsel of the Class, and directs that notice of this action be given to Class members;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

(c) That the Court award Plaintiffs and the Class damages in an amount to be determined at trial;

(d) That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the Class are entitled, including a declaration that the purchase agreements between each members of the Class and Binance are void;

(e) That the Court award Plaintiffs and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

(f) That the Court award Plaintiffs and the Class their reasonable attorneys' fees and costs of suit; and

(g) That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL

356. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all claims.

Dated:    April 3, 2020
          New York, New York

Respectfully submitted,

/s/ Philippe Z. Selendy          /s/ Kyle W. Roche
Philippe Z. Selendy              Kyle W. Roche
Jordan A. Goldstein              Edward Normand
Oscar Shine                      Velvel (Devin) Freedman (*pro hac* pending)
Mitchell Nobel                   Alex T. Potter (admission pending)
SELENDY & GAY, PLLC              Richard Cipolla (admission pending)
1290 Sixth Avenue, 17th Floor    ROCHE CYRULNIK
New York, NY 10104                 FREEDMAN LLP
pselendy@selendygay.com          99 Park Avenue, 19th Floor
jgoldstein@selendygay.com        New York, NY 10016
oshine@selendygay.com            kyle@rcfllp.com
mnobel@selendygay.com            tnormand@rcfllp.com
                                 vel@rcfllp.com
                                 apotter@rcfllp.com
                                 rcipolla@rcfllp.com

CERTIFICATION OF
<u>SECURITIES CLASS ACTION COMPLAINT</u>

I, Eric Lee, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I have reviewed the complaint filed herein (the "Complaint"), and have authorized the filing of a similar complaint and a lead plaintiff motion on my behalf.

2.      I did not purchase the securities at issue in the Complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

3.      I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period (as defined in the Complaint), I purchased and/or sold the unregistered securities on Binance: ICX, ETHlend, ELF, TRX.

5.      During the three-year period preceding the date of this Certification, I have not sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

7.      I understand that executing this Certification is not a prerequisite to participation in this Class Action as members of the Class.

*Eric Lee*
Eric Lee (Apr 1, 2020)
_____

Eric Lee
Ithaca, New York

CERTIFICATION OF
SECURITIES CLASS ACTION COMPLAINT

I, Chase Williams, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I have reviewed the complaint filed herein (the "Complaint"), and have authorized the filing of a similar complaint and a lead plaintiff motion on my behalf.

2.      I did not purchase the securities at issue in the Complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

3.      I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period (as defined in the Complaint), I purchased and/or sold the unregistered securities on Binance: EOS ("EOS"), Tron ("TRX"), Quantstamp ("QSP").

5.      During the three-year period preceding the date of this Certification, I have not sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

7.      I understand that executing this Certification is not a prerequisite to participation in this Class Action as members of the Class.

_____
Chase Williams
Houston, Texas