**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JD ANDERSON, CORY HARDIN, ERIC LEE, BRETT MESSIEH, DAVID MUHAMMAD, RANJITH THIAGARAJAN, CHASE WILLIAMS, and TOKEN FUND I LLC individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BINANCE, CHANGPENG ZHAO, YI HE, and ROGER WANG, <br><br> Defendants. | No. 20-cv-02803-ALC <br><br> **JURY DEMANDED** |

## [PROPOSED] AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.    INTRODUCTION ........................................................................................ 1

II.   PARTIES ................................................................................................... 7

      A.    Plaintiffs ......................................................................................... 7

      B.    Defendants ...................................................................................... 8

III.  JURISDICTION AND VENUE ................................................................. 9

IV.   FACTUAL ALLEGATIONS ................................................................... 12

      A.    The First Cryptocurrency: Bitcoin ............................................... 12

      B.    Ethereum ....................................................................................... 14

      C.    ERC-20 Tokens ............................................................................. 15

      D.    The Advent Of The "ICO" ............................................................ 16

      E.    Binance Issued, Solicited, And Sold ERC-20 Tokens in the United States ......... 18

      a.    Binance Allowed and Targeted U.S. Investors on Its Exchange ......................... 19

      b.    Binance Solicited the Buying and Selling of the Tokens on Its Exchange ........... 21

      F.    Because of Defendants' and Issuers' Efforts, Investors Would Not Reasonably Have Understood Prior To April 3, 2019, At The Earliest, That The Tokens Were Securities ......... 33

      G.    The Tokens Are Securities ............................................................ 37

            a.    ERC-20 Investors Invested Money ...................................... 38

            b.    ERC-20 Investors Participated In A Common Enterprise ......................... 39

            c.    Investors Purchased The Tokens With A Reasonable Expectation Of Profit From Owning Them ......... 40

            d.    Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers ......... 43

      H.    Each Token Is A Security .............................................................. 49

            a.    EOS ...................................................................................... 49

            b.    Bancor (BNT) ...................................................................... 52

            c.    Status (SNT) ......................................................................... 56

            d.    Quantstamp (QSP) ............................................................... 59

     e.     Kyber Network (KNC) ........................................................................63

     f.     TRON (TRX) ....................................................................................66

     g.     FunFair (FUN) ................................................................................69

     h.     ICON (ICX) ......................................................................................73

     i.     OmiseGo (OMG) .............................................................................76

     j.     ETHLend (LEND) ...........................................................................79

     k.     aelf (ELF) ........................................................................................82

     l.     Civic (CVC) .....................................................................................85

    I.     Binance Is A Domestic Securities Exchange........................................ 88

    J.     The Class Has Suffered Significant Damages From Defendants' Actions........... 89

V.     DEFENDANTS' AND ISSUERS' CONCEALMENT OF THEIR MISCONDUCT PREVENTED PLAINTIFFS AND MEMBERS OF THE CLASS FROM BRINGING A CLAIM AT THE TIME THE EVENTS OCCURRED.................................................. 90

VI.    CLASS ALLEGATIONS ......................................................................... 93

VII.   CAUSES OF ACTION ............................................................................ 96

FIRST CAUSE OF ACTION ............................................................................. 96

SECOND CAUSE OF ACTION ......................................................................... 97

THIRD CAUSE OF ACTION ........................................................................... 100

FOURTH CAUSE OF ACTION ....................................................................... 102

FIFTH CAUSE OF ACTION ............................................................................ 103

SIXTH CAUSE OF ACTION (ALABAMA STATE LAW – PRIMARY LIABILITY) .......... 104

SEVENTH CAUSE OF ACTION (ALABAMA STATE LAW – PRIMARY LIABILITY).... 106

EIGHTH CAUSE OF ACTION (ALABAMA STATE LAW – ADDITIONAL LIABILITY) 107

NINTH CAUSE OF ACTION (ALASKA STATE LAW – PRIMARY LIABILITY) ............. 109

TENTH CAUSE OF ACTION (ALASKA STATE LAW – PRIMARY LIABILITY)............. 110

ELEVENTH CAUSE OF ACTION (ALASKA STATE LAW – ADDITIONAL LIABILITY) 112

TWELFTH CAUSE OF ACTION (ARIZONA STATE LAW – PRIMARY LIABILITY) ..... 113

THIRTEENTH CAUSE OF ACTION (ARIZONA STATE LAW – PRIMARY LIABILITY) 115

FOURTEENTH CAUSE OF ACTION (ARIZONA STATE LAW – ADDITIONAL
    LIABILITY) ................................................................................................................... 116

FIFTEENTH CAUSE OF ACTION (ARKANSAS STATE LAW – PRIMARY LIABILITY) 117

SIXTEENTH CAUSE OF ACTION (ARKANSAS STATE LAW – PRIMARY LIABILITY)
    119

SEVENTEENTH CAUSE OF ACTION (ARKANSAS STATE LAW – ADDITIONAL
    LIABILITY) ................................................................................................................... 120

EIGHTEENTH CAUSE OF ACTION (CALIFORNIA STATE LAW – PRIMARY LIABILITY)
    122

NINETEENTH CAUSE OF ACTION (CALIFORNIA STATE LAW – PRIMARY LIABILITY)
    123

TWENTIETH CAUSE OF ACTION (CALIFORNIA STATE LAW – ADDITIONAL
    LIABILITY) ................................................................................................................... 124

TWENTY-FIRST CAUSE OF ACTION (COLORADO STATE LAW – PRIMARY
    LIABILITY) ................................................................................................................... 126

TWENTY-SECOND CAUSE OF ACTION (COLORADO STATE LAW – PRIMARY
    LIABILITY) ................................................................................................................... 127

TWENTY-THIRD CAUSE OF ACTION (COLORADO STATE LAW – ADDITIONAL
    LIABILITY) ................................................................................................................... 129

TWENTY-FOURTH CAUSE OF ACTION (CONNECTICUT STATE LAW – PRIMARY
    LIABILITY) ................................................................................................................... 130

TWENTY-FIFTH CAUSE OF ACTION (CONNECTICUT STATE LAW – PRIMARY
    LIABILITY) ................................................................................................................... 131

TWENTY-SIXTH CAUSE OF ACTION (CONNECTICUT STATE LAW – ADDITIONAL
    LIABILITY) ................................................................................................................... 133

TWENTY-SEVENTH CAUSE OF ACTION (DELAWARE STATE LAW – PRIMARY
    LIABILITY) ................................................................................................................... 135

TWENTY-EIGHTH CAUSE OF ACTION (DELAWARE STATE LAW – ADDITIONAL
    LIABILITY) ................................................................................................................... 136

iii

TWENTY-NINTH CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY) ............................................................................................................... 137

THIRTIETH CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY) ............................................................................................................... 139

THIRTY-FIRST CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW – ADDITIONAL LIABILITY) ............................................................................................................... 140

THIRTY-SECOND CAUSE OF ACTION (FLORIDA STATE LAW – PRIMARY LIABILITY) 142

THIRTY-THIRD CAUSE OF ACTION (FLORIDA STATE LAW – PRIMARY LIABILITY) 143

THIRTY-FOURTH CAUSE OF ACTION (FLORIDA STATE LAW – ADDITIONAL LIABILITY) ............................................................................................................... 144

THIRTY-FIFTH CAUSE OF ACTION (GEORGIA STATE LAW – PRIMARY LIABILITY) 146

THIRTY-SIXTH CAUSE OF ACTION (GEORGIA STATE LAW – PRIMARY LIABILITY) 147

THIRTY-SEVENTH CAUSE OF ACTION (GEORGIA STATE LAW – ADDITIONAL LIABILITY ................................................................................................................ 148

THIRTY-EIGHTH CAUSE OF ACTION (HAWAII STATE LAW – PRIMARY LIABILITY) 150

THIRTY-NINTH CAUSE OF ACTION (HAWAII STATE LAW – PRIMARY LIABILITY) 151

FORTIETH CAUSE OF ACTION (HAWAII STATE LAW – ADDITIONAL LIABILITY) . 152

FORTY-FIRST CAUSE OF ACTION (IDAHO STATE LAW – PRIMARY LIABILITY).... 154

FORTY-SECOND CAUSE OF ACTION (IDAHO STATE LAW – PRIMARY LIABILITY 155

FORTY-THIRD CAUSE OF ACTION (IDAHO STATE LAW – ADDITIONAL LIABILITY) 157

FORTY-FOURTH CAUSE OF ACTION (ILLINOIS STATE LAW – PRIMARY LIABILITY) 159

FORTY-FIFTH CAUSE OF ACTION (ILLINOIS STATE LAW – PRIMARY LIABILITY) 160

FORTY-SIXTH CAUSE OF ACTION (ILLINOIS STATE LAW – ADDITIONAL LIABILITY) ............................................................................................................... 162

FORTY-SEVENTH CAUSE OF ACTION (INDIANA STATE LAW – PRIMARY LIABILITY) ................................................................................................................. 164

FORTY-EIGHTH CAUSE OF ACTION (INDIANA STATE LAW – PRIMARY LIABILITY) 165

FORTY-NINTH CAUSE OF ACTION (INDIANA STATE LAW – ADDITIONAL LIABILITY) ................................................................................................................. 167

FIFTIETH CAUSE OF ACTION (IOWA STATE LAW – PRIMARY LIABILITY) ............... 169

FIFTY-FIRST CAUSE OF ACTION (IOWA STATE LAW – PRIMARY LIABILITY) ........ 170

FIFTY-SECOND CAUSE OF ACTION (IOWA STATE LAW – ADDITIONAL LIABILITY) 171

FIFTY-THIRD CAUSE OF ACTION (KANSAS STATE LAW – PRIMARY LIABILITY) . 173

FIFTY-FOURTH CAUSE OF ACTION (KANSAS STATE LAW – PRIMARY LIABILITY) 174

FIFTY-FIFTH CAUSE OF ACTION (KANSAS STATE LAW – ADDITIONAL LIABILITY) 175

FIFTY-SIXTH CAUSE OF ACTION (KENTUCKY STATE LAW – PRIMARY LIABILITY) 177

FIFTY-SEVENTH CAUSE OF ACTION (KENTUCKY STATE LAW – PRIMARY LIABILITY) ................................................................................................................. 178

FIFTY-EIGHTH CAUSE OF ACTION (KENTUCKY STATE LAW – ADDITIONAL LIABILITY) ................................................................................................................. 180

FIFTY-NINTH CAUSE OF ACTION (LOUISIANA STATE LAW – PRIMARY LIABILITY) 181

SIXTIETH CAUSE OF ACTION (LOUISIANA STATE LAW – PRIMARY LIABILITY) .. 183

SIXTY-FIRST CAUSE OF ACTION (LOUISIANA STATE LAW – ADDITIONAL LIABILITY) ................................................................................................................. 184

SIXTY-SECOND CAUSE OF ACTION (MAINE STATE LAW – PRIMARY LIABILITY) 186

SIXTY-THIRD CAUSE OF ACTION (MAINE STATE LAW – PRIMARY LIABILITY).... 187

SIXTY-FOURTH CAUSE OF ACTION (MAINE STATE LAW – ADDITIONAL LIABILITY) 189

SIXTY-FIFTH CAUSE OF ACTION (MARYLAND STATE LAW – PRIMARY LIABILITY) 191

SIXTY-SIXTH CAUSE OF ACTION (MARYLAND STATE LAW – PRIMARY LIABILITY) 192

SIXTY-SEVENTH CAUSE OF ACTION (MARYLAND STATE LAW – ADDITIONAL LIABILITY) ............................................................................................................. 194

SIXTY-EIGHTH CAUSE OF ACTION (MASSACHUSETTS STATE LAW – PRIMARY LIABILITY) ............................................................................................................. 195

SIXTY-NINTH CAUSE OF ACTION (MASSACHUSETTS STATE LAW – PRIMARY LIABILITY) ............................................................................................................. 197

SEVENTIETH CAUSE OF ACTION (MASSACHUSETTS STATE LAW – ADDITIONAL LIABILITY) ............................................................................................................. 198

SEVENTY-FIRST CAUSE OF ACTION (MICHIGAN STATE LAW – PRIMARY LIABILITY) ............................................................................................................. 200

SEVENTY-SECOND CAUSE OF ACTION (MICHIGAN STATE LAW – PRIMARY LIABILITY) ............................................................................................................. 201

SEVENTY-THIRD CAUSE OF ACTION (MICHIGAN STATE LAW – ADDITIONAL LIABILITY) ............................................................................................................. 202

SEVENTY-FOURTH CAUSE OF ACTION (MINNESOTA STATE LAW – PRIMARY LIABILITY) ............................................................................................................. 204

SEVENTY-FIFTH CAUSE OF ACTION (MINNESOTA STATE LAW – PRIMARY LIABILITY) ............................................................................................................. 205

SEVENTY-SIXTH CAUSE OF ACTION (MINNESOTA STATE LAW – ADDITIONAL LIABILITY) ............................................................................................................. 206

SEVENTY-SEVENTH CAUSE OF ACTION (MISSISSIPPI STATE LAW – PRIMARY LIABILITY) ............................................................................................................. 208

SEVENTY-EIGHTH CAUSE OF ACTION (MISSISSIPPI STATE LAW – PRIMARY LIABILITY) ............................................................................................................. 209

SEVENTY-NINTH CAUSE OF ACTION (MISSISSIPPI STATE LAW – ADDITIONAL LIABILITY) ............................................................................................................. 211

EIGHTIETH CAUSE OF ACTION (MISSOURI STATE LAW – PRIMARY LIABILITY).. 213

EIGHTY-FIRST CAUSE OF ACTION (MISSOURI STATE LAW – PRIMARY LIABILITY) 214

EIGHTY-SECOND CAUSE OF ACTION (MISSOURI STATE LAW – ADDITIONAL LIABILITY) ................................................................................................ 215

EIGHTY-THIRD CAUSE OF ACTION (MONTANA STATE LAW – PRIMARY LIABILITY) 217

EIGHTY-FOURTH CAUSE OF ACTION (MONTANA STATE LAW – ADDITIONAL LIABILITY) ................................................................................................ 218

EIGHTY-FIFTH CAUSE OF ACTION (NEBRASKA STATE LAW – PRIMARY LIABILITY) 220

EIGHTY-SIXTH CAUSE OF ACTION (NEBRASKA STATE LAW – ADDITIONAL LIABILITY) ................................................................................................ 221

EIGHTY-SEVENTH CAUSE OF ACTION (NEVADA STATE LAW – PRIMARY LIABILITY) ................................................................................................ 223

EIGHTY-EIGHTH CAUSE OF ACTION (NEVADA STATE LAW – PRIMARY LIABILITY) 224

EIGHTY-NINTH CAUSE OF ACTION (NEVADA STATE LAW – ADDITIONAL LIABILITY) ................................................................................................ 225

NINETIETH CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY) ................................................................................................ 227

NINETY-FIRST CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY) ................................................................................................ 228

NINETY-SECOND CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW – ADDITIONAL LIABILITY) .............................................................................. 230

NINETY-THIRD CAUSE OF ACTION (NEW JERSEY STATE LAW – PRIMARY LIABILITY) ................................................................................................ 232

NINETY-FOURTH CAUSE OF ACTION (NEW JERSEY STATE LAW – PRIMARY LIABILITY) ................................................................................................ 233

NINETY-FIFTH CAUSE OF ACTION (NEW JERSEY STATE LAW – ADDITIONAL LIABILITY) ................................................................................................ 234

NINETY-SIXTH CAUSE OF ACTION (NEW MEXICO STATE LAW – PRIMARY LIABILITY) ................................................................................................ 236

NINETY-SEVENTH CAUSE OF ACTION (NEW MEXICO STATE LAW – PRIMARY LIABILITY) ................................................................................................ 237

NINETY-EIGHTH CAUSE OF ACTION (NEW MEXICO STATE LAW – ADDITIONAL LIABILITY) .................................................................................................. 239

NINETY-NINTH CAUSE OF ACTION (NORTH CAROLINA STATE LAW – PRIMARY LIABILITY) .................................................................................................. 241

ONE HUNDREDTH CAUSE OF ACTION (NORTH CAROLINA STATE LAW – PRIMARY LIABILITY) .................................................................................................. 242

ONE-HUNDRED-AND-FIRST CAUSE OF ACTION (NORTH CAROLINA STATE LAW – ADDITIONAL LIABILITY) ............................................................................. 243

ONE-HUNDRED-AND-SECOND CAUSE OF ACTION (NORTH DAKOTA STATE LAW – PRIMARY LIABILITY) ............................................................................. 245

ONE-HUNDRED-AND-THIRD CAUSE OF ACTION (NORTH DAKOTA STATE LAW – PRIMARY LIABILITY) ............................................................................. 246

ONE-HUNDRED-AND-FOURTH CAUSE OF ACTION (NORTH DAKOTA STATE LAW – ADDITIONAL LIABILITY) ............................................................................. 247

ONE-HUNDRED-AND-FIFTH CAUSE OF ACTION (OHIO STATE LAW – PRIMARY LIABILITY) .................................................................................................. 249

ONE-HUNDRED-AND-SIXTH CAUSE OF ACTION (OHIO STATE LAW – PRIMARY LIABILITY) .................................................................................................. 250

ONE-HUNDRED-AND-SEVENTH CAUSE OF ACTION (OHIO STATE LAW – ADDITIONAL LIABILITY) ............................................................................. 251

ONE-HUNDRED-AND-EIGHTH CAUSE OF ACTION (OKLAHOMA STATE LAW – PRIMARY LIABILITY) ............................................................................. 253

ONE-HUNDRED-AND-NINTH CAUSE OF ACTION (OKLAHOMA STATE LAW – PRIMARY LIABILITY) ............................................................................. 254

ONE-HUNDRED-AND-TENTH CAUSE OF ACTION (OKLAHOMA STATE LAW – ADDITIONAL LIABILITY) ............................................................................. 255

ONE-HUNDRED-AND-ELEVENTH CAUSE OF ACTION (OREGON STATE LAW – PRIMARY LIABILITY) ............................................................................. 257

ONE-HUNDRED-AND-TWELFTH CAUSE OF ACTION (OREGON STATE LAW – PRIMARY LIABILITY) ............................................................................. 258

ONE-HUNDRED-AND-THIRTEENTH CAUSE OF ACTION (OREGON STATE LAW – ADDITIONAL LIABILITY) ............................................................................. 260

ONE-HUNDRED-AND-FOURTEENTH CAUSE OF ACTION (PENNSYLVANIA STATE
    LAW – PRIMARY LIABILITY) ................................................................................. 261

ONE-HUNDRED-AND-FIFTEENTH CAUSE OF ACTION (PENNSYLVANIA STATE LAW
    – PRIMARY LIABILITY) .......................................................................................... 263

ONE-HUNDRED-AND-SIXTEENTH CAUSE OF ACTION (PENNSYLVANIA STATE LAW
    – ADDITIONAL LIABILITY)..................................................................................... 264

ONE-HUNDRED-AND-SEVENTEENTH CAUSE OF ACTION (PUERTO RICO STATE
    LAW – PRIMARY LIABILITY) ................................................................................. 266

ONE-HUNDRED-AND-EIGHTEENTH CAUSE OF ACTION (PUERTO RICO STATE LAW
    – PRIMARY LIABILITY) .......................................................................................... 267

ONE-HUNDRED-AND-NINTEENTH CAUSE OF ACTION (PUERTO RICO STATE LAW –
    ADDITIONAL LIABILITY)........................................................................................ 268

ONE-HUNDRED-AND-TWENTIETH CAUSE OF ACTION (RHODE ISLAND STATE LAW
    – PRIMARY LIABILITY) .......................................................................................... 270

ONE-HUNDRED-AND-TWENTY-FIRST CAUSE OF ACTION (RHODE ISLAND STATE
    LAW – PRIMARY LIABILITY) ................................................................................. 271

ONE-HUNDRED-AND-TWENTY-SECOND CAUSE OF ACTION (RHODE ISLAND
    STATE LAW – ADDITIONAL LIABILITY) ............................................................... 272

ONE-HUNDRED-AND-TWENTY-THIRD CAUSE OF ACTION (SOUTH CAROLINA
    STATE LAW – PRIMARY LIABILITY)...................................................................... 274

ONE-HUNDRED-AND-TWENTY-FOURTH CAUSE OF ACTION (SOUTH CAROLINA
    STATE LAW – PRIMARY LIABILITY)...................................................................... 275

ONE-HUNDRED-AND-TWENTY-FIFTH CAUSE OF ACTION (SOUTH CAROLINA
    STATE LAW – ADDITIONAL LIABILITY) ............................................................... 277

ONE-HUNDRED-AND-TWENTY-SIXTH CAUSE OF ACTION (SOUTH DAKOTA STATE
    LAW – PRIMARY LIABILITY) ................................................................................. 279

ONE-HUNDRED-AND-TWENTY-SEVENTH CAUSE OF ACTION (SOUTH DAKOTA
    STATE LAW – PRIMARY LIABILITY)...................................................................... 280

ONE-HUNDRED-AND-TWENTY-EIGHTH CAUSE OF ACTION (SOUTH DAKOTA
    STATE LAW – ADDITIONAL LIABILITY) ............................................................... 281

ONE-HUNDRED-AND-TWENTY-NINTH CAUSE OF ACTION (TENNESSEE STATE LAW
    – PRIMARY LIABILITY) .......................................................................................... 283

ONE-HUNDRED-AND-THIRTIETH CAUSE OF ACTION (TENNESSEE STATE LAW – PRIMARY LIABILITY) ........................................................................................ 284

ONE-HUNDRED-AND-THIRTY-FIRST CAUSE OF ACTION (TENNESSEE STATE LAW – ADDITIONAL LIABILITY) ........................................................................ 285

ONE-HUNDRED-AND-THIRTY-SECOND CAUSE OF ACTION (TEXAS STATE LAW – PRIMARY LIABILITY) ........................................................................................ 287

ONE-HUNDRED-AND-THIRTY-THIRD CAUSE OF ACTION (TEXAS STATE LAW – PRIMARY LIABILITY) ........................................................................................ 289

ONE-HUNDRED-AND-THIRTY-FOURTH CAUSE OF ACTION (TEXAS STATE LAW – ADDITIONAL LIABILITY) ........................................................................ 290

ONE-HUNDRED-AND-THIRTY-FIFTH CAUSE OF ACTION (UTAH STATE LAW – PRIMARY LIABILITY) ........................................................................................ 292

ONE-HUNDRED-AND-THIRTY-SIXTH CAUSE OF ACTION (UTAH STATE LAW – PRIMARY LIABILITY) ........................................................................................ 293

ONE-HUNDRED-AND-THIRTY-SEVENTH CAUSE OF ACTION (UTAH STATE LAW – ADDITIONAL LIABILITY) ........................................................................ 294

ONE-HUNDRED-AND-THIRTY-EIGHTH CAUSE OF ACTION (VERMONT STATE LAW – PRIMARY LIABILITY) ................................................................................ 296

ONE-HUNDRED-AND-THIRTY-NINTH CAUSE OF ACTION (VERMONT STATE LAW – PRIMARY LIABILITY) ........................................................................................ 297

ONE-HUNDRED-AND-FORTIETH CAUSE OF ACTION (VERMONT STATE LAW – ADDITIONAL LIABILITY) ........................................................................ 298

ONE-HUNDRED-AND-FORTY-FIRST CAUSE OF ACTION (VIRGINIA STATE LAW – PRIMARY LIABILITY) ........................................................................................ 300

ONE-HUNDRED-AND-FORTY-SECOND CAUSE OF ACTION (VIRGINIA STATE LAW – PRIMARY LIABILITY) ........................................................................................ 301

ONE-HUNDRED-AND-FORTY-THIRD CAUSE OF ACTION (VIRGINIA STATE LAW – ADDITIONAL LIABILITY) ........................................................................ 302

ONE-HUNDRED-AND-FORTY-FOURTH CAUSE OF ACTION (WASHINGTON STATE LAW – PRIMARY LIABILITY) ................................................................................ 304

ONE-HUNDRED-AND-FORTY-FIFTH CAUSE OF ACTION (WASHINGTON STATE LAW – ADDITIONAL LIABILITY) ................................................................................ 305

ONE-HUNDRED-AND-FORTY-SIXTH CAUSE OF ACTION (WEST VIRGINIA STATE
        LAW – PRIMARY LIABILITY) ................................................................................ 307

ONE-HUNDRED-AND-FORTY-SEVENTH CAUSE OF ACTION (WEST VIRGINIA STATE
        LAW – PRIMARY LIABILITY) ................................................................................ 308

ONE-HUNDRED-AND-FORTY-EIGHTH CAUSE OF ACTION (WEST VIRGINIA STATE
        LAW – ADDITIONAL LIABILITY) .......................................................................... 309

ONE-HUNDRED-AND-FORTY-NINTH CAUSE OF ACTION (WISCONSIN STATE LAW –
        PRIMARY LIABILITY) ........................................................................................... 311

ONE-HUNDRED-AND-FIFTIETH CAUSE OF ACTION (WISCONSIN STATE LAW –
        PRIMARY LIABILITY) ........................................................................................... 312

ONE-HUNDRED-AND-FIFTY-FIRST CAUSE OF ACTION (WISCONSIN STATE LAW –
        ADDITIONAL LIABILITY) ..................................................................................... 314

ONE-HUNDRED-AND-FIFTY-SECOND CAUSE OF ACTION (WYOMING STATE LAW –
        PRIMARY LIABILITY) ........................................................................................... 315

ONE-HUNDRED-AND-FIFTY-THIRD CAUSE OF ACTION (WYOMING STATE LAW –
        PRIMARY LIABILITY) ........................................................................................... 317

ONE-HUNDRED-AND-FIFTY-FOURTH CAUSE OF ACTION (WYOMING STATE LAW –
        ADDITIONAL LIABILITY) ..................................................................................... 318

VIII.    PRAYER FOR RELIEF ................................................................................................. 320

IX.    JURY TRIAL ................................................................................................................... 321

Plaintiffs JD Anderson, Cory Hardin, Eric Lee, Brett Messieh, David Muhammad, Ranjith Thiagarajan, Chase Williams, and Token Fund I LLC, individually and on behalf of all others similarly situated, bring this action against Defendants Binance, Changpeng Zhao, Yi He, and Roger Wang. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of whitepapers of the digital tokens at issue, press releases, media reports, and other publicly disclosed reports and information about Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiffs hereby allege as follows:

## I.    **<u>INTRODUCTION</u>**

1.    Within the Class Period, which is from July 1, 2017 through the present, Binance and Defendants Changpeng Zhao, Yi He, and Roger Wang (the "Individual Defendants") promoted, offered, and sold twelve digital tokens, EOS, BNT, SNT, QSP, KNC, TRX, FUN, ICX, OMG, LEND, ELF, and CVC (together, the "Tokens") throughout the United States through its online exchange without registering as an exchange or broker-dealer, and without a registration statement in effect for the securities it was selling, in violation of federal and state securities laws. Individually and on behalf of investors who purchased the Tokens in the United States (the "Class"), Plaintiffs bring claims to recover the consideration paid for the Tokens, together with interest thereon, as well as attorneys' fees and costs.

2.    A digital token is a type of digital asset that exists on a "blockchain," which is essentially a decentralized digital ledger that records transactions; these blockchain-dependent assets are sometimes referred to as "crypto-assets.". Various types of crypto-assets can reside on blockchains, including crypto-assets, such as Bitcoin and Ethereum, which are decentralized

digital commodities. There are also "smart contracts," which operate under a set of predetermined conditions agreed on by users. With smart contracts, the terms of the contract are automatically carried out by the software underlying the digital tokens (which, as relevant here, are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain) when the agreed conditions are met.

3.     Certain of these digital tokens are classified as "utility tokens" and are associated with particular projects. Their primary purpose is to allow the holder to use or access the associated project. For example, one private-jet company has adopted a business model based on issuing utility tokens to participants in its membership program, who can then use them to charter flights on the company's planes. A utility token presumes a functional network on which the token can be used.

4.     Other tokens are more speculative, are referred to as "security tokens," and like a traditional security essentially represent one's investment in a project that is to be undertaken with the funds raised through the sale of the tokens. Although these tokens derive their value from the startup behind the project, they are unlike traditional securities in that they do not give the holder ownership in any corporate entity. Rather, investors purchase these tokens with the hope that their value will increase in the future as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project. Because such "security tokens" are properly classified as securities under federal and state law, issuers of these Tokens (the "Issuers") were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC"). Binance was required to register with the SEC as an exchange and to file a registration statement in connection with the issuance of its own Token, known as "BNB." Neither the Issuers nor Binance—in its dual capacity as an exchange and issuer—filed any such registration statements. Instead, Binance and the Issuers entered into contracts to list these Tokens

2

for sale on the Binance exchange in violation of federal and state law. As a result, Binance and the Issuers reaped billions of dollars in profits.

5.      The scheme worked as follows: working to capitalize on the enthusiasm for crypto-assets like bitcoin, an Issuer would announce a revolutionary digital token. This token would typically be billed as "better," "faster," "cheaper," "more connected," "more trustworthy," and "more secure." The Issuer would then sell some of its tokens in an initial coin offering ("ICO") to investors and then turn to Binance to list the new token, at which point Binance would undertake its own efforts to promote sales, and to solicit and encourage purchases, and to facilitate the consummation of these transactions, by a wide universe of investors. The Issuers would thereby raise hundreds of millions, even billions, of dollars from purchasers of the tokens. Binance would profit handsomely by receiving payments from Issuers to have their tokens listed and, more lucratively, by receiving a percentage of each trade. Binance also profited handsomely as an Issuer of the BNB Token—which it issued in an ICO in June and July 2017 in the lead up to the launch of its exchange.

6.      The Issuers were generally careful to describe these tokens both as providing some specific utility and as something other than "securities." But the vast majority of these new tokens turned out to be empty promises. They were not "better," "faster," "cheaper," "more connected," "more trustworthy," or "more secure" than what existed in the marketplace. In reality, they often had no utility at all. The promises of new products and markets went unfulfilled, with the networks never fully developed, while investors were left holding the bag when these tokens crashed. Indeed, all of the Tokens are now trading at a tiny fraction of their 2017–2018 highs. One of the Tokens at issue, TRX, is down more than 88 percent from its 2018 high. Another token, BNT, is down 87.6 percent from its January 2018 high. QSP was trading at around 72 cents in

3

January 2018; today, it trades at around 4 cents. After their ICOs, the prices of OMG and ELF tokens skyrocketed to more than $25 and $2.50 per token, respectively; today, they trade at around $4.03 and $0.17 per token. The EOS token reached a high of $22.89. Today, it is worth only $2.81.

7.     Investors were provided with scant information when deciding whether to purchase a token. The main offering materials available to investors were "whitepapers" that would describe, in highly technical terms, the supposed utility of a token. These whitepapers would often omit, however, the robust disclosures that securities laws and the SEC have long deemed essential to investor protections in initial public offerings, including use of "plain English" to describe the offering; a required list of key risk factors; a description of key information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow. Instead, these ICOs were the "Wild West"—with investors left to fend for themselves. Without the mandatory disclosures that would have been required had these ICOs been properly registered with the SEC, investors could not reliably assess the representations made or the risks of their investments.

8.     In 2017 and 2018, at the height of this frenzy of activity, hundreds of ICOs raised nearly $20 billion with virtually no regulatory oversight or guidance to investors. Issuers and exchanges like Binance, preying on the public's lack of familiarity with the technology underpinning these tokens, characterized these tokens as "utility tokens," even though they were in effect bets that a particular project would develop into a successful venture. In truth, these tokens were securities under federal and state securities laws.

9.      It was not clear to a reasonable investor at purchase that, contrary to the Issuers' and Binance's representations, the Tokens were securities.  That the Tokens were securities would not have been reasonably apparent until, at the earliest, April 3, 2019, when the SEC released a detailed "Framework" to analyze digital assets, indicating the Tokens are "investment contracts" and therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1), and Section 3 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 77c(a)(10).[1]  Prior to that time, based on statements of Binance and the SEC, a reasonable investor would not have concluded that these Tokens were securities that should have been registered with the SEC.  But the Tokens are in fact securities.

10.      For example, on September 30, 2019—nearly six months after releasing its Framework, and more than two years after the Binance exchange launched—the SEC completed an investigation and found that Block.one had violated the Securities Act by selling the digital token EOS, an unregistered security, to the public.  As a result of this SEC enforcement action, Block.one was required to pay a $24 million fine.[2]  The SEC's determination that EOS was an unregistered security applies with equal force to the other Tokens.

11.      Binance and the Issuers wrongfully engaged in millions of transactions—including the solicitation, offer, and sale of securities—without registering the Tokens as securities, and without Binance registering with the SEC as an exchange or broker-dealer.  As a result, investors

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

[2] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

were not informed of the significant risks inherent in these investments, as federal and state securities laws require.

12.    Binance participated in illegal solicitations and sales of securities for which no registration statement was in effect, and as to which no exemption from registration was available. Each ICO was a generalized solicitation made using statements posted on the Internet and distributed throughout the world, including throughout the United States, and the securities were offered and sold to Plaintiffs and the general public in the United States.  Because these sales, as well as Binance's underlying contracts with the Issuers that facilitated these sales, violated both the Securities Act and the Exchange Act, Plaintiffs and the Class are entitled to recover the consideration they paid for the Tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase, as well as the fees they paid Binance on such purchases.

13.    In addition, numerous Class members resided, and were present when they traded in the Tokens, in jurisdictions or territories with their own "Blue Sky" protections for investors.[3] Under these laws, investors in these jurisdictions who purchased unregistered Tokens are entitled to rescission, and generally interest thereon, attorneys' fees, and costs.

14.    Accordingly, individually and on behalf of the Class, Plaintiffs bring claims to recover the consideration paid for the Tokens, together with interest thereon, as well as attorneys' fees and costs.

---

[3] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky."  *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted).  Blue Sky statutes typically define "securities" to include "investment contracts," and the term "investment contracts" has been interpreted by state courts commensurate with the standard set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

## II.     PARTIES

### A.     Plaintiffs

15.     Plaintiff JD Anderson is a resident of Aubrey, Texas.  Anderson and members of the Class purchased Tokens on Binance, and pursuant to contracts with Binance, from Texas during the Class Period.  A true and correct copy of Anderson's transactions is included in Exhibit A.

16.     Plaintiff Cory Hardin is a resident of Las Vegas, Nevada.  Hardin and members of the Class purchased Tokens on Binance, and pursuant to contracts with Binance, from Nevada during the Class Period.  A true and correct copy of Hardin's transactions is included in Exhibit B.

17.     Plaintiff Eric Lee is a resident of Ithaca, New York.  Lee and members of the Class purchased Tokens on Binance, and pursuant to contracts with Binance, from New York during the Class Period.  A true and correct copy of Lee's transactions is included in Exhibit C.

18.     Plaintiff Brett Messieh is a resident of Tampa, Florida.  Messieh and members of the Class purchased Tokens on Binance, and pursuant to contracts with Binance, from Florida during the Class Period.  A true and correct copy of Messieh's transactions is included in Exhibit D.

19.     Plaintiff David Muhammad is a resident of Grand Prairie, Texas.  Muhammad and members of the Class purchased Tokens on Binance, and pursuant to contracts with Binance, from Texas during the Class Period.  A true and correct copy of Muhammad's transactions is included in Exhibit E.

20.     Plaintiff Ranjith Thiagarajan is a resident of San Jose, California.  Thiagarajan and members of the Class purchased Tokens on Binance, and pursuant to contracts with Binance, from

California during the Class Period.  A true and correct copy of Thiagarajan's transactions is included in Exhibit F.

21.  Plaintiff Chase Williams is a resident of Houston, Texas.  Williams and members of the Class purchased Tokens on Binance, and pursuant to contracts with Binance, from Texas during the Class Period.  A true and correct copy of Williams's transactions is included in Exhibit G.

22.  Plaintiff Token Fund I LLC is a limited liability investment company formed under the laws of Puerto Rico in order to hold the investments of an individual who purchased Tokens on Binance, and pursuant to contracts with Binance from California and Puerto Rico during the Class Period.  A true and correct copy of Token Fund I LLC's transactions is included in Exhibit H.

### B.  Defendants

23.  Defendant Binance issued its own token, BNB, in the BNB ICO from June 26 to July 3, 2017.  Eleven days later, on July 14, 2017, Defendant Binance launched its digital asset exchange.  By January 2018, it was reported to have become the largest cryptocurrency exchange in the world.  As of September 1, 2020, Binance continued to represent itself as the world's largest crypto-asset exchange, claiming a trading volume of nearly $11 billion.  Binance facilitates trades in digital assets, including the Tokens, by providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for Binance taking a fee for every transaction it facilitates.

24.  Binance's Chief Executive Officer, defendant Changpeng Zhao, founded Binance in China but shortly thereafter moved Binance's headquarters to Japan, in advance of the Chinese government's ban on crypto-asset trading.  In March 2018, as a result of increasing regulatory scrutiny in Japan, Binance moved its headquarters to Malta.

25.     On February 21, 2020, the Malta Financial Services Authority ("MFSA") issued a statement responding to media reports referring to Binance as a "Malta-based cryptocurrency" company.  The statement said that Binance "is not authorized by the MFSA to operate in the cryptocurrency sphere and is therefore not subject to regulatory oversight by the MFSA."

26.     Zhao stated the same day that "Binance.com is not headquartered or operated in Malta … There are misconceptions some people have on how the world must work a certain way, you must have offices, HQ, etc.  But there is a new world with blockchain now … Binance.com has always operated in a decentralized manner as we reach out to our users across more than 180 nations worldwide."

27.     Although it is thus unclear where Binance is physically headquartered, it is clear that since its founding Binance has regularly and intentionally engaged in numerous online securities transactions inside the United States, with U.S. residents, without complying with U.S. laws.  In addition, Binance has promoted, inside the United States, the sale of digital assets on its exchange.

28.     On information and belief, Zhao resides in Taiwan.

29.     Defendant Yi He is the Chief Marketing Officer ("CMO") of Binance and co-founded Binance along with Zhao and Wang.  In her role as CMO, she oversees "all marketing efforts" and has touted that she increased "Binance's global influence to become a top cryptocurrency exchange."  On information and belief, she resides in Malta.

30.     Defendant Roger Wang is the Chief Technology Officer of Binance and co-founded Binance with Zhao and He.  On information and belief, he resides in Malta.

## III.    **JURISDICTION AND VENUE**

31.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a

class action in which any member of a class of plaintiffs is a citizen of a State different from any

defendant, and in which any member of a class of plaintiffs is a citizen of a State and any defendant

is a citizen or subject of a foreign state.

32.    Jurisdiction of this Court is further founded upon 28 U.S.C. § 1331 because the

Amended Complaint asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15

U.S.C. §§ 77e, 77*l*(a)(1), 77o.  This Court further has jurisdiction over the Securities Act claims

pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

33.    Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act,

15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations

of the Exchange Act, including Sections 5, 15(a)(1), 20, and 29(b), 15 U.S.C. §§ 77e, 78o(a)(1),

78t, 78cc(b).

34.    This Court has jurisdiction over violations of State Blue Sky statutes pursuant to

this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

35.    This Court has personal jurisdiction over Defendants.  Defendants purposefully

availed themselves of the privilege of conducting activities in the United States in connection with

their offer or sale of unregistered securities and failure to register with the SEC as an exchange or

broker-dealer, including activities occurring in or aimed at the State of New York, by maintaining

an interactive commercial website accessible and used by U.S. investors; marketing in the United

States and New York to those investors, employing agents, employees, and vendors in the United

States and New York; and participating, enabling, and directing those contacts from within the

United States and New York.  For example, Binance hosts a blockchain incubation program in San

Francisco through Binance Labs, Binance's venture capital division, and has solicited via social

media job applicants for the San Francisco chapter of Binance Labs. Binance has also participated in several conferences and events in the United States, including in New York City:

     (a) January 2018: Binance offered its "Binancians" tickets to the Blockchain Connect Conference hosted in San Francisco.

     (b) September 2018:  Helen Haiyu, Head of Binance Charity, represented Binance at Blockchain for Social Good, held in New York City in September 2018.

     (c) October 2018: Binance Labs gave presentations at Harvard University in Boston and Columbia University in New York City in October 2018 about blockchain startups.

     (d) June 2018: Binance Labs represented Binance at the Blockchain Connect Conference in San Jose.

     (e) February 2019: Binance Labs attended ETH Denver.

36.    Defendants engaged in conduct that had a foreseeable substantial effect in the United States connected with those offers and sales. Defendants also transacted business within New York pursuant to N.Y. C.P.L.R. 302(a)(1).

37.    Venue is proper pursuant to each of 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa(a) in that this is a district wherein one or more defendants is found or is an inhabitant or transacts business, or in the district where offers or sales at issue took place.  For example, a Binance representative promoted Binance at a leading blockchain conference, Consensus, which was held in New York City.  Binance has also sought and received approval from the New York State Department of Financial Services for its U.S. Dollar-pegged stablecoin—the "BUSD."

IV.   **FACTUAL ALLEGATIONS**

A.   **The First Cryptocurrency: Bitcoin**

38.   A crypto-asset is a digital asset designed to work as a medium of exchange or a store of value or both.  Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

39.   Bitcoin was the world's first decentralized crypto-asset.  It is also the largest and most popular crypto-asset, with a market capitalization of approximately $192 billion.  Bitcoin spawned a market of other crypto-assets that, together with Bitcoin, have a current market capitalization of $340 billion.  (The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

40.   At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the blockchain.

41.   Blockchains act as the central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

42.   Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network.  In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure.  For Bitcoin, those who

validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin. This process is colloquially referred to as "mining."

43.    Mining is one method by which an individual can acquire crypto-assets like Bitcoin. A second and more common manner is to obtain crypto-assets from someone else. This is often accomplished by acquiring it through an online "crypto-asset exchange."

44.    Online crypto-asset exchanges are one place to purchase Bitcoin and other crypto-assets. These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

45.    In April 2013, there were only seven crypto-assets listed on coinmartketcap.com, a popular website that tracks the crypto-asset markets. As of this filing, the site monitors more than 6,900 cryptocurrencies.

46.    For a time, bitcoin was the only crypto-asset available on exchanges. As crypto-assets grew in popularity, exchanges began listing other crypto-assets as well, and trading volumes expanded. In early 2013, daily bitcoin trading volumes hovered between $1 million and $25 million. By the end of 2017, daily bitcoin trading volumes ranged between $200 million and $3.8 billion.

47.    Bitcoin is a commodity, rather than a security, because it allows for quick and secure transactions, can serve as a long-term store of value, and is decentralized from any government or private control. There is no "Bitcoin Inc." that has the ability to cause the price of bitcoin to rise through careful management or fall through mismanagement or deception. Instead, Bitcoin's value is purely a response to market-wide forces, and a customer buying a bitcoin is not investing in a common enterprise. Both the CFTC and courts have accordingly recognized that Bitcoin is appropriately classified as a commodity.

13

### B.    Ethereum

48.    Ethereum is the second-most popular crypto-asset, with a market capitalization of approximately $42 billion.  The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network.  Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether.  (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem," that is, the overall network of individuals using Ethereum or participating in the development of its network.  Ethereum, like Bitcoin, is a commodity rather than a security.)

49.    Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality.  A smart contract is a program that verifies and enforces the negotiation or performance of a contract.  Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

50.    As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract.  They each put up $1,000 worth of ether.  They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether.  The rest of the ether may or may not be worth more than it was at the beginning of the month.

51.    A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action.  The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met.

52.    In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the box smart contracts called Ethereum Request for Comments ("ERCs").

53.    An ERC is an application standard for a smart contract. Anyone can create an ERC and then seek support for that standard. Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes. The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

### C.    ERC-20 Tokens

54.    ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015. ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain, known as "ERC-20 tokens."

55.    ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it. Accordingly, ERC-20 tokens are functionally different than crypto-assets like Bitcoin and Ethereum because they do not operate on an independent blockchain.

56.    ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard. Some properties related to ERC-20 tokens are customizable, such as the total supply of tokens, the token's ticker symbol, and the token's name. All ERC-20 tokens transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

57.    ERC-20 tokens are simple and easy to deploy. Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then distribute and make available for purchase. Even people without any technical expertise can have their own ERC-20 token created for them, which can then be marketed to investors.

**D.** **The Advent Of The "ICO"**

58.    Between 2014 and 2016, bitcoin's price fluctuated between $200 and $800. During this same time frame, ether's price fluctuated between roughly $1 and $10.

59.    By the end of 2016, interest in crypto-assets began to accelerate, with prices growing at a rate historically unprecedented for any asset class. Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000. Ethereum's growth was even more dramatic. On January 1, 2017, Ethereum was trading at approximately $8 per ether. Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

60.    Seeking to capitalize on the growing enthusiasm for crypto-assets, many entrepreneurs sought to raise funds through initial coin offerings, or ICOs, including ICOs for newly created ERC-20 tokens, such as the Tokens. Many of these issuers improperly chose not to register their securities offerings with the SEC in order to save money and not "open their books" to the SEC, even though investors thereby were denied access to critical information they would have received from an SEC-registered offering. As a result investors, including investors in the Tokens, were denied access to important information before making their investment decision.

61.    Potential purchasers were reached through various crypto-asset exchanges and social media sites that published active and upcoming ICOs.

62.    Between 2017 and 2018, nearly $20 billion was raised through ICOs. None of these ICOs was registered with the SEC.

63.    Of the approximately 800 ICOs launched between 2017 and 2018, the vast majority were issued using the ERC-20 protocol. Around the same time Binance launched its ICO, for example, issuers such as EOS, Bancor, and Status had each raised at least one hundred million dollars from selling their ERC-20 tokens through ICOs.

16

64.     Like most ICOs, ERC-20 ICOs were typically announced and promoted through public online channels.  Issuers typically released a "whitepaper" describing the project and terms of the ICO.  These whitepapers advertised the sale of tokens or coins through the ICO.  They typically advertised the creation of a "new blockchain architecture."

65.     The whitepapers typically contained vastly less information than a registration statement filed with the SEC would have included.  For example, whitepapers did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

66.     When tokens were sold through an ERC-20 ICO, the issuer usually asserted that such tokens entitled their holders to certain rights related to a venture underlying the ICO, such as the right to use certain services provided by the issuer. In almost all cases, these tokens could also be traded, thereby giving investors a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others (that is, the people operating the issuer whose efforts will impact the value of those tokens on the secondary market).

67.     These tokens were frequently listed on crypto-asset exchanges, where they were bought and sold using other crypto-assets (such as Bitcoin or Ethereum) or traditional currencies such as the U.S. dollar.

68.     Even after an ICO, an issuer could receive a direct financial benefit from high prices of their tokens by selling them to customers on these exchanges. These subsequent offerings were not registered or flagged to customers; instead, they most often relied on the same whitepapers that

had accompanied the sale of the tokens in the ICO, as well as continuing marketing efforts from the issuers seeking to increase the price of the tokens.

69.    As a result of the lack of information, trading of tokens on exchanges such as Binance was rife with manipulation.  In fact, as Aries Wanlin Wang, the founder of a rival exchange, admitted, "the secondary market [for digital assets] can be rigged by manipulators.  If you put major currencies such as Bitcoin and Ethereum aside, many of the tokens you'll find issued through ICOs are there to be manipulated.  These tokens are similar to penny stocks.  And everyone wants to believe they've discovered the next Bitcoin and Ethereum."  Mr. Wang further conceded that "[t]he problems facing the secondary market in crypto are similar to the problems that were faced by American stock exchanges 100 years ago.  When a market lacks certain regulations and oversights, predictable things happen.  Pump and dumps are very common in the secondary market of cryptocurrency, just as they were on the US stock exchange so many years ago."

70.    The Issuers declined to register the Tokens with the SEC, and Binance declined to register itself as an exchange or broker-dealer, which registrations would have provided crucial risk disclosure to investors, including members of the Class.

**E.    Binance Issued, Solicited, And Sold ERC-20 Tokens in the United States**

71.    In June 2017, Binance issued an ICO of its own Token, "BNB," and it launched its crypto-asset exchange website on July 14, 2017.

72.    On its exchange, Binance solicited and facilitated the buying and selling of ERC-20 tokens on its unregistered exchange and reaped extraordinary profits as a result.

73.    In fact, Binance recently boasted on its website that, in 2019 alone, it averaged more than $2.8 billion in daily trading volume, had more than 15 million users world-wide, and listed 184 tokens.  Public reporting shows that, in 2018 alone, Binance brought in $446 million in *profit*.

### a.   Binance Allowed and Targeted U.S. Investors on Its Exchange

74.     Binance targeted U.S. residents by, *inter alia*, marketing its interactive exchange website to U.S. users, allowing deposits from U.S.-based exchanges, hosting video tutorials on how to deposit crypto-assets into the Binance exchange on its website in English, allowing users to purchase crypto-assets and BNB on its exchange with credit cards and bank deposits, and helping users utilize the exchange through the website's Support Center.

75.     Binance was aware that U.S. residents were using its services to purchase Tokens because of its Know Your Customer (KYC) process.  Whether to address purported "suspicious activity" or to exceed the relatively low withdrawal limits, Binance required most users to verify their account.  This verification process required users to submit their full name, gender, country and territory, their passport or driver's license ID number, a copy of their passport or license, and a photo of the user holding their passport or license:





76. In addition to providing customer service through the Support Center, Binance has publicly provided support to customers located in the United States on Twitter.

77. Binance also created "lending products" that allowed users to "invest" in tokens and earn an annualized interest rate on their investment. Binance sent emails targeted to its U.S.

users offering its "lending products," which would allow U.S. users to buy its BNB token and other tokens, such as EOS, and earn an annualized interest rate on their investment.

78.    In addition, as a security measure, when a user would attempt to log in to Binance's website exchange from a new device or location, Binance would send an "Authorize New Device" email to the user to authorize the new device.  The email would include the user's location, listing the user's city and state, and the user's IP address.  These are just a few ways in which U.S. users provided residency information, and these users were allowed to continue trading on the exchange until restrictions on U.S. residents were enacted in September 2019.

79.    Zhao has recognized that a lot of his "Twitter followers are US-centric and they ask a lot of questions," many of which are presumably about the Binance exchange.  Zhao has also appeared on Bloomberg to discuss Binance and crypto-assets and allows Forbes to profile him, interviewing in English.

### b. Binance Solicited the Buying and Selling of the Tokens on Its Exchange

80.    How did a company that was barely a year old generate such extraordinary profits? By building a platform that solicited and facilitated the buying and selling of unregistered securities on a historically unprecedented scale.  Defendants did this by taking advantage of the market's lack of sophistication with digital tokens, particularly ERC-20 tokens, and the general market excitement for Bitcoin and Ethereum more generally.  Binance advertised and continues to advertise its exchange on crypto-asset related and other websites, actively soliciting new investors to transact on its exchange.

81.    Shortly after an issuer launched an ICO, the issuer would quickly seek to have their tokens listed on crypto-asset exchanges like Binance, in order to give the issuer access to millions of retail investors to whom it could market the tokens.

82.    On July 11, 2018, in an interview with CNBC, Defendant Zhao stated that there are three key fundamentals Binance considers before it lists a token:  the whitepaper, the team, and the users.  Zhao explained:

> If a project has a concept, that's good.  But, Binance is presently too big to list concept coins.  They advise that if you just have a concept, it is better to list on smaller exchanges first, and Binance can monitor the performance of the business.

83.    Zhao noted that the team behind a particular token is a fundamental factor to the success of a project:  *"It's kind of hard to tell if they're going to do the right thing or the wrong thing.  But a team with a good history tends to carry on."*  Zhao explained that "if you have a good project, we will list it."

84.    Exchanges like Binance are crucial to the successful sale of unregistered securities to investors.  In discussing Binance's role in crypto-assets, Zhao stated:  "As the exchange, we are the liquidity provider.  If you think about cryptocurrency as the blood of the economy, we are the heart, we are pumping the blood.  Right, so we are making everything circulate."  Indeed, after their ICOs, Issuers aggressively pursued "listing agreements" with crypto-asset exchanges such as Binance.  The purpose of pursuing these listing agreements was to create secondary markets for the purchase, sale, and trading of their Tokens.

85.    Issuers entered into listing agreements with crypto-asset exchanges that targeted U.S. consumers with the intent of creating secondary trading markets for the purchase, sale, and trading of their Tokens in the United States.

86.    These listing agreements were critical to the Issuers' efforts to increase the trading price of their Tokens by increasing market demand and access to the Tokens, especially in the United States. Indeed, many of these trading agreements included "listing fees," whereby the Issuer paid the crypto-asset exchanges an upfront fee to get the exchange to list their Token.

87.    Defendants also engaged in steps necessary for the distribution of the Tokens throughout the Class Period by promoting them via email and on social media. For example, shortly after Binance agreed to list a new token on its crypto-asset exchange, it would advertise that listing to its user base, such as per the below:

## Binance Will Add OAX, DNT, MCO, ICN

**Binance**
3 years ago

**Fellow Binancians,**

We will add OAX/ETH、DNT/ETH, MCO/ETH、ICN/ETH trading pairs on Binance exchange.

The trading time and date will be as follows:

1. OAX/ETH will be traded at 12pm, Aug 21, 2017 (Monday) Beijing Time.
2. DNT/ETH will be traded at 12pm, Aug 22, 2017 (Tuesday) Beijing Time.
3. MCO/ETH and ICN/ETH trading pairs will be traded at 3pm, Aug 23, 2017 (Wednesday) Beijing Time.

The deposits and withdrawals of OAX, DNT, MCO, ICN will open at Aug 18, 2017 (Friday) Beijing Time. Click here to start deposit and withdrawal your token.

1. About OpenANX (OAX), District0x (DNT), MONACO (MCO), ICONOMI (ICN)
2. Fees
3. Rule

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make best efforts to choose high quality coins, but will not be responsible for your investment losses.

Thank you for your support!

Binance Team

August 18, 2017

88.    In announcing a new token available for trading, Binance would sometimes run promotions to "celebrate the launch" of the token. On September 26, 2017, for example, when launching an ERC-20 token called "FUN," Binance "committed a total of 3,000,000 FUN tokens to reward customers worldwide."

23

**Fellow Binancians,**

Binance will add FUN/BTC and FUN/ETH trading pairs on 2017/09/28, 04:00 AM (UTC). You can start depositing FUN here now.

To celebrate the launch, Binance and FunFair have committed a total of 3,000,000 FUN to reward customers worldwide. The reward program will be made available as part of the listing of FUN on Binance, according to the following structure:

**Top FUN Holding Leaderboard Reward Program**

1. Bounty 1 (6 spots) -

| | |
|---|---|
| 1st Place | 300,000 FUN Token |
| 2nd Place | 200,000 FUN Token |
| 3rd Place | 200,000 FUN Token |
| 4th Place | 100,000 FUN Token |
| 5th Place | 100,000 FUN Token |
| 6th Place | 100,000 FUN Token |

2. Bounty 2 (200 spots) -

10,000 FUN tokens per user for the 7th to 206th users with the highest FUN balance at end of program .

3. Program Period:

Program ends  2017/10/01 04:00 AM (UTC).

89.    Just a few months after this announcement, the price of FUN token went from about 2 cents per token up to 20 cents per token, a 10X increase in trading value.  Unfortunately for many

investors, by January 2019, the price of a FUN token had collapsed to less than half a cent per token:



90.    Binance would also use its Twitter account to encourage users to purchase the Tokens through its exchange.  For example, on July 26, 2017, Binance announced through its Twitter account that it would list BNT, EOS and SNT:



91.    Binance also announced through its Twitter account the launch of TRX, OMG, and KNC:







92.     Binance would also use its Twitter account continuously to drive users to trade the Tokens on its exchange after it listed them:









93.     Defendant Changpeng Zhao, Binance's CEO, also used his Twitter accounts to solicit users to purchase Tokens on the Binance exchange:





94. Each of the Tokens was listed on Binance, pursuant to agreements with the Issuers, and each was traded by members of the Class. Binance's website served as a continuous form of

solicitation, throughout the Class Period, that both promoted and enabled sales of the Tokens—

displaying detailed price and trading data of the Tokens:



95.    Binance also regularly republished on its website investor reports assigning a credit

rating to each of the Tokens and encouraging users to purchase them:

(a) Binance republished ratings reports recommending purchases of BNT on

August 28, 2018, and November 12, 2019.

30

(b) Binance republished ratings reports recommending purchases of CVC on June 10, 2017, April 27, 2018, September 5, 2018, and April 11, 2019.

(c) Binance republished ratings reports recommending purchases of ELF on August 20, 2018, September 3, 2018, and January 8, 2019.

(d) Binance republished ratings reports recommending purchases of EOS on February 21, 2018, April 18, 2018, August 28, 2018, August 30, 2018, September 11, 2018, November 2, 2018, November 12, 2018, and November 26, 2018.

(e) Binance republished ratings reports recommending purchases of FUN on September 4, 2018, September 18, 2018, and September 19, 2018.

(f) Binance republished ratings reports recommending purchases of ICX on September 14, 2017, September 17, 2017, October 5, 2017,February 11, 2018, September 10, 2018, September 18, 2018, and November 12, 2018.

(g) Binance republished ratings reports recommending purchases of KNC on August 16, 2017, September 7, 2017, March 29, 2018, August 27, 2018, March 28, 2019, and September 19, 2019.

(h) Binance republished ratings reports recommending purchases of LEND on November 19, 2017, September 5, 2018, September 18, 2018, October 17, 2018, January 13, 2019, and April 29, 2019.

(i) Binance republished ratings reports recommending purchases of OMG on June 15, 2017, August 26, 2018, September 3, 2018, September 18, 2018, and November 13, 2018.

(j) Binance republished ratings reports recommending purchases of QSP on October 23, 2017, November 12, 2017, August 29, 2018, August 30, 2018, September 5, 2018, September 18, 2018, and January 24, 2019.

(k) Binance republished ratings reports recommending purchases of SNT on June 12, 2017, May 22, 2018, August 27, 2018, and November 13, 2018.

(l) Binance republished ratings reports recommending purchases of TRX on December 27, 2017, August 1, 2018, August 20, 2018, November 14, 2018, and February 27, 2019.

96.    In addition to bringing issuers and investors together by listing the Tokens and soliciting investors to transact in the Tokens, Binance took and takes other steps to facilitate trades in the Tokens.  Binance: (i) allows investors to exchange traditional (or fiat) currencies for crypto-assets through their credit or debit cards or through supported third-party services, (ii) maintains custody of the crypto-assets in each investor's wallets, (iii) answers transaction-related questions through the website's FAQ section and support messaging center, (iv) suggests crypto-assets to explore transacting in via emails to investors and posts by Binance Research, its market-research arm, and (v) allow users to invest in Tokens and earn an annualized interest rate on their investment in such Tokens.  Binance also buys and sells crypto-assets for its own account in order to maintain its Bitcoin reserves.

97.    Binance profited handsomely from listing the Tokens on its platform.  In addition to receiving fees for each transaction performed on its exchange, Binance received large cash payments from Issuers seeking to have their tokens listed.  These fees often exceeded $1 million per listing.  These base listing fees, however, pale in comparison to the commissions Binance received:  approximately 0.1% of the value of each transaction executed on its exchange from each

transacting party.  Given that Binance's average daily trading volume in September 2020 is over $11 billion, of which over $7.4 billion was subject to Binance's percentage fee, this usage calculates to *daily* revenues for Binance of approximately $14.8 million.

**F.      Because of Defendants' and Issuers' Efforts, Investors Would Not Reasonably Have Understood Prior To April 3, 2019, At The Earliest, That The Tokens Were Securities**

98.      In connection with the ICOs, from 2017 until early 2019, the Issuers and Binance made numerous misleading statements and omitted key information that lead reasonable investors to conclude that the Tokens were not securities.

99.      <u>Issuers</u>.  Issuers touted false technical details about their supposed crypto-asset and its utility, compared their Tokens to Bitcoin and Ethereum (which are not securities), and then often explicitly told investors that the Token was not a security.

100.      Beyond their express statements, Issuers took advantage of two key informational asymmetries in order to mislead the market into believing that the tokens were not securities.  First, the market lacked understanding and awareness concerning how crypto-assets operated, and specifically the differences between Bitcoin, Ethereum, and ERC-20 tokens.  Second, the market had no visibility into Issuers' technology or development during and after their ICO, and the Issuers took advantage of the excitement generated by the hundreds of millions of dollars flooding into various crypto-asset projects marketing themselves as the next Bitcoin.  The high-profile success of each successive ICO lent temporary credibility to ICOs as a whole.

101.      Issuers of ERC-20 tokens repeatedly asserted that their tokens were "utility tokens" (which are not securities), rather than "security tokens" (which would be securities that would have to be registered with the SEC).  Moreover, Issuers refused to register the Tokens with the SEC, thus signaling to investors that these were not securities.

33

102. Issuers in fact expressly declared that the Tokens were not securities. For example, the EOS Purchase Agreement stated:

> As mentioned above, the EOS Tokens do not have any rights, uses, purpose, attributes, functionalities or features, expressed or implied. Although EOS Tokens may be tradable, they are not an investment, currency, security, commodity, a swap on a currency, security, or commodity or any kind of financial instrument.

103. Similarly, the TRON whitepaper stated that it "is not a security, and owning

> TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/or policy-making right regarding the TRON platform. As an encrypted token used in TRON, TRX does not belong to any of the following categories: (a) currency of any type; (b) securities; (c) stock rights of a legal entity; (d) stocks, bonds, bills, warrants, certificates, investment contract, or other instruments affording similar rights.

104. Through the summer of 2017, TRON issued a buzzword-heavy whitepaper, which it updated multiple times in the lead up to its ICO. TRON described the design and capabilities of its "***currently up and running platform***," with a roadmap for ten years of prospective developments. TRON described its offering as a Bitcoin-like protocol for "a worldwide free content entertainment system with the blockchain and distributed storage technology." TRON explained that its protocol "allows each user to freely publish, store and own data, and in the decentralized autonomous form, decides the distribution, subscription and push of contents and enables content creators by releasing, circulating and dealing with digital assets, thus forming a ***decentralized*** content entertainment ecosystem."

105. To further the impression that TRX was not a security, TRON misleadingly compared TRX to Bitcoin in its whitepapers. The TRON whitepaper asserted, for example, that its "distributed user registration mechanism is *as secure as Bitcoin*"; "the number of blocks generated per hour is automatically set by the system, which is *similar to the Bitcoin network*";

and "[s]imilar to Bitcoin, [t]he [TRON] market is based on blockchain and trade in virtual currency."

106.   In the face of promises that TRX would be "similar to Bitcoin," and "better than" Ethereum, and considering the new technology at issue and TRON's other statements, many investors were understandably unaware that TRX tokens had fundamentally different features than other crypto-assets, which the SEC has determined are not securities.  Many of the other Tokens likewise misleadingly compared themselves to Bitcoin or Ethereum, which are not required to be registered as securities.

107.   The EOS whitepaper, for example, argued that EOS would replace Bitcoin and Ethereum.  The ELF whitepaper discussed, at length, how governance structures for crypto-assets like Bitcoin were "not well defined when [they were] created."  aelf insisted that its governance structure represented an improvement over crypto-assets like Bitcoin and Ethereum.  The OMG whitepaper discussed "Bitcoin and Bitcoin-like systems" and how OMG would serve as a "clearinghouse" for these type of assets.  The ICON whitepaper asserted that the ICON network was comprised of different "communities," just like "governments, schools, e-commerce platform, healthcare, Bitcoin, and Ethereum."

108.   Accordingly, it was not apparent to a reasonable investor, at issuance, that the Tokens were securities under the law, and a reasonable investor would not have believed they were securities.

109.   <u>Binance</u>.  Binance also routinely touted and continues to tout its offerings of tokens as not requiring registration with the SEC because they did not constitute securities.   For example, Binance's "analysis division," Binance Research,[4] "provide[s] quality analysis on

---

[4] Binance Research is a "analysis division" of Binance which "provide[s] quality analysis on cryptocurrencies and the blockchain projects they represent."

cryptocurrencies and the blockchain projects they represent" but purports not to "report[] on companies that issue securities or on securities generally; rather its reports relate solely to digital assets that are not securities." The fact that Binance Research has analyzed and produced reports on each of the twelve Tokens thus conveyed to a reasonable investor that Binance was not treating the Tokens as securities.  Similarly, in promoting the Telegram Open Network (TON) ICO, which is also an ERC-20 token, Binance Research stated:  "As the fundraising of TON was covered via an SEC exemption and Grams have similar use cases as Ether, Grams are thus likely to be classified as crypto assets."

110.    Even today, after the SEC's April 2019 guidance, Binance allows only that "*some* ICOs might qualify as securities."  Only *after* the SEC had issued its "Framework" in April 2019 for analyzing if a digital asset is an investment contract and whether offers and sales are securities transactions (discussed below) did Binance (apparently around July 2019) acknowledge on its website the possibility that some tokens might qualify as securities.

111.    SEC.  Prior to its April 2019 pronouncement, the SEC too left uncertain whether tokens, such as the Tokens at issue in the Amended Complaint, are securities.  In fact, it was not until six months after the Framework issued in April 2019, and more than two years after the relevant ICO began, that the SEC entered into a settlement with Block.one (the issuer of ERC-20 token EOS), concluding in September 2019 that EOS's $4.1 billion issuance constituted an unlawful unregistered offering.

112.    Prior to that time, the SEC had not determined that ERC-20 tokens were securities. On June 14, 2018, the Director of the Corporation Finance Division, William H. Hinman, explained that "the ICOs I am seeing, strictly speaking, the token—or coin or whatever the digital information packet is called—all by itself is not a security."  On May 2, 2018, Commissioner

Hester Peirce similarly expressed her view that not "all ICOs must be deemed securities offerings." Critically, Commissioner Peirce identified numerous open questions that Issuers emphasized when arguing ERC-20 tokens are not securities, such as the utility of the token in an incomplete or partially complete network.

113.    Other.    Other thought leaders in the space, such as the registered broker-dealer Coinbase, opined in late 2016 that "we have considered the question of whether issuance of a Blockchain Token prior to the existence of a system would constitute a security.  We have not found conclusive law on the subject, but believe that the better view is that a non-security Blockchain Token does not become a security merely because the system as to which it has rights has not yet been created or completed."

114.    In sum, before the SEC issued its Framework on April 3, 2019, a reasonable investor would not have concluded that ERC-20 tokens were generally subject to the securities laws.  On the contrary, they were confronted with representations both from issuers and from crypto-asset discussions that would have led them reasonably to believe they were not investing in securities.

## G.    The Tokens Are Securities

115.    In 2019, the SEC clarified, with the benefit of labor-intensive research and investigations, that the Tokens were securities.   On April 3, 2019, the SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

116.    Among the most significant statements therein is the SEC's description of how to analyze the various facts surrounding ICOs in determining whether a given digital asset (including

an ERC-20 token) is a security.  Under application of the Framework, the Tokens were securities at issuance.

117.    In the Framework, the SEC cautioned potential issuers:  "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply."  The SEC explained the basics of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities.  The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales).  Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

Investors who bought the Tokens invested money or other valuable consideration, such as bitcoin and ether, in a common enterprise—the Issuers.  Investors had a reasonable expectation of profit based upon the efforts of the Issuers, including, among other things, the Issuers obtaining listing of their ERC-20 tokens on crypto-asset exchanges such as Binance.

### a.    ERC-20 Investors Invested Money

118.    Investors in ERC-20 tokens made an investment of money or other valuable consideration for purposes of *Howey*.  The SEC Framework states:  "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

119.    Investors invested traditional and other digital currencies, such as bitcoin and ether, to purchase the Tokens.  The Tokens were listed on Binance, and Binance permitted investors to purchase ICOs with bitcoin and ether.

**b.    ERC-20 Investors Participated In A Common Enterprise**

120.    The SEC Framework states:  "In evaluating digital assets, we have found that a 'common enterprise' typically exists."  This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

121.    The Tokens are no different.  Investors were passive participants in the Tokens' ICOs and the profits of each investor were intertwined with those of the Issuers and of other investors.  Issuers typically conceded in their whitepapers that they sold Tokens in order to fund their operations and promote their networks and thereby increase the value of the issued ERC-20 tokens.  Issuers typically were responsible for supporting the Tokens, pooled investors' assets, and controlled those assets.  Issuers would also typically hold a significant stake in the Tokens, and thus shared in the profits and risk of the project.

122.    For example, promoters of the Bancor token, BNT, explained the objectives of their "crowdsale" (*i.e.*, their ICO) as follows:  "A portion of the funds will be used to develop, promote, and support the open-sourced, blockchain-agnostic, Bancor protocol implementations and support related technologies and applications such as an open-source, user-friendly web service (desktop and mobile) to provide wallet, marketplace, token-conversion, new smart token creation and crowdsale solutions."

123.    Similarly, promoters of the EOS token described the proceeds of their ICO as "revenue" they would use to "offer[] developers and entrepreneurs the funding they need to create community driven business leveraging EOSIO software."  That money, in return, "will be returned

value for the network." For the other Tokens as well, investors participated in a common enterprise by purchasing the Tokens.

   **c. Investors Purchased The Tokens With A Reasonable Expectation Of Profit From Owning Them**

  124. As to "reasonable expectation of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

  125. Investors in the Tokens, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits. The Tokens were sold to investors prior to a network or "ecosystem" being fully developed on which they could be used. For pre-functional tokens, such as the Tokens at issue in the Amended Complaint, the primary purpose for purchasing such Tokens was to make a profit, rather than to utilize the Tokens themselves for a task.

  126. Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise"), the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security. In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets, thereby satisfy the *Howey* test:

   The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:

   • The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.

    o The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network,

particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

- o This also can be the case where the digital asset gives the holder rights to dividends or distributions.

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

- o The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

- o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

- o   The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

- o   The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

- o   The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

- o   The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

- o   The ready transferability of the digital asset is a key selling feature.

- o   The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

- o   The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

127.    The SEC Framework clarifies that investors purchased the Tokens with a reasonable expectation of profits.

128.    For example, the "ready transferability of the" Tokens was promoted by Issuers as a "key selling feature." The Status Network, for instance, told investors the SNT tokens "will be transferrable 7 days after the end of the Contribution Period."

129.    The Tokens also "emphasized" the "potential appreciation in the value of the digital asset" in their marketing materials. The Issuer of the Bancor token, BNT, explained that the widespread adoption of BNT "establishes network dynamics where increased demand for any of the network's smart tokens increases demand for the common BNT, benefiting all other smart tokens holding it in reserve."

130.    The Tokens were not described as "delivering currently available goods or services for use on an existing network," but rather explained as raising capital necessary "to build a

business or operation." The whitepaper for the aelf Token, for example, promised to bring about "the next phase" and a "new paradigm" of blockchain technology, and acknowledged that "[b]uilding an ecosystem requires a large amount of capital," including "the funds raised during the Token sale." The Issuers of BNT, the Bancor Token, likewise explained they would use the funds raised "to develop, promote and support the open-sourced, blockchain-agnostic, Bancor protocol." Under the SEC's April 2019 Framework, the Tokens were securities under federal and state securities laws.

### d.    Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers

131.    The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

132.    Investors' profits in the Tokens were to be derived from the managerial efforts of others—specifically the Issuers, their co-founders, and their development teams. ERC-20 investors relied on the managerial and entrepreneurial efforts of the Issuers and their executive and development teams to manage and develop the projects funded by the Tokens' ICOs.

133.    Issuers' executive teams typically held themselves out to investors as experts in the blockchain and crypto field. Investors in the Tokens reasonably expected the Issuers' development teams to provide significant managerial efforts after the Tokens' launch.

134.    On July 11, 2018, for example, Zhao explained that the team behind a particular token is a fundamental factor to the success of a project and that Binance actually considers the

team in determining which coins to list: "It's kind of hard to tell if they're going to do the right

thing or the wrong thing. But a team with a good history tends to carry on."

135.    The SEC explained in its April 2019 Framework, further underlining the depth of

study the agency had devoted to the matter over the years and the complexity of such legal analysis

from the perspective of a reasonable investor, that the more of the following characteristics that

are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of

others'":

- An ["Active Participant" or "AP"] is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

  o Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

- o   Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

- o   Determining whether and where the digital asset will trade.  For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

- o   Determining who will receive additional digital assets and under what conditions.

- o   Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

- o   Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

- o   Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

- o   The AP has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

- o   The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market.  To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

- o   The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

- o   The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

45

136.    Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further:

Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

    o This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

    o If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services. Relevant factors may include:

    o There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

- o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

- o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

137.    Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments.   The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.  Each of the Tokens was a security at issuance because profit from the Tokens would be derived primarily from the managerial efforts of the Issuer teams developing the associated networks on which the Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

138.    This dependency, however, on the managerial efforts of the Issuer was not apparent at issuance to a reasonable investor.  Considering the limited available information about how these Tokens were designed and intended to operate, if such an investor were even able to interpret

the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the tokens she had acquired were securities.  It was only after the passage of some significant amount of time, and only with more information about the Issuer's intent, process of management, and lack of success in allowing decentralization to arise, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

139.    The EOS Token is a prime example.  At the time of the EOS ICO, EOS had no functional software product available—instead, EOS told its investors it would use the proceeds of the ICO to develop the promised software, which would in turn make the Tokens more valuable to investors.

140.    The Issuers of the Status SNT Tokens likewise wrote in its whitepaper it had only an "alpha" build of its product, but with the funds raised through its ICO, it hoped its technology would "reach[] widespread mobile use."  The whitepaper continued:  "Funds raised during the Contribution Period will be used solely for the development and benefit of the Status Network."

141.    Another Issuer offered Bancor Network Tokens ("BNT"), which it touted to investors as "The First Smart Token."  The Bancor whitepaper advertised BNT as a way for others to create "user-generated smart tokens," and claimed that "increased demand for *any* of the network's smart tokens increases demand for the common BNT."

142.    Under the Framework, notwithstanding the complexity of the issue to a reasonable investor, the Tokens satisfied most if not all of the factors the SEC described as relevant to its determination that a digital asset is a security.

48

H.    **Each Token Is A Security**

a.    **EOS**

143.    The EOS ICO has been widely reported as the largest ICO to date, having raised over $4 billion assets from the sale of unregistered EOS tokens from June 2017 through July 2018. EOS tokens have been listed on Binance since at least April 2018.

144.    EOS tokens were advertised as being an improvement on Bitcoin, Ethereum, and other crypto-assets.  In addition to claiming EOS's technical superiority over other crypto-assets, EOS's issuer, Block.one, publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

145.    In the EOS Token Purchase Agreement, the issuers of EOS tokens made the following representations concerning the development of EOSIO:

- MATTERS RELATING TO EOS.IO SOFTWARE AND EOS PLATFORM:

  1. block.one is developing the EOS.IO software (the "EOS.IO Software") as further described in the EOS.IO Technical White Paper (as it may be amended from time to time) (the "White Paper");

  2. at the end of its development stage, block.one will be releasing the EOS.IO Software it has developed under an open source software license;

146.    At the time of the EOS ICO, Block.one took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  With promises that EOS would be better than other crypto-assets, many individuals were unaware that EOS tokens had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all EOS tokens were issued by Block.one at creation at very little economic cost—and enormous potential upside—to the Block.one founders.

147.    The creation of EOS tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that EOS was something other than a security, when it was a security.

148.    Investors purchased EOS tokens with the reasonable expectation that they would make a profit.

149.    EOS token holders stood to share in potential profits from the successful launch of the EOS token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the EOS ecosystem.

150.    EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.  The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer."

151.    Investors' profits were to be derived from the managerial efforts of others—Block.one, its co-founders, and the Block.one development team.  Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software.

152.    Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch.

153.    The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds.  Investors had little choice but to rely on their

expertise.  The EOS protocol and governance structure were predetermined before the ICO was launched.

154.    Accordingly, under the SEC's Framework, the EOS token was a security.

155.    Indeed, on September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors.  Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws."

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC.  The SEC enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

156.    The SEC's September 30, 2019, settlement with Block.one reflected the SEC's "Framework" for analyzing whether digital assets, and in particular ERC-20 tokens, constitute securities.  Consistent with that Framework, the SEC determined that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register them.

157.    The SEC's determination that EOS was and is a security applies not only to EOS, but also to each of the other digital tokens discussed herein.

158.    A recently published scholarly article found that after the ICOs of EOS and two other highly traded tokens, Tezos (XTZ) and XRP, "a large portion of on-chain traffic, including payment-related transactions, does not result in actual value transfer."  The research demonstrates that the tokens' advertised uses at the time of launch, when whitepapers touted tokens' utility in a fully decentralized network of value transfer, did not come to pass.  Investors, however, would not have known about tokens' lack of utility at the time of purchase, as this analysis was performed on data from the fourth quarter of 2019 and was not published until March 2020.[5]

### b.    Bancor (BNT)

159.    Bancor Network Tokens ("BNT") were issued by the Bprotocol Foundation ("Bancor").  The BNT ICO raised $153 million in assets from the sale of unregistered BNT tokens in just three hours on June 12, 2017.  A press release from Bancor celebrated what was at the time "the largest crowdsale in history."

160.    After being distributed through the ICO, BNT have been listed on Binance since at least October 17, 2017:

---

[5] Daniel Perez, Jiahua Xu & Benjamin Livshits, *We Know What They've Been Put Through: Revisiting High-scalability Blockchain Transactions* (Mar. 5, 2020), *available at* https://www.scribd.com/document/461209594/2003-02693#download&from_embed



161.    In the months following the Binance listing, the price of the BNT Token skyrocketed from less than $3 to more than $10 per token:



162.    As of 10 a.m. today, the BNT token trades at approximately $1.24.

163.    In its whitepaper, BNT was advertised as being "The First Smart Token," which Bancor said would "enabl[e] asynchronous price discovery and continuous liquidity for

53

cryptocurrencies using constant ratios of reserve tokens held through smart contracts, acting as automated market makers." Bancor claimed "BNT will be used to establish the first decentralized interconnected currency exchange system which does not rely on matching bid and ask orders, thus remaining liquid irrespective of its trading volume."

164.    Bancor publicly stated that it would use the funds raised through the ICO to enhance the Bancor software and support the growth of its platform, telling investors that "a portion of the funds" raised would "be used to develop, promote and support the open-sourced, blockchain-agnostic, Bancor protocol implementations, and support related technologies and applications[.]"

165.    At the time of the BNT ICO, Bancor took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked. Many individuals were unaware that BNT had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum. One of these primary differences is that all BNT were issued by Bancor at creation at very little economic cost—and enormous potential upside—to the Bancor founders.

166.    The creation of BNT tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which BNT tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that BNT was something other than a security, when it was a security.

167.    Investors purchased BNT with the reasonable expectation that they would make a profit in what Bancor called "The Bancor Protocol Ecosystem."

168.    BNT holders stood to share in potential profits from the successful launch of BNT. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the BNT ecosystem.

169.    Bancor told investors that "BNT establishes network dynamics where increased demand for any of the network's smart tokens increases demand for the common BNT, benefitting all other smart tokens holding it in reserve." A reasonable investor would have understood that its holdings of BNT would appreciate in value as BNT became more widely adopted.

170.    Investors' profits were to be derived from the managerial efforts of others—Bancor, its co-founders, and the Bancor development team. Bancor held itself out as having "[t]he A-Team of visionaries and advisors," including two co-founders who "have each founded and exited a startup." Bancor further touted outside advisors including "venture capitalist Tim Draper, Founders Fund partner Brian Singerman, governance visionary John Clippinger, founder of Asana Justin Rosenstein and more."

171.    BNT investors relied on the managerial and entrepreneurial efforts of Bancor and its executive and development team to manage and develop the BNT software.

172.    Investors in BNT reasonably expected Bancor and Bancor's development team to provide significant managerial efforts after BNT's launch.

173.    The expertise of its issuer was critical in monitoring the operation of BNT, promoting BNT, and deploying investor funds. Investors had little choice but to rely on their expertise. The BNT protocol and governance structure were predetermined before the ICO was launched.

174.    Accordingly, under the SEC's Framework, BNT was and is a security.

c.    **Status (SNT)**

175.    Status Network's ("Status") SNT token ICO has been widely reported as one of the largest ICOs to date, having raised over $100 million in assets from the sale of unregistered SNT tokens over a 24-hour period from June 20 to June 21, 2017.

176.    After being distributed through the ICO, SNT tokens have been listed on Binance since at least July 2017.

## Binance Adds Four-Token Markets, and Starts 0 Fee Trading


Binance
3 years ago

**Fellow Binancians,**

Binance will add four new markets: Qtum/ETH, SNT/ETH, EOS/ETH, BNT/ETH

1. About Qtum
2. About Status (SNT)
3. About EOS
4. About Bancor (BNT)

Deposit Starts 2017/7/26 (Beijing Time)

Trading Starts 2017/7/27 08:00AM (Beijing Time)

Together with this new markets, Binance will also start 0 fee trading from 2017/7/25 0:00 - 2017/8/24 24:00 (Beijing Time) .

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make best efforts to choose high quality coins, but will not be responsible for your investment losses.

Thank you for your support!

Binance Team

July 26, 2017

177.    In the months following the Binance listing, the price of the SNT token skyrocketed from less than 10 cents to more than 60 cents per token:



178.    As of 10 a.m. today, the SNT token trades for approximately 3 cents.

179.    Status made statements suggesting that SNT tokens were similar to Bitcoin, Ethereum, and other crypto-assets.  For example, the SNT whitepaper asserted that SNT was "[i]nspired by one of Satoshi Nakamoto's original suggested use cases for Bitcoin"; "organized around smart contracts running on Ethereum"; "the first ever mobile Ethereum client," which "connects directly to the Ethereum network"; and that "Status and Ethereum provide the foundation necessary to give all stakeholders in a socioeconomic network equal footing."  In addition, the SNT whitepaper asserted that "the Status mobile Ethereum client" was "well suited for mass adoption," and that the "core team and the Status community are committed to ensuring that the SNT token adds value to the platform and drives network effects."

180.    At the time of the SNT ICO, Status took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  With representations that SNT would be similar to other crypto-assets, many individuals were unaware that SNT tokens had fundamentally different features than other crypto-assets, including being more centralized than

Bitcoin or Ethereum.  One of these primary differences is that all SNT tokens were issued by Status at creation at very little economic cost—and enormous potential upside—to the Status founders, Jarrad Hope and Carl Bennetts.

181.    The creation of SNT tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which SNT tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that SNT was something other than a security, when it was a security.

182.    Investors purchased SNT tokens with the reasonable expectation that they would make a profit.

183.    SNT token holders stood to share in potential profits from the successful launch of the SNT token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the SNT ecosystem.

184.    Investors' profits were to be derived from the managerial efforts of others—Status, its co-founders, Hope and Bennetts, and the Status development team.  Investors in SNT relied on the managerial and entrepreneurial efforts of Status and its executive and development team to manage and develop the SNT software.  Indeed, both Hope's and Bennett's biographies were featured in the Status whitepaper and were held out to be integral parts of the success of SNT.  The whitepaper emphasized that "Carl and Jarrad, the co-founders of Status, have had a working relationship for 6 years on various projects, and 3 of those years were spent operating a software

distribution network, driving over 20 million installs to various software offerings, the profits of which were used to fund Status and our team of 10 until this point.  During the operation of this business we were uniquely positioned to see firsthand how personal data on the internet is bought and sold and how users are acquired and retained."

185.    Investors in SNT thus reasonably expected Status, co-founders Hope and Bennetts, and Status's development team to provide significant managerial efforts after SNT's launch.

186.    The expertise of the issuers was critical in monitoring the operation of SNT, promoting SNT, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The SNT protocol and governance structure were predetermined before the ICO was launched.

187.    Accordingly, under the SEC's Framework, the SNT token was and is a security.

### d.    Quantstamp (QSP)

188.    The QSP ICO raised over $31 million in assets from the sale of unregistered QSP tokens over a period of time that extended from November 17 to November 19, 2017.

189.    After being distributed through the ICO, the issuer of QSP, Quantstamp, listed QSP

tokens on Binance since at least November 21, 2017.



190.    In the months following the Binance listing, the price of the QSP Token

skyrocketed from less than 20 cents to more than 76 cents per token:



191.    As of 10 a.m. today, the QSP token trades for approximately 4 cents.

192.    Quantstamp's stated "goal is to create a permissionless and decentralized network much like Ethereum and Bitcoin."  And Quantstamp's co-founder Steven Stewart has compared QSP tokens to other crypto-assets:  "Ether is used for fueling token transfers and other state changes.  We are committed to exclusively using QSP to fuel our protocol."  Indeed, in the QSP whitepaper, Quantstamp represented to investors that "we are extending Ethereum with technology designed to ensure the security of smart contracts."

193.    In addition to comparing QSP tokens to other crypto-assets and characterizing Quantstamp as "extending Ethereum," Quantstamp publicly stated that it would use the funds raised through the ICO to continue to develop the Quantstamp protocol software.

194.    At the time of the QSP ICO, Quantstamp took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  With comparisons to other crypto-assets, many individuals were unaware that QSP tokens had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all QSP tokens were issued by Quantstamp at creation at very little economic cost—and enormous potential upside—to the Quantstamp founders.

195.    The creation of QSP tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which QSP tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that QSP was something other than a security, when it was a security.

61

196.    And the QSP whitepaper explicitly stated that the QSP tokens were "not intended to constitute securities in any jurisdiction"—investors thus reasonably understood that QSP was not subject, at issuance, to U.S. securities laws.

197.    Investors purchased QSP tokens with the reasonable expectation that they would make a profit.

198.    QSP token holders stood to share in potential profits from the successful launch of the QSP token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the Quantstamp ecosystem.

199.    The QSP whitepaper speculated that Quantstamp expected "every Ethereum smart contract to use the Quantstamp protocol to perform a security audit because security is essential." Quantstamp represented that since contract creators would "pay QSP tokens to get their smart contract verified," then as "the number of smart contracts grows exponentially, we expect demand from Contract Creators to grow commensurately." Quantstamp's statements fueled speculation that "[t]here is a very large potential for [Quantstamp co-founder] Richard [Ma] to lead the product to a 9 or 10 figure value in a very short time frame …. The ICO valuation offers outstanding value given the massive and probable growth they have planned." And investors were participating in a common enterprise with Quantstamp, since any profits were intertwined with the success of Quantstamp and other investors.

200.    Investors' profits were to be derived from the managerial efforts of others—Quantstamp, its co-founders, and the Quantstamp development team. The QSP whitepaper advertises on its cover page that the Quantstamp "team is made of [sic] up of software testing experts who collectively have over 500 Google Scholar citations." Investors in QSP relied on the

managerial and entrepreneurial efforts of Quantstamp and its executive and development team to manage and develop the Quantstamp protocol software.

201.    Investors in QSP reasonably expected Quantstamp and Quantstamp's development team to provide significant managerial efforts after QSP's launch.

202.    The expertise of the issuers was critical in monitoring the operation of QSP, promoting QSP, and deploying investor funds.  Investors had little choice but to rely on their expertise.

203.    Accordingly, under the SEC's Framework, the QSP token was and is a security.

**e.      Kyber Network (KNC)**

204.    The KNC ICO raised approximately $52 million from the sale of unregistered KNC tokens in September 2017.

205.    After being distributed through the ICO, KNC tokens have been listed on Binance since at least September 26, 2017.

206.    In the months following the Binance listing, the price of the KNC token skyrocketed from less than $2 to more than $5.40 per token:



207.    As of 10 a.m. today, the KNC token trades at approximately $1.25.

208.   KNC tokens were advertised as being an improvement on Bitcoin, Ethereum, and other crypto-assets.  KNC's issuer, Kyber Network, publicly stated that KNC would "be the FIRST deflationary token with a staking mechanism" and that an upgrade to the Kyber Network protocol would result in "ultimately enhancing liquidity for the ecosystem, Kyber Network growth, and KNC value creation."

209.   In the KNC whitepaper, for example, the issuers of KNC tokens made the following representation:  "The collected KNC tokens from the fees, after paying for the operation expenses and to the supporting partners, will be *burned*, i.e. taken out of circulation.  The burning of tokens could potentially increase the appreciation of the remaining KNC tokens as the total supply in circulation reduces."

210.   At the time of the KNC ICO, Kyber Network took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  With promises that KNC would be better than other crypto-assets, many individuals were unaware that KNC tokens had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all KNC tokens were issued by Kyber Network at creation at very little economic cost—and enormous potential upside—to the Kyber Network founders.  Approximately 39 percent of the KNC tokens minted into circulated were reserved for the company and its founders and advisors.

211.   The creation of KNC tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which KNC tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process

64

of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that KNC was something other than a security, when it was a security.

212.    Investors purchased KNC tokens with the reasonable expectation that they would make a profit.

213.    KNC token holders stood to share in potential profits from the successful launch of the KNC token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the KNC ecosystem.

214.    KNC tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains.

215.    Investors' profits were to be derived from the managerial efforts of others—Kyber Network, its co-founders, and the Kyber Network development team. Investors in KNC relied on the managerial and entrepreneurial efforts of Kyber Network and its executive and development team to manage and develop the KNC software.

216.    Investors in KNC reasonably expected Kyber Network and Kyber Network's development team to provide significant managerial efforts after KNC's launch.

217.    The expertise of the issuers was critical in monitoring the operation of KNC, promoting KNC, and deploying investor funds. Investors had little choice but to rely on their expertise. The KNC protocol and governance structure were predetermined before the ICO was launched.

218.    Accordingly, under the SEC's Framework, the KNC token was and is a security.

####         f.        **TRON (TRX)**

219.    The TRX ICO was offered and promoted on Binance starting on August 24, 2017,

and 35 percent of unregistered TRX tokens were sold through the ICO, raising $70 million over a

three-day period.

220.    On August 24, 2017, TRX's issuer, TRON promoted the TRX ICO on Binance:

## Binance Will Launch 1.9 Billion TRX ICO Today (BTC and ETH Session)

 Binance
3 years ago

**Dear community,**

We will launch 1.9 billion TRX ICO ( BTC and ETH session) on Binance exchange at
8PM. Aug 24, 2017 (Beijing Time).

**The details for TRX ICO session:**

1. Token name: TRX;
2. ICO ammount of BNB session: 1,900,000,000 TRX;
3. Support market: BTC(1 billion), ETH (900 million);
4. Exchange rate: 1 TRX = 0.00000038 BTC; 1 TRX ≈  0.00000488 ETH;
5. ICO time: 8PM. 2017/08/24 - 8PM. 2017/08/31 (Beijing Time);
6. Sale type: first come first served basis. at the Bitcoin Price and Ethereum Price
   stated on page at the time.

221.    In the months following the Binance listing, the price of the TRX token skyrocketed from less than 5 cents to more than 20 cents per token:



222.    As of 10 a.m. today, the TRX token trades for less than 4 cents.

223.    In June 2017, TRON published the first version of the "TRON whitepaper." Casting the TRON protocol as an attempt to "heal the Internet," the whitepaper described the protocol as "the blockchain's entertainment system of free content, in which TRX, TRON's coin, is circulated." The whitepaper asserted that, through TRX, content providers would no longer need to pay high fees to centralized platforms such as Google Play and Apple's App Store.

224.    The TRON whitepaper stated that "TRX is not a security" and that "owning TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/or policy-making right regarding the TRON platform." The whitepaper identified potential "risks after supervisory regulations are formed." This disclaimer merely contemplated potential *future* regulations that could impact the status of the TRX offering, indicating the regulations did not apply at the time:

> Risks after supervisory regulations are formed: It cannot be denied that in the near future, supervisory regulations will be formed to restrain the fields of blockchain and electronic tokens. If supervisory and regulatory bodies perform a standard management over these fields, the electronic tokens purchased during the ICO period may be affected. The impacts include, but are not limited to, price and stability fluctuations and restraints.

On this basis, and the others described below, investors reasonably understood that TRX was not subject, at issuance, to U.S. securities laws.

225.    TRON promoted TRX as being similar to Bitcoin.  The TRON whitepaper asserted, as examples, that its "distributed user registration mechanism is *as secure as Bitcoin*"; "the number of blocks generated per hour is automatically set by the system, which is *similar to the Bitcoin network*"; and "[s]imilar to Bitcoin," "[t]he [TRON] market is based on blockchain and trade in virtual currency."  By contrast, TRON issued nearly all of the TRX tokens up front, at very little economic cost—and enormous potential upside—to TRON's founders.

226.    The creation of TRX tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which TRX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that TRX was something other than a security, when it was a security.

227.    Investors purchased TRX tokens with the reasonable expectation that they would make a profit.

228.    TRX token holders stood to share in potential profits from the successful launch of the TRX token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the TRX ecosystem.

229.    Investors' profits were to be derived from the managerial efforts of others—the TRON Foundation, its co-founders, and the development team.  Investors in TRX relied on the managerial and entrepreneurial efforts of the TRON Foundation and its executive and development team to manage and develop the TRX software.

230.    Investors in TRX reasonably expected the TRON Foundation and the TRON Foundation's development team to provide significant managerial efforts after TRX's launch.

231.    The expertise of the TRON Foundation was critical in monitoring the operation of TRX, promoting TRX, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The TRX protocol and governance structure were predetermined before the ICO was launched.

232.    Accordingly, under the SEC's Framework, the TRX token was and is a security.

**g.    FunFair (FUN)**

233.    The FunFair team sold approximately 33 percent of its unregistered FUN tokens to investors through its ICO beginning on September 26, 2017, raising $20 million over a two-day period.

234.    In June 2017, the "FunFair Team" published the "FunFair whitepaper."  The FunFair team promoted itself as "revolutionizing the gaming industry by harnessing the power of the blockchain in the online gaming market."  In its whitepaper, the FunFair Team announced that "FunFair's token, FUN, is the coin of the realm on the FunFair platform.  It is the fundamental method of interacting with FunFair smart contracts:  players make wagers, game makers and affiliates get paid and operators will receive profits, all in FUN."

235.    The FunFair whitepaper was silent as to the regulatory nature of FUN tokens. Instead, in its disclaimer, the FunFair whitepaper merely contemplated future regulatory action that could impact the tokens:

> The token economy is exciting and also incredibly innovative. Any tokens could be impacted by regulatory action, including restrictions on ownership, use or possession. Regulators or other circumstances may demand that the FUN mechanics be altered, in all or part. Therefore, we may revise mechanics to comply with regulatory requirements or other governmental or business obligations. Nevertheless, we believe our planned mechanics to be proper and likely in final version.

236.    In the same disclaimer, the FunFair Team wrote that "FUN tokens have no known potential uses outside of the FunFair platform ecosystem and are not permitted to be sold or otherwise traded on third-party exchanges."

237.    Notwithstanding the above, the FUN token ICO was offered and promoted on Binance:

## Binance Lists FUN

 Binance
3 years ago

**Fellow Binancians,**

Binance will add FUN/BTC and FUN/ETH trading pairs on 2017/09/28, 04:00 AM (UTC). You can start depositing FUN here now.

To celebrate the launch, Binance and FunFair have committed a total of 3,000,000 FUN to reward customers worldwide. The reward program will be made available as part of the listing of FUN on Binance, according to the following structure:

**Top FUN Holding Leaderboard Reward Program**

1. Bounty 1 (6 spots) -

| | |
|---|---|
| 1st Place | 300,000 FUN Token |
| 2nd Place | 200,000 FUN Token |
| 3rd Place | 200,000 FUN Token |
| 4th Place | 100,000 FUN Token |
| 5th Place | 100,000 FUN Token |
| 6th Place | 100,000 FUN Token |

2. Bounty 2 (200 spots) -

10,000 FUN tokens per user for the 7th to 206th users with the highest FUN balance at end of program .

3. Program Period:

Program ends  2017/10/01 04:00 AM (UTC).

All FUN tokens from this reward program will be distributed to your account on 2017/10/01 10:00 AM (UTC)

238.    In the months following the Binance listing, the price of the FUN token skyrocketed from less than 4 cents to more than 17 cents per token:



239.    As of 10 a.m. today, the FUN token trades for approximately half of a cent.

240.    At the time of the FUN ICO, FunFair took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  Many individuals were unaware that FUN had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all FUN were issued by FunFair at creation at very little economic cost—and enormous potential upside—to the FunFair founders.

241.    The creation of FUN tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which FUN tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise

71

that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that FUN was something other than a security, when it was a security.

242.    Investors purchased FUN tokens with the reasonable expectation that they would make a profit.

243.    FUN token holders stood to share in potential profits from the successful launch of the FUN token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the FUN ecosystem.

244.    Investors' profits were to be derived from the managerial efforts of others—the FunFair Team, its co-founders, and its development team.  Investors in FUN relied on the managerial and entrepreneurial efforts of the FunFair Team and its executive and development team to manage and develop the FUN software.

245.    Investors in FUN reasonably expected the FunFair Team and its development team to provide significant managerial efforts after FUN's launch.

246.    The expertise of the FunFair Team was critical in monitoring the operation of FUN, promoting FUN, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The FUN protocol and governance structure were predetermined before the ICO was launched.

247.    Accordingly, under the SEC's Framework, the FUN token was and is a security.

### h.    ICON (ICX)

248.    The ICON Foundation sold approximately 50 percent of its unregistered ICX Tokens to investors through its ICO, raising $42.7 million over a one-day period:



249.    In August 2017, the ICON Foundation published the "ICON whitepaper." The whitepaper outlined the "vision and philosophy of the ICON Project," which was to "to introduce the new era of decentralization by redefining the meaning of communities and creating a new world by connecting such communities." The whitepaper elaborated that "ICON is not limited to the real world, but it directly connects and communicates with the crypto world creating the most robust network that can scale without limits." As part of this system, the ICON Foundation announced the "ICT Token," which it described as "a loopchain-based smart contract digital protocol that facilitates, verifies, and enacts a negotiated agreement between consenting parties within ICON."

250.    The ICON whitepaper was silent as to the regulatory nature of ICX tokens. Instead, the whitepaper asserted that the ICON network was comprised of different "communities," just

like "governments, schools, e-commerce platform, healthcare, Bitcoin, and Ethereum."  Investors

thus reasonably understood that ICX was not subject, at issuance, to U.S. securities laws.

251.    On December 18, 2017, Binance listed the ICX token:



252.    Less than a month after the Binance listing, the price of the ICX Token skyrocketed

from less than $2 to more than $12 per token:



253.    As of 10 a.m. today, the ICX token trades for less than 46 cents.

254.    At the time of the ICX ICO, ICON took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  Many individuals were unaware that ICX had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all ICX were issued by ICON at creation at very little economic cost—and enormous potential upside—to the ICON founders.

255.    The creation of ICX tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which ICX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that ICX was something other than a security, when it was a security.

256.    Investors purchased ICX tokens with the reasonable expectation that they would make a profit.

257.    ICX token holders stood to share in potential profits from the successful launch of the ICX token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the ICX ecosystem.

258.    Investors' profits were to be derived from the managerial efforts of others—the ICON Foundation, its co-founders, and the ICON development team.  Investors in ICX relied on the managerial and entrepreneurial efforts of the ICON Foundation and its executive and development team to manage and develop the ICX software.

259.    Investors in ICX reasonably expected the ICON Foundation and its development team to provide significant managerial efforts after ICX's launch.

260.    The expertise of the ICON Foundation was critical in monitoring the operation of ICX, promoting ICX, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The ICX protocol and governance structure were predetermined before the ICO was launched.

261.    Accordingly, under the SEC's Framework, the ICX token was and is a security.

### i.    OmiseGo (OMG)

262.    OmiseGO sold approximately 65 percent of its unregistered OMG Tokens to investors through its ICO on September 9, 2017, raising $25 million over a one-day period.

263.    In June 2017, OmiseGO published the "OmiseGO whitepaper."  The OMG whitepaper asserted that OmiseGO was building a "decentralized exchange, liquidity provider mechanism, clearinghouse messaging network, and asset-backed blockchain gateway."  As part of this system, OmiseGO announced the OMG token.  According to the whitepaper, "[o]wning OMG tokens buys the right to validate this blockchain, within its consensus rules."

264.    The OMG whitepaper was silent as to the regulatory nature of OMG tokens.  Instead, the whitepaper discussed, at length, "Bitcoin and Bitcoin-like systems" and how OMG would serve as a "clearinghouse" for these type of assets.  The whitepaper provided an example of this use case where "Alice sells [bitcoin] for [ether] and Bob buys [bitcoin] for [ether], the trade is now cleared on the OMG chain."

265.    On September 9, 2017, Binance listed the OMG token:



266.    In the months following the Binance listing, the price of the OMG Token skyrocketed from less than $10 to more than $25 per token:



267.    As of 10 a.m. today, the OMG token trades at approximately $4.03.

268.    At the time of the OMG ICO, OmiseGO took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  Many individuals were unaware that OMG had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all OMG were issued by OmiseGO at creation at very little economic cost—and enormous potential upside—to the OmiseGO founders.

269.    The creation of OMG tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which OMG tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that OMG was something other than a security, when it was a security.

270.    Investors purchased OMG tokens with the reasonable expectation that they would make a profit.

271.    OmiseGO token holders stood to share in potential profits from the successful launch of the OMG token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the OMG ecosystem.

272.    Investors' profits were to be derived from the managerial efforts of others— OmiseGO, its co-founders, and OmiseGO development team.  Investors in OMG relied on the

managerial and entrepreneurial efforts of OmiseGO and its executive and development team to manage and develop the OMG software.

273.    Investors in OMG reasonably expected OmiseGO and its development team to provide significant managerial efforts after OMG's launch.

274.    The expertise of OmiseGO was critical in monitoring the operation of OMG, promoting OMG, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The OMG protocol and governance structure were predetermined before OMG was launched.

275.    Accordingly, under the SEC's Framework, the OMG token was and is a security.

### j.    ETHLend (LEND)

276.    The LEND ICO raised approximately $17 million from the sale of unregistered securities in November 2017.

277.    On December 12, 2017, Binance listed the LEND token:

## Binance Lists December Community Coin - ETHLend (LEND)


Binance
2 years ago

**Fellow Binancians,**

The fourth session of "Community Coin per Month" has now concluded. We have weighed all factors in the voting/retweeting process and have also applied a consistent methodology across all candidate votes to filter for oddities.

We would like to congratulate the winner - ETHLend (LEND)!

As promised, LEND has been awarded with a free listing placement on Binance.

LEND/BTC and LEND/ETH trading pairs are now available on Binance. You can start depositing and trading LEND now.

Details:

1. About ETHLend (LEND)
2. Fees
3. Rules

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make best efforts to choose high quality coins, but will not be responsible for your investment losses.

Thank you for your patience and support!

Binance Team

2017/12/12

278.    In the months following the Binance listing, the price of LEND skyrocketed from less than 8 cents to more than 37 cents per token:



279.    As of 10 a.m. today, the LEND token trades for approximately $0.71.

280.    The LEND whitepaper, released by a company called ETHLend, stated that the LEND platform "provides secured lending with the use of ERC-20 compatible tokens as a collateral.  For example, users with a token portfolio are not required to sell the tokens to receive liquidity."  ETHLend promoted the LEND token as enabling individuals to "borrow[] Ether to participate in different ICOs, buy[] dips (bear market movements) and purchas[e] tokens from the exchange for investment strategies without the need to sell tokens."

281.    The LEND whitepaper was silent as to the regulatory nature of LEND tokens. Instead, the whitepaper discussed how LEND would be used "as the medium of exchange" and "the main utility that is used for lending and borrowing within the Ethereum network."  It asserted that this would "allow all ETH and ERC20 token holders the ability to unlock billions of dollars' worth of liquidity" and that it would "do the same with Bitcoin in the near future."  Given its supposed relationship to Ethereum and Bitcoin, investors reasonably understood that LEND was not subject, at issuance, to U.S. securities laws.

282.    At the time of the LEND ICO, ETHLend took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  Many individuals were unaware that LEND had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all LEND were issued by ETHLend at creation at very little economic cost—and enormous potential upside—to the ETHLend founders.

283.    The creation of LEND tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which LEND tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that LEND was something other than a security, when it was a security.

284.    Investors purchased LEND tokens with the reasonable expectation that they would make a profit.

285.    LEND token holders stood to share in potential profits from the successful launch of the LEND token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the LEND ecosystem.

286.    Investors' profits were to be derived from the managerial efforts of others—ETHLend, its co-founders, and the ETHLend development team.  Investors in LEND relied on the

managerial and entrepreneurial efforts of LEND and its executive and development team to manage and develop the LEND software.

287.   Investors in LEND reasonably expected ETHLend and the ETHLend's development team to provide significant managerial efforts after LEND's launch.

288.   The expertise of ETHLend was critical in monitoring the operation of LEND, promoting LEND, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The LEND protocol and governance structure were predetermined before the ICO was launched.

289.   Accordingly, under the SEC's Framework, the LEND token was and is a security.

**k.    aelf (ELF)**

290.   In December 2017, aelf sold 25 percent of its unregistered ELF tokens to investors through private placement, raising $25 million.

291.   In November 2017, aelf published the "aelf whitepaper."   The whitepaper "envision[ed] aelf as a highly efficient and customizable OS and [that would] l become the 'Linux system' in [the] Blockchain community."   As part of this system, alef announced the ELF token.  According to the whitepaper, "[ELF] Token holders have the greatest right in the future of aelf, and token holders' interests are linked with the destiny of aelf, in particular those with long-term locked-in tokens in particular."

292.   The aelf whitepaper was silent as to the regulatory nature of ELF tokens.  Instead, the whitepaper discussed, at length, how governance structures for crypto-assets like Bitcoin were "not well defined when [they were] created."  aelf insisted that its governance structure represented an improvement over cryptocurrencies like Bitcoin and Ethereum because "vital decisions [in aelf] will be carried out through a mechanism that resembles *representative democracy*."  (Emphasis added.)

293.    On December 21, 2017, Binance listed the ELF token:



294.    In the month following the Binance listing, the price of the ELF Token skyrocketed from less than $1 to more than $2.50 per token:

295.    As of 10 a.m. today, the ELF token trades at less than 71 cents.

296.    At the time of the ELF ICO, aelf took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  Many individuals were unaware that ELF had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all ELF were issued by aelf at creation at very little economic cost—and enormous potential upside—to the aelf founders.

297.    The creation of ELF tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.  Although the centralized process by which ELF tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that ELF was something other than a security, when it was a security.

298.    Investors purchased ELF tokens with the reasonable expectation that they would make a profit.

299.    The aelf token holders stood to share in potential profits from the successful launch of the ELF token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the ELF ecosystem.

300.    Investors' profits were to be derived from the managerial efforts of others—aelf, its co-founders, and aelf's development team.  Investors in ELF relied on the managerial and entrepreneurial efforts of aelf and its executive and development team to manage and develop the ELF software.

301.   Investors in ELF reasonably expected aelf and its development team to provide significant managerial efforts after ELF's launch.

302.   The expertise of aelf was critical in monitoring the operation of ELF, promoting ELF, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The ELF protocol and governance structure were predetermined before ELF was launched.

303.   Accordingly, under the SEC's Framework, the ELF token was and is a security.

### l.    Civic (CVC)

304.   Over its two-day ICO, from June 20-21, 2017, Civic raised approximately $33 million in proceeds from the sale of 33 percent of CVC tokens.  Civic retained 33 percent of those tokens and allocated an additional 33 percent "for distribution to incentivize participation in the ecosystem."



305.   In June 2017, Civic published the first version of the "Civic whitepaper."  In its whitepaper, Civic stated that it was "building an ecosystem that is designed to facilitate on-demand, secure and low-cost access to identity verification ('IDV') services via the blockchain, such that background and personal information verification checks will no longer need to be

undertaken from the ground up every time."  It also introduced, for the first time, the CVC token "that participants in the ecosystem will use to transact in IDV-related services."

306.    After CVC tokens were distributed through the ICO, CVC tokens have been listed on Binance since at least May 2018.

307.    The Civic Purchase Agreement stated that "[CVC] Tokens are not intended to be a digital currency, security, commodity, or any kind of financial instrument" and that "[CVC] Tokens do not represent or confer any ownership right or stake, share, security, or equivalent rights, or any right to receive future revenue shares, intellectual property rights or any other form of participation in or relating to the Ecosystem and/or Company and its corporate affiliates."

308.    Investors thus reasonably understood that CVC was not subject, at issuance, to U.S. securities laws.

309.    At the time of the CVC ICO, Civic took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked.  Many individuals were unaware that CVC had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all CVC were issued by Civic at creation at very little economic cost—and enormous potential upside—to the Civic founders.

310.    Civic also made false statements that concerned CVC's expected utility and technical functionality and that conveyed to a reasonable investor that CVC tokens would not constitute securities.  For example, the Civic whitepaper represented that CVC tokens would be part of a larger "consensus" system—a core feature of crypto-commodities like Bitcoin and Ethereum's Proof of Work mechanism.  As part of this system, investors would accumulate CVC by signing up for a service or referring a consumer to the Civic platform.  The point of this service

was to enable "[t]he CVC that the [investors] received for participation [to] be reusable within the Civic ecosystem." Notwithstanding the tens of millions of dollar raised in the ICO to develop this ecosystem, however, none of this proposed utility was implemented. The passage of time has established that there is not, and never was, any "consensus" system akin to Bitcoin and Ethereum's Proof of Work mechanism, serving further to illustrate that CVC tokens were and are securities.

311.    Civic also touted many "advantages" of using CVC "over existing tokens" such that they would have lead reasonable investors to conclude that CVC tokens were not securities. Civic claimed that CVC could be used "across any number of jurisdictions, retaining a single uniform method of settlement." Civic also touted the benefits of using a "blockchain-based token" to "make it possible to perform settlements automatically and irrefutably," but as an ERC-20 token, CVC offers no advantages in that respect over any other ERC-20 token built off the Ethereum blockchain. Purchasers were thereby misled into believing that CVC was something other than a security, when it was a security.

312.    The creation of CVC tokens occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which CVC tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that CVC was something other than a security, when it was a security.

313.    Investors purchased CVC tokens with the reasonable expectation that they would make a profit.

87

314.    CVC token holders stood to share in potential profits from the successful launch of the CVC token.  A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the CVC ecosystem.

315.    Investors' profits were to be derived from the managerial efforts of others—Civic, its co-founders, and the CVC development team.  Investors in CVC relied on the managerial and entrepreneurial efforts of Civic and its executive and development team to manage and develop the CVC software.

316.    Investors in CVC reasonably expected Civic and its development team to provide significant managerial efforts after CVC launch.

317.    The expertise of Civic was critical in monitoring the operation of CVC, promoting CVC, and deploying investor funds.  Investors had little choice but to rely on their expertise.  The CVC protocol and governance structure were predetermined before the ICO was launched.

318.    Accordingly, under the SEC's Framework, the CVC token was and is a security.

**I.    Binance Is A Domestic Securities Exchange**

319.    Binance has rejected the concept of having physical headquarters in any geographic jurisdiction and describes its operations as decentralized. Even though Binance is nominally headquartered in Malta, the Malta Financial Services Authority ("MFSA") has stated that Binance "is not authorized by the MFSA to operate in the cryptocurrency sphere and is therefore not subject to regulatory oversight by the MFSA."  Binance has not conceded that it is subject to any regulatory regime.

320.    To protect investors, a securities exchange cannot be allowed to operate free of any regulation.  Binance is subject to U.S. jurisdiction and securities laws because it has availed itself of the benefits of (i) transacting with U.S. investors and (ii) computers on the Ethereum blockchain network located in the United States.

88

321.    On information and belief, at least a plurality of transactions on Binance during the Class Period involved investors who resided in the United States at the time of execution.  The Binance website defaults to English and was designed for ease of use by English speakers, notably using American English (*e.g.*, using "center" instead of "centre").

322.    Because at least a plurality of transactions on Binance involve U.S. residents, Binance functions as a national online securities exchange subject to U.S. securities laws.

323.    Tokens were also listed for sale on other domestic security exchanges, including Bittrex, Poloniex, Kraken, Coinbase, and Gate.io.

      (a) Bittrex is incorporated in, and is a citizen of, Delaware. Its principal place of business is in Seattle, Washington.

      (b) Poloniex is incorporated in, and is a citizen of, Delaware. Its principal place of business is in Boston, Massachusetts.

      (c) Kraken is incorporated in, and is a citizen of, Delaware. Its principal place of business is in San Francisco, California.

      (d) Coinbase is incorporated in, and is a citizen of, Delaware. Its principal place of business is in San Francisco, California.

      (e) On information and belief, Gate.io's parent company, Gate Technologies, Inc., is incorporated in, and is a citizen of, Delaware.

**J.    The Class Has Suffered Significant Damages From Defendants' Actions**

324.    As a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiffs and members of the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the Tokens—have suffered significant damages in an amount to be proven at trial.

325.    The Tokens today are worth far less than the price Plaintiffs and members of the Class paid for them.

326.    To the extent Plaintiffs and members of the Class still hold any Tokens, they hereby demand rescission and make any necessary tender of the Tokens.

## V.    DEFENDANTS' AND ISSUERS' CONCEALMENT OF THEIR MISCONDUCT PREVENTED PLAINTIFFS AND MEMBERS OF THE CLASS FROM BRINGING A CLAIM AT THE TIME THE EVENTS OCCURRED

327.    Consistent with the perspective of a reasonable investor, neither Plaintiffs nor members of the Class were in a position to appreciate their ability to bring claims based on Defendants' misconduct until April 3, 2019, at the earliest. Plaintiffs makes the following allegations regarding Defendants' intentional or reckless statements and conduct solely for purposes of alleging the timeliness of all of Plaintiffs' and the Class's claims, which do not sound in fraud.

328.    In the whitepapers describing the Tokens, as well as in their social media and other marketing, as described above, Defendants and Issuers deliberately created the impression that Tokens were not securities. This included explicit statements that the Tokens were not securities, as well as misleading comparisons to Bitcoin and other crypto-assets that are not securities.

329.    For example, in its summer of 2017 whitepapers, TRON falsely stated that "TRX is not a security" and does not belong to the category of securities, in that TRX was a security at the time.

330.    In the EOS Token Purchase Agreement, Block.one expressly represented that EOS tokens were not securities and to disclaim in its FAQ that EOS tokens were securities—stating "block.one does not believe that the distribution of EOS Tokens or the EOS Tokens themselves are securities" or similar financial instruments.

331.    Similarly, in its whitepaper, Quantstamp stated that its Tokens "to be offered at the Quantstamp Token Pre-Sale and the Public Sale … are not intended to constitute securities in any jurisdiction" and that the whitepaper "does not constitute a prospectus or offer document of any sort and is not intended to constitute an offer of securities or a solicitation for investment in securities in any jurisdiction."  The whitepaper also stated that readers "acknowledge that the QSP Tokens do not constitute securities in any form in any jurisdiction" and "acknowledge that this White Paper does not constitute a prospectus or offer document of any sort and is not intended to constitute an offer of securities in any jurisdiction or a solicitation for investment in securities" amongst other things.

332.    Binance has stated that it "provide[s] quality analysis on cryptocurrencies and the blockchain projects they represent" but purports not to "report[] on companies that issue securities or on securities generally; rather its reports relates solely to digital assets that are not securities." Yet, as noted, Binance Research has analyzed and produced reports on each of the twelve Tokens. And similarly, in promoting the Telegram Open Network (TON) ICO, which is also an ERC-20 token, Binance Research stated:  "As the fundraising of TON was covered via an SEC exemption and Grams have similar use cases as Ether, Grams are thus likely to be classified as crypto assets."

333.    These intentional or reckless misstatements were material to the assessment of purchasers' legal rights and claims based on the Tokens' status as securities.

334.    Issuers also made material misleading omissions in their whitepapers.  In describing the technical details about the TRON protocol design and implementation to enable TRX's utility (including the file structure protocol and technical implementation details such as BitSwap strategy and Proof-of-Replication), TRON failed to disclose that it had plagiarized those technical details from other issuers' whitepapers.

335.    In describing its plan to create a decentralized blockchain that would be technically superior to other available blockchains in its June 5, 2017 whitepaper, Block.one failed to disclose that its blockchain's governance system could be controlled by a single "arbitrator" and was not decentralized.

336.    These intentional or reckless omissions were material to the assessment of the Tokens' prospective utility.

337.    Because of these intentional or reckless representations and omissions, Plaintiffs and members of the Class reasonably believed they were purchasing a decentralized asset that had functionality at issuance.  In fact, however, they were investing in Defendants' efforts, not knowing that some Issuers had no plan for the Tokens.

338.    Under the misimpression that the Tokens were not securities, as a result of Defendants' and Issuers' fraudulent statements and omissions, Plaintiffs and members of the Class did not realize that they were in a position to bring claims under federal or state law regulating securities.  Defendants' and Issuers' misrepresentation would not have been apparent until, at the earliest, April 3, 2019, when the SEC clarified the legal paradigm for assessing the security status of crypto-assets like the Tokens.

339.    Indeed, independent of Defendants' and the Issuers' state of mind in making the materially misleading misstatements and omissions described above, these misstatements and omissions—which reflected the massive asymmetry in information available to Defendants and Issuers and unavailable to Plaintiffs and the Class—prevented Plaintiffs and the Class from realizing that they were in a position to bring claims under federal or state law regulating securities until April 3, 2019, at the earliest.

## VI.   CLASS ALLEGATIONS

340.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the following two Subclasses (together, the "Class"):

- Subclass 1:  All persons who purchased on the Binance exchange any of the Tokens (each of which was listed for sale on a domestic U.S. exchange), or who otherwise purchased on the Binance exchange any of the Tokens in a domestic U.S. transaction, between July 1, 2017 and Binance's imposition of an arbitration clause (which appears to have occurred on or about February 20, 2019) and were harmed thereby.

- Subclass 2:  All persons who purchased on the Binance exchange any of the Tokens (each of which was listed for sale on a domestic U.S. exchange), or who otherwise purchased on the Binance exchange any of the Tokens in a domestic U.S. transaction, between Binance's imposition of an arbitration clause (which appears to have occurred on or about February 20, 2019) and the present and were harmed thereby.

341.   Accordingly, the Class Period is July 1, 2017 through the present.

342.   Excluded from the Class and Subclasses are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

343.   Plaintiffs reserve the right to amend the Class and Subclass definitions if investigation or discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

344.    The members of the Class and Subclasses are so numerous that joinder of all members is impracticable.  The precise number of Class and Subclass members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

345.    Members of the Class and Subclasses are readily ascertainable and identifiable. Members of the Class and Subclasses may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or its agents.  They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

346.    Plaintiffs' claims are typical of the claims of the Class and Subclass members as all Class and Subclass members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiffs do not have any interest that is in conflict with the interests of the members of the Class or the Subclasses.

347.    Plaintiffs and members of the Class and Subclasses sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

348.    Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and Subclasses and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to those of the Class and Subclasses.

349.    Plaintiffs seek declaratory relief for themselves and the Class and Subclasses, asking the Court to declare their purchase agreements with Binance void, such that prosecuting separate actions by or against individual members of the Class and Subclasses would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and

Subclasses that would establish incompatible standards of conduct for Binance; and Binance has acted on grounds that apply generally to the Class and Subclasses, so that the declaratory relief is appropriate respecting the class as a whole.

350.    Common questions and answers of law and fact exist as to all members of the Class and Subclasses and predominate over any questions solely affecting individual members of the Class and Subclasses, including but not limited to the following:

- Whether the Tokens are securities under federal and state law;

- Whether Binance operated as an unregistered exchange;

- Whether Binance operated as an unregistered broker-dealer;

- Whether Binance offered or sold the Tokens to members of the Class and Subclasses;

- Whether the members of the Class and Subclasses suffered damages as a result of Defendants' conduct in violation of federal and state law; and

- Whether the Class and Subclass members are entitled to void their purchase agreements with Binance and to recover the monies they paid thereunder.

351.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by some of the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class and Subclasses to individually redress the wrongs done to them.

352.    There will be no difficulty in the management of this action as a class action.

# VII.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION
(SECURITIES ACT – PRIMARY LIABILITY)
Unregistered Offer and Sale of Securities
Sections 5 and 12(a)(1) of the Securities Act
(Binance)**

353.    Plaintiffs reallege the allegations above.

354.    Section 5(a) of the Securities Act states:  "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."  15 U.S.C. § 77e(a).

355.    Section 5(c) of the Securities Act states:  "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."  *Id*. § 77e(c).

356.    When issued, the Tokens are securities within the meaning of Section 2(a)(1) of the Securities Act.  *Id*. § 77b(a)(1).  Binance promoted, solicited or sold Tokens to Plaintiffs and members of the Class.  Binance thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate

96

commerce for the purpose of sale or for delivery after sale. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

357.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title … shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id*. § 77*l*(a)(1).

358.    Accordingly, Binance has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id*. §§ 77e(a), 77e(c), and 77*l*(a)(1).

359.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest. *Id*. § 77m.

360.    Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest. *Id.*

## SECOND CAUSE OF ACTION
### (EXCHANGE ACT – PRIMARY LIABLIITY)
### Contracts With an Unregistered Exchange
### Sections 5 and 29(b) of the Exchange Act
### (Binance)

361.    Plaintiffs reallege the allegations above.

362.    In relevant part, section 5 of the Exchange Act makes it unlawful "for any … exchange, directly or indirectly, to make use of … any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security … unless such exchange (1) is registered

as national securities exchange under section 78f of this title, or (2) is exempted from such registration."  15 U.S.C. § 78e.  An "exchange" is any entity that "constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities."  17 C.F.R. § 240.3b-16.

363.    Binance has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and subject to the jurisdiction of the United States throughout the Class Period, including because Binance has operated as an exchange throughout the Class Period through the utilization of the Internet within, and multiple servers throughout, the United States.

364.    Binance has thus made use of such means and instrumentality without being registered as national securities exchange under section 78f and without any exemption from such registration requirement.

365.    In the course of planning to operate and as operating as an unregistered exchange within the United States, Binance has entered into contracts with issuers of digital tokens whereby the parties to those contracts agreed that, operating as an unregistered exchange within the United States, Binance would make available for sale the issuers' digital tokens.  The parties to these contracts thus reached an agreement whereby and pursuant to which Binance would operate in violation of section 5 of the Exchange Act.

366.    In the course of operating as an unregistered exchange within and subject to the jurisdiction of the United States, in the performance of its contracts with the issuers of digital tokens, which is a contract for listing a security on an exchange, and pursuant to and consistent with its Terms of Use, Binance has entered into contracts with the members of the Class pursuant to which the members purchased digital tokens through Binance and paid Binance fees for the use

of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which Binance was operating in violation of section 5 of the Exchange Act, and whereby and pursuant to which these parties were continuing a practice in violation of section 5 of the Exchange Act.

367.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in violation of section 5, because Binance entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which Binance would be and was operating in violation of section 5.

368.    Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of such contract."  15 U.S.C. § 78cc.

369.    Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void their purchase agreements with Binance and to recover, as rescissory damages, the fees they have paid under those contracts.

370.    Plaintiffs and the Class seek to void contracts and recover damages with respect to purchases on Binance of any of the Tokens (each of which was listed for sale on a domestic U.S. exchange), or purchases on the Binance exchange of any of the Tokens in a domestic U.S. transaction.  *Id*. § 78cc(b).

**THIRD CAUSE OF ACTION**
**(EXCHANGE ACT – PRIMARY LIABLIITY)**
**Unregistered Broker and Dealer**
**Sections 15(a)(1) and 29(b) of the Exchange Act**
**(Binance)**

371.    Plaintiffs reallege the allegations above.

372.    In relevant part, with respect to a broker or dealer who is engaged in interstate commerce in using the facility of an exchange, section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer … to make use of … any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

373.    As a broker-dealer engaged in interstate commerce using the facility of an exchange, and without being registered in accordance with subsection (b) of section 15 of the Exchange Act, throughout the Class Period, Binance has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities.

374.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." *Id*. § 78a(4)(A). In addition, an entity is a broker if it assists issuers with structuring a securities offering, identifies potential purchasers, or advertises a securities offering. Binance has operated as a broker during the Class Period by facilitating the sale of digital assets as part of other entities' ICOs in exchange for compensation primarily in the form of commissions, including by marketing the digital assets, accepting investors' orders, providing answers to investor questions about transaction details, accepting payment for orders, and working with issuers to transfer digital assets to investors after payment.

375.    A "dealer" includes an entity "engaged in the business of buying and selling securities … for such person's own account," insofar as such transactions are part of that person's "regular business."  Binance has operated as a dealer during the Class Period by holding itself out as willing to buy or sell securities on a continuous basis and as willing to provide liquidity to the market for digital assets, by having regular customers, by maintaining custody over their customers' digital assets, by providing customers with access to services allowing purchase of digital assets on credit, by having a regular turnover inventory of securities, by purchasing digital assets for accounts in Binance's name (often at a discount to the ICO price), and by then selling the digital assets to investors for profit immediately or at a later time after being held in inventory.

376.    In the course of planning to operate and as operating as an unregistered broker-dealer, Binance has entered into contracts with issuers of digital tokens whereby the parties to those contracts agreed that, operating as an unregistered broker-dealer within the United States, Binance would make available for sale the issuers' digital tokens.  The parties to these contracts thus reached an agreement whereby and pursuant to which Binance would operate in violation of section 15(a)(1) of the Exchange Act.

377.    In the course of operating as an unregistered broker-dealer, in the performance of its contracts with the issuers of digital tokens, and pursuant to and consistent with its Terms of Use, Binance has entered into contracts with the members of the Class pursuant to which the members purchased digital tokens through Binance and paid Binance fees for the use of its exchange.  The parties to these contracts thus reached an agreement whereby and pursuant to which Binance was operating in violation of section 15(a)(1) of the Exchange Act.

378.    The foregoing contracts were made in violation of section 5 of the Exchange Act, and their performance involves the violation of section 5, and the continuation of a practice in

violation of section 5, because Binance entered into them for the purpose of operating, and as operating, as an unlicensed exchange in violation of section 5; and because the parties to the contracts reached agreements whereby and pursuant to which Binance would be and was operating in violation of section 5.

379.     Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter … and every contract (including any contract for listing a security on an exchange) … the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter … shall be void … as regards the rights of any person who, in violation of any such provision, … shall have made or engaged in the performance of such contract."  *Id*. § 78cc.

380.     Section 29(b) affords Plaintiffs and the Class the right, which they hereby pursue, to void their purchase agreements with Binance and to recover, as rescissory damages, the fees they have paid under those contracts.

381.     Plaintiffs and the Class seek to void contracts and recover damages with respect to purchases on Binance of any of the Tokens (each of which was listed for sale on a domestic U.S. exchange), or purchases on the Binance exchange of any of the Tokens in a domestic U.S. transaction.  *Id*. § 78cc(b).

**FOURTH CAUSE OF ACTION**
**(EXCHANGE ACT – ADDITIONAL LIABLIITY)**
**Control Person Liability for Violations of**
**Section 20 of the Exchange Act**
**(Individual Defendants)**

382.     Plaintiffs reallege the allegations above.

383.     This Count is asserted against the Individual Defendants for violations of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

384.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful sales of securities on an unregistered exchange and operation as an unregistered broker-dealer as described herein.

385.    The Individual Defendants have the power to direct or cause the direction of the management and policies of Binance.

386.    The Individual Defendants, separately or together, have sufficient influence to have either caused Binance to register as an exchange and broker-dealer or prevented Binance from effecting transactions of securities as an unregistered exchange and unregistered broker-dealer.

387.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Binance's failure to register as an exchange or broker-dealer and Binance's offer of securities on an unregistered exchange and operation as an unregistered broker-dealer.

388.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

**FIFTH CAUSE OF ACTION**
**(SECURITIES ACT – ADDITIONAL LIABILITY)**
**Control Person Liability for Violations of**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Individual Defendants)**

389.    Plaintiffs reallege the allegations above.

390.    This Count is asserted against Binance and the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

103

391.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful solicitation of various ERC-20 tokens as described herein.

392.    The Individual Defendants have the power to direct or cause the direction of the management and policies of Binance.

393.    The Individual Defendants, separately or together, have sufficient influence to have caused Binance to solicit transactions of securities.

394.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Binance's solicitation of securities.

395.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

<div align="center">

**SIXTH CAUSE OF ACTION**
**(ALABAMA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Ala. Code § 8-6-19**
**(Binance)**

</div>

396.    Plaintiffs reallege the allegations above.

397.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Alabama.

398.    The Alabama Securities Act forbids the offer or sale of unregistered securities. Ala. Code § 8-6-4. Any person who offers or sells a security in violation of Section 8-6-4 is "liable to

<div align="center">104</div>

the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition." *Id.* § 8-6-19(a).

399.    When issued, the Tokens were securities within the meaning of the Alabama Securities Act. *Id.* § 8-6-2. On information and belief, Binance offered or sold the Tokens to members of the Class in Alabama. The Tokens were neither registered under, nor subject to exemption from registration under the Alabama Securities Act. *Id.* § 8-6-10.

400.    Upon information and belief, the Tokens were offered or sold in Alabama, including without limitation through solicitations directed by Binance to Alabama and received in Alabama.

401.    Accordingly, Binance has violated the Alabama Securities Act through Binance's sale of unregistered securities.

402.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

403.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SEVENTH CAUSE OF ACTION
### (ALABAMA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Ala. Code § 8-6-19
### (Binance)

404.    Plaintiffs reallege the allegations above.

405.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Alabama.

406.    The Alabama Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Alabama law. Ala. Code § 8-6-3. Any person who offers or sells a security in violation of Section 8-6-3 is "liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition." *Id.* § 8-6-19.

407.    When issued, the Tokens were securities within the meaning of the Alabama Securities Act. *Id.* § 8-6-2. On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Alabama. *Id.* § 8-6-2.

408.    On information and belief, Binance transacted business as a broker-dealer or agent in Alabama, including without limitation through solicitations directed by Binance to Alabama and received in Alabama.

409.    Binance was not registered as a broker-dealer or agent in Alabama, nor was it subject to any exemption from registration.

410.    Accordingly, Binance has violated the Alabama Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

411.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

412.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTH CAUSE OF ACTION**
**(ALABAMA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Ala. Code § 8-6-19**
**(Individual Defendants)**

</div>

413.    Plaintiffs reallege the allegations above.

414.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Alabama.

415.    Every person who directly or indirectly controls an entity liable under the Alabama Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the conduct giving rise to the liability, and every dealer or agent who materially aids in such conduct" is jointly and severally liable "with and to the same extent" as the seller, unless the non-seller "is able to sustain the burden of proof that he

did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." Ala. Code § 8-6-19(c).

416.    When issued, the Tokens were securities within the meaning of the Alabama Securities Act. *Id.* § 8-6-19. On information and belief, Binance offered and sold the Tokens to members of the Class in Alabama and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Alabama Securities Act, and Binance was not registered as a broker-dealer or agent under Alabama law. *Id.* § 8-6-3.

417.    On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Alabama, including without limitation through solicitations directed by Binance to Alabama and received in Alabama.

418.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

419.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Alabama Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

420.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

421.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINTH CAUSE OF ACTION**
**(ALASKA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**AS § 45.56.710**
**(Binance)**

</div>

422.    Plaintiffs reallege the allegations above.

423.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Alaska.

424.    The Alaska Securities Act forbids the sale of unregistered securities. AS § 45.56.100. Any person who sells a security in violation of Section 45.56.100 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court, upon the tender of the security, or for actual damages," defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court." *Id.* § 45.56.710.

425.    When issued, the Tokens were securities within the meaning of the Alaska Securities Act. *Id.* § 45.56.900. On information and belief, Binance sold the Tokens to members

<div align="center">109</div>

of the Class in Alaska. The Tokens were neither registered under, nor subject to exemption from registration under the Alaska Securities Act. *Id.* § 45.56.110.

426.    Upon information and belief, the Tokens were sold in Alaska, including without limitation through solicitations directed by Binance to Alaska and received in Alaska.

427.    Accordingly, Binance has violated the Alaska Securities Act through Binance's sale of unregistered securities.

428.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

429.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**TENTH CAUSE OF ACTION**
**(ALASKA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**AS § 45.56.710**
**(Binance)**

</div>

430.    Plaintiffs reallege the allegations above.

431.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Alaska.

432.    The Alaska Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Alaska law. AS § 45.56.300. Any person who sells a security in violation of Section 45.56.300 is "liable to the customer," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase,

<div align="center">110</div>

costs, and attorney fees as determined by the court, upon the tender of the security, or for actual damages," defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court." *Id.* § 45.56.710.

433.    When issued, the Tokens were securities within the meaning of the Alaska Securities Act. *Id.* § 45.56.900. On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Alaska. *Id.*

434.    On information and belief, Binance transacted business as a broker-dealer or agent in Alaska, including without limitation through solicitations directed by Binance to Alaska and received in Alaska.

435.    Binance was not registered as a broker-dealer or agent in Alaska, nor was it subject to any exemption from registration.

436.    Accordingly, Binance has violated the Alaska Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

437.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

438.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ELEVENTH CAUSE OF ACTION
### (ALASKA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### AS § 45.56.710(g)
### (Individual Defendants)

439.    Plaintiffs reallege the allegations above.

440.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Alaska.

441.    Every person who "directly or indirectly controls a person liable under" the Alaska Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "managing partner, executive officer, or director of a person liable … including an individual having a similar status or performing similar functions," every "individual who is an employee of or associated with a person liable … and who materially aids the conduct giving rise to the liability," and every "person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability" is "jointly and severally with and to the same extent as" the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.  *Id.* § 45.56.710(g).

442.    When issued, the Tokens were securities within the meaning of the Alaska Securities Act. *Id.* § 45.56.900. On information and belief, Binance sold the Tokens to members of the Class in Alaska and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Alaska Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Alaska law. *Id.* § 45.56.300.

443.    On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Alaska, including without limitation through solicitations directed by Binance to Alaska and received in Alaska.

444.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

445.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Alaska Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

446.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

447.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### TWELFTH CAUSE OF ACTION
### (ARIZONA STATE LAW – PRIMARY LIABILITY)
### Unregistered Sale of Securities
### A.R.S. § 44-2001
### (Binance)

448.    Plaintiffs reallege the allegations above.

449.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Arizona.

450.    The Arizona Securities Act forbids the sale of unregistered securities. A.R.S. § 44-1841. Any purchase of a security in violation of Section 44-1841 is "voidable at the election of the purchaser," who "may bring an action in a court of competent jurisdiction to recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities, on tender of the securities purchased or the contract made, or for damages if the purchaser no longer owns the securities." *Id.* § 44-2001.

451.    When issued, the Tokens were securities within the meaning of the Arizona Securities Act. *Id.* § 1801. On information and belief, Binance sold the Tokens to members of the Class in Arizona. The Tokens were neither registered under, nor subject to exemption from registration under the Arizona Securities Act. *Id.* § 1843.

452.    Upon information and belief, the Tokens were sold in Arizona, including without limitation through solicitations directed by Binance to Arizona and received in Arizona.

453.    Accordingly, Binance has violated the Arizona Securities Act through Binance's sale of unregistered securities.

454.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

455.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTEENTH CAUSE OF ACTION**
**(ARIZONA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**A.R.S. § 44-2001**
**(Binance)**

456.    Plaintiffs reallege the allegations above.

457.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Arizona.

458.    The Arizona Securities Act forbids any person from transacting business as a dealer or agent unless he is registered under Arizona law. A.R.S. § 44-1842. Any purchase of a security in violation of Section 44-1842 is "voidable at the election of the purchaser," who "may bring an action in a court of competent jurisdiction to recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities, on tender of the securities purchased or the contract made, or for damages if the purchaser no longer owns the securities." *Id.* § 44-2001.

459.    When issued, the Tokens were securities within the meaning of the Arizona Securities Act. *Id.* § 1801. On information and belief, Binance transacted business as a dealer or agent when it sold the Tokens to members of the Class in Arizona. *Id.* § 1801.

460.    On information and belief, Binance transacted business as a dealer or agent in Arizona, including without limitation through solicitations directed by Binance to Arizona and received in Arizona.

461.    Binance was not registered as a dealer or agent in Arizona, nor was it subject to any exemption from registration.

462.    Accordingly, Binance has violated the Arizona Securities Act by transacting business as an unregistered dealer or agent in the sale of securities.

463.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

464.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FOURTEENTH CAUSE OF ACTION**
**(ARIZONA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**A.R.S. § 44-2003**
**(Individual Defendants)**

</div>

465.    Plaintiffs reallege the allegations above.

466.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Arizona.

467.    Any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale of securities under the Arizona Securities Act "shall be jointly and severally liable to the person who is entitled to maintain" an action under A.R.S. § 44-2001. A.R.S. § 44-2003.

468.    When issued, the Tokens were securities within the meaning of the Arizona Securities Act. *Id.* § 1801. On information and belief, Binance sold the Tokens to members of the Class in Arizona and acted as the dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Arizona Securities Act, and Binance was not registered as a dealer or agent under Arizona law. *Id.* § 1841.

469.    On information and belief, Binance sold the Tokens and acted as a dealer or agent in Arizona, including without limitation through solicitations directed by Binance to Arizona and received in Arizona.

<div align="center">116</div>

470.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered dealer or agent as described herein.

471.     Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Arizona Securities Act through Binance's sale of unregistered securities and operation as an unregistered dealer or agent.

472.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

473.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTEENTH CAUSE OF ACTION**
**(ARKANSAS STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Ark. Stat. Ann. § 23-42-106**
**(Binance)**

474.     Plaintiffs reallege the allegations above.

475.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Arkansas.

476.     The Arkansas Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Arkansas law. *Id.* 23-42-301. Any person who transacts business in violation of Section 23-42-301 is liable to the person buying the security from

him, who "may recover costs and reasonable attorney's fees plus: (A) [u]pon tender of the security, the consideration paid for the security and interest at six percent (6%) per year from the date of payment, less the amount of any income received from owning the security; or (B)(i) [d]amages if the buyer no longer owns the security." *Id.* § 23-42-106(a)(1) – (2)(B)(i). "Damages are the amount that would be recoverable upon a tender of the security less the value of the security when the buyer disposed of the security plus interest at six percent (6%) per year from the date of disposition of the security." *Id.* § 23-42-106(a)(2)(B)(ii).

477.    When issued, the Tokens were securities within the meaning of the Arkansas Securities Act. *Id.* § 23-42-102(17). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Arkansas. *Id.* §§ 23-42-102(1)(A), 23-42-102(3)(A).

478.    On information and belief, Binance transacted business as a broker-dealer or agent in Arkansas, including without limitation through solicitations directed by Binance to Arkansas and received in Arkansas.

479.    Binance was not registered as a broker-dealer or agent in Arkansas.

480.    Accordingly, Binance has violated the Arkansas Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

481.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

482.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTEENTH CAUSE OF ACTION**
**(ARKANSAS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer or Sale of Securities**
**Ark. Stat. Ann. § 23-42-106(a)**
**(Binance)**

483.    Plaintiffs reallege the allegations above.

484.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Arkansas.

485.    The Arkansas Securities Act forbids the offer or sale of unregistered securities. Ark. Code Ann. § 23-42-501. Any person who offers or sells a security in violation of Section 23-42-501 is liable to the person buying the security from him, who "may recover costs and reasonable attorney's fees plus: (A) [u]pon tender of the security, the consideration paid for the security and interest at six percent (6%) per year from the date of payment, less the amount of any income received from owning the security; or (B)(i) [d]amages if the buyer no longer owns the security." *Id.* § 23-42-106(a)(1) – (2)(B)(i). "Damages are the amount that would be recoverable upon a tender of the security less the value of the security when the buyer disposed of the security plus interest at six percent (6%) per year from the date of disposition of the security." *Id.* § 23-42-106(a)(2)(B)(ii).

486.    When issued, the Tokens were securities within the meaning of the Arkansas Securities Act. *Id.* § 23-42-102(17). On information and belief, Binance offered or sold the Tokens to members of the Class in Arkansas. The Tokens were neither registered under, nor subject to exemption from registration under the Arkansas Securities Act. *Id.* § 23-42-503.

487.    Upon information and belief, the Tokens were offered or sold in Arkansas, including without limitation through solicitations directed by Binance to Arkansas and received in Arkansas.

119

488.    Accordingly, Binance has violated the Arkansas Securities Act through Binance's sale of unregistered securities.

489.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

490.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTEENTH CAUSE OF ACTION**
**(ARKANSAS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Ark. Stat. Ann § 23-42-106**
**(Individual Defendants)**

</div>

491.    Plaintiffs reallege the allegations above.

492.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Arkansas.

493.    Every person who controls a person liable under the Arkansas Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every partner, officer, or director of the seller and any other person occupying a similar status or performing a similar function with respect to the seller is jointly and severally liable for the actions of the seller, unless the non-seller satisfies the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of actions of the seller that give rise to the liability alleged to exist. *Id*. § 23-42-106(d).

494.    When issued, the Tokens were securities within the meaning of the Arkansas Securities Act. *Id.* § 23-42-102(17). On information and belief, Binance offered and sold the Tokens to members of the Class in Arkansas and acted as the broker-dealer or agent for the sale

and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Arkansas Securities Act, and Binance was not registered as a broker-dealer or agent under Arkansas law. *Id.* §§ 23-42-501, 23-42-301.

495.    On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Arkansas, including without limitation through solicitations directed by Binance to Arkansas and received in Arkansas.

496.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

497.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Arkansas Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

498.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

499.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTEENTH CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – PRIMARY LIABILITY)**
**Unqualified Offer or Sale of Securities**
**Cal. Corp. Code § 25503**
**(Binance)**

500.    Plaintiffs reallege the allegations above.

501.    This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in California.

502.    The California Corporate Securities Law of 1968 ("California Securities Act") forbids the offer or sale of unqualified securities. Cal Corp. Code §§ 25110, 25130. Any person who offers or sells a security in violation of Sections 25110 or 25130 are "liable to any person acquiring from him the security sold in violation of such section, who may sue to recover the consideration he paid for such security with interest thereon at the legal rate, less the amount of any income received therefrom, upon the tender of such security, or for damages, if he no longer owns the security, or if the consideration given for the security is not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) his purchase price plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id.* § 25503.

503.    When issued, the Tokens were securities within the meaning of the California Securities Act. *Id.* § 25019. Binance offered or sold the Tokens to at least one Plaintiff in California. The Tokens were neither qualified under, nor subject to exemption from qualification under the California Securities Act. *Id.* §§ 25110, 25130.

504.    The Tokens were offered or sold in California, including without limitation through solicitations directed by Binance to California and received in California.

122

505.     Accordingly, Binance has violated the California Securities Act through Binance's sale of unqualified securities.

506.     Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

507.     Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETEENTH CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unlicensed Broker-Dealer**
**Cal. Corp. Code § 25501.5(a)**
**(Binance)**

</div>

508.     Plaintiffs reallege the allegations above.

509.     This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in California.

510.     The California Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law. *Id*. § 25210. Any person who offers or sells a security in violation of Section 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 25501.5(a)(1). Upon recission and tender of the Tokens, such purchaser is entitled to recover the consideration paid for the Tokens plus interest at the legal rate, less the amount of any income received on the Tokens. *Id.* § 25501.5(a)(2). A purchaser who no longer owns the Tokens is entitled to damages in an amount equal to the difference between: (i) the price at which the security was brought plus interest at the legal rate from the date of purchase; and (ii) the value of the security

at the time it was disposed of by the purchaser plus the amount of any income received on the Tokens by the purchaser. *Id.* § 25501.5(a)(4).

511.    When issued, the Tokens were securities within the meaning of the California Securities Act. *Id.* § 25019. Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to at least one Plaintiff in California. *Id.* § 25004.

512.    Binance transacted business as a broker-dealer or agent in California, including without limitation through solicitations directed by Binance to California and received in California.

513.    Binance was not licensed as a broker-dealer or agent in California, nor was it subject to any exemption from licensing.

514.    Accordingly, Binance has violated the California Securities Act by transacting business as an unlicensed broker-dealer or agent in the sale of securities.

515.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

516.    Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTIETH CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Cal. Corp. Code § 25504**
**(Individual Defendants)**

517.    Plaintiffs reallege the allegations above.

518.    This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in California.

519.    Every person who directly or indirectly controls an entity liable under the California Securities Act for unlawfully selling unqualified securities or for operating as an unregistered broker-dealer or agent in the sale of those securities as well as "every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 25504.

520.    When issued, the Tokens were securities within the meaning of the California Securities Act. *Id.* § 25019. Binance offered and sold the Tokens to at least one Plaintiff in California. The Tokens were neither qualified under, nor subject to exemption from qualification under the California Securities Act, and Binance was not licensed or exempt from licensing as a broker-dealer or agent under California law. *Id.* § 25210.

521.    Binance offered and sold the Tokens and acted as a broker-dealer or agent in California, including without limitation through solicitations directed by Binance to California and received in California.

522.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unqualified securities.

523.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the California Securities Act through Binance's offer or sale of unqualified securities.

524.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

525.    Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**TWENTY-FIRST CAUSE OF ACTION**
**(COLORADO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Colo. Rev. Stat. § 11-51-604**
**(Binance)**

</div>

526.    Plaintiffs reallege the allegations above.

527.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in state of Colorado.

528.    The Colorado Securities Act forbids the sale of unregistered securities. Colo. Rev. Stat. § 11-51-301. Any person who sells a security in violation of Section 301 "is liable to the person buying the security from such seller for the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security, or is liable for damages if the buyer no longer owns the security. Damages are deemed to be the amount that would be recoverable upon a tender, less the value of the security when the buyer disposed of it, and interest at the statutory rate from the date of disposition." *Id.* § 11-51-604(1).

529.    When issued, the Tokens were securities within the meaning of the Colorado Securities Act. *Id.* § 11-51-201(17). On information and belief, Binance sold the Tokens to members of the Class in the state of Colorado. The Tokens were neither registered under, nor subject to exemption from registration under the Colorado Securities Act. *Id.* § 11-51-301.

530.    On information and belief, the Tokens were sold in the state of Colorado, including without limitation through solicitations directed by Binance to the state of Colorado and received in the state of Colorado.

531.    Accordingly, Binance has violated the Colorado Securities Act through Binance's sale of unregistered securities.

532.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

533.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**TWENTY-SECOND CAUSE OF ACTION**
**(COLORADO STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Colo. Rev. Stat. § 11-51-604**
**(Binance)**

</div>

534.    Plaintiffs reallege the allegations above.

535.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Colorado.

536.    The Colorado Securities Act forbids any person from transacting business as a broker-dealer or sales representative unless he is registered or exempt from registration under Colorado law. Colo. Rev. Stat. § 11-51-401(1). Any person who sells a security in violation of

Section 401 "is liable to the person buying the security from such seller for the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security, or is liable for damages if the buyer no longer owns the security." *Id.* § 11-51-604(2)(a).

537.    When issued, the Tokens were securities within the meaning of the Colorado Securities Act. *Id.* § 11-51-201(17). Binance transacted business as a broker-dealer or sales representative when it sold the Tokens to members of the Class in the state of Colorado. *Id.* § 11-51-201(2), (14).

538.    On information and belief, Binance transacted business as a broker-dealer or sales representative in the state of Colorado, including without limitation through solicitations directed by Binance to the state of Colorado and received in the state of Colorado.

539.    Binance was not registered as a broker-dealer or sales representative in the state of Colorado, nor was it subject to any exemption from registration.

540.    Accordingly, Binance has violated the Colorado Securities Act by transacting business as an unregistered broker-dealer or sales representative in the sale of securities.

541.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

542.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-THIRD CAUSE OF ACTION**
**(COLORADO STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Colo. Rev. Stat. § 11-51-604**
**(Individual Defendants)**

543.    Plaintiffs reallege the allegations above.

544.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Colorado.

545.    Every person who directly or indirectly controls an entity liable under the Colorado Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or sales representative in the sale of those securities, "is liable jointly and severally with and to the same extent as such controlled person, unless the controlling person sustains the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Colo. Rev. Stat. § 11-51-604(5).

546.    When issued, the Tokens were securities within the meaning of the Colorado Securities Act. *Id.* § 11-51-201(17). On information and belief, Binance sold the Tokens to members of the Class in the state of Colorado and acted as the broker-dealer or sales representative for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Colorado Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or sales representative under Colorado law. *Id.* §§ 11-51-301, 11-51-401(1).

547.    On information and belief, Binance sold the Tokens and acted as a broker-dealer or sales representative in the state of Colorado, including without limitation through solicitations directed by Binance to the state of Colorado and received in the state of Colorado.

129

548.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or sales representative as described herein.

549.     Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Colorado Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or sales representative.

550.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

551.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**TWENTY-FOURTH CAUSE OF ACTION**
**(CONNECTICUT STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Conn. Gen. Stat. § 36b-29**
**(Binance)**

</div>

552.     Plaintiffs reallege the allegations above.

553.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the state of Connecticut.

554.     The Connecticut Uniform Securities Act forbids the offer or sale of unregistered securities. Conn. Gen. Stat. § 36b-16. Any person who offers or sells a security in violation of

Section 36b-16 "is liable to the person buying the security, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 36b-29(a).

555.    When issued, the Tokens were securities within the meaning of the Connecticut Uniform Securities Act. *Id.* § 36b-3(19). Binance offered or sold the Tokens to members of the Class in the state of Connecticut. The Tokens were neither registered under, nor subject to exemption from registration under the Connecticut Uniform Securities Act. *Id.* § 36b-16.

556.    On information and belief, the Tokens were offered or sold in the state of Connecticut, including without limitation through solicitations directed by Binance to the state of Connecticut and received in the state of Connecticut.

557.    Accordingly, Binance has violated the Connecticut Uniform Securities Act through Binance's sale of unregistered securities.

558.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

559.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### TWENTY-FIFTH CAUSE OF ACTION
### (CONNECTICUT STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Conn. Gen. Stat. § 36b-29
### (Binance)

560.    Plaintiffs reallege the allegations above.

561.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the state of Connecticut.

562.    The Connecticut Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Connecticut law. Conn. Gen. Stat. § 36b-6(a). Any person who offers or sells a security in violation of Section 36b-6(a) is "is liable to the person buying the security, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 36b-29(a).

563.    When issued, the Tokens were securities within the meaning of the Connecticut Uniform Securities Act. *Id.* § 36b-3(19). Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in the state of Connecticut. *Id.* § 36b-3(1) and (5).

564.    On information and belief, Binance transacted business as a broker-dealer or agent in the state of Connecticut, including without limitation through solicitations directed by Binance to the state of Connecticut and received in the state of Connecticut.

565.    Binance was not registered as a broker-dealer or agent in the state of Connecticut, nor was it subject to any exemption from registration.

566.    Accordingly, Binance has violated the Connecticut Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

567.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

568.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-SIXTH CAUSE OF ACTION**
**(CONNECTICUT STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Conn. Gen. Stat. § 36b-29**
**(Individual Defendants)**

569.     Plaintiffs reallege the allegations above.

570.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the state of Connecticut.

571.     Every person who directly or indirectly controls an entity liable under the Connecticut Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer or director of such a person, [and] every person occupying a similar status or performing similar functions," is jointly and severally liable "with and to the same extent" as the entity liable, unless "the person who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." Conn. Gen. Stat. § 36b-29(c).

572.     When issued, the Tokens were securities within the meaning of the Connecticut Uniform Securities Act. *Id.* § 36b-3(19). Binance offered and sold the Tokens to members of the Class in the state of Connecticut and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from

registration under the Connecticut Uniform Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Connecticut law. *Id.* §§ 36b-16, 36b-6(a).

573.    On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in the state of Connecticut, including without limitation through solicitations directed by Binance to the state of Connecticut and received in the state of Connecticut.

574.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

575.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Connecticut Uniform Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

576.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

577.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## TWENTY-SEVENTH CAUSE OF ACTION
### (DELAWARE STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Del. Code tit. 6, § 73-605
### (Binance)

578.    Plaintiffs reallege the allegations above.

579.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the state of Delaware.

580.    The Delaware Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Delaware law. Del. Code tit. 6, § 73-301. Any person who offers or sells a security in violation of Section 301 "is liable to the person buying … the security from or to him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with the interest at the legal rate from the date of payment costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security." *Id.* § 73-605(a)(1-2).

581.    When issued, the Tokens were securities within the meaning of the Delaware Securities Act. *Id.* § 73-103(23). Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in the state of Delaware. *Id.* § 73-103(1), (3).

582.    On information and belief, Binance transacted business as a broker-dealer or agent in the state of Delaware, including without limitation through solicitations directed by Binance to the state of Delaware and received in the state of Delaware.

583.    Binance was not registered as a broker-dealer or agent in the state of Delaware.

584.    Accordingly, Binance has violated the Delaware Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

585.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

586.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## TWENTY-EIGHTH CAUSE OF ACTION
### (DELAWARE STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Del. Code tit. 6, § 73-605
### (Individual Defendants)

587.    Plaintiffs reallege the allegations above.

588.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the state of Delaware.

589.    Every person who directly or indirectly controls an entity liable under the Delaware Securities Act for operating as an unregistered broker-dealer or agent, as well as "every partner, officer, or director of such a seller … [and] every person occupying a similar status or performing similar functions" is jointly and severally liable "unless the nonseller who is so liable sustains the burden of proof that the person did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Del. Code tit. 6, § 73-605(b).

590.    When issued, the Tokens were securities within the meaning of the Delaware Securities Act. *Id.* § 73-103(23). Binance offered and sold the Tokens to members of the Class in the state of Delaware and acted as the broker-dealer or agent for the sale and purchase of those securities. Binance was not registered as a broker-dealer or agent under Delaware law. *Id.* § 73-301.

591.    On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in the state of Delaware, including without limitation through solicitations directed by Binance to the state of Delaware and received in the state of Delaware.

592.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of securities and the operation of an unregistered broker-dealer or agent as described herein.

593.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Delaware Securities Act through Binance's offer or sale of securities and operation as an unregistered broker-dealer or agent.

594.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

595.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-NINTH CAUSE OF ACTION**
**(DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**D.C. Code Ann. § 31-5606.05**
**(Binance)**

596.    Plaintiffs reallege the allegations above.

597.    This Cause of Action is brought on behalf of Class members to whom the Tokens were offered or sold in the District of Columbia.

598.    The District of Columbia Securities and Investor Protection Act forbids the offer or sale of unregistered securities. D.C. Code Ann. § 31-5603.01. Any person who offers or sells a security in violation of Section 5603.01 is liable to the purchaser for "the consideration paid for the security, interest at the rate used in the Superior Court of the District of Columbia from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security and any income received on it" or for "damages if the buyer no longer owns the security" in the "amount that would be recoverable on a tender less the value of the security when the buyer disposed of it, plus interest at the rate used in the Superior Court of the District of Columbia from the date of disposition." *Id.* § 31.5606.05(b).

599.    When issued, the Tokens were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, Binance offered or sold the Tokens to members of the Class in District of Columbia. The Tokens were neither registered under, nor subject to exemption from registration under the District of Columbia Securities and Investor Protection Act. *Id.* § 31.5601.01(31).

600.    On information and belief, the Tokens were offered or sold in District of Columbia, including without limitation through solicitations directed by Binance to District of Columbia and received in District of Columbia.

601.    Accordingly, Binance has violated the District of Columbia Securities and Investor Protection Act through Binance's sale of unregistered securities.

602.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any the Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

603.    Class members who no longer own the Tokens seek damages for any the Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTIETH CAUSE OF ACTION**
**(DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**D.C. Code Ann. § 31-5606.05**
**(Individual Defendants)**

604.    Plaintiffs reallege the allegations above.

605.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in the District of Columbia.

606.    The District of Columbia Securities and Investor Protection Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under District of Columbia law. D.C. Code Ann. § 31-5602.01. Any person who offers or sells a security in violation of Section 5603.01 is liable to the purchaser for "the consideration paid for the security, interest at the rate used in the Superior Court of the District of Columbia from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security and any income received on it" or for "damages if the buyer no longer owns the security" in the "amount that would be recoverable on a tender less the value of the security when the buyer disposed of it, plus interest at the rate used in the Superior Court of the District of Columbia from the date of disposition." *Id.* § 31.5606.05(b).

607.    When issued, the Tokens were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in the District of Columbia. *Id.* § 36b-3(1) and (5).

608.    On information and belief, Binance transacted business as a broker-dealer or agent in the District of Columbia, including without limitation through solicitations directed by Binance to the District of Columbia and received in District of Columbia.

609.    Binance was not registered as a broker-dealer or agent in the District of Columbia, nor was it subject to any exemption from registration.

610.    Accordingly, Binance has violated the District of Columbia Securities and Investor Protection Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

611.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

612.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTY-FIRST CAUSE OF ACTION
### (DISTRICT OF COLUMBIA LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### D.C. Code Ann. § 31-5606.05
### (Individual Defendants)

613.    Plaintiffs reallege the allegations above.

614.    This Cause of Action is brought on behalf of Class members to whom the Tokens were offered or sold in District of Columbia.

615.    Every person who directly or indirectly controls an entity liable under the District of Columbia Securities Act for unlawfully selling unregistered securities or for operation of an unlicensed broker-dealer, as well as "partner, officer, or director of the person liable" or "a person occupying a similar status or performing similar functions" is "liable jointly and severally with,

and to the same extent as the person liable, unless her or she is able to sustain the burden of proof that he or she did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution among the several persons so liable." D.C. Code Ann. § 31-5606.05(c).

616.    When issued, the Tokens were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, Binance offered and sold the Tokens to members of the Class in District of Columbia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the District of Columbia Securities and Investor Protection Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under District of Columbia law.

617.    On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in District of Columbia, including without limitation through solicitations directed by Binance to District of Columbia and received in District of Columbia.

618.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and operation of an unregistered broker-dealer as described herein.

619.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the District of Columbia Securities and Investor Protection Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer.

620.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any the Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

621.     Class members who no longer own the Tokens seek damages for any the Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-SECOND CAUSE OF ACTION**
**(FLORIDA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Fla. Stat. § 517.211**
**(Binance)**

</div>

622.     Plaintiffs reallege the allegations above.

623.     This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Florida.

624.     The Florida Securities and Investor Protection Act forbids the offer or sale of unregistered securities. Fla. Stat. § 517.07(1). Any person who offers or sells a security in violation of Section 517.07(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees. *Id.* § 517.211.

625.     When issued, the Tokens were securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22). Binance offered or sold the Tokens to a Plaintiff in Florida. The Tokens were neither registered under, nor subject to exemption from registration under the Florida Securities and Investor Protection Act. *Id.* §§ 517.051, 517.061.

626.     The Tokens were offered or sold in Florida, including without limitation through solicitations directed by Binance to Florida and received in Florida.

627.    Accordingly, Binance has violated the Florida Securities and Investor Protection Act through Binance's sale of unregistered securities.

628.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

629.    Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-THIRD CAUSE OF ACTION**
**(FLORIDA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**Fla. Stat. § 517.211**
**(Binance)**

</div>

630.    Plaintiffs reallege the allegations above.

631.    This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Florida.

632.    The Florida Securities and Investor Protection Act forbids any person from transacting business as a dealer unless he is registered or exempt from registration under Florida law. Fla. Stat. § 517.12(1). Any person who offers or sells a security in violation of Section 517.12(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees. *Id.* § 517.211.

633.    When issued, the Tokens were securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22). Binance transacted business as a dealer when it offered or sold the Tokens to a Plaintiff in Florida. *Id.* § 517.021(6).

634.    Binance transacted business as a dealer in Florida, including without limitation through solicitations directed by Binance to Florida and received in Florida.

635.    Binance was not registered as a dealer in Florida, nor was it subject to any exemption from registration.

636.    Accordingly, Binance has violated the Florida Securities and Investor Protection Act by transacting business as an unregistered dealer in the sale of securities.

637.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

638.    Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTY-FOURTH CAUSE OF ACTION
### (FLORIDA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Fla. Stat. § 517.211
### (Individual Defendants)

639.    Plaintiffs reallege the allegations above.

640.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Florida.

641.    Every person who directly or indirectly controls an entity liable under the Florida Securities and Investor Protection Act for unlawfully selling unregistered securities or for operating as an unregistered dealer in the sale of those securities, as well as "every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action

for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security." *Id.* § 517.211(1).

642.    When issued, the Tokens were securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22). Binance offered and sold the Tokens to a Plaintiff in Florida and acted as the dealer for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Florida Securities and Investor Protection Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Florida law. *Id.* § 517.12(1).

643.    Binance offered and sold the Tokens and acted as a dealer in Florida, including without limitation through solicitations directed by Binance to Florida and received in Florida.

644.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer as described herein.

645.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Florida Securities and Investor Protection Act through Binance's offer or sale of unregistered securities and operation as an unregistered dealer.

646.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

647.    Plaintiffs and Class members who no longer own the Tokens seek damages for any

Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTY-FIFTH CAUSE OF ACTION**
**(GEORGIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Ga. Code Ann. § 10-5-58**
**(Binance)**

648.    Plaintiffs reallege the allegations above.

649.    This Cause of Action is brought on behalf of Class members to whom Tokens were

sold in Georgia.

650.    The Georgia Uniform Securities Act forbids the sale of unregistered securities. Ga.

Code Ann. § 10-5-20. Any person who sells a security in violation of Section 10-5-20 is "liable to

the purchaser," who may "maintain an action to recover the consideration paid for the security,

less the amount of any income received on the security, and interest at the legal rate of interest

from the date of purchase, costs, and reasonable attorney fees determined by the Court upon the

tender of the security or for actual damages." *Id.* § 10-5-58.

651.    When issued, the Tokens were securities within the meaning of the Georgia

Uniform Securities Act. *Id.* § 10-5-2(31). On information and belief, Binance sold the Tokens to

members of the Class in Georgia. The Tokens were neither registered under, nor subject to

exemption from registration under the Georgia Uniform Securities Act. *Id.* § 10-5-10.

652.    Upon information and belief, the Tokens were sold in Georgia, including without

limitation through solicitations directed by Binance to Georgia and received in Georgia.

653.    Accordingly, Binance has violated the Georgia Uniform Securities Act through

Binance's sale of unregistered securities.

654.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

655.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-SIXTH CAUSE OF ACTION**
**(GEORGIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Ga. Code Ann. § 10-5-58**
**(Binance)**

</div>

656.    Plaintiffs reallege the allegations above.

657.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Georgia.

658.    The Georgia Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Georgia law. Ga. Code Ann. §§ 10-5-30, 10-5-31. Any person who sells a security in violation of Sections 10-5-30 or 10-5-31 is "liable to the purchaser," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of purchase, costs, and reasonable attorney fees determined by the Court upon the tender of the security or for actual damages." *Id.* § 10-5-58.

659.    When issued, the Tokens were securities within the meaning of the Georgia Uniform Securities Act. *Id.* § 10-5-2(31). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Georgia. *Id.* §§ 10-5-2(1), (3).

660.    On information and belief, Binance transacted business as a broker-dealer or agent in Georgia, including without limitation through solicitations directed by Binance to Georgia and received in Georgia.

661.    Binance was not registered as a broker-dealer or agent in Georgia, nor was it subject to any exemption from registration.

662.    Accordingly, Binance has violated the Georgia Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

663.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

664.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-SEVENTH CAUSE OF ACTION**
**(GEORGIA STATE LAW – ADDITIONAL LIABILITY**
**Control Person Liability**
**Ga. Code Ann. § 10-5-58**
**(Individual Defendants)**

</div>

665.    Plaintiffs reallege the allegations above.

666.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Georgia.

667.    Every person who directly or indirectly controls an entity liable under the Georgia Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "[a]n individual who is a managing partner, executive officer, or director of a person liable" including "an individual having similar status or performing similar functions," "[a]n individual who is an employee of or

<div align="center">148</div>

associated with the person liable, and who materially aids the conduct giving rise to the liability," and "[a] person who is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the seller, unless the non-seller "sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." *Id.* §§ 10-5-58(g).

668.    When issued, the Tokens were securities within the meaning of the Georgia Uniform Securities Act. *Id.* § 10-5-2(31). On information and belief, Binance sold the Tokens to members of the Class in Georgia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Georgia Uniform Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Georgia law. *Id.* §§ 10-5-30, 10-5-31.

669.    On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Georgia, including without limitation through solicitations directed by Binance to Georgia and received in Georgia.

670.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

671.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Georgia Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

672.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

673.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-EIGHTH CAUSE OF ACTION**
**(HAWAII STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**HRS § 485A-509(d)**
**(Binance)**

</div>

674.    Plaintiffs reallege the allegations above.

675.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Hawaii.

676.    The Hawaii Uniform Securities Act forbids the offer or sale of unregistered securities. HRS § 485A-301. Any person who sells a security in violation of Section 485A-301 is "liable to the purchaser … the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest, from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages" if the purchaser no longer owns the security. *Id.* § 485A-509(b).

677.    When issued, the Tokens were securities within the meaning of the Hawaii Uniform Securities Act. *Id.* § 485A-102. On information and belief, Binance sold the Tokens to members

of the Class in Hawaii. The Tokens were neither registered under, nor subject to exemption from registration under the Hawaii Uniform Securities Act. *Id.* § 485A-201.

678.    Upon information and belief, the Tokens were sold in Hawaii, including without limitation through solicitations directed by Binance to Hawaii and received in Hawaii.

679.    Accordingly, Binance has violated the Hawaii Uniform Securities Act through Binance's sale of unregistered securities.

680.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

681.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**THIRTY-NINTH CAUSE OF ACTION**
**(HAWAII STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**HRS § 485A-509(d)**
**(Binance)**

</div>

682.    Plaintiffs reallege the allegations above.

683.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Hawaii.

684.    The Hawaii Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Hawaii law. HRS § 485A-401(a). Any person who sells a security in violation of Section 485A-401(a) is "liable to the purchaser … the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest, from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual

damages" if the purchaser no longer owns the security. *Id.* § 485A-509(d) (citing *Id.* § 485A-509(b)).

685.    When issued, the Tokens were securities within the meaning of the Hawaii Uniform Securities Act. *Id.* § *Id.* § 485A-102. On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Hawaii. *Id.* § *Id.* § 485A-402.

686.    On information and belief, Binance transacted business as a broker-dealer or agent in Hawaii, including without limitation through solicitations directed by Binance to Hawaii and received in Hawaii.

687.    Binance was not registered as a broker-dealer or agent in Hawaii, nor was it subject to any exemption from registration.

688.    Accordingly, Binance has violated the Hawaii Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

689.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

690.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FORTIETH CAUSE OF ACTION
### (HAWAII STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### HRS § 485A-509(g)
### (Individual Defendants)

691.    Plaintiffs reallege the allegations above.

692.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Hawaii.

693.    Every person who directly or indirectly controls an entity liable under the Hawaii Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "individual who is a managing partner, executive officer, or director of a person liable," is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. HRS § 485A-509(g).

694.    When issued, the Tokens were securities within the meaning of the Hawaii Uniform Securities Act. *Id.* § 485A-102. On information and belief, Binance sold the Tokens to members of the Class in Hawaii and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Hawaii Uniform Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Hawaii law. *Id.* § 485A-401(a).

695.    On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Hawaii, including without limitation through solicitations directed by Binance to Hawaii and received in Hawaii.

696.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of

unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

697.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Hawaii Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

698.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

699.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-FIRST CAUSE OF ACTION**
**(IDAHO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**I.C. § 30-14-509(b)**
**(Binance)**

</div>

700.    Plaintiffs reallege the allegations above.

701.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Idaho.

702.    The Idaho Uniform Securities Act forbids the offer or sale of unregistered securities. I.C. § 30-14-301. Any person who sells a security in violation of Section 30-14-301 is liable to the purchaser for "the consideration paid for the security, less the amount of any income received on the security, and interest at the annual rate of interest set forth in section 28-22-104(2), Idaho Code, from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages as provided in subsection (b)(3) of this section. *Id.* § 30-14-509(b)(1). The annual rate of interest on judgments is "five percent (5%)

<div align="center">154</div>

plus the base rate in effect at the time of entry of the judgment. The base rate shall be determined on July 1 of each year by the Idaho state treasurer and shall be the weekly average yield on United States treasury securities as adjusted to a constant maturity of one (1) year and rounded up to the nearest one-eighth percent (1/8%)." *Id.* § 28-22-104.

703.    When issued, the Tokens were securities within the meaning of the Idaho Uniform Securities Act. *Id.* § 30-14-102 (28). On information and belief, Binance sold the Tokens to members of the Class in Idaho. The Tokens were neither registered under, nor subject to exemption from registration under the Idaho Uniform Securities Act. *Id.* § 30-14-201.

704.    Upon information and belief, the Tokens were sold in Idaho, including without limitation through solicitations directed by Binance to Idaho and received in Idaho.

705.    Accordingly, Binance has violated the Idaho Uniform Securities Act through Binance's sale of unregistered securities.

706.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

707.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FORTY-SECOND CAUSE OF ACTION
### (IDAHO STATE LAW – PRIMARY LIABILITY
### Transacting Business as an Unregistered Broker-Dealer
### I.C. § 30-14-509(d)
### (Binance)

708.    Plaintiffs reallege the allegations above.

709.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Idaho.

710.    The Idaho Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Idaho law. I.C. §§ 30-14-401(a), 30-14-402(a). Any person who sells a security in violation of Sections 30-14-401(a) and 30-14-402(a) "is liable to the customer. The customer, if a purchaser, may maintain an action for recovery of actual damages as specified in subsections (b)(1) through (3)." *Id.* § 30-14-509(d). Actual damages are defined as "the amount that would be recoverable upon a tender [of the security] less the value of the security when the purchaser disposed of it, and interest at the annual rate of interest set forth in section 28-22-104(2), Idaho Code, from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 30-14-509(b)(3). The annual rate of interest on judgments is "five percent (5%) plus the base rate in effect at the time of entry of the judgment. The base rate shall be determined on July 1 of each year by the Idaho state treasurer and shall be the weekly average yield on United States treasury securities as adjusted to a constant maturity of one (1) year and rounded up to the nearest one-eighth percent (1/8%)." *Id.* § 28-22-104.

711.    When issued, the Tokens were securities within the meaning of the Idaho Uniform Securities Act. *Id.* § 30-14-102(28). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Idaho. *Id.* §§ 30-14-102(2), 30-14-102(4).

712.    On information and belief, Binance transacted business as a broker-dealer or agent in Idaho, including without limitation through solicitations directed by Binance to Idaho and received in Idaho.

713.    Binance was not registered as a broker-dealer or agent in Idaho, nor was it subject to any exemption from registration.

714.    Accordingly, Binance has violated the Idaho Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

715.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

716.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-THIRD CAUSE OF ACTION**
**(IDAHO STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**I.C. § 30-14-509(g)**
**(Individual Defendants)**

</div>

717.    Plaintiffs reallege the allegations above.

718.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Idaho.

719.    Every person who directly or indirectly controls an entity liable under the Idaho Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f), including an individual having a similar status or performing similar functions" is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist. I.C. § 30-14-509(g).

720.    When issued, the Tokens were securities within the meaning of the Idaho Uniform Securities Act. *Id.* § 30-14-102(28). On information and belief, Binance sold the Tokens to members of the Class in Idaho and acted as the broker-dealer or agent for the sale and purchase of those securities. *Id.* §§ 30-14-102(2), 30-14-102(4). The Tokens were neither registered under, nor subject to exemption from registration under the Idaho Uniform Securities Act, and Binance was not registered as a broker-dealer or agent under Idaho law. *Id.* §§ 30-14-201, 30-14-202.

721.    On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Idaho, including without limitation through solicitations directed by Binance to Idaho and received in Idaho.

722.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

723.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Idaho Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

724.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

725.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FORTY-FOURTH CAUSE OF ACTION**
**(ILLINOIS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**815 Ill. Comp. Stat. Ann. 5/13**
**(Binance)**

726.    Plaintiffs reallege the allegations above.

727.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Illinois.

728.    The Illinois Securities Law of 1953 forbids the sale of unregistered securities. 815 Ill. Comp. Stat. Ann. 5/5. Any person who sells a security in violation of Section 5/5 is "liable to the purchaser," who may recover "the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10% per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold," as well as "reasonable fees and expenses." *Id.* § 5/13.

729.    When issued, the Tokens were securities within the meaning of the Illinois Securities Law of 1953. *Id.* § 5/2.1. On information and belief, Binance sold the Tokens to members of the Class in Illinois. The Tokens were neither registered under, nor subject to exemption from registration under the Illinois Securities Law of 1953. *Id.* §§ 5/3, 5/4.

730.    Upon information and belief, the Tokens were sold in Illinois, including without limitation through solicitations directed by Binance to Illinois and received in Illinois.

731.    Accordingly, Binance has violated the Illinois Securities Law of 1953 through Binance's sale of unregistered securities.

732.    Plaintiffs learned that the sale was voidable under Illinois law within six months prior to the submission of the Proposed Amended Complaint (ECF No. 31-1) (the "Proposed Amended Complaint"). Prior to filing the Proposed Amended Complaint, Plaintiffs provided to Binance, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind, on behalf of the Class, the purchase of any Tokens they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

733.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

734.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FORTY-FIFTH CAUSE OF ACTION**
**(ILLINOIS STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer or Salesperson**
**815 Ill. Comp. Stat. Ann. 5/13**
**(Binance)**

735.    Plaintiffs reallege the allegations above.

736.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Illinois.

737.    The Illinois Securities Law of 1953 forbids any person from transacting business as a dealer or salesperson unless he is registered or exempt from registration under Illinois law. 815 Ill. Comp. Stat. Ann. 5/8. Any person who sells a security in violation of Section 5/8 is "liable to the purchaser," who may recover "the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10% per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold," as well as "reasonable fees and expenses." *Id.* § 5/13.

738.    When issued, the Tokens were securities within the meaning of the Illinois Securities Law of 1953. *Id.* § 5/2.1. On information and belief, Binance transacted business as a dealer or salesperson when it sold the Tokens to members of the Class in Illinois. *Id.* §§ 5/2.7, 5/2.9.

739.    On information and belief, Binance transacted business as a dealer or salesperson in Illinois, including without limitation through solicitations directed by Binance to Illinois and received in Illinois.

740.    Binance was not registered as a dealer or salesperson in Illinois, nor was it subject to any exemption from registration.

741.    Accordingly, Binance has violated the Illinois Securities Law of 1953 by transacting business as an unregistered dealer or salesperson in the sale of securities.

742.    Plaintiffs learned that the sale was voidable under Illinois law within six months prior to the filing of the Proposed Amended Complaint. Prior to filing the Proposed Amended Complaint, Plaintiffs provided to Binance, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind,

on behalf of the Class, the purchase of any Tokens they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

743.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

744.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-SIXTH CAUSE OF ACTION**
**(ILLINOIS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**815 Ill. Comp. Stat. Ann. 5/13**
**(Individual Defendants)**

</div>

745.    Plaintiffs reallege the allegations above.

746.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Illinois.

747.    Every person who directly or indirectly controls an entity liable under the Illinois Securities Law of 1953 for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter, dealer,

or internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale, shall be jointly and severally liable to the purchaser." *Id.* § 5/15(A).

748.    When issued, the Tokens were securities within the meaning of the Illinois Securities Law of 1953. *Id.* § 5/2.1. On information and belief, Binance sold the Tokens to members of the Class in Illinois and acted as the dealer or salesperson for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Illinois Securities Law of 1953, and Binance was not registered or exempt from registration as a dealer or salesperson under Illinois law. *Id.* § 5/8.

749.    On information and belief, Binance sold the Tokens and acted as a dealer or salesperson in Illinois, including without limitation through solicitations directed by Binance to Illinois and received in Illinois.

750.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered dealer or salesperson as described herein.

751.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Illinois Securities Law of 1953 through Binance's sale of unregistered securities and operation as an unregistered dealer or salesperson.

752.    Plaintiffs learned that the sale was voidable under Illinois law within six months prior to the filing of the Proposed Amended Complaint. Prior to filing the Proposed Amended Complaint, Plaintiffs provided to Binance, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind, on behalf of the Class, the purchase of any Tokens they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

753.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

754.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FORTY-SEVENTH CAUSE OF ACTION**
**(INDIANA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Indiana Code § 23-19-5-9(a)**
**(Binance)**

755.    Plaintiffs reallege the allegations above.

756.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Indiana.

757.    The Indiana Uniform Securities Act forbids the offer or sale of unregistered securities. Indiana Code § 23-19-3-1. Any person who sells a security in violation of Section 23-

19-3-1 is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the greater of eight percent (8%) per annum or the rate provided for in the security from the date of the purchase, costs, and reasonable attorney's fees determined by the court or arbitrator, upon the tender of the security, or for actual damages...." *Id.* § 23-19-5-9(a).

758.    When issued, the Tokens were securities within the meaning of the Indiana Securities Act. *Id.* § 23-19-1-2(28). On information and belief, Binance sold the Tokens to members of the Class in Indiana. The Tokens were neither registered under, nor subject to exemption from registration under the Indiana Securities Act. *Id.* § 23-19-2-1

759.    Upon information and belief, the Tokens were sold in Indiana, including without limitation through solicitations directed by Binance to Indiana and received in Indiana.

760.    Accordingly, Binance has violated the Indiana Uniform Securities Act through Binance's sale of unregistered securities.

761.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

762.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FORTY-EIGHTH CAUSE OF ACTION
### (INDIANA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### 23-19-5-9(a)
### (Binance)

763.    Plaintiffs reallege the allegations above.

764.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Indiana.

765.    The Indiana Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Indiana law. Indiana Code § 23-19-4-1(a). Any person who sells a security in violation of Section 23-19-4-1(a) is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the greater of eight percent (8%) per annum or the rate provided for in the security from the date of the purchase, costs, and reasonable attorney's fees determined by the court or arbitrator, upon the tender of the security, or for actual damages…." *Id.* § 23-19-5-9(a).

766.    When issued, the Tokens were securities within the meaning of the Indiana Securities Act. *Id.* § 23-19-1-2(28). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Indiana. *Id.* § 23-19-1-2(1), (3).

767.    On information and belief, Binance transacted business as a broker-dealer or agent in Indiana, including without limitation through solicitations directed by Binance to Indiana and received in Indiana.

768.    Binance was not registered as a broker-dealer or agent in Indiana, nor was it subject to any exemption from registration.

769.    Accordingly, Binance has violated the Indiana Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

770.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

771.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FORTY-NINTH CAUSE OF ACTION**
**(INDIANA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Indiana Code § 23-19-5-9(d)**
**(Individual Defendants)**

</div>

772.    Plaintiffs reallege the allegations above.

773.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Indiana.

774.    Every person who directly or indirectly controls an entity liable under the Indiana Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "individual who is a managing partner, executive officer, or director of a person liable," is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist  Indiana Code § 23-19-5-9(d).

775.    When issued, the Tokens were securities within the meaning of the Indiana Securities Act. *Id.* § 23-19-1-2(28). On information and belief, Binance sold the Tokens to members of the Class in Indiana and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from

<div align="center">167</div>

registration under the Indiana Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Indiana law. *Id.* § 23-19-4-1(a).

776.    On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Indiana, including without limitation through solicitations directed by Binance to Indiana and received in Indiana.

777.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

778.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Indiana Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

779.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

780.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTIETH CAUSE OF ACTION
### (IOWA STATE LAW – PRIMARY LIABILITY)
### Unregistered Sale of Securities
### I.C.A. § 502.509(2)
### (Binance)

781.    Plaintiffs reallege the allegations above.

782.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Iowa.

783.    The Iowa Uniform Securities Act forbids the offer or sale of unregistered securities. I.C.A. § 502.301. Any person who sells a security in violation of Section 502.301 is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages…." *Id.* § 502.509(2).

784.    When issued, the Tokens were securities within the meaning of the Iowa Securities Act. *Id.* § 502.102(28) sold the Tokens to members of the Class in Iowa. The Tokens were neither registered under, nor subject to exemption from registration under the Iowa Securities Act. *Id.* § 502.201.

785.    Upon information and belief, the Tokens were sold in Iowa, including without limitation through solicitations directed by Binance to Iowa and received in Iowa.

786.    Accordingly, Binance has violated the Iowa Uniform Securities Act through Binance's sale of unregistered securities.

787.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

788.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-FIRST CAUSE OF ACTION
### (IOWA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### I.C.A. § 502.509(4)
### (Binance)

789.    Plaintiffs reallege the allegations above.

790.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Iowa.

791.    The Iowa Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Iowa law. I.C.A. § 502.401(1). Any person who sells a security in violation of Section 502.401(1) is "liable to the customer" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages…." *Id.* § 502.509(4) (citing § 502.509(2)).

792.    When issued, the Tokens were securities within the meaning of the Iowa Securities Act. *Id.* § 502.102(28). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Iowa. *Id.* § 502.102(2), (4).

793.    On information and belief, Binance transacted business as a broker-dealer or agent in Iowa, including without limitation through solicitations directed by Binance to Iowa and received in Iowa.

794.    Binance was not registered as a broker-dealer or agent in Iowa, nor was it subject to any exemption from registration.

795.    Accordingly, Binance has violated the Iowa Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

796.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

797.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FIFTY-SECOND CAUSE OF ACTION**
**(IOWA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**I.C.A. § 502.509(7)**
**(Individual Defendants)**

</div>

798.    Plaintiffs reallege the allegations above.

799.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Iowa.

800.    Every person who directly or indirectly controls an entity liable under the Iowa Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "managing partner, executive officer, or director of a person liable … including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. I.C.A. § 502.509(7)

801.    When issued, the Tokens were securities within the meaning of the Iowa Securities Act. *Id.* § 502.102(28). On information and belief, Binance sold the Tokens to members of the

Class in Iowa and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Iowa Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Iowa law. *Id.* § 502.401(1).

802.    On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Iowa, including without limitation through solicitations directed by Binance to Iowa and received in Iowa.

803.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

804.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Iowa Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

805.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

806.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-THIRD CAUSE OF ACTION**
**(KANSAS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Kan. Stat. Ann. § 17-12a509**
**(Binance)**

807.    Plaintiffs reallege the allegations above.

808.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Kansas.

809.    The Kansas Uniform Securities Act forbids the offer or sale of unregistered securities. Kan. Stat. Ann. § 17-12a301. Any person who sells a security in violation of Section 17-12a301 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest from the date of the purchase … costs, and reasonable attorneys' fees determined by the court, upon the tender of the security," or if the purchaser no longer owns the security, "[a]ctual damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest from the date of the purchase … costs, and reasonable attorneys' fees determined by the court." *Id.* § 17-12a509(b).

810.    When issued, the Tokens were securities within the meaning of the Kansas Uniform Securities Act. *Id.* § 17-12a102(28). On information and belief, Binance sold the Tokens to members of the Class in Kansas. The Tokens were neither registered under, nor subject to exemption from registration under the Kansas Uniform Securities Act. *Id.* § 17-12a301.

811.    Upon information and belief, the Tokens were sold in Kansas, including without limitation through solicitations directed by Binance to Kansas and received in Kansas.

812.    Accordingly, Binance has violated the Kansas Uniform Securities Act through Binance's sale of unregistered securities.

813.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

814.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**FIFTY-FOURTH CAUSE OF ACTION**
**(KANSAS STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Kan. Stat. Ann. § 17-12a509**
**(Binance)**

</div>

815.    Plaintiffs reallege the allegations above.

816.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Kansas.

817.    The Kansas Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Kansas law. Kan. Stat. Ann. § 17-12a401(a). Any person acting as a broker-dealer who sells a security in violation of Section 17-12a401(a) is "liable to the customer," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security … upon the tender of the security, or for actual damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it," and "interest from the date of the purchase at the rate provided for interest on judgments by Kan. Stat. Ann. § 16-204, and amendments thereto, costs, and reasonable attorneys' fees determined by the court." *Id.* §§ 17-12a509(b)(1)-(3), (d).

818.    When issued, the Tokens were securities within the meaning of the Kansas Uniform Securities Act. *Id.* § 17-12a102(28). On information and belief, Binance transacted business as a

broker-dealer or agent when it sold the Tokens to members of the Class in Kansas. *Id.* § 17-12a102(2), (4).

819.    On information and belief, Binance transacted business as a broker-dealer or agent in Kansas, including without limitation through solicitations directed by Binance to Kansas and received in Kansas.

820.    Binance was not registered as a broker-dealer or agent in Kansas, nor was it subject to any exemption from registration.

821.    Accordingly, Binance has violated the Kansas Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

822.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

823.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-FIFTH CAUSE OF ACTION**
**(KANSAS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Kan. Stat. Ann. § 17-12a509**
**(Individual Defendants)**

824.    Plaintiffs reallege the allegations above.

825.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Kansas.

826.    Every person who directly or indirectly controls an entity liable under the Kansas Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "individual who

is a managing partner, executive officer, or director" of such an entity, "including an individual having a similar status or performing similar functions," and any "individual who is an employee of or associated with" such an entity "and who materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless the individual "sustains the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Kan. Stat. Ann. § 17-12a509(g).

827.    When issued, the Tokens were securities within the meaning of the Kansas Uniform Securities Act. *Id.* § 17-12a102(28). On information and belief, Binance sold the Tokens to members of the Class in Kansas and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Kansas Uniform Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Kansas law. *Id.* §§ 17-12a301, 17-12a401.

828.    On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Kansas, including without limitation through solicitations directed by Binance to Kansas and received in Kansas.

829.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

830.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Kansas Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

831.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

832.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTY-SIXTH CAUSE OF ACTION
## (KENTUCKY STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### Ky. Rev. Stat. Ann. § 292.480
### (Binance)

833.    Plaintiffs reallege the allegations above.

834.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Kentucky.

835.    The Securities Act of Kentucky forbids the offer or sale of unregistered securities. Ky. Rev. Stat. Ann. § 292.340. Any person who offers or sells a security in violation of Section 292.340 is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security," or if the purchaser no longer owns the security, for damages in the "amount that would be recoverable upon a tender less … [t]he value of the security when the buyer is disposed of it; and … [i]nterest at the legal rate per annum from the date of disposition." *Id.* § 292.480(1).

836.    When issued, the Tokens were securities within the meaning of the Securities Act of Kentucky. *Id.* § 292.310(19). On information and belief, Binance offered or sold the Tokens to members of the Class in Kentucky. The Tokens were neither registered under, nor subject to exemption from registration under the Securities Act of Kentucky. *Id.* § 292.340.

837.    Upon information and belief, the Tokens were offered or sold in Kentucky, including without limitation through solicitations directed by Binance to Kentucky and received in Kentucky.

838.    Accordingly, Binance has violated the Securities Act of Kentucky through Binance's offer and sale of unregistered securities.

839.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

840.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-SEVENTH CAUSE OF ACTION**
**(KENTUCKY STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Ky. Rev. Stat. Ann. § 292.480**
**(Binance)**

841.    Plaintiffs reallege the allegations above.

842.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Kentucky.

843.    The Securities Act of Kentucky forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Kentucky law. Ky. Rev. Stat. Ann. § 292.330(1), (3). Any person who offers or sells a security in violation of Section

178

292.330 is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security," or if the purchaser no longer owns the security, for damages in the "amount that would be recoverable upon a tender less … [t]he value of the security when the buyer is disposed of it; and … [i]nterest at the legal rate per annum from the date of disposition." *Id.* § 292.480(1).

844.    When issued, the Tokens were securities within the meaning of the Securities Act of Kentucky. *Id.* § 292.310(19). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Kentucky. *Id.* § 292.310(1), (2).

845.    On information and belief, Binance transacted business as a broker-dealer or agent in Kentucky, including without limitation through solicitations directed by Binance to Kentucky and received in Kentucky.

846.    Binance was not registered as a broker-dealer or agent in Kentucky, nor was it subject to any exemption from registration.

847.    Accordingly, Binance has violated the Securities Act of Kentucky by transacting business as an unregistered broker-dealer or agent in the offer and sale of securities.

848.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

849.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-EIGHTH CAUSE OF ACTION
### (KENTUCKY STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Ky. Rev. Stat. Ann. § 292.480
### (Individual Defendants)

850.    Plaintiffs reallege the allegations above.

851.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Kentucky.

852.    Every person who directly or indirectly controls an entity liable under the Securities Act of Kentucky for unlawfully offering or selling unregistered securities or for operating as an unregistered broker-dealer or agent in the offer or sale of those securities, as well as "every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of a seller or purchaser who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase is also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. Ky. Rev. Stat. Ann. § 292.480(4).

853.    When issued, the Tokens were securities within the meaning of the Securities Act of Kentucky. *Id.* § 292.310(19). On information and belief, Binance offered and sold the Tokens to members of the Class in Kentucky and acted as the broker-dealer or agent for the offer, sale, and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Securities Act of Kentucky, and Binance was not registered or exempt from registration as a broker-dealer or agent under Kentucky law. *Id.* §§ 292.330, 292.340.

854.    On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Kentucky, including without limitation through solicitations directed by Binance to Kentucky and received in Kentucky.

855.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

856.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Securities Act of Kentucky through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

857.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

858.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-NINTH CAUSE OF ACTION**
**(LOUISIANA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**La. Stat. Ann. § 51:714**
**(Binance)**

859.    Plaintiffs reallege the allegations above.

860.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Louisiana.

861.    The Louisiana Securities Law forbids the offer or sale of unregistered securities. La. Stat. Ann. § 51:705. Any person who offers or sells a security in violation of Section 51:705 is "liable to the person buying such security, and such buyer may sue in any court to recover the consideration paid in cash or, if such consideration was not paid in cash, the fair value thereof at the time such consideration was paid for the security with interest thereon from the date of payment down to the date of repayment … less the amount of any income received thereon, together with all taxable court costs and reasonable attorneys' fees, upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security" in the amount "which equals the difference between the fair value of the consideration the buyer gave for the security and the fair value of the security at the time the buyer disposed of it, plus interest thereon from the date of payment to the date of repayment." *Id.* §§ 51:714(A); 51:712(A)(1).

862.    When issued, the Tokens were securities within the meaning of the Louisiana Securities Law. *Id.* § 51:702(15)(b). On information and belief, Binance offered or sold the Tokens to members of the Class in Louisiana. The Tokens were neither registered under, nor subject to exemption from registration under the Louisiana Securities Law. *Id.* § 51:705.

863.    Upon information and belief, the Tokens were offered or sold in Louisiana, including without limitation through solicitations directed by Binance to Louisiana and received in Louisiana.

864.    Accordingly, Binance has violated the Louisiana Securities Law through Binance's offer and sale of unregistered securities.

865.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

866.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTIETH CAUSE OF ACTION**
**(LOUISIANA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**La. Stat. Ann. § 51:714**
**(Binance)**

</div>

867.    Plaintiffs reallege the allegations above.

868.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Louisiana.

869.    The Louisiana Securities Law forbids any dealer or salesman from offering for sale or selling any securities unless he is registered or exempt from registration under Louisiana law. La. Stat. Ann. § 51:703(1). Any person who offers or sells a security in violation of Section 51:703 is "liable to the person buying such security, and such buyer may sue in any court to recover the consideration paid in cash or, if such consideration was not paid in cash, the fair value thereof at the time such consideration was paid for the security with interest thereon from the date of payment down to the date of repayment … less the amount of any income received thereon, together with all taxable court costs and reasonable attorneys' fees, upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security" in the amount "which equals the difference between the fair value of the consideration the buyer gave for the security and the fair value of the security at the time the buyer disposed of it, plus

interest thereon from the date of payment to the date of repayment." *Id.* §§ 51:714(A); 51:712(A)(1).

870.    When issued, the Tokens were securities within the meaning of the Louisiana Securities Law. *Id.* § 51:702(15)(b). On information and belief, Binance transacted business as a dealer or salesman when it offered or sold the Tokens to members of the Class in Louisiana. *Id.* § 51:702(5), (14).

871.    On information and belief, Binance transacted business as a dealer or salesman in Louisiana, including without limitation through solicitations directed by Binance to Louisiana and received in Louisiana.

872.    Binance was not registered as a dealer or salesman in Louisiana, nor was it subject to any exemption from registration.

873.    Accordingly, Binance has violated the Louisiana Securities Law by transacting business as an unregistered dealer or salesman in the offer or sale of securities.

874.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

875.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-FIRST CAUSE OF ACTION**
**(LOUISIANA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**La. Stat. Ann. § 51:714**
**(Individual Defendants)**

876.    Plaintiffs reallege the allegations above.

184

877.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Louisiana.

878.    Every person who directly or indirectly controls an entity liable under the Louisiana Securities Act for unlawfully offering or selling unregistered securities or for operating as an unregistered dealer or salesman in the offer or sale of those securities, as well as "every general partner, executive officer, or director of such [entity], every person occupying a similar status or performing similar functions, and every dealer or salesman who participates in any material way in the sale is liable jointly and severally with and to the same extent as the [entity] unless the person whose liability arises under this Subsection sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist." La. Stat. Ann. § 51:714(B).

879.    When issued, the Tokens were securities within the meaning of the Louisiana Securities Law. *Id.* § 51:702(15)(b). On information and belief, Binance offered and sold the Tokens to members of the Class in Louisiana and acted as the dealer or salesman for the offer, sale, and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Louisiana Securities Law, and Binance was not registered or exempt from registration as a broker-dealer or agent under Louisiana law. *Id.* §§ 51:703; 51:705.

880.    On information and belief, Binance offered and sold the Tokens and acted as a dealer or salesman in Louisiana, including without limitation through solicitations directed by Binance to Louisiana and received in Louisiana.

881.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer or salesman as described herein.

882.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Louisiana Securities Law through Binance's offer or sale of unregistered securities and operation as an unregistered dealer or salesman.

883.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

884.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTY-SECOND CAUSE OF ACTION**
**(MAINE STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Me. Rev. Stat. tit. 32, § 16509**
**(Binance)**

</div>

885.    Plaintiffs reallege the allegations above.

886.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Maine.

887.    The Maine Uniform Securities Act forbids the offer or sale of unregistered securities. Me. Rev. Stat. tit. 32, § 16301. Any person who sells a security in violation of Section 16301 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined

<div align="center">186</div>

by the court, upon the tender of the security, or for actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 16509(2).

888.   When issued, the Tokens were securities within the meaning of the Maine Uniform Securities Act. *Id.* § 16102(28). On information and belief, Binance sold the Tokens to members of the Class in Maine. The Tokens were neither registered under, nor subject to exemption from registration under the Maine Uniform Securities Act. *Id.* § 16301.

889.   Upon information and belief, the Tokens were sold in Maine, including without limitation through solicitations directed by Binance to Maine and received in Maine.

890.   Accordingly, Binance has violated the Maine Uniform Securities Act through Binance's sale of unregistered securities.

891.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

892.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTY-THIRD CAUSE OF ACTION
### (MAINE STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Me. Rev. Stat. tit. 32, § 16509
### (Binance)

893.   Plaintiffs reallege the allegations above.

894.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Maine.

895.    The Maine Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Maine law. Me. Rev. Stat. tit. 32, §§ 16401(1), 16402(1). Any person who sells a security in violation of Sections 16401(1) or 16402(1) is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 16509(2).

896.    When issued, the Tokens were securities within the meaning of the Maine Uniform Securities Act. *Id.* § 16102(28). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Maine. *Id.* § 16102(2), (4).

897.    On information and belief, Binance transacted business as a broker-dealer or agent in Maine, including without limitation through solicitations directed by Binance to Maine and received in Maine.

898.    Binance was not registered as a broker-dealer or agent in Maine, nor was it subject to any exemption from registration.

899.    Accordingly, Binance has violated the Maine Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

900.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

901.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-FOURTH CAUSE OF ACTION**
**(MAINE STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Me. Rev. Stat. tit. 32, § 16509**
**(Individual Defendants)**

902.    Plaintiffs reallege the allegations above.

903.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Maine.

904.    Every person who directly or indirectly controls an entity liable under the Maine Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "managing partner, executive officer or director" of such an entity, "including an individual having a similar status or performing similar functions," any "individual who is an employee of or associated with" such an entity "and who materially aids the conduct giving rise to the liability," and any "broker-dealer, agent, investment adviser or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless the individual sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Me. Rev. Stat. tit. 32, § 16509(7).

905. When issued, the Tokens were securities within the meaning of the Maine Uniform Securities Act. *Id.* § 16102(28). On information and belief, Binance sold the Tokens to members of the Class in Maine and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Maine Uniform Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Maine law. *Id.* §§ 16401(1), 16402(1).

906. On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Maine, including without limitation through solicitations directed by Binance to Maine and received in Maine.

907. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

908. Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Maine Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

909. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

910.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-FIFTH CAUSE OF ACTION**
**(MARYLAND STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Md. Code Ann., Corps. & Ass'ns § 11-703**
**(Binance)**

911.    Plaintiffs reallege the allegations above.

912.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Maryland.

913.    The Maryland Securities Act forbids the offer or sale of unregistered securities. Md. Code Ann., Corps. & Ass'ns § 11-501. Any person who offers or sells a security in violation of Section 501 is "civilly liable to the person buying a security from him," who "may sue either at law or in equity … [o]n tender of the security, to recover the consideration paid for the security, together with interest at the rate provided for in § 11-107(a) of the [Maryland] Courts and Judicial Proceedings Article, as amended, from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security; or … [i]f he no longer owns the security, for damages" in "the amount that would be recoverable on a tender less the value of the security when the buyer disposed of it and interest at the rate provided for in § 11-107(a) of the Courts and Judicial Proceedings Article, as amended, from the date of disposition." *Id.* § 11-703(a)(1)(i), (b)(1), (b)(3).

914.    When issued, the Tokens were securities within the meaning of the Maryland Securities Act. *Id.* § 11-101(s)(1). On information and belief, Binance offered or sold the Tokens to members of the Class in Maryland. The Tokens were neither registered under, nor subject to exemption from registration under the Maryland Securities Act. *Id.* § 11-501.

915.    Upon information and belief, the Tokens were offered or sold in Maryland, including without limitation through solicitations directed by Binance to Maryland and received in Maryland.

916.    Accordingly, Binance has violated the Maryland Securities Act through Binance's offer and sale of unregistered securities.

917.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

918.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SIXTY-SIXTH CAUSE OF ACTION**
**(MARYLAND STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Md. Code Ann., Corps. & Ass'ns § 11-703**
**(Binance)**

</div>

919.    Plaintiffs reallege the allegations above.

920.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Maryland.

921.    The Maryland Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Maryland law. Md. Code Ann., Corps. & Ass'ns § 11-401(a). Any person who offers or sells a security in violation of Section 401(a) is "civilly liable to the person buying a security from him," who "may sue either at law or in equity … [o]n tender of the security, to recover the consideration paid for the security, together with interest at the rate provided for in § 11-107(a) of the [Maryland] Courts and Judicial Proceedings Article, as amended, from the date of payment, costs, and reasonable attorneys' fees,

less the amount of any income received on the security; or … [i]f he no longer owns the security, for damages" in "the amount that would be recoverable on a tender less the value of the security when the buyer disposed of it and interest at the rate provided for in § 11-107(a) of the Courts and Judicial Proceedings Article, as amended, from the date of disposition." *Id.* § 11-703(a)(1)(i), (b)(1), (b)(3).

922.    When issued, the Tokens were securities within the meaning of the Maryland Securities Act. *Id.* § 11-101(s)(1). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Maryland. *Id.* § 11-101(b), (c).

923.    On information and belief, Binance transacted business as a broker-dealer or agent in Maryland, including without limitation through solicitations directed by Binance to Maryland and received in Maryland.

924.    Binance was not registered as a broker-dealer or agent in Maryland, nor was it subject to any exemption from registration.

925.    Accordingly, Binance has violated the Maryland Securities Act by transacting business as an unregistered broker-dealer or agent in the offer or sale of securities.

926.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

927.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-SEVENTH CAUSE OF ACTION**
**(MARYLAND STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Md. Code Ann., Corps. & Ass'ns § 11-703**
**(Individual Defendants)**

928.    Plaintiffs reallege the allegations above.

929.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Maryland.

930.    Every person who directly or indirectly controls an entity liable under the Maryland Securities Act for unlawfully offering or selling unregistered securities or for operating as an unregistered broker-dealer or agent in the offer or sale of those securities, as well as "every person occupying a similar status or performing similar functions, every employee of the [entity] who materially aids in the conduct giving rise to the liability, and every broker-dealer or agent who materially aids in such conduct are also liable jointly and severally with and to the same extent as the [entity], unless able to sustain the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 11-703(c)(1).

931.    When issued, the Tokens were securities within the meaning of the Maryland Securities Act. *Id.* § 11-101(s)(1). On information and belief, Binance offered and sold the Tokens to members of the Class in Maryland and acted as the broker-dealer or agent for the offer, sale, and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Maryland Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Maryland law. *Id.* § 11-401(a).

932.    On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Maryland, including without limitation through solicitations directed by Binance to Maryland and received in Maryland.

933.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

934.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Maryland Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

935.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

936.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTY-EIGHTH CAUSE OF ACTION
### (MASSACHUSETTS STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### Mass. Gen. Laws Ann. ch. 110A, § 410(a)
### (Binance)

937.    Plaintiffs reallege the allegations above.

938.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Massachusetts.

939.    The Massachusetts Securities Act forbids the offer or sale of unregistered securities. Mass. Gen. Laws Ann. ch. 110A, § 301. Any person who offers or sells a security in violation of Section 301 is "is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 410(a).

940.    When issued, the Tokens were securities within the meaning of the Massachusetts Securities Act. *Id.* § 401(f). On information and belief, Binance offered or sold the Tokens to members of the Class in Massachusetts. The Tokens were neither registered under, nor subject to exemption from registration under the Massachusetts Securities Act. *Id.* § 402.

941.    Upon information and belief, the Tokens were offered or sold in Massachusetts, including without limitation through solicitations directed by Binance to Massachusetts and received in Massachusetts.

942.    Accordingly, Binance has violated the Massachusetts Securities Act through Binance's sale of unregistered securities.

943.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

944.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SIXTY-NINTH CAUSE OF ACTION
### (MASSACHUSETTS STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Mass. Gen. Laws Ann. ch. 110A, § 410(a)
### (Binance)

945.   Plaintiffs reallege the allegations above.

946.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Massachusetts.

947.   The Massachusetts Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Massachusetts law. Mass. Gen. Laws Ann. ch. 110A, § 201. Any person who offers or sells a security in violation of Section 201 is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 410.

948.   When issued, the Tokens were securities within the meaning of the Massachusetts Securities Act. *Id.* § 401(f). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Massachusetts. *Id.* § 401(b),(c).

949.   On information and belief, Binance transacted business as a broker-dealer or agent in Massachusetts, including without limitation through solicitations directed by Binance to Massachusetts and received in Massachusetts.

950.   Binance was not registered as a broker-dealer or agent in Massachusetts, nor was it subject to any exemption from registration.

951.     Accordingly, Binance has violated the Massachusetts Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

952.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

953.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTIETH CAUSE OF ACTION**
**(MASSACHUSETTS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Mass. Gen. Laws Ann. ch. 110A, § 410(b)**
**(Individual Defendants)**

</div>

954.     Plaintiffs reallege the allegations above.

955.     This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Massachusetts.

956.     Every person who directly or indirectly controls an entity liable under the Massachusetts Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Mass. Gen. Laws Ann. ch. 110A, § 410(b).

957.    When issued, the Tokens were securities within the meaning of the Massachusetts Securities Act. *Id.* § 401(f). On information and belief, Binance offered and sold the Tokens to members of the Class in Massachusetts and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Massachusetts Securities Act, and Binance was not registered as a broker-dealer or agent under Massachusetts law. *Id.* §§ 201(a), 301.

958.    On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Massachusetts, including without limitation through solicitations directed by Binance to Massachusetts and received in Massachusetts.

959.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

960.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Massachusetts Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

961.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

962.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SEVENTY-FIRST CAUSE OF ACTION
### (MICHIGAN STATE LAW – PRIMARY LIABILITY)
### Unregistered Sale of Securities
### Mich. Comp. Laws Ann. § 451.2509
### (Binance)

963.    Plaintiffs reallege the allegations above.

964.    This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Michigan.

965.    The Michigan Securities Act forbids the offer or sale of unregistered securities. Mich. Comp. Laws Ann. § 451.2301. Any person who sells a security in violation of Section 451.2301 is "liable to the purchaser" who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at 6% per year from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security," or for "actual damages" if the purchaser no longer owns the security. *Id.* § 451.2509.

966.    When issued, the Tokens were securities within the meaning of the Michigan Securities Act. *Id.* § 451.2102c. On information and belief, Binance sold the Tokens to members of the Class in Michigan. The Tokens were neither registered under, nor subject to exemption from registration under the Michigan Securities Act. *Id.* § 451.2201.

967.    Upon information and belief, the Tokens were sold in Michigan, including without limitation through solicitations directed by Binance to Michigan and received in Michigan.

968.    Accordingly, Binance has violated the Michigan Securities Act through Binance's sale of unregistered securities.

969.     Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

970.     Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTY-SECOND CAUSE OF ACTION**
**(MICHIGAN STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Mich. Comp. Laws Ann. § 451.2509**
**(Binance)**

</div>

971.     Plaintiffs reallege the allegations above.

972.     This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Michigan.

973.     The Michigan Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Michigan law. Mich. Comp. Laws Ann. § 451.2401. Any person who sells a security in violation of Section 451.2401 is "liable to the customer" who, if a purchaser, "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at 6% per year from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security" or for "actual damages" if the purchaser no longer owns the security. *Id.* § 451.2509.

974.     When issued, the Tokens were securities within the meaning of the Michigan Securities Act. *Id.* § 451.2102c. On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Michigan. *Id.* § 451.2102.

975.    On information and belief, Binance transacted business as a broker-dealer or agent in Michigan, including without limitation through solicitations directed by Binance to Michigan and received in Michigan.

976.    Binance was not registered as a broker-dealer or agent in Michigan, nor was it subject to any exemption from registration.

977.    Accordingly, Binance has violated the Michigan Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

978.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

979.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-THIRD CAUSE OF ACTION**
**(MICHIGAN STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Mich. Comp. Laws Ann. § 451.2509**
**(Individual Defendants)**

980.    Plaintiffs reallege the allegations above.

981.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Michigan.

982.    Every person who directly or indirectly controls an entity liable under the Michigan Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as an "individual who is a managing partner, executive officer, or director" of a person liable … including each individual having a similar status or performing similar functions" is jointly and severally liable with and to the same

extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Mich. Comp. Laws Ann. § 451.2509(7).

983.    When issued, the Tokens were securities within the meaning of the Michigan Securities Act. *Id.* § 451.2102c. On information and belief, Binance sold the Tokens to members of the Class in Michigan and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Michigan Securities Act, *id.* § 451.2201, and Binance was not registered or exempt from registration as a broker-dealer or agent under Michigan law. *Id.* § 451.2401.

984.    On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Michigan, including without limitation through solicitations directed by Binance to Michigan and received in Michigan.

985.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

986.    Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Michigan Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

203

987.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

988.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTY-FOURTH CAUSE OF ACTION**
**(MINNESOTA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Minnesota Statutes § 80A.76(b)**
**(Binance)**

</div>

989.    Plaintiffs reallege the allegations above.

990.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Minnesota.

991.    The Minnesota Securities Act forbids the offer or sale of unregistered securities. Minnesota Statutes § 80A.49(c). Any person who sells a security in violation of Section 80A.49(c) is "liable to the purchaser" for "consideration paid for the security, less the amount of any income received on the security, and interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 80A.76(b).

992.    When issued, the Tokens were securities within the meaning of the Minnesota Securities Act. *Id.* § 80A.41(30). On information and belief, Binance sold the Tokens to members of the Class in Minnesota. The Tokens were neither registered under, nor subject to exemption from registration under the Minnesota Securities Act. *Id.* § 80A.45.

993.    Upon information and belief, the Tokens were sold in Minnesota, including without limitation through solicitations directed by Binance to Minnesota and received in Minnesota.

994.    Accordingly, Binance has violated the Minnesota Securities Act through Binance's sale of unregistered securities.

995.    Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

996.    Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div style="text-align:center">

**SEVENTY-FIFTH CAUSE OF ACTION**
**(MINNESOTA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Minnesota Statutes § 80A.76(d)**
**(Binance)**

</div>

997.    Plaintiffs reallege the allegations above.

998.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Minnesota.

999.    The Minnesota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Minnesota law. Minnesota Statutes § 80A.56(a). Any person who sells a security in violation of Section 80A.56(a) is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security together with interest at 6 percent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 80A.76(d)

1000.    When issued, the Tokens were securities within the meaning of the Minnesota Securities Act. *Id.* § 80A.41(30). On information and belief, Binance transacted business as a

broker-dealer or agent when it sold the Tokens to members of the Class in Minnesota. *Id.* § 80A.41(3), (5).

1001.  On information and belief, Binance transacted business as a broker-dealer or agent in Minnesota, including without limitation through solicitations directed by Binance to Minnesota and received in Minnesota.

1002.  Binance was not registered as a broker-dealer or agent in Minnesota, nor was it subject to any exemption from registration.

1003.  Accordingly, Binance has violated the Minnesota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1004.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1005.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-SIXTH CAUSE OF ACTION**
**(MINNESOTA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Minnesota Statutes § 80A.76(g)**
**(Individual Defendants)**

1006.  Plaintiffs reallege the allegations above.

1007.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Minnesota.

1008.  Every person who directly or indirectly controls an entity liable under the Minnesota Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "managing partner,

executive officer, or director of a person liable … including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. *Id.* § 80A.76(g).

1009.   When issued, the Tokens were securities within the meaning of the Minnesota Securities Act. *Id.* § 80A.41(30). On information and belief, Binance sold the Tokens to members of the Class in Minnesota and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Minnesota Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Minnesota law. *Id.* § 80A.56(a).

1010.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Minnesota, including without limitation through solicitations directed by Binance to Minnesota and received in Minnesota.

1011.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1012.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Minnesota Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1013.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1014.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**SEVENTY-SEVENTH CAUSE OF ACTION**
**(MISSISSIPPI STATE LAW – PRIMARY LIABILITY)**
Unregistered Sale of Securities
Miss. Code Ann. § 75-71-509(b)
(Binance)

</div>

1015.   Plaintiffs reallege the allegations above.

1016.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Mississippi.

1017.   The Mississippi Securities Act forbids the offer or sale of unregistered securities. Miss. Code Ann. § 75-71-301. "A person is liable to the purchaser if the person sells a security in violation of Section 75-71-301." *Id.* § 75-71-509(b). Such purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or," *id.* § 75-71-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court," *id.* § 75-71-509(b)(3).

1018.  When issued, the Tokens were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28). On information and belief, Binance sold the Tokens to members of the Class in Mississippi. The Tokens were neither registered under, nor subject to exemption from registration under the Mississippi Securities Act. *Id.* § 75-71-301.

1019.  Upon information and belief, the Tokens were sold in Mississippi, including without limitation through solicitations directed by Binance to Mississippi and received in Mississippi.

1020.  Accordingly, Binance has violated the Mississippi Securities Act through Binance's sale of unregistered securities.

1021.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1022.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-EIGHTH CAUSE OF ACTION**
**(MISSISSIPPI STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Miss. Code Ann. § 75-71-509(d)**
**(Binance)**

1023.  Plaintiffs reallege the allegations above.

1024.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Mississippi.

1025.  The Mississippi Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Mississippi law. Miss. Code Ann. § 75-71-401(a). "A person acting as a broker-dealer or agent that sells or buys a

security in violation of Section 75-71-401(a) … is liable to the customer," *id.* § 75-71-509(d), who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or," *id.* § 75-71-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court," *id.* § 75-71-509(b)(3).

1026.  When issued, the Tokens were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Mississippi. *Id.* § 75-71-102(2), (4).

1027.  On information and belief, Binance transacted business as a broker-dealer or agent in Mississippi, including without limitation through solicitations directed by Binance to Mississippi and received in Mississippi.

1028.  Binance was not registered as a broker-dealer or agent in Mississippi, nor was it subject to any exemption from registration.

1029.  Accordingly, Binance has violated the Mississippi Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1030.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1031.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SEVENTY-NINTH CAUSE OF ACTION
### (MISSISSIPPI STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Miss. Code Ann. § 75-71-509(g)
### (Individual Defendants)

1032.  Plaintiffs reallege the allegations above.

1033.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Mississippi.

1034.  Every person who directly or indirectly controls an entity liable under the Mississippi Securities Act for unlawfully selling unregistered securities or for unlawfully operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "managing partner, executive officer, or director of" such entity, and every person who was "an employee of or associated with" such entity "who materially aid[ed] the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. Miss. Code Ann. § 75-71-509(g).

1035.  When issued, the Tokens were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28). On information and belief, Binance sold the Tokens to members of the Class in Mississippi and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Mississippi Securities Act, and Binance was not registered or exempt

from registration as a broker-dealer or agent under Mississippi law. *Id.* §§ 75-71-301, 75-71-401(a).

1036.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Mississippi, including without limitation through solicitations directed by Binance to Mississippi and received in Mississippi.

1037.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1038.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Mississippi Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1039.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1040.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTIETH CAUSE OF ACTION**
**(MISSOURI STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Mo. Rev. Stat. § 409.5-509(b)**
**(Binance)**

1041.   Plaintiffs reallege the allegations above.

1042.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Missouri.

1043.   The Missouri Securities Act forbids the offer or sale of unregistered securities. Mo. Rev. Stat. § 409.3-301. "A person is liable to the purchaser if the person sells a security in violation of section 409.3-301," and such purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or," *id.* § 409.5-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court," *id.* § 409.5-509(b)(3).

1044.   When issued, the Tokens were securities within the meaning of the Missouri Securities Act. *Id.* § 409.1-102(28). On information and belief, Binance sold the Tokens to members of the Class in Missouri. The Tokens were neither registered under, nor subject to exemption from registration under the Missouri Securities Act. *Id.* § 409.3-301.

1045.   Upon information and belief, the Tokens were sold in Missouri, including without limitation through solicitations directed by Binance to Missouri and received in Missouri.

1046.   Accordingly, Binance has violated the Missouri Securities Act through Binance's sale of unregistered securities.

1047.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1048.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-FIRST CAUSE OF ACTION**
**(MISSOURI STATE LAW – PRIMARY LIABILITY)**
Transacting Business as an Unregistered Broker-Dealer
Mo. Rev. Stat. § 409.5-509(d)
**(Binance)**

</div>

1049.   Plaintiffs reallege the allegations above.

1050.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Missouri.

1051.   The Missouri Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Missouri law. Mo. Rev. Stat. § 409.4-401(a). "A person acting as a broker-dealer or agent that sells or buys a security in violation of section 409.4-401(a) … is liable to the customer," *id.* § 409.5-509(d), who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or," *id.* § 409.5-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and

interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court," *id.* § 409.5-509(b)(3).

1052. When issued, the Tokens were securities within the meaning of the Missouri Securities Act. *Id.* § 409.1-102(28). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in the state of Missouri. *Id.* § 409.1-102(1), (4).

1053. On information and belief, Binance transacted business as a broker-dealer or agent in Missouri, including without limitation through solicitations directed by Binance to Missouri and received in Missouri.

1054. Binance was not registered as a broker-dealer or agent in Missouri, nor was it subject to any exemption from registration.

1055. Accordingly, Binance has violated the Missouri Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1056. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1057. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-SECOND CAUSE OF ACTION**
**(MISSOURI STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Mo. Rev. Stat. § 409.5-509(g)**
**(Individual Defendants)**

</div>

1058. Plaintiffs reallege the allegations above.

1059.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Missouri.

1060.  Every person who directly or indirectly controls an entity liable under the Missouri Securities Act for unlawfully selling unregistered securities or for unlawfully operating as an unregistered broker-dealer or agent in the sale of those securities, as well as any "managing partner, executive officer, or director of" such entity, and every person who was "an employee of or associated with" such entity "who materially aid[ed] the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. Mo. Rev. Stat. § 409.5-509(g).

1061.  When issued, the Tokens were securities within the meaning of the Missouri Securities Act. *Id.* § 409.1-102(28). On information and belief, Binance sold the Tokens to members of the Class in Missouri and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Missouri Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Missouri law. *Id.* §§ 409.3-301, 409.4-401(a).

1062.  On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Missouri, including without limitation through solicitations directed by Binance to Missouri and received in Missouri.

1063. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1064.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Missouri Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1065.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1066.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-THIRD CAUSE OF ACTION**
**(MONTANA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Mont. Code Ann. § 30-10-307(1)**
**(Binance)**

</div>

1067.   Plaintiffs reallege the allegations above.

1068.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Montana.

1069.   The Montana Securities Act forbids the offer or sale of unregistered securities. Mont. Code Ann. § 30-10-202. "Any person who offers or sells a security in violation of 30-10-202 … is liable to the person buying the security from the offeror or seller, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at 10% a year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income

received on the security, upon the tender of the security, or for damages if the buyer no longer owns the security" in "the amount that would be recoverable upon a tender less: (a) the value of the security when the buyer disposed of it; and (b) interest at 10% a year from the date of disposition." *Id.* § 30-10-307(1).

1070.  When issued, the Tokens were securities within the meaning of the Montana Securities Act. *Id.* § 30-10-103(24). On information and belief, Binance offered or sold the Tokens to members of the Class in Montana. The Tokens were neither registered under, nor subject to exemption from registration under the Montana Securities Act. *Id.* § 30-10-202.

1071.  Upon information and belief, the Tokens were offered or sold in Montana, including without limitation through solicitations directed by Binance to Montana and received in Montana.

1072.  Accordingly, Binance has violated the Montana Securities Act through Binance's sale of unregistered securities.

1073.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1074.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-FOURTH CAUSE OF ACTION**
**(MONTANA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Mont. Code Ann. § 30-10-307(2)**
**(Individual Defendants)**

1075.  Plaintiffs reallege the allegations above.

1076.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Montana.

1077.   "Every person who directly or indirectly controls a seller liable under subsection (1), every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of the seller, and every broker-dealer or salesperson who participates or materially aids in the sale is liable jointly and severally with and to the same extent as the seller if the nonseller knew, or in the exercise of reasonable care could have known, of the existence of the facts by reason of which the liability is alleged to exist." Mont. Code Ann. § 30-10-307(2).

1078.   When issued, the Tokens were securities within the meaning of the Montana Securities Act. *Id.* § 30-10-103(24). On information and belief, Binance offered or sold the Tokens to members of the Class in Montana. The Tokens were neither registered under, nor subject to exemption from registration under the Montana Securities Act. *Id.* § 30-10-202.

1079.   Binance offered or sold the Tokens in Montana, including without limitation through solicitations directed by Binance to Montana and received in Montana.

1080.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers and sales of unregistered securities.

1081.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Montana Securities Act through Binance's offer and sale of unregistered securities.

1082.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1083.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-FIFTH CAUSE OF ACTION**
**(NEBRASKA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Neb. Rev. Stat. § 8-1118(1)**
**(Binance)**

</div>

1084.   Plaintiffs reallege the allegations above.

1085.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Nebraska.

1086.   The Nebraska Securities Act forbids the offer or sale of unregistered securities. Neb. Rev. Stat. § 8-1104. Any person who offers or sells a security in violation of section 8-1104 … shall be liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six percent per annum from the date of payment, costs, and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security" in "the amount that would be recoverable upon a tender less (a) the value of the security when the buyer disposed of it and (b) interest at six percent per annum from the date of disposition." *Id.* § 8-1118(1).

1087.   When issued, the Tokens were securities within the meaning of the Nebraska Securities Act. *Id.* § 8-1101(15). On information and belief, Binance offered or sold the Tokens to

members of the Class in Nebraska. The Tokens were neither registered under, nor subject to exemption from registration under the Nebraska Securities Act. *Id.* § 8-1104.

1088.  Upon information and belief, the Tokens were offered or sold in Nebraska, including without limitation through solicitations directed by Binance to Nebraska and received in Nebraska.

1089.  Accordingly, Binance has violated the Nebraska Securities Act through Binance's sale of unregistered securities.

1090.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1091.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-SIXTH CAUSE OF ACTION**
**(NEBRASKA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Neb. Rev. Stat. § 8-1118(3)**
**(Individual Defendants)**

</div>

1092.  Plaintiffs reallege the allegations above.

1093.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Nebraska.

1094.  "Every person who directly or indirectly controls a person liable under subsections (1) … of this section, including every partner, limited liability company member, officer, director, or person occupying a similar status or performing similar functions of a partner, limited liability company member, officer, or director, or employee of such person who materially aids in the conduct giving rise to liability, and every broker-dealer, issuer-dealer, agent, investment adviser,

or investment adviser representative who materially aids in such conduct shall be liable jointly and severally with and to the same extent as such person, unless able to sustain the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Neb. Rev. Stat. § 8-1118(3).

1095.  When issued, the Tokens were securities within the meaning of the Nebraska Securities Act. *Id.* § 8-1101(15). On information and belief, Binance offered or sold the Tokens to members of the Class in Nebraska. The Tokens were neither registered under, nor subject to exemption from registration under the Nebraska Securities Act. *Id.* § 8-1104.

1096.  Binance offered or sold the Tokens in Nebraska, including without limitation through solicitations directed by Binance to Nebraska and received in Nebraska.

1097.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers and sales of unregistered securities.

1098.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Nebraska Securities Act through Binance's offer and sale of unregistered securities.

1099.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1100.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-SEVENTH CAUSE OF ACTION**
**(NEVADA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Nev. Stat. § 90.660(1)(b)**
**(Binance)**

1101.   Plaintiffs reallege the allegations above.

1102.   This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Nevada.

1103.   The Nevada Securities Act forbids the offer or sale of unregistered securities. Nev. Stat. § 90.460. "A person who offers or sells a security in violation of" Neb. Rev. Stat. § 90.460 "is liable to the person purchasing the security." *Id.* § 90.660. "Upon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of [Nevada] from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security. A purchaser who no longer owns the security may recover damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of [Nevada] from the date of disposition of the security, costs and reasonable attorney's fees determined by the court." *Id.*

1104.   When issued, the Tokens were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295. Binance offered or sold the Tokens to a Plaintiff in Nevada. The Tokens were neither registered under, nor subject to exemption from registration under the Nevada Securities Act. *Id.* § 90.460.

1105.   The Tokens were offered or sold in Nevada, including without limitation through solicitations directed by Binance to Nevada and received in Nevada.

1106.   Accordingly, Binance has violated the Nevada Securities Act through Binance's sale of unregistered securities.

1107.   Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1108.   Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**EIGHTY-EIGHTH CAUSE OF ACTION**
**(NEVADA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Nev. Stat. § 90.660(1)(a)**
**(Binance)**

</div>

1109.   Plaintiffs reallege the allegations above.

1110.   This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Nevada.

1111.   The Nevada Securities Act forbids any person from transacting business as a broker-dealer or sales representative unless the person is registered or exempt from registration under Nevada law. Nev. Stat. § 90.310(1). "A person who offers or sells a security in violation of … Subsection 1 of [Nevada Securities Act Section] 90.310 … is liable to the person purchasing the security," who "may recover the consideration paid for the security and interest at the legal rate of [Nevada] from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security" or "[d]amages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of [Nevada] from the date of disposition of the security, costs and reasonable attorney's fees determined by the court." *Id.* § 90.660(1)(a).

1112.   When issued, the Tokens were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295. Binance transacted business as a broker-dealer or agent when it sold the Tokens to a Plaintiff in the state of Nevada. *Id.* §§ 90.220, 90.285.

1113.   Binance transacted business as a broker-dealer or agent in Nevada, including without limitation through solicitations directed by Binance to Nevada and received in Nevada.

1114.   Binance was not registered as a broker-dealer or agent in Nevada, nor was it subject to any exemption from registration.

1115.   Accordingly, Binance has violated the Nevada Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1116.   Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1117.   Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## EIGHTY-NINTH CAUSE OF ACTION
### (NEVADA STATE LAW – ADDITIONAL LIABILITY)
Control Person Liability
Nev. Stat. § 90.660(4)
(Individual Defendants)

1118.   Plaintiffs reallege the allegations above.

1119.   This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Nevada.

1120.   Every person who directly or indirectly controls an entity liable under the Nevada Securities Act for unlawfully selling unregistered securities or for unlawfully operating as an unregistered broker-dealer or sales representative in the sale of those securities, as well as any

"partner, officer or director of the [entity] liable, a person occupying a similar status or performing similar functions, any agent of the [entity] liable, an employee of the [entity] liable if the employee materially aids in the act, omission or transaction constituting the violation," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by which the liability is alleged to exist. Nev. Stat. § 90.660(4).

1121.  When issued, the Tokens were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295. Binance offered or sold the Tokens to a Plaintiff in Nevada and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Nevada Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Nevada law. *Id.* §§ 90.310(1), 90.460.

1122.  Binance offered or sold the Tokens and acted as a broker-dealer or agent in Nevada, including without limitation through solicitations directed by Binance to Nevada and received in Nevada.

1123.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1124.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Nevada Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1125.   Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1126.   Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETIETH CAUSE OF ACTION**
**(NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**N.H. Rev. Stat. § 421-B:5-509(b)**
**(Binance)**

</div>

1127.   Plaintiffs reallege the allegations above.

1128.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Hampshire.

1129.   The New Hampshire Uniform Securities Act forbids the offer or sale of unregistered securities. N.H. Rev. Stat. § 421-B:3-301. Any person who sells a security in violation of Section 421-B:3-301 is liable to the purchaser for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages as provided in subsection (b)(3)." *Id.* § 421-B:5-509(b)(1). The annual rate of interest on judgments is "a rate determined by the state treasurer as the prevailing discount rate of interest on 26-week United States Treasury bills at the last auction

thereof preceding the last day of September in each year, plus 2 percentage points, rounded to the nearest tenth of a percentage point." *Id.* § 336-1 II.

1130.   When issued, the Tokens were securities within the meaning of the New Hampshire Uniform Securities Act. *Id.* § 421-B:1-102(53)(A). On information and belief, Binance sold the Tokens to members of the Class in New Hampshire. The Tokens were neither registered under, nor subject to exemption from registration under the New Hampshire Uniform Securities Act. *Id.* § 421-B:2-201.

1131.   Upon information and belief, the Tokens were sold in New Hampshire, including without limitation through solicitations directed by Binance to New Hampshire and received in New Hampshire.

1132.   Accordingly, Binance has violated the New Hampshire Uniform Securities Act through Binance's sale of unregistered securities.

1133.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1134.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-FIRST CAUSE OF ACTION**
**(NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**N.H. Rev. Stat. § 421-B:5-509(d)**
**(Binance)**

</div>

1135.   Plaintiffs reallege the allegations above.

1136.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Hampshire.

1137.   The New Hampshire Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under New Hampshire law. N.H. Rev. Stat. §§ 421-B:4-401(a), 421-B:4-402(a). Any person who sells a security in violation of Sections 421-B:4-401(a) and 421-B:4-402(a) "is liable to the customer. The customer, if a purchaser, may maintain an action for recovery of actual damages as specified in subsections (b)(1) through (c)(3) [*sic*]." ((b)(3)) *Id.* § 421-B:5-509(d). Actual damages are defined as "the amount that would be recoverable upon a tender [of the security] less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 421-B:5-509(b)(3). The annual rate of interest on judgments is "a rate determined by the state treasurer as the prevailing discount rate of interest on 26-week United States Treasury bills at the last auction thereof preceding the last day of September in each year, plus 2 percentage points, rounded to the nearest tenth of a percentage point." *Id.* § 336-1 II.

1138.   When issued, the Tokens were securities within the meaning of the New Hampshire Uniform Securities Act. *Id.* § 421-B:1-102(53)(A). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in New Hampshire. *Id.* §§ 421-B:1-102(3), 421-B:1-102(6).

1139.   On information and belief, Binance transacted business as a broker-dealer or agent in New Hampshire, including without limitation through solicitations directed by Binance to New Hampshire and received in New Hampshire.

1140.   Binance was not registered as a broker-dealer or agent in New Hampshire, nor was it subject to any exemption from registration.

1141.  Accordingly, Binance has violated the New Hampshire Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1142.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1143.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-SECOND CAUSE OF ACTION**
**(NEW HAMPSHIRE STATE LAW – ADDITIONAL LIABILITY)**
Control Person Liability
N.H. Rev. Stat. § 421-B:5-509(g)
(Individual Defendants)

</div>

1144.  Plaintiffs reallege the allegations above.

1145.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Hampshire.

1146.  Every person who directly or indirectly controls an entity liable under the New Hampshire Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f), including an individual having a similar status or performing similar functions" is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist. N.H. Rev. Stat. § 421-B:5-509(g).

1147.   When issued, the Tokens were securities within the meaning of the New Hampshire Uniform Securities Act. *Id.* § 421-B:1-102(53)(A). On information and belief, Binance sold the Tokens to members of the Class in New Hampshire and acted as the broker-dealer or agent for the sale and purchase of those securities. *Id.* §§ 421-B:1-102(3), 421-B:1-102(6). The Tokens were neither registered under, nor subject to exemption from registration under the New Hampshire Uniform Securities Act, and Binance was not registered as a broker-dealer or agent under New Hampshire law. *Id.* §§ 421-B:2-201, 421-B:2-202*.

1148.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in New Hampshire, including without limitation through solicitations directed by Binance to New Hampshire and received in New Hampshire.

1149.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1150.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the New Hampshire Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1151.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1152. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-THIRD CAUSE OF ACTION**
**(NEW JERSEY STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**NJ Stat. Ann. § 49:3-71(a), (c)**
**(Binance)**

</div>

1153. Plaintiffs reallege the allegations above.

1154. This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in New Jersey.

1155. The New Jersey Uniform Securities Act forbids the offer or sale of unregistered securities. NJ Stat. Ann. § 49:3-60(e). Any person who offers or sells a security in violation of Section 49:3-60 is "liable … an action either at law or in equity to recover the consideration paid for the security or the investment advice and any loss due to the advice, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the investment advice or security, and costs, less the amount of any income received on the security, upon the tender of the security and any income received from the investment advice or on the security, or for damages if he no longer owns the security." *Id.* § 49:3-71(c).

1156. When issued, the Tokens were securities within the meaning of the New Jersey Securities Act. *Id.* § 49:3-49(m). On information and belief, Binance offered or sold the Tokens to members of the Class in New Jersey. The Tokens were neither registered under, nor subject to exemption from registration under the New Jersey Securities Act. *Id.* § 49:3-50

1157.   Upon information and belief, the Tokens were offered or sold in New Jersey, including without limitation through solicitations directed by Binance to New Jersey and received in New Jersey.

1158.   Accordingly, Binance has violated the New Jersey Uniform Securities Act through Binance's sale of unregistered securities.

1159.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1160.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## NINETY-FOURTH CAUSE OF ACTION
### (NEW JERSEY STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### NJ Stat. Ann. § 49:3-71(a)
### (Binance)

1161.   Plaintiffs reallege the allegations above.

1162.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in New Jersey.

1163.   The New Jersey Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under New Jersey law. NJ Stat. Ann. § 49:3-56(a). Any person who offers or sells a security in violation of Section 49:3-56(a) is "liable … an action either at law or in equity to recover the consideration paid for the security or the investment advice and any loss due to the advice, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the

investment advice or security, and costs, less the amount of any income received on the security, upon the tender of the security and any income received from the investment advice or on the security, or for damages if he no longer owns the security." *Id.* § 49:3-71(c).

1164.  When issued, the Tokens were securities within the meaning of the New Jersey Securities Act. *Id.* § 49:3-49(m). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in New Jersey. *Id.* § 49:3-49(b), (c).

1165.  On information and belief, Binance transacted business as a broker-dealer or agent in New Jersey, including without limitation through solicitations directed by Binance to New Jersey and received in New Jersey.

1166.  Binance was not registered as a broker-dealer or agent in New Jersey, nor was it subject to any exemption from registration.

1167.  Accordingly, Binance has violated the New Jersey Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1168.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1169.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-FIFTH CAUSE OF ACTION**
**(NEW JERSEY STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**NJ Stat. Ann. § 49:3-71(d)**
**(Individual Defendants)**

</div>

1170.  Plaintiffs reallege the allegations above.

1171.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in New Jersey.

1172.  Every person who directly or indirectly controls an entity liable under the New Jersey Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.  *Id.* § 49:3-71(d)

1173.  When issued, the Tokens were securities within the meaning of the New Jersey Securities Act. *Id.* § 49:3-49(m). On information and belief, Binance offered and sold the Tokens to members of the Class in New Jersey and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the New Jersey Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under New Jersey law. *Id.* § 49:3-56(a).

1174.  On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in New Jersey, including without limitation through solicitations directed by Binance to New Jersey and received in New Jersey.

1175. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the

wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1176.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the New Jersey Uniform Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1177.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1178.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-SIXTH CAUSE OF ACTION**
**(NEW MEXICO STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**N.M. Stat. Ann. § 58-13C-509**
**(Binance)**

</div>

1179.   Plaintiffs reallege the allegations above.

1180.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Mexico.

1181.   The New Mexico Uniform Securities Act forbids the sale of unregistered securities. N.M. Stat. Ann. § 58-13C-301. Any person who sells a security in violation of Section 58-13C-301 is "liable to the purchaser," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages," which are "the difference between

<div align="center">236</div>

the price at which the security was sold and the value the security would have had at the time of the sale in the absence of the purchaser's conduct causing liability, and interest at the legal rate of interest from the date of the sale of the security, costs and reasonable attorney fees determined by the court." *Id.* § 58-13C-509.

1182.  When issued, the Tokens were securities within the meaning of the New Mexico Uniform Securities Act. *Id.* § 58-13C-102(DD). On information and belief, Binance sold the Tokens to members of the Class in New Mexico. The Tokens were neither registered under, nor subject to exemption from registration under the New Mexico Uniform Securities Act. *Id.* §§ 58-13C-201–202.

1183.  Upon information and belief, the Tokens were sold in New Mexico, including without limitation through solicitations directed by Binance to New Mexico and received in New Mexico.

1184.  Accordingly, Binance has violated the New Mexico Uniform Securities Act through Binance's sale of unregistered securities.

1185.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1186.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**NINETY-SEVENTH CAUSE OF ACTION**
**(NEW MEXICO STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**N.M. Stat. Ann. § 58-13C-509**
**(Binance)**

1187.  Plaintiffs reallege the allegations above.

1188.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Mexico.

1189.   The New Mexico Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under New Mexico law. N.M. Stat. Ann. §§ 58-13C-401–402. Any person who sells a security in violation of Sections 58-13C-401 or 58-13C-402 is "liable to the customer," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages," which are "the difference between the price at which the security was sold and the value the security would have had at the time of the sale in the absence of the purchaser's conduct causing liability, and interest at the legal rate of interest from the date of the sale of the security, costs and reasonable attorney fees determined by the court." *Id.* § 58-13C-509.

1190.   When issued, the Tokens were securities within the meaning of the New Mexico Uniform Securities Act. *Id.* § 58-13C-102(DD). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in New Mexico. *Id.* §§ 58-13C-102(A), (C).

1191.   On information and belief, Binance transacted business as a broker-dealer or agent in New Mexico, including without limitation through solicitations directed by Binance to New Mexico and received in New Mexico.

1192.   Binance was not registered as a broker-dealer or agent in New Mexico, nor was it subject to any exemption from registration.

1193.  Accordingly, Binance has violated the New Mexico Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1194.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1195.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**NINETY-EIGHTH CAUSE OF ACTION**
**(NEW MEXICO STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**N.M. Stat. Ann. § 58-13C-509**
**(Individual Defendants)**

</div>

1196.  Plaintiffs reallege the allegations above.

1197.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in New Mexico.

1198.  Every person who directly or indirectly controls an entity liable under the New Mexico Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "individual who is a managing partner, executive officer or director of a person liable" and every "individual who is an employee of or associated with a person liable" is jointly and severally liable with and to the same extent as the seller, unless the non-seller "sustains the burden of proof that the person did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist." *Id.* § 58-13C-509(G).

1199.  When issued, the Tokens were securities within the meaning of the New Mexico Uniform Securities Act. *Id.* § 58-13C-102(DD). On information and belief, Binance sold the

Tokens to members of the Class in New Mexico and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the New Mexico Uniform Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under New Mexico law. *Id.* §§ 58-13C-(401)–(402).

1200.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in New Mexico, including without limitation through solicitations directed by Binance to New Mexico and received in New Mexico.

1201.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1202.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the New Mexico Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1203.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1204.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## NINETY-NINTH CAUSE OF ACTION
### (NORTH CAROLINA STATE LAW – PRIMARY LIABILITY)
#### Unregistered Offer and Sale of Securities
#### N.C. Gen. Stat. Ann. § 78A-56(a)
#### (Binance)

1205.   Plaintiffs reallege the allegations above.

1206.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Carolina.

1207.   The North Carolina Securities Act forbids the offer or sale of unregistered securities. N.C. Gen. Stat. Ann. § 78A-24. Any person who offers or sells a security in violation of Section 24 is "is liable to the person purchasing the security" who "may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security." Id. §§ 78A-56(a)(1)–(2).

1208.   When issued, the Tokens were securities within the meaning of the North Carolina Securities Act. Id. § 78A-2(11). On information and belief, Binance offered or sold the Tokens to members of the Class in North Carolina. The Tokens were neither registered under, nor subject to exemption from registration under the North Carolina Securities Act. Id. § 78A-24.

1209.   Upon information and belief, the Tokens were offered or sold in North Carolina, including without limitation through solicitations directed by Binance to North Carolina and received in North Carolina.

1210.   Accordingly, Binance has violated the North Carolina Securities Act through Binance's sale of unregistered securities.

1211.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1212.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE HUNDREDTH CAUSE OF ACTION**
**(NORTH CAROLINA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**N.C. Gen. Stat. Ann. § 78A-36**
**(Binance)**

1213.  Plaintiffs reallege the allegations above.

1214.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Carolina.

1215.  The North Carolina Securities Act forbids any person from transacting business as a dealer or salesman unless he is registered under North Carolina law. N.C. Gen. Stat. Ann § 78A-36(a). Any person who offers or sells a security in violation of Section 36(a) "is liable to the person purchasing the security" who "may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security." Id. §§ 78A-56(a)(1)–(2).

1216.  When issued, the Tokens were securities within the meaning of the North Carolina Securities Act. *Id.* § 78A-2 (11). On information and belief, Binance transacted business as a dealer or salesman when it offered or sold the Tokens to members of the Class in North Carolina. *Id.* §§ 78A-2 (2), (9).

1217.  On information and belief, Binance transacted business as a dealer or salesman in North Carolina, including without limitation through solicitations directed by Binance to North Carolina and received in North Carolina.

1218.  Binance was not registered as a dealer or salesman in North Carolina, nor was it subject to any exemption from registration.

1219.  Accordingly, Binance has violated the North Carolina Securities Act by transacting business as an unregistered dealer or salesman in the sale of securities.

1220.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1221.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-FIRST CAUSE OF ACTION**
**(NORTH CAROLINA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**N.C. Gen. Stat. Ann. § 78A-56(c)**
**(Individual Defendants)**

</div>

1222.  Plaintiffs reallege the allegations above.

1223.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Carolina.

1224.  Every person who directly or indirectly controls an entity liable under the North Carolina Securities Act for unlawfully offering or selling unregistered securities or for operating as an unregistered dealer or salesman in the sale of those securities, as well as every "partner, officer, or director of the person," "every person occupying a similar status or performing similar functions," as well as "every dealer or salesman who materially aids in the sale" is jointly and

severally liable with and to the same extent as the person, unless "able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Id. §§ 78A-56(c)(1).

1225.   When issued, the Tokens were securities within the meaning of the North Carolina Securities Act. *Id.* § 78A-2 (11). On information and belief, Binance offered and sold the Tokens to members of the Class in North Carolina and acted as the dealer or salesman for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the North Carolina Securities Act, and Binance was not registered or exempt from registration as a dealer or salesman under North Carolina law. *Id.* 78A-24.

1226.   On information and belief, Binance offered and sold the Tokens and acted as a dealer or salesman in North Carolina, including without limitation through solicitations directed by Binance to North Carolina and received in North Carolina.

1227.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer or salesman as described herein.

1228.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the North Carolina Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered dealer or salesman.

1229.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1230.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-SECOND CAUSE OF ACTION**
**(NORTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**N.D.C.C. § 10-04-17**
**(Binance)**

1231.   Plaintiffs reallege the allegations above.

1232.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Dakota.

1233.   The North Dakota Securities Act forbids the offer or sale of unregistered securities. N.D.C.C. § 10-04-04. Any person who unlawfully contracts to sell or sells an unregistered security is liable to "such purchaser" who "may sue either at law or in equity to recover the full amount paid," together with "all taxable court costs, interest as provided in this subsection, and reasonable attorney's fees, less the amount of any income received on the securities, upon tender to the seller, in person or in open court, of the securities sold or of the contracts made, or for damages if the purchaser no longer owns the securities." Id. § 10-04-17(1).

1234.   When issued, the Tokens were securities within the meaning of the North Dakota Securities Act. Id. § 10-04-02 (19). On information and belief, Binance offered or sold the Tokens to members of the Class in North Dakota. The Tokens were neither registered under, nor subject to exemption from registration under the North Dakota Securities Act. Id. § 10-04-04.

245

1235.  Upon information and belief, the Tokens were offered or sold in North Dakota, including without limitation through solicitations directed by Binance to North Dakota and received in North Dakota.

1236.  Accordingly, Binance has violated the North Dakota Securities Act through Binance's sale of unregistered securities.

1237.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1238.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-THIRD CAUSE OF ACTION**
**(NORTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**N.D.C.C. § 10-04-17**
**(Binance)**

</div>

1239.  Plaintiffs reallege the allegations above.

1240.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Dakota.

1241.  The North Dakota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under North Dakota law. N.D.C.C. § 10-04-10. Any person who offers or sells a security in violation of Section 10 is liable to "such purchaser" who "may sue either at law or in equity to recover the full amount paid," together with "all taxable court costs, interest as provided in this subsection, and reasonable attorney's fees, less the amount of any income received on the securities, upon tender to the seller,

in person or in open court, of the securities sold or of the contracts made, or for damages if the purchaser no longer owns the securities." Id. § 10-04-17 (1).

1242.   When issued, the Tokens were securities within the meaning of the North Dakota Securities Act. *Id.* § 10-04-02(19). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in North Dakota. *Id.* §§ 10-04-02 (1), (3).

1243.   On information and belief, Binance transacted business as a broker-dealer or agent in North Dakota, including without limitation through solicitations directed by Binance to North Dakota and received in North Dakota.

1244.   Binance was not registered as a broker-dealer or agent in North Dakota, nor was it subject to any exemption from registration.

1245.   Accordingly, Binance has violated the North Dakota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1246.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1247.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-FOURTH CAUSE OF ACTION**
**(NORTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**N.D.C.C. § 10-04-17**
**(Individual Defendants)**

</div>

1248.   Plaintiffs reallege the allegations above.

1249.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Dakota.

1250.   Every person who directly or indirectly controls a seller liable under the North Dakota Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as well as any person who "supervises, or serves as an officer, director, or managing partner of a person liable under this section," an individual "who is an employee of or associated with a person liable under this section and who materially aids the conduct giving rise to the liability," as well as every "person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the seller, unless that person or individual "did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." N.D.C.C. § 10-04-17(6).

1251.   When issued, the Tokens were securities within the meaning of the North Dakota Securities Act. *Id.* § 10-04-02 (19). On information and belief, Binance offered and sold the Tokens to members of the Class in North Dakota and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the North Dakota Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under North Dakota law. *Id.* § 10-04-04.

1252.   On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in North Dakota, including without limitation through solicitations directed by Binance to North Dakota and received in North Dakota.

1253.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1254.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the North Dakota Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1255.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1256.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-FIFTH CAUSE OF ACTION
### (OHIO STATE LAW – PRIMARY LIABILITY)
### Unregistered Sale of Securities
### Ohio Rev. Code Ann. § 1707.43
### (Binance)

1257.   Plaintiffs reallege the allegations above.

1258.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Ohio.

1259.   The Ohio Securities Act forbids the sale of unregistered securities. Ohio Rev. Code Ann. § 1707.09 (A)(1). Any person who sells a security in violation of Section 9(A)(1) is liable to

the purchaser "in an action at law in any court of competent jurisdiction" for "the full amount paid by the purchaser and for all taxable costs." *Id.* § 1707.43(A).

1260.   When issued, the Tokens were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B). On information and belief, Binance sold the Tokens to members of the Class in Ohio. The Tokens were neither registered under, nor subject to exemption from registration under the Ohio Securities Act. *Id.* § 1707.09.

1261.   The Tokens were sold in Ohio, including without limitation through solicitations directed by Binance to Ohio and received in Ohio.

1262.   Accordingly, Binance has violated the Ohio Securities Act through Binance's sale of unregistered securities.

1263.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1264.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-SIXTH CAUSE OF ACTION**
**(OHIO STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**Ohio Rev. Code Ann. § 1707.43**
**(Binance)**

</div>

1265.   Plaintiffs reallege the allegations above.

1266.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Ohio.

1267.   The Ohio Securities Act forbids any person from transacting business as a dealer unless he is registered or exempt from registration under Ohio law. Ohio Rev. Code Ann. §

1707.14. Any person who sells a security in violation of Section 14 is "liable to the purchaser "in an action at law in any court of competent jurisdiction" for " the full amount paid by the purchaser and for all taxable costs. *Id.* § 1707.43(A).

1268. When issued, the Tokens were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B). On information and belief, Binance transacted business as a dealer when it sold the Tokens to members of the Class in Ohio. *Id.* §§ 1707 E (1).

1269. On information and belief, Binance transacted business as a dealer in Ohio, including without limitation through solicitations directed by Binance to Ohio and received in Ohio.

1270. Binance was not registered as a dealer in Ohio, nor was it subject to any exemption from registration.

1271. Accordingly, Binance has violated the Ohio Securities Act by transacting business as an unregistered dealer in the sale of securities.

1272. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1273. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-SEVENTH CAUSE OF ACTION**
**(OHIO STATE LAW – ADDITIONAL LIABILITY)**
**Joint and Several Liability**
**Ohio Rev. Code Ann. § 1707.43**
**(Individual Defendants)**

1274. Plaintiffs reallege the allegations above.

251

1275.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Ohio.

1276.   Every person that has "participated in or aided the seller in any way in making" the sale or contract for sale, are "jointly and severally liable" to the purchaser. Ohio Rev. Code Ann. § 1707.43.

1277.   When issued, the Tokens were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B). On information and belief, Binance sold the Tokens to members of the Class in Ohio and acted as the dealer for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Ohio Securities Act, and Binance was not registered or exempt from registration as a dealer under Ohio law. *Id.* §§ 1707.09, 1707.14.

1278.   Binance sold the Tokens and acted as a dealer in Ohio, including without limitation through solicitations directed by Binance to Ohio and received in Ohio.

1279.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered dealer as described herein.

1280.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Ohio Securities Act through Binance's sale of unregistered securities and operation as an unregistered dealer.

1281.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1282.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-EIGHTH CAUSE OF ACTION**
**(OKLAHOMA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Okla. Sta. Ann. tit. 71§ 1-509(C)**
**(Binance)**

</div>

1283.  Plaintiffs reallege the allegations above.

1284.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oklahoma.

1285.  The Oklahoma Securities Act forbids the offer or sale of unregistered securities. Okla. Sta. Ann. tit. 71 § 1-301. Any person who offers or sells a security in violation of Section 301 is liable to the "purchaser may maintain an action at law or in equity to recover the consideration paid for the security, and interest at the legal rate of interest per year from the date of the purchase, less the amount of any income received on the security, plus costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" "*Id.* § 1-509 (B)(1).

1286.  When issued, the Tokens were securities within the meaning of the Oklahoma Securities Act. *Id.* § 1-102 (32). On information and belief, Binance offered or sold the Tokens to members of the Class in Oklahoma. The Tokens were neither registered under, nor subject to exemption from registration under the Oklahoma Securities Act. *Id.* § 1-301.

1287.  Upon information and belief, the Tokens were offered or sold in Oklahoma, including without limitation through solicitations directed by Binance to Oklahoma and received in Oklahoma.

1288.  Accordingly, Binance has violated the Oklahoma Securities Act through Binance's sale of unregistered securities.

1289.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1290.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-NINTH CAUSE OF ACTION
### (OKLAHOMA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Okla. Sta. Ann. tit. 71§ 1-509 (D)
### (Binance)

1291.  Plaintiffs reallege the allegations above.

1292.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oklahoma.

1293.  The Oklahoma Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Oklahoma law. Okla. Sta. Ann. tit. 71 §§ 1-401-2. Any person who offers or sells a security in violation of Sections 401 and 402 is liable to the customer, if purchaser, who "may maintain an action at law or in equity for recovery of actual damages…" in " the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest

per year from the date of purchase, costs, and reasonable attorneys' fees determined by the court."
*Id.* § § 1-509 (D).

1294.  When issued, the Tokens were securities within the meaning of the Oklahoma
Securities Act. *Id.* § 1-102. On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Oklahoma. *Id.* §§ 1-102(4),(2).

1295.  On information and belief, Binance transacted business as a broker-dealer or agent
in Oklahoma, including without limitation through solicitations directed by Binance to Oklahoma
and received in Oklahoma.

1296.  Binance was not registered as a broker-dealer or agent in Oklahoma, nor was it
subject to any exemption from registration.

1297.  Accordingly, Binance has violated the Oklahoma Securities Act by transacting
business as an unregistered broker-dealer or agent in the sale of securities.

1298.  Class members who own the Tokens have made or will make any necessary tender
and seek all remedies available at law or in equity for any Tokens purchased in the Class Period,
including any applicable costs, attorneys' fees, and interest.

1299.  Class members who no longer own the Tokens seek damages for any Tokens
purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TENTH CAUSE OF ACTION
### (OKLAHOMA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Okla. Sta. Ann. tit. 71§ 1-509 (G)
### (Individual Defendants)

1300.  Plaintiffs reallege the allegations above.

1301.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oklahoma.

1302.  Every person who directly or indirectly controls an entity liable under the Oklahoma Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "managing partner, executive officer, or director" of such seller, "including an individual having similar status or performing similar functions," every employee of or associated with such a seller who materially aids in the sale" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Okla. Sta. Ann. tit. 71§ 1-509(G).

1303.  When issued, the Tokens were securities within the meaning of the Oklahoma Securities Act. *Id.* § 1-102. On information and belief, Binance offered and sold the Tokens to members of the Class in Oklahoma and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Oklahoma Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Oklahoma law. *Id.* § 1-401-02.

1304.  On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Oklahoma, including without limitation through solicitations directed by Binance to Oklahoma and received in Oklahoma.

1305. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1306. Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Oklahoma Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1307. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1308. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-ELEVENTH CAUSE OF ACTION**
**(OREGON STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**O.R.S. § 59:115**
**(Binance)**

</div>

1309. Plaintiffs reallege the allegations above.

1310. This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oregon.

1311. The Oregon Securities Act forbids the offer or sale of unregistered securities. O.R.S. § 59:055. Any person who offers or sells a security in violation of Section 55 "is liable to the purchaser," who may recover "the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 for judgements for the payment of money or the rate provided in the security if the security in an interest bearing

obligation, less any amount received on the security, or if the purchaser no longer owns the security, damages." Id. §§ 59.115 (2)(a)-(b).

1312.  When issued, the Tokens were securities within the meaning of the Oregon Securities Act. *Id.* § 59.015 (19). On information and belief, Binance offered or sold the Tokens to members of the Class in Oregon. The Tokens were neither registered under, nor subject to exemption from registration under the Oregon Securities Act. *Id.* § 59.055 .

1313.  Upon information and belief, the Tokens were offered or sold in Oregon, including without limitation through solicitations directed by Binance to Oregon and received in Oregon.

1314.  Accordingly, Binance has violated the Oregon Securities Act through Binance's sale of unregistered securities.

1315.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1316.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-TWELFTH CAUSE OF ACTION**
**(OREGON STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**O.R.S. § 59:115**
**(Binance)**

</div>

1317.  Plaintiffs reallege the allegations above.

1318.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oregon.

1319. The Oregon Securities Act forbids any person from transacting business as a broker-dealer or salesperson unless he is registered under Oregon law. O.R.S. § 59:165. Any

<div align="center">258</div>

person who offers or sells a security in violation of Section 165 is "liable to the purchaser" who may recover "the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 for judgements for the payment of money or the rate provided in the security if the security in an interest bearing obligation, less any amount received on the security, or if the purchaser no longer owns the security, damages." Id. § 59.115 (2).

1320.  When issued, the Tokens were securities within the meaning of the Oregon Securities Act. *Id.* § 59.015 (19). On information and belief, Binance transacted business as a broker-dealer or salesperson when it offered or sold the Tokens to members of the Class in Oregon. *Id.* § 59.015 (1),(18).

1321.  On information and belief, Binance transacted business as a broker-dealer or salesperson in Oregon, including without limitation through solicitations directed by Binance to Oregon and received in Oregon.

1322.  Binance was not registered as a broker-dealer or salesperson in Oregon, nor was it subject to any exemption from registration.

1323.  Accordingly, Binance has violated the Oregon Securities Act by transacting business as an unregistered broker-dealer or salesperson in the sale of securities.

1324.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1325.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-THIRTEENTH CAUSE OF ACTION
### (OREGON STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### O.R.S. § 59:115 (3)
### (Individual Defendants)

1326.  Plaintiffs reallege the allegations above.

1327.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oregon.

1328.  Every person who directly or indirectly controls an entity liable under the Oregon Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or salesperson in the sale of those securities, as well as every "partner, limited liability company manager, including a member who is a manager, officer or director of such seller", "every person occupying a similar status or performing similar functions," and "every person who participated or materially aids in the sale" is liable for unlawfully selling unregistered securities, unless that nonseller "sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care could not have known, of the existence of facts on which the liability is based." O.R.S. § 59:115 (3).

1329.  When issued, the Tokens were securities within the meaning of the Oregon Securities Act. *Id.* § O.R.S.§ 59.015 (19).  On information and belief, Binance offered and sold the Tokens to members of the Class in Oregon and acted as the broker-dealer or salesperson for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Oregon Securities Act, and Binance was not registered as a broker-dealer or salesperson under Oregon law. *Id.* § 59.165.

1330.  Binance offered and sold the Tokens and acted as a broker-dealer or salesperson in Oregon, including without limitation through solicitations directed by Binance to Oregon and received in Oregon.

1331.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or salesperson as described herein.

1332.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Oregon Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or salesperson.

1333.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1334.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-FOURTEENTH CAUSE OF ACTION**
**(PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**70 Pa. Stat. Ann. § 1-502**
**(Binance)**

1335.  Plaintiffs reallege the allegations above.

1336.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Pennsylvania.

1337.   The Pennsylvania Securities Act forbids the offer or sale of unregistered securities. 70 Pa. Stat. Ann. § 1-201. Any person who offers or sells a security in violation of Section 1-201 is "liable to the person purchasing the security offered or sold in violation of section 201 from him who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 1-502.

1338.   When issued, the Tokens were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102(t). On information and belief, Binance offered or sold the Tokens to members of the Class in Pennsylvania. The Tokens were neither registered under, nor subject to exemption from registration under the Pennsylvania Securities Act. *Id.* § 1-202.

1339.   Upon information and belief, the Tokens were offered or sold in Pennsylvania, including without limitation through solicitations directed by Binance to Pennsylvania and received in Pennsylvania.

1340.   Accordingly, Binance has violated the Pennsylvania Securities Act through Binance's sale of unregistered securities.

1341.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1342.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-FIFTEENTH CAUSE OF ACTION
### (PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Broker-Dealer**
**70 Pa. Stat. Ann. § 1-501(a)**
**(Binance)**

1343.   Plaintiffs reallege the allegations above.

1344.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Pennsylvania.

1345.   The Pennsylvania Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Pennsylvania law. 70 Pa. Stat. Ann. § 1-301(a). Any person who offers or sells a security in violation of Section 1-301(a) is "liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 1-501(a).

1346.   When issued, the Tokens were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102(t). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Pennsylvania. *Id.* § 1-102(c) ("Agent"), (e) ("Broker-dealer").

1347.   On information and belief, Binance transacted business as a broker-dealer or agent in Pennsylvania, including without limitation through solicitations directed by Binance to Pennsylvania and received in Pennsylvania.

1348.   Binance was not registered as a broker-dealer or agent in Pennsylvania, nor was it subject to any exemption from registration.

263

1349.   Accordingly, Binance has violated the Pennsylvania Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1350.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1351.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-SIXTEENTH CAUSE OF ACTION**
**(PENNSYLVANIA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**70 Pa. Stat. Ann. § 1-503**
**(Individual Defendants)**

</div>

1352.   Plaintiffs reallege the allegations above.

1353.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Pennsylvania.

1354.   Every affiliate of an entity liable under the Pennsylvania Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "partner, principal executive officer or director of such person" and "every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.  70 Pa. Stat. Ann. § 1-503(a).

1355.   When issued, the Tokens were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102. On information and belief, Binance offered and sold the Tokens to

members of the Class in Pennsylvania and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Pennsylvania Securities Act, *id.* § 1-202, and Binance was not registered or exempt from registration as a broker-dealer or agent under Pennsylvania law. *Id.* §§ 1-301, 1-302.

1356. On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Pennsylvania, including without limitation through solicitations directed by Binance to Pennsylvania and received in Pennsylvania.

1357. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1358. Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Pennsylvania Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1359. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1360. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-SEVENTEENTH CAUSE OF ACTION
### (PUERTO RICO STATE LAW – PRIMARY LIABILITY)
#### Unregistered Offer and Sale of Securities
#### 10 L.P.R.A. § 890
#### (Binance)

1361.   Plaintiffs reallege the allegations above.

1362.   This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Puerto Rico.

1363.   The Puerto Rico Securities Act forbids the offer or sale of unregistered securities. 10 L.P.R.A. § 871. Any person who offers or sells a security in violation of Section 871 is "liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards … starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 890.

1364.   When issued, the Tokens were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. Binance offered or sold the Tokens to a Plaintiff in Puerto Rico. The Tokens were neither registered under, nor subject to exemption from registration under the Puerto Rico Securities Act. *Id.* § 882.

1365.   The Tokens were offered or sold in Puerto Rico, including without limitation through solicitations directed by Binance to Puerto Rico and received in Puerto Rico.

1366.   Accordingly, Binance has violated the Puerto Rico Securities Act through Binance's sale of unregistered securities.

1367.   Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1368.   Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-EIGHTEENTH CAUSE OF ACTION
### (PUERTO RICO STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### 10 L.P.R.A. § 890
### (Binance)

1369.   Plaintiffs reallege the allegations above.

1370.   This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Puerto Rico.

1371.   The Puerto Rico Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Puerto Rico law. 10 L.P.R.A. § 861(a). Any person who offers or sells a security in violation of Section 861(a) is "liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards … starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 890.

1372.   When issued, the Tokens were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to a Plaintiff in Puerto Rico. *Id.*

1373.   Binance transacted business as a broker-dealer or agent in Puerto Rico, including without limitation through solicitations directed by Binance to Puerto Rico and received in Puerto Rico.

1374.   Binance was not registered as a broker-dealer or agent in Puerto Rico.

1375. Accordingly, Binance has violated the Puerto Rico Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1376. Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1377. Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-NINTEENTH CAUSE OF ACTION**
**(PUERTO RICO STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**10 L.P.R.A. § 890**
**(Individual Defendants)**

</div>

1378. Plaintiffs reallege the allegations above.

1379. This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Puerto Rico.

1380. Every person who directly or indirectly controls an entity liable under the Puerto Rico Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller," and "every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. 10 L.P.R.A. § 890(b).

1381. When issued, the Tokens were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. Binance offered and sold the Tokens to a Plaintiff in Puerto Rico and

acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Puerto Rico Securities Act, and Binance was not registered as a broker-dealer or agent under Puerto Rico law. *Id.* § 861(a).

1382.  Binance offered and sold the Tokens and acted as a broker-dealer or agent in Puerto Rico, including without limitation through solicitations directed by Binance to Puerto Rico and received in Puerto Rico.

1383.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1384.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Puerto Rico Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1385.  Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1386.  Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-TWENTIETH CAUSE OF ACTION
### (RHODE ISLAND STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### 7 R.I. Gen. Laws Ann. § 7-11-605
### (Binance)

1387.  Plaintiffs reallege the allegations above.

1388.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Rhode Island.

1389.  The Rhode Island Securities Act forbids the offer or sale of unregistered securities. 7 R.I. Gen. Laws Ann. § 7-11-301. Any person who offers or sells a security in violation of Section 7-11-301 is "liable to the purchaser of the security from that person" and "[u]pon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this state from the date of payment, costs, and reasonable attorney's fees as determined by the court, less the amount of income received on the security," or if the "purchaser no longer owns the security, the purchaser may recover damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this state from the date of disposition of the security, costs and reasonable attorney's fees as determined by the court." *Id.* § 7-11-605.

1390.  When issued, the Tokens were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, Binance offered or sold the Tokens to members of the Class in Rhode Island. The Tokens were neither registered under, nor subject to exemption from registration under the Rhode Island Securities Act. *Id.* § 7-11-401.

1391.  Upon information and belief, the Tokens were offered or sold in Rhode Island, including without limitation through solicitations directed by Binance to Rhode Island and received in Rhode Island.

1392.   Accordingly, Binance has violated the Rhode Island Securities Act through Binance's sale of unregistered securities.

1393.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1394.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWENTY-FIRST CAUSE OF ACTION
### (RHODE ISLAND STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### 7 R.I. Gen. Laws Ann. § 7-11-605
### (Binance)

1395.   Plaintiffs reallege the allegations above.

1396.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Rhode Island.

1397.   The Rhode Island Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Rhode Island law. 7 R.I. Gen. Laws Ann. § 7-11-201(a). Any person who offers or sells a security in violation of Section 7-11-201(a) is "liable to the purchaser of the security from that person" and "[u]pon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this state from the date of payment, costs, and reasonable attorney's fees as determined by the court, less the amount of income received on the security," or if the "purchaser no longer owns the security, the purchaser may recover damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus

interest at the legal rate of this state from the date of disposition of the security, costs and reasonable attorney's fees as determined by the court." *Id.* § 7-11-605(a).

1398.   When issued, the Tokens were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Rhode Island. *Id.* § 7-11-101(1).

1399.   On information and belief, Binance transacted business as a broker-dealer or agent in Rhode Island, including without limitation through solicitations directed by Binance to Rhode Island and received in Rhode Island.

1400.   Binance was not registered as a broker-dealer or agent in Rhode Island, nor was it subject to any exemption from registration.

1401.   Accordingly, Binance has violated the Rhode Island Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1402.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1403.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-TWENTY-SECOND CAUSE OF ACTION**
**(RHODE ISLAND STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**R.I. Gen. Laws Ann. § 7-11-605(d)**
**(Individual Defendants)**

1404.   Plaintiffs reallege the allegations above.

272

1405.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Rhode Island.

1406.  Every person who directly or indirectly controls an entity liable under the Rhode Island Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "a partner, officer, or director of the person liable" and "a person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. R.I. Gen. Laws Ann. § 7-11-605(d).

1407.  When issued, the Tokens were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, Binance offered and sold the Tokens to members of the Class in Rhode Island and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Rhode Island Securities Act, *id.* § 7-11-401, and Binance was not registered or exempt from registration as a broker-dealer or agent under Rhode Island law. *Id.* § 7-11-202.

1408.  On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Rhode Island, including without limitation through solicitations directed by Binance to Rhode Island and received in Rhode Island.

1409.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1410.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Rhode Island Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1411.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1412.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWENTY-THIRD CAUSE OF ACTION
### (SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)
### Unregistered Sale of Securities
### S.C. Code Ann. § 35-1-509
### (Binance)

1413.  Plaintiffs reallege the allegations above.

1414.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in South Carolina.

1415.  The South Carolina Securities Act forbids the offer or sale of unregistered securities. S.C. Code Ann. § 35-1-301. Any person who sells a security in violation of Section 35-1-301 is liable to the purchaser who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the

court" or for "actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 35-1-509(b).

1416.  When issued, the Tokens were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, Binance sold the Tokens to members of the Class in South Carolina. The Tokens were neither registered under, nor subject to exemption from registration under the South Carolina Securities Act. *Id.* § 35-1-201.

1417.  Upon information and belief, the Tokens were sold in South Carolina, including without limitation through solicitations directed by Binance to South Carolina and received in South Carolina.

1418.  Accordingly, Binance has violated the South Carolina Securities Act through Binance's sale of unregistered securities.

1419.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1420.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-TWENTY-FOURTH CAUSE OF ACTION**
**(SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**S.C. Code Ann. § 35-1-509**
**(Binance)**

1421.  Plaintiffs reallege the allegations above.

1422.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Carolina.

1423.   The South Carolina Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under South Carolina law. S.C. Code Ann. § 35-1-401(a). Any person who sells a security in violation of Section 35-1-401(a) is liable to the purchaser who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court" or for "actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* §§ 35-1-509(d), 35-1-509(b).

1424.   When issued, the Tokens were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in South Carolina. *Id.* §§ 35-1-102(2) ("Agent"), 35-1-102(4) ("Broker-dealer").

1425.   On information and belief, Binance transacted business as a broker-dealer or agent in South Carolina, including without limitation through solicitations directed by Binance to South Carolina and received in South Carolina.

1426.   Binance was not registered as a broker-dealer or agent in South Carolina, nor was it subject to any exemption from registration.

1427.   Accordingly, Binance has violated the South Carolina Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1428.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1429.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-TWENTY-FIFTH CAUSE OF ACTION**
**(SOUTH CAROLINA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**S.C. Code Ann. § 31-1-509**
**(Individual Defendants)**

</div>

1430.   Plaintiffs reallege the allegations above.

1431.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Carolina.

1432.   Every person who directly or indirectly controls an entity liable under the South Carolina Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as an individual "who is a managing partner, executive officer, or director of a person liable, … including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. S.C. Code. Ann. § 31-1-509(g).

1433.   When issued, the Tokens were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, Binance sold the Tokens to members of the Class in South Carolina and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from

registration under the South Carolina Securities Act, *id.* § 35-1-201, and Binance was not registered or exempt from registration as a broker-dealer or agent under South Carolina law. *Id.* § 35-1-401.

1434.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in South Carolina, including without limitation through solicitations directed by Binance to South Carolina and received in South Carolina.

1435.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1436.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the South Carolina Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1437.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1438.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-TWENTY-SIXTH CAUSE OF ACTION
### (SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)
### Sale of Unregistered Securities
### S.D. Codified Laws § 47-31B-509(b)
### (Binance)

1439.   Plaintiffs reallege the allegations above.

1440.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Dakota.

1441.   The South Dakota Securities Act forbids the sale of unregistered securities. S.D. Codified Laws § 47-31B-301. Any person who sells a security in violation of Section 47-31B-301 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at Category D, § 54-3-16 from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 47-31B-509(b).

1442.   When issued, the Tokens were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, Binance sold the Tokens to members of the Class in South Dakota. The Tokens were neither registered under, nor subject to exemption from registration under the South Dakota Securities Act. *Id.* §§ 47-31B-201-47-31B-203.

1443.   Upon information and belief, the Tokens were sold in South Dakota, including without limitation through solicitations directed by Binance to South Dakota and received in South Dakota.

1444.   Accordingly, Binance has violated the South Dakota Securities Act through Binance's sale of unregistered securities.

1445.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1446.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-TWENTY-SEVENTH CAUSE OF ACTION**
**(SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**S.D. Codified Laws § 47-31B-509(d)**
**(Binance)**

1447.   Plaintiffs reallege the allegations above.

1448.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Dakota.

1449.   The South Dakota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under South Dakota law. S.D. Codified Laws § 47-31B-401(a).

1450.   . Any person who sells a security in violation of Section 47-31B-401(a) is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at Category D, § 54-3-16 from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 47-31B-509(b),(d).

1451.   When issued, the Tokens were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in South Dakota. *Id.* § 47-31B-102(2),(4).

1452.   On information and belief, Binance transacted business as a broker-dealer or agent in South Dakota, including without limitation through solicitations directed by Binance to South Dakota and received in South Dakota.

1453.   Binance was not registered as a broker-dealer or agent in South Dakota, nor was it subject to any exemption from registration.

1454.   Accordingly, Binance has violated the South Dakota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1455.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1456.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWENTY-EIGHTH CAUSE OF ACTION
### (SOUTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### S.D. Codified Laws § 47-31B-509
### (Individual Defendants)

1457.   Plaintiffs reallege the allegations above.

1458.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Dakota.

1459.   Every person who directly or indirectly controls an entity liable under the South Dakota Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as an "individual who is a managing partner, executive officer, or director … employee of or associated with" an entity so

liable is "liable jointly and severally with and to the same extent as" such a person. S.D. Codified Laws § 47-31B-509.

1460.   When issued, the Tokens were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, Binance sold the Tokens to members of the Class in South Dakota and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the South Dakota Securities Act, and Binance was not registered as a broker-dealer or agent under South Dakota law. *Id.* §§ 47-31B-301, 47-31B-401(a).

1461.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in South Dakota, including without limitation through solicitations directed by Binance to South Dakota and received in South Dakota.

1462.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1463.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the South Dakota Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1464.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1465.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-TWENTY-NINTH CAUSE OF ACTION**
**(TENNESSEE STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Tenn. Code Ann. § 48-1-122**
**(Binance)**

</div>

1466.   Plaintiffs reallege the allegations above.

1467.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Tennessee.

1468.   The Tennessee Securities Act forbids the sale of unregistered securities. Tenn. Code Ann. § 48-1-104(a). Any person who sells a security in violation of Section 104(a) is "liable to the person purchasing the security from the seller to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security, or, if the purchaser no longer owns the security, the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it and interest at the legal rate from the date of disposition." *Id.* § 48-1-122(a).

1469.   When issued, the Tokens were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, Binance sold the Tokens to members of the Class in Tennessee. The Tokens were neither registered under, nor subject to exemption from registration under the Tennessee Securities Act. *Id.* § 48-1-103.

1470.   Upon information and belief, the Tokens were sold in Tennessee, including without limitation through solicitations directed by Binance to Tennessee and received in Tennessee.

1471.   Accordingly, Binance has violated the Tennessee Securities Act through Binance's sale of unregistered securities.

1472.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1473.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div style="text-align:center">

**ONE-HUNDRED-AND-THIRTIETH CAUSE OF ACTION**
**(TENNESSEE STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Tenn. Code Ann. § 48-1-122**
**(Binance)**

</div>

1474.   Plaintiffs reallege the allegations above.

1475.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Tennessee.

1476.   The Tennessee Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Tennessee law. Tenn. Code Ann. § 48-1-109. Any person who sells a security in violation of Section 109 is "liable to the person purchasing the security from the seller to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security, or, if the purchaser no longer owns the security, the amount that would be recoverable upon a tender, less the value of the

security when the purchaser disposed of it and interest at the legal rate from the date of disposition." *Id.* § 48-1-122(a).

1477.  When issued, the Tokens were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Tennessee. *Id.* § 48-1-102(3),(4).

1478.  On information and belief, Binance transacted business as a broker-dealer or agent in Tennessee, including without limitation through solicitations directed by Binance to Tennessee and received in Tennessee.

1479.  Binance was not registered as a broker-dealer or agent in Tennessee, nor was it subject to any exemption from registration.

1480.  Accordingly, Binance has violated the Tennessee Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1481.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1482.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-THIRTY-FIRST CAUSE OF ACTION**
**(TENNESSEE STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Tenn. Code Ann. § 48-1-122(g)**
**(Individual Defendants)**

1483.  Plaintiffs reallege the allegations above.

1484. This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Tennessee.

1485. Every person who directly or indirectly controls an entity liable under the Tennessee Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, principal executive officer, or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation" is "liable jointly and severally with and to the same extent as such person, unless the person who would be liable under this subsection (g) proves that the person who would be liable did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 48-1-122(g).

1486. When issued, the Tokens were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, Binance sold the Tokens to members of the Class in Tennessee and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Tennessee Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Tennessee law. *Id.* §§ 48-1-104(a), 48-1-109.

1487. On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Tennessee, including without limitation through solicitations directed by Binance to Tennessee and received in Tennessee.

1488.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1489.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Tennessee Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1490.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1491.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTY-SECOND CAUSE OF ACTION
### (TEXAS STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### Texas Civ. St. Art. § 581-33 A
### (Binance)

1492.  Plaintiffs reallege the allegations above.

1493.  This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Texas.

1494.  The Texas Blue Sky Law – Securities forbids the offer or sale of unregistered securities. Texas Civ. St. Art. § 581-7. Any person who offers or sells a security in violation of

Section 581-7 is "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." *Id.* § 581-33 A. Damages are defined as "(a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of: (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security." *Id.* § 581-33 D(3).

1495.   When issued, the Tokens were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A. Binance offered or sold the Tokens to three Plaintiffs in Texas. The Tokens were neither registered under, nor subject to exemption from registration under the Texas Blue Sky Law – Securities. *Id.* § 581-6.

1496.   The Tokens were offered or sold in Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

1497.   Accordingly, Binance has violated the Texas Blue Sky Law – Securities through Binance's sale of unregistered securities.

1498.   Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1499.   Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-THIRTY-THIRD CAUSE OF ACTION
### (TEXAS STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Dealer
### Texas Civ. St. Art. § 581-33 A
### (Binance)

1500.   Plaintiffs reallege the allegations above.

1501.   This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Texas.

1502.   The Texas Blue Sky Law – Securities forbids any person from transacting business as a dealer or agent unless he is registered or exempt from registration under Texas law. Texas Civ. St. Art. § 581-12. Any person who offers or sells a security in violation of Sections 581-12 "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." *Id.* § 581-33 A. Damages are defined as "(a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of: (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security." *Id.* § 581-33 D(3).

1503.   When issued, the Tokens were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A. Binance transacted business as a dealer or agent when it offered or sold the Tokens to three Plaintiffs in Texas. *Id.* §§ 581-4 C, 581-4 D.

1504.   Binance transacted business as a dealer or agent in Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

1505.   Binance was not registered as a dealer or agent in Texas, nor was it subject to any exemption from registration.

1506. Accordingly, Binance has violated the Texas Blue Sky Law – Securities by transacting business as an unregistered dealer or agent in the sale of securities.

1507. Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1508. Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-THIRTY-FOURTH CAUSE OF ACTION**
**(TEXAS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Texas Civ. St. Art. § 581-33 F**
**(Individual Defendants)**

</div>

1509. Plaintiffs reallege the allegations above.

1510. This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Texas.

1511. Every person who directly or indirectly controls an entity liable under the Texas Blue Sky Law – Securities for unlawfully selling unregistered securities or for operating as an unregistered dealer or agent in the sale of those securities, is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. Texas Civ. St. Art. § 581-33 F.

1512. When issued, the Tokens were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A. Binance offered and sold the Tokens to three Plaintiffs in Texas and acted as the dealer or agent for the sale and purchase of those securities. *Id.* §§ 581-4 C, 581-4 D. The Tokens were neither registered under, nor subject to exemption from registration under

<div align="center">290</div>

the Texas Blue Sky Law – Securities, and Binance was not registered or exempt from registration as a dealer or agent under Texas law. *Id.* §§ 581-5, 581-6.

1513.   Binance offered and sold the Tokens and acted as a dealer or agent in Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

1514.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer or agent as described herein.

1515.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Texas Blue Sky Law – Securities through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1516.   Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1517.   Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-THIRTY-FIFTH CAUSE OF ACTION
### (UTAH STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### Utah Code § 61-1-22
### (Binance)

1518.   Plaintiffs reallege the allegations above.

1519.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Utah.

1520.   The Utah Securities Act forbids the offer or sale of unregistered securities. Utah Code Ann. § 61-1-7. Any person who offers or sells a security in violation of Section 61-1-7 is liable to the buyer for "the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security." *Id.* § 61-1-22(b).

1521.   When issued, the Tokens were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, Binance offered or sold the Tokens to members of the Class in Utah. The Tokens were neither registered under, nor subject to exemption from registration under the Utah Securities Act. *Id.* § 61-14.

1522.   Upon information and belief, the Tokens were offered or sold in Utah, including without limitation through solicitations directed by Binance to Utah and received in Utah.

1523.   Accordingly, Binance has violated the Utah Securities Act through Binance's sale of unregistered securities.

1524.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1525.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTY-SIXTH CAUSE OF ACTION
### (UTAH STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Utah Code § 61-1-22
### (Binance)

1526.   Plaintiffs reallege the allegations above.

1527.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Utah.

1528.   The Utah Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Utah law. Utah Code § 61-1-3(1). Any person who offers or sells a security in violation of Section 61-1-3(1)is "liable to the buyer for "the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security." *Id.* § 61-1-22(b).

1529.   When issued, the Tokens were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Utah. *Id.* § 61-1-13(b),(c).

1530.   On information and belief, Binance transacted business as a broker-dealer or agent in Utah, including without limitation through solicitations directed by Binance to Utah and received in Utah.

1531.   Binance was not registered as a broker-dealer or agent in Utah, nor was it subject to any exemption from registration.

1532.   Accordingly, Binance has violated the Utah Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1533.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1534.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTY-SEVENTH CAUSE OF ACTION
#### (UTAH STATE LAW – ADDITIONAL LIABILITY)
#### Control Person Liability
#### Utah Code Ann. § 61-1-22
#### (Individual Defendants)

1535.   Plaintiffs reallege the allegations above.

1536.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Utah.

1537.   Every person who directly or indirectly controls an entity liable under the Utah Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase" are liable jointly and severally "with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that the nonseller or nonpurchaser did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Utah Code Ann. § 61-1-22.

1538.   When issued, the Tokens were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, Binance offered and sold the Tokens to members of the Class in Utah and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Utah Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Utah law. *Id.* §§ 61-1-3, 61-1-7.

1539.   On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Utah, including without limitation through solicitations directed by Binance to Utah and received in Utah.

1540.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1541.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Utah Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1542.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1543.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTY-EIGHTH CAUSE OF ACTION
### (VERMONT STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### Vt. Stat. Ann. tit. 9, § 5509
### (Binance)

1544.  Plaintiffs reallege the allegations above.

1545.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Vermont.

1546.  The Vermont Securities Act forbids the offer or sale of unregistered securities. Vt. Stat. Ann. tit. 9, § 5309. Any person who offers or sells a security in violation of Section 5309 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 5509.

1547.  When issued, the Tokens were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, Binance offered or sold the Tokens to members of the Class in Vermont. The Tokens were neither registered under, nor subject to exemption from registration under the Vermont Securities Act. *Id.* §§ 5201-5203.

1548.  Upon information and belief, the Tokens were offered or sold in Vermont, including without limitation through solicitations directed by Binance to Vermont and received in Vermont.

1549.  Accordingly, Binance has violated the Vermont Securities Act through Binance's sale of unregistered securities.

1550.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1551.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-THIRTY-NINTH CAUSE OF ACTION**
**(VERMONT STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Vt. Stat. Ann. tit. 9, § 5509**
**(Binance)**

</div>

1552.   Plaintiffs reallege the allegations above.

1553.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Vermont.

1554.   The Vermont Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Vermont law. Vt. Stat. Ann. tit. 9, § 5401. Any person who offers or sells a security in violation of Section 5401 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 5509 (b),(d).

1555.   When issued, the Tokens were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Vermont. *Id.* § 5102(1),(3).

1556.   On information and belief, Binance transacted business as a broker-dealer or agent in Vermont, including without limitation through solicitations directed by Binance to Vermont and received in Vermont.

1557.   Binance was not registered as a broker-dealer or agent in Vermont, nor was it subject to any exemption from registration.

1558.   Accordingly, Binance has violated the Vermont Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1559.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1560.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-FORTIETH CAUSE OF ACTION**
**(VERMONT STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Vt. Stat. Ann. tit. 9, § 5509**
**(Individual Defendants)**

1561.   Plaintiffs reallege the allegations above.

1562.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Vermont.

1563.   Every person who directly or indirectly controls an entity liable under the Vermont Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "an individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f) of this section, including an individual having a similar status or performing similar functions," is jointly

298

and severally liable with the entity "unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Vt. Stat. Ann. tit. 9, § 5509(g).

1564. When issued, the Tokens were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, Binance offered and sold the Tokens to members of the Class in Vermont and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Vermont Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Vermont law. *Id.* §§ 5309, 5401.

1565. On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Vermont, including without limitation through solicitations directed by Binance to Vermont and received in Vermont.

1566. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1567. Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Vermont Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1568.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1569.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-FORTY-FIRST CAUSE OF ACTION**
**(VIRGINIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Va. Code Ann. § 13.1-522 A**
**(Binance)**

</div>

1570.  Plaintiffs reallege the allegations above.

1571.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Virginia.

1572.  The Virginia Securities Act forbids the offer or sale of unregistered securities. Va. Code Ann. § 13.1-507. Any person who sells a security in violation of Section 13.1-507 "shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security." *Id.* § 13.1-522 A.

1573.  When issued, the Tokens were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A. On information and belief, Binance sold the Tokens to members of the Class in Virginia. The Tokens were neither registered under, nor subject to exemption from registration under the Virginia Securities Act. *Id.* § 13.1-514 A.

1574.   Upon information and belief, the Tokens were sold in Virginia, including without limitation through solicitations directed by Binance to Virginia and received in Virginia.

1575.   Accordingly, Binance has violated the Virginia Securities Act through Binance's sale of unregistered securities.

1576.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1577.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-FORTY-SECOND CAUSE OF ACTION**
**(VIRGINIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Va. Code Ann. § 13.1-522 A**
**(Binance)**

</div>

1578.   Plaintiffs reallege the allegations above.

1579.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Virginia.

1580.   The Virginia Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Virginia law. Va. Code Ann. § 13.1-504 A. Any person who sells a security in violation of Section 13.1-504 A "shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security." *Id.* § 13.1-522 A.

1581.  When issued, the Tokens were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A. On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Virginia. *Id.*

1582.  On information and belief, Binance transacted business as a broker-dealer or agent in Virginia, including without limitation through solicitations directed by Binance to Virginia and received in Virginia.

1583.  Binance was not registered as a broker-dealer or agent in Virginia, nor was it subject to any exemption from registration.

1584.  Accordingly, Binance has violated the Virginia Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1585.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1586.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FORTY-THIRD CAUSE OF ACTION
### (VIRGINIA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Va. Code Ann. § 13.1-522 C
### (Individual Defendants)

1587.  Plaintiffs reallege the allegations above.

1588.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Virginia.

1589.  Every person who directly or indirectly controls an entity liable under the Virginia Securities Act for unlawfully selling unregistered securities or for operating as an unregistered

broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Va. Code Ann. § 13.1-522 C.

1590.   When issued, the Tokens were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A. On information and belief, Binance sold the Tokens to members of the Class in Virginia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Virginia Securities Act, and Binance was not registered as a broker-dealer or agent under Virginia law. *Id.* §§ 13.1-514, 13.1-514.1.

1591.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Virginia, including without limitation through solicitations directed by Binance to Virginia and received in Virginia.

1592.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1593.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Virginia Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1594.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1595.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-FORTY-FOURTH CAUSE OF ACTION**
**(WASHINGTON STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Wash. Rev. Code § 21.20.430(1)**
**(Binance)**

</div>

1596.   Plaintiffs reallege the allegations above.

1597.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Washington.

1598.   The Securities Act of Washington forbids the offer or sale of unregistered securities. Wash. Rev. Code § 21.20.140. Any person who offers or sells a security in violation of Section 21.20.140 is "liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security. " *Id.* § 21.20.430(1).

1599.   When issued, the Tokens were securities within the meaning of the Securities Act of Washington. *Id.* § 21.20.005(17). On information and belief, Binance offered or sold the Tokens

<div align="center">304</div>

to members of the Class in Washington. The Tokens were neither registered under, nor subject to exemption from registration under the Securities Act of Washington. *Id.* § 21.20.310.

1600.  Upon information and belief, the Tokens were offered or sold in Washington, including without limitation through solicitations directed by Binance to Washington and received in Washington.

1601.  Accordingly, Binance has violated the Securities Act of Washington through Binance's sale of unregistered securities.

1602.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1603.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-FORTY-FIFTH CAUSE OF ACTION**
**(WASHINGTON STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Wash. Rev. Code Ann. § 21.20.430**
**(Individual Defendants)**

1604.  Plaintiffs reallege the allegations above.

1605.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Washington.

1606.  Every person who directly or indirectly controls an entity liable under the Securities Act of Washington for unlawfully selling unregistered securities, as well as "every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable

305

care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 21.20.430(3).

1607.  When issued, the Tokens were securities within the meaning of the Washington Securities Act. *Id.* § 21.20.005(17). On information and belief, Binance sold the Tokens to members of the Class in Washington. The Tokens were neither registered under, nor subject to exemption from registration under the Washington Securities Act.

1608.  On information and belief, Binance sold the Tokens in Washington, including without limitation through solicitations directed by Binance to Washington and received in Washington.

1609.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities.

1610.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Washington Securities Act through Binance's sale of unregistered securities.

1611.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1612.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-FORTY-SIXTH CAUSE OF ACTION
### (WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer or Sale of Securities
### W. Va. Code Ann. § 32-4-410(a)
### (Binance)

1613.   Plaintiffs reallege the allegations above.

1614.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in West Virginia.

1615.   The West Virginia Uniform Securities Act forbids the offer or sale of unregistered securities. W. Va. Code Ann. § 32-3-301. Any person who offers or sells a security in violation of Section 32-3-301 is "liable to the person buying the security from him, who may assert a claim in a civil action to recover the consideration paid for the security, together with interest at nine percent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at nine percent per year from the date of disposition." *Id.* § 32-4-410(a).

1616.   When issued, the Tokens were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, Binance offered or sold the Tokens to members of the Class in West Virginia. The Tokens were neither registered under, nor subject to exemption from registration under the West Virginia Uniform Securities Act. *Id.* § 32-4-402.

1617.   Upon information and belief, the Tokens were offered or sold in West Virginia, including without limitation through solicitations directed by Binance to West Virginia and received in West Virginia.

307

1618.  Accordingly, Binance has violated the West Virginia Uniform Securities Act through Binance's sale of unregistered securities.

1619.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1620.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-FORTY-SEVENTH CAUSE OF ACTION**
**(WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**W. Va. Code Ann. § 32-2-201**
**(Binance)**

</div>

1621.  Plaintiffs reallege the allegations above.

1622.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in West Virginia.

1623.  The West Virginia Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under West Virginia law. *Id.* § 32-2-201. Any person who offers or sells a security in violation of Section 32-2-201 is "liable to the person buying the security from him, who may assert a claim in a civil action to recover the consideration paid for the security, together with interest at nine percent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at nine percent per year from the date of disposition." *Id.* § 32-4-410(a).

1624.  When issued, the Tokens were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in West Virginia. *Id.* §§ 32-4-401(b), 32-4-401(c).

1625.  On information and belief, Binance transacted business as a broker-dealer or agent in West Virginia, including without limitation through solicitations directed by Binance to West Virginia and received in West Virginia.

1626.  Binance was not registered as a broker-dealer or agent in West Virginia.

1627.  Accordingly, Binance has violated the West Virginia Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1628.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1629.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-FORTY-EIGHTH CAUSE OF ACTION**
**(WEST VIRGINIA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**W. Va. Code Ann. § 32-4-410**
**(Individual Defendants)**

1630.  Plaintiffs reallege the allegations above.

1631.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in West Virginia.

1632.  Every person who directly or indirectly controls an entity liable under the West Virginia Uniform Securities Act for unlawfully selling unregistered securities or for operating as

an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 32-4-410(b).

1633.   When issued, the Tokens were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, Binance offered and sold the Tokens to members of the Class in West Virginia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the West Virginia Uniform Securities Act, and Binance was not registered as a broker-dealer or agent under West Virginia law. *Id.* § 32-2-201.

1634.   On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in West Virginia, including without limitation through solicitations directed by Binance to West Virginia and received in West Virginia.

1635.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1636.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the West Virginia Uniform Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1637.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1638.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FORTY-NINTH CAUSE OF ACTION
### (WISCONSIN STATE LAW – PRIMARY LIABILITY)
### Unregistered Sale of Securities
### Wis. Stat. § 551.509
### (Binance)

1639.   Plaintiffs reallege the allegations above.

1640.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Wisconsin.

1641.   The Wisconsin Uniform Securities Law forbids the sale of unregistered securities. Wis. Stat. § 551.301. Any person who sells a security in violation of Section 301 is liable to the purchaser for the "consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages as provided in par. (c)." *Id.* § 551.509(2)(a). Actual damages are defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court." *Id.* § 551.509(2)(c).

311

1642. When issued, the Tokens were securities within the meaning of the Wisconsin Uniform Securities Law. *Id.* § 551.102(28). On information and belief, Binance sold the Tokens to members of the Class in the state of Wisconsin. The Tokens were neither registered under, nor subject to exemption from registration under the Wisconsin Uniform Securities Law. *Id.* § 551.301.

1643. On information and belief, the Tokens were offered or sold in the state of Wisconsin, including without limitation through solicitations directed by Binance to the state of Wisconsin and received in the state of Wisconsin.

1644. Accordingly, Binance has violated the Wisconsin Uniform Securities Law through Binance's sale of unregistered securities.

1645. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1646. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FIFTIETH CAUSE OF ACTION
### (WISCONSIN STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Wis. Stat. § 551.509
### (Binance)

1647. Plaintiffs reallege the allegations above.

1648. This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Wisconsin.

1649. The Wisconsin Uniform Securities Law forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Wisconsin law. Wis. Stat. §§ 551.401(1), 551.402(1). Any "person acting as a broker-dealer or

agent that sells … a security in violation" of Sections 401 or 402 is "is liable to the customer …
[who] if a purchaser, may maintain an action for recovery of actual damages as specified in sub.
(2)(a) to (c)" (*Id.* § 551.509(4)) which in turn provide that a purchaser may "recover the
consideration paid for the security, less the amount of any income received on the security, and
interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable
attorney fees determined by the court, upon the tender of the security, or for actual damages as
provided in par. (c)." *Id.* § 551.509(2)(a). Actual damages are defined as "the amount that would
be recoverable upon a tender less the value of the security when the purchaser disposed of it, and
interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable
attorney fees determined by the court." *Id.* 551.509(2)(c).

1650.   When issued, the Tokens were securities within the meaning of the Wisconsin
Uniform Securities Law. *Id.* § 551.102(28). Binance transacted business as a broker-dealer or agent
when it sold the Tokens to members of the Class in the state of Wisconsin. *Id.* § 551.102(2), (4).

1651.   On information and belief, Binance transacted business as a broker-dealer or agent
in the state of Wisconsin, including without limitation through solicitations directed by Binance to
the state of Wisconsin and received in the state of Wisconsin.

1652.   Binance was not registered as a broker-dealer or agent in the state of Wisconsin,
nor was it subject to any exemption from registration.

1653.   Accordingly, Binance has violated the Wisconsin Uniform Securities Law by
transacting business as an unregistered broker-dealer or agent in the sale of securities.

1654.   Class members who own the Tokens have made or will make any necessary tender
and seek all remedies available at law or in equity for any Tokens purchased in the Class Period,
including any applicable costs, attorneys' fees, and interest.

1655.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-FIFTY-FIRST CAUSE OF ACTION**
**(WISCONSIN STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Wis. Stat. Ann. § 551.509**
**(Individual Defendants)**

</div>

1656.  Plaintiffs reallege the allegations above.

1657.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Wisconsin.

1658.  Every person who directly or indirectly controls an entity liable under the Wisconsin Uniform Securities Law for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "managing partner, executive officer, or director of a person liable under subs. (2) to (6), including an individual having a similar status or performing similar functions," is jointly and severally liable "unless the individual sustains the burden of proof that the individual did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Wis. Stat. Ann. § 551.509(7)(d).

1659.  When issued, the Tokens were securities within the meaning of the Wisconsin Uniform Securities Law. *Id.* § 551.102(28). On information and belief, Binance sold the Tokens to members of the Class in the state of Wisconsin and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Wisconsin Uniform Securities Law, and Binance was not registered or exempt from registration as a broker-dealer or agent under Wisconsin law. *Id.* §§ 551.301, 551.401(1), 551.402(1).

<div align="center">314</div>

1660.  On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in the state of Wisconsin, including without limitation through solicitations directed by Binance to the state of Wisconsin and received in the state of Wisconsin.

1661.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1662.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Wisconsin Uniform Securities Law through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1663.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1664.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FIFTY-SECOND CAUSE OF ACTION
### (WYOMING STATE LAW – PRIMARY LIABILITY)
### Unregistered Sale of Securities
### Wyo. Stat. Ann. § 17-4-509(b)
### (Binance)

1665.  Plaintiffs reallege the allegations above.

1666.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Wyoming.

1667.   The Wyoming Uniform Securities Act forbids the offer or sale of unregistered securities. Wyo. Stat. Ann. § 17-4-301. Any person who sells a security in violation of Section 17-4-301 is liable to the purchaser, who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security." *Id.* § 17-4-509(b)(i). If the purchaser no longer owns the security, then he may seek actual damages, which are "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at six percent (6%) per year from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 17-4-509(b)(iii).

1668.   When issued, the Tokens were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, Binance offered or sold the Tokens to members of the Class in Wyoming. The Tokens were neither registered under, nor subject to exemption from registration under the Wyoming Uniform Securities Act. *Id.* § 17-4-201 - 204.

1669.   Upon information and belief, the Tokens were offered or sold in Wyoming, including without limitation through solicitations directed by Binance to Wyoming and received in Wyoming.

1670.   Accordingly, Binance has violated the Wyoming Uniform Securities Act through Binance's sale of unregistered securities.

1671.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1672.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FIFTY-THIRD CAUSE OF ACTION
### (WYOMING STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Wyo. Stat. Ann. § 17-4-509(d)
### (Binance)

1673.  Plaintiffs reallege the allegations above.

1674.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Wyoming.

1675.  The Wyoming Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Wyoming law. *Id.* §§ 17-4-401, 17-4-402. Any person acting as a broker-dealer or agent who sells a security in violation of Sections 17-4-401(a) or 17-4-402(a) is liable to the customer. *Id.* § 17-4-509(d). The "customer, if a purchaser may maintain an action for recovery of actual damages as specified in paragraphs (b)(i) through (b)(iii) of this section." *Id*. Pursuant to § 17-4-509(b)(i) the purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security." *See Id.* § 17-4-509(d) (citing to § 17-4-509(b)(i) for recovery). If the purchaser no longer owns the security, then pursuant to § 17-4-509(b)(iii), the purchaser may seek actual damages, which are "the amount that would be recoverable upon a tender less the value of the security when

317

the purchaser disposed of it, and interest at six percent (6%) per year from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 17-4-509(d) (citing to § 17-4-509(b)(iii) for recovery).

1676.  When issued, the Tokens were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Wyoming. *Id.* § 17-4-102(a)(ii) and (iv).

1677.  On information and belief, Binance transacted business as a broker-dealer or agent in Wyoming, including without limitation through solicitations directed by Binance to Wyoming and received in Wyoming.

1678.  Binance was not registered as a broker-dealer or agent in Wyoming, nor was it subject to any exemption from registration.

1679.  Accordingly, Binance has violated the Wyoming Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1680.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1681.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FIFTY-FOURTH CAUSE OF ACTION
### (WYOMING STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Wyo. Stat. Ann. § 17-4-509(g)
### (Individual Defendants)

1682.  Plaintiffs reallege the allegations above.

1683.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Wyoming.

1684.   Every person who directly or indirectly controls a person liable under the Wyoming Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every managing partner, executive officer, or director of such a seller, including every person having a similar status or performing similar functions … is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. *Id.* §§ 17-4-509(g)(i) – (iv).

1685.   When issued, the Tokens were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, Binance sold the Tokens to members of the Class in Wyoming and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Wyoming Uniform Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Wyoming law. *Id.* §§ 17-4-401(a), 17-4-402(a).

1686.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Wyoming, including without limitation through solicitations directed by Binance to Wyoming and received in Wyoming.

1687.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1688.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Wyoming Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1689.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1690.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## VIII.   <u>PRAYER FOR RELIEF</u>

1691.   On behalf of themselves and the Class, Plaintiffs request relief as follows:

 a.   That the Court determines that this action may be maintained as a class action, that Plaintiffs be named as Class Representatives of the Class, that the undersigned be named as Lead Class Counsel of the Class, and directs that notice of this action be given to Class members;

 b.   That the Court enter an order declaring that Defendants' actions, as set forth in this Amended Complaint, violate the federal and state laws set forth above;

 c.   That the Court award Plaintiffs and the Class damages in an amount to be determined at trial;

 d.   That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the Class are entitled, including a declaration

that the purchase agreements between each member of the Class and Binance

are void;

e.  That the Court award Plaintiffs and the Class pre- and post-judgment interest

(including pursuant to statutory rates of interest set under State law);

f.  That the Court award Plaintiffs and the Class their reasonable attorneys' fees

and costs of suit; and

g.  That the Court award any and all other such relief as the Court may deem just

and proper under the circumstances.

## IX.    **JURY TRIAL**

1692.  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a

trial by jury for all claims.

Dated:     September 10, 2020
           New York, New York

Respectfully submitted,

/s/ Philippe Z. Selendy          /s/ Kyle W. Roche
Philippe Z. Selendy              Kyle W. Roche
Jordan A. Goldstein              Edward Normand
Oscar Shine                      Velvel (Devin) Freedman (*pro hac vice*)
Mitchell Nobel                   Alex T. Potter
SELENDY & GAY, PLLC              Richard Cipolla
1290 Sixth Avenue, 17th Floor    ROCHE CYRULNIK
New York, NY 10104                  FREEDMAN LLP
pselendy@selendygay.com          99 Park Avenue, 19th Floor
jgoldstein@selendygay.com        New York, NY 10016
oshine@selendygay.com            kyle@rcfllp.com
mnobel@selendygay.com            tnormand@rcfllp.com
                                 vel@rcfllp.com
                                 apotter@rcfllp.com
                                 rcipolla@rcfllp.com