**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JD ANDERSON, CORY HARDIN, ERIC LEE, BRETT
MESSIEH, DAVID MUHAMMAD, RANJITH
THIAGARAJAN, CHASE WILLIAMS, and TOKEN
FUND I LLC individually and on behalf of all others
similarly situated,

        *Plaintiffs*,

               v.

BINANCE, CHANGPENG ZHAO, YI HE, and ROGER
WANG,

        *Defendants*.

---

Case No. 1:20-cv-02803

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT
<u>AND/OR TO COMPEL ARBITRATION</u>**

DAVIS POLK & WARDWELL LLP

James P. Rouhandeh
Daniel J. Schwartz
M. Nick Sage
450 Lexington Avenue
New York, New York  10017
(212) 450-4000

*Counsel for Defendants Binance, Changpeng
Zhao, Yi He, and Roger Wang*

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND.......................................................................................4

LEGAL STANDARDS ...............................................................................................6

ARGUMENT ..............................................................................................................7

    I.    PLAINTIFFS' FEDERAL CLAIMS FAIL BECAUSE THE
SECURITIES LAWS DO NOT APPLY TO EXTRATERRITORIAL
CONDUCT ...................................................................................................7

    II.    PLAINTIFFS' SECTION 12(A)(1) CLAIM FAILS ..............................12

    III.    PLAINTIFFS' EXCHANGE ACT CLAIMS FAIL ...............................14

        A.    Sections 5 and 15 Do Not Permit Private Damages Claims .....................14

        B.    Plaintiffs' Section 29(b) Claims Fail Because They Do Not Allege
a Facial Violation of the Exchange Act or Privity ....................................15

        C.    Plaintiffs Fail to Allege Any Underlying Violation of Section 15
Because They Do Not Allege That Binance Is a Broker Or Dealer ..........17

    IV.    PLAINTIFFS' FEDERAL CLAIMS ARE TIME-BARRED...............19

        A.    The Securities Act Claims Are Time-Barred.............................................19

        B.    The Exchange Act Claims Are Time-Barred.............................................21

        C.    Plaintiffs' Alleged Inability to Discover That the Tokens
Purportedly Were Securities Does Not Toll Their Claims ........................22

    V.    PLAINTIFFS LACK STANDING TO ASSERT CLAIMS
CONCERNING BNT, CVC, AND SNT................................................25

    VI.    ALL OF PLAINTIFFS' CLAIMS ARE SUBJECT TO ARBITRATION
AND SHOULD BE DISMISSED ..........................................................26

    VII.    PLAINTIFFS' BLUE SKY LAW CLAIMS FAIL ...............................30

    VIII.    PLAINTIFFS' CONTROL PERSON CLAIMS AGAINST THE
INDIVIDUAL DEFENDANTS MUST BE DISMISSED FOR LACK OF
PERSONAL JURISDICTION AND BECAUSE THEY ARE
INSUFFICIENTLY ALLEGED..........................................................31

A.      The Court Lacks Personal Jurisdiction over the Individual
        Defendants ................................................................................................32

B.      "Control Person" Liability Claims Should Be Dismissed ........................34

CONCLUSION...........................................................................................................................35

# TABLE OF AUTHORITIES

## C<small>ASES</small>

P<small>AGE(S)</small>

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) .................................................................. 10

*Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*,
  No. 19 CV 9270, 2020 WL 3318029 (S.D.N.Y. June 18, 2020) ........................................... 14

*Alpha Capital Anstalt v. Oxysure Sys.*,
  216 F. Supp. 3d 403 (S.D.N.Y. 2016) .................................................. 21

*In re Alstom SA*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................................. 35

*Antares Mgmt. LLC v. Galt Glob. Capital, Inc.*,
  No. 12-CV-6075, 2013 WL 1209799 (S.D.N.Y. Mar. 22, 2013) ........................................... 16

*Asch v. Philips, Appel & Walden, Inc.*,
  867 F.2d 776 (2d Cir. 1989) .................................................. 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................. 7

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) .................................................. 28

*Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
  571 U.S. 49 (2013) .................................................. 29

*Bakken Res., Inc. v. Edington*,
  No. 15 Civ. 8686 (ALC), 2019 WL 1437273 (S.D.N.Y. Mar. 29, 2019) ........................... 34

*Balestra v. ATBCOIN LLC*,
  380 F. Supp. 3d 340 (S.D.N.Y. 2019) ........................................... 25, 34

*Banco Safra S.A.- Cayman Is. Branch v. Samarco Mineracao S.A*,
  No. 16 Civ. 8800 (RMB), 2019 WL 2514056 (S.D.N.Y. June 18, 2019) ........................... 11

*In re Banco Santander Sec.-Optimal Litig.*,
  732 F. Supp. 2d 1305 (S.D. Fla. 2010), *aff'd sub nom. Inversiones Mar Octava Limitada
  v. Banco Santander S.A.*, 439 F. App'x 840 (11th Cir. 2011) ........................................... 11-12

*Barnebey v. E.F. Hutton & Co.*,
    715 F. Supp. 1512 (M.D. Fla. 1989) ................................................................. 31

*Barilli v. Sky Solar Holdings, Ltd*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019) .............................................................. 20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................... 6, 7

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007) ............................................................................. 34

*Brawer v. Options Clearing Corp.*,
    807 F.2d 297 (2d Cir. 1986) ............................................................................. 15

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462, 475 (1985) ................................................................................... 7

*Capri v. Murphy*,
    856 F.2d 473 (2d Cir. 1988) ........................................................................ 13-14

*Celsion Corp. v. Stearns Mgmt. Corp.*,
    157 F. Supp. 2d 942 (N.D. Ill. 2001) .............................................................. 21

*Ceres Partners v. GEL Assocs.*,
    918 F.2d 349 (2d Cir. 1990) ............................................................................. 21

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018) ................................................................................. 7

*Citizens United v. Schneiderman*,
    882 F.3d 374 (2d Cir. 2018) ............................................................................... 9

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011) ............................................................................. 24

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) .............................................................. 10, 10-11

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ................................................................................. 5

*Credit Suisse First Bos. Corp. v. ARM Fin. Grp., Inc.*,
    No. 99 CIV 12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ......................... 12

iv

*Das v. Rio Tinto PLC*,
   332 F. Supp. 3d 786 (S.D.N.Y. 2018) .................................................................. 33

*Dervan v. Gordian Grp. LLC*,
   No. 16-CV-1694, 2017 WL 819494 (S.D.N.Y. Feb. 28, 2017) ............................ 16

*Du Quenoy v. Am. Univ. of Beirut*,
   828 F. App'x 769 (2d Cir. 2020) ......................................................................... 29

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ................................................................................ 32

*Erickson v. Pardus*,
   551 U.S. 89 (2007) ................................................................................................ 7

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017) .................................................................................. 31

*Ferguson v. Lion Holding Inc.*,
   312 F. Supp. 2d 484 (S.D.N.Y. 2004) ................................................................. 17

*First Eagle SoGen Funds, Inc. v. Bank for Int'l Settlements*,
   No. 01 Civ. 0087, 2001 WL 1150323 (S.D.N.Y. Sept. 27, 2001) ........................ 27

*Fragin v. Mezei*,
   No. 09 Civ. 10287, 2012 WL 3613813 (S.D.N.Y. Aug. 22, 2012) ...................... 20

*Frati v. Saltzstein*,
   No. 10 Civ. 3255, 2011 WL 1002417 (S.D.N.Y. Mar. 14, 2011) ................... 16-17

*Garland v. Advanced Med. Funding L.P.*,
   86 F. Supp. 2d 1195 (N.D. Ga. 2000) ................................................................. 31

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
   639 F. App'x 664 (2d Cir. 2016) ..................................................................... 21-22

*Genesee Cnty. Employees' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3*,
   825 F. Supp. 2d 1082 (D.N.M. 2011) .................................................................. 31

*Goodman v. Shearson Lehman Bros.*,
   698 F. Supp. 1078 (S.D.N.Y. 1988) .................................................................... 15

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ............................................................................................ 33

*Griffin v. PaineWebber, Inc.*,
  No. 99 CIV. 2292, 2001 WL 740764 (S.D.N.Y. June 29, 2001) ........................................... 14

*Grupo Verzatec S.A. de C.V. v. RFE Inv. Partners*,
  No. 17-CV-9887 (ALC), 2019 WL 1437617 (S.D.N.Y. Mar. 29, 2019) .............................. 35

*Indus. Servs. of Am., Inc. v. Abcom Trading Pte. Ltd.*,
  869 F. Supp. 2d 807 (W.D. Ky. 2012) .................................................................................... 29

*Invista N. Am. S.a.r.l. v. Rhodia Polyamide Intermediates S.A.S.*,
  503 F. Supp. 2d 195 (D.D.C. 2007) ........................................................................................ 29

*Kerusa Co. v. W10Z/515 Real Estate Ltd. P'ship*,
  12 N.Y.3d 236 (2009) ............................................................................................................. 30

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006) .................................................................................................. 8-9

*Konopasek v. Ten Assocs., LLC*,
  No. SACV 18-00272, 2018 WL 6177249 (C.D. Cal. Oct. 22, 2018) .................................... 30

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
  501 U.S. 350 (1991) ................................................................................................................ 21

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
  650 F.3d 167 (2d Cir. 2011) ................................................................................................... 34

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) ............................................................................................. 32, 33

*Loginovskaya v. Batratchenko*,
  764 F.3d 266 (2d Cir. 2014) ................................................................................................... 11

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................................ 25

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013) .................................................................................... 35

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010) ................................................................................................................ 21

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  Nos. 09 MD 2030, 10 Civ. 0124, 2012 WL 1994707 (S.D.N.Y. June 4, 2012) ................... 20

*Merryman v. J.P. Morgan Chase Bank, N.A.*,
   No. 15-CV-9188, 2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016) ......................................... 26

*In re Micro Focus Int'l Plc Sec. Litig.*,
   No. 1:18-CV-06763 (ALC), 2020 WL 5817275 (S.D.N.Y. Sept. 29, 2020) ........................ 32

*Mihalakis v. Pac. Brokerage Svcs. Corp.*,
   No. 91 CIV. 994, 1991 WL 280236 (S.D.N.Y. Dec. 23, 1991) ............................................ 15

*Minholz v. Lockheed Martin Corp.*,
   227 F. Supp. 3d 249 (N.D.N.Y. 2016) ................................................................................. 34

*Mitsui & Co. v. Delta Brands, Inc.*,
   No. 3:04-CV-1070-L, 2005 WL 1214603 (N.D. Tex. May 20, 2005) ................................... 29

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ................................................................................................. 12

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010) ................................................................................... 7, 7-8, 8

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ................................................................................................................. 27

*Mullen Techs., Inc. v. Qiantu Motor (Suzhou) LTD.*,
   No. 3:19-CV-1979 W, 2020 WL 3573371 (S.D. Cal. July 1, 2020) .................................... 29

*In re Nat'l Century Fin. Enterprises, Inc. Inv. Litig.*,
   504 F. Supp. 2d 287 (S.D. Ohio 2007) ................................................................................ 31

*Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co.*,
   No. 13 Civ. 6705, 2014 WL 241739 (S.D.N.Y. Jan. 22, 2014) ........................................... 30

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012) ................................................................................................. 26

*In re North Sea Brent Crude Oil Futures Litig.*,
   256 F. Supp. 3d 298 (S.D.N.Y. 2017) ................................................................................... 8

*Olympus Capital KEB Cards, Ltd. v. Lone Star Mgmt. Co. IV*,
   No. 3:06-CV-2020-B, 2007 WL 9712192 (N.D. Tex. Sept. 24, 2007) ................................ 29

*Omega Overseas Partners, Ltd. v. Griffith*,
   No. 13-Civ. 4202, 2014 WL 3907082 (S.D.N.Y. Aug. 7 2014) ........................................... 16

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
    933 F.3d 99 (2d Cir. 2019) ............................................................................... 16, 17

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004) ..................................................................................... 20

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
    609 F.3d 30 (2d Cir. 2010) .................................................................................. 7, 32

*Phillips v. Audio Active Ltd.*,
    494 F.3d 378 (2d Cir. 2007) ................................................................................... 29

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ...................................................................................... 12, 13, 14

*Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013) ..................................................................................... 20

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*,
    794 F. Supp. 1265 (S.D.N.Y. 1992) ............................................................... 15, 17-18

*In re Poseidon Concepts Sec. Litig.*,
    No. 13CV1213, 2016 WL 3017395 (S.D.N.Y. May 24, 2016) ............................... 8

*Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*,
    678 F.2d 552 (5th Cir. 1982) ................................................................................. 15

*Reliance First Capital, LLC v. Mid Am. Mortg., Inc.*,
    No. 18-cv-3528, 2019 WL 2504039 (E.D.N.Y. June 17, 2019) ....................... 33-34

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*,
    775 F.3d 154 (2d Cir. 2014) ............................................................................. 25-26

*Rodriguez de Quijas v. Shearson/American Exp., Inc.*,
    490 U.S. 477 (1989) .............................................................................................. 27

*Rush v. Savchuk*,
    444 U.S. 320 (1980) ................................................................................................ 7

*Rushing v. Wells Fargo Bank, N.A.*,
    752 F. Supp. 2d 1254 (M.D. Fla. 2010) ................................................................ 30

*Saizhang Guan v. Uber Techs., Inc.*,
    236 F. Supp. 3d 711 (E.D.N.Y. 2017) .................................................................. 28

*Schentag v. Nebgen*,
   No. 1:17-CV-8734-GHW, 2018 WL 3104092 (S.D.N.Y. June 21, 2018) ............................ 11

*Scottrade, Inc. v. Broco Invs., Inc.*,
   774 F. Supp. 2d 573 (S.D.N.Y. 2011) .................................................................. 17

*Shreiber v. Synacor, Inc.*,
   832 F. App'x 54, 58 (2d Cir. 2020) ...................................................................... 7

*SDM Holdings, Inc. v. UBS Fin. Servs., Inc. of Puerto Rico*,
   No. 12 Civ. 1663, 2016 WL 9461324 (D.P.R. Mar. 1, 2016)
   *report and recommendation adopted sub nom. Roman v. UBS Fin. Servs., Inc.*
   *of Puerto Rico*, 2016 WL 9460664 (D.P.R. Sept. 30, 2016) .................................. 30

*SEC  v. Hansen*,
   No. 83 CIV. 3692, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984) .................................. 19

*SEC v. Martino*,
   255 F. Supp. 2d 268 (S.D.N.Y. 2003) ........................................................ 18, 18-19

*SEC v. Nutra Pharma Corp.*,
   No. 18-CV-5459, 2020 WL 1550661 (E.D.N.Y. Mar. 31, 2020) ......................... 19

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ............................................................................... 23, 24

*Shearson/American Exp., Inc. v. McMahon*,
   482 U.S. 220 (1987) ................................................................................... 27

*Shepherd v. S3 Partners, LLC*,
   No. C-09-01405, 2011 WL 4831194 (N.D. Cal. Oct. 12, 2011) ..................... 30-31

*Singapore Techs. Marine, Ltd. v. Pac. Princess P'ship Ltd.*,
   No. 14-CV-1734-H, 2014 WL 12577599 (S.D. Cal. Dec. 8, 2014) ..................... 29

*In re Smart Techs., Inc. S'holder Litig.*,
   295 F.R.D. 50 (S.D.N.Y. 2013) .......................................................................... 8

*Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*,
   198 F.3d 88 (2d Cir. 1999) ............................................................................ 28

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
   450 F.3d 100 (2d Cir. 2006) ............................................................................ 33

*Solymar Investments, Ltd. v. Banco Santander S.A.*,
No. 10-20695-CIV, 2011 WL 1790116 (S.D. Fla. Mar. 14, 2011)
*report and recommendation adopted*, No. 10-20695-CIV, 2011 WL 1791290
(S.D. Fla. May 10, 2011), *aff'd*, 672 F.3d 981 (11th Cir. 2012) ........................................... 29

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
277 F. Supp. 3d 521 (S.D.N.Y. 2017) .................................................................................. 10

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
No. 00 CIV 8058, 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) ........................................ 12

*Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*,
No. 18 Civ. 4201, 2019 WL 1368570 (S.D.N.Y. Mar. 26, 2019) ......................................... 16

*Teva Pharms. Indus. Ltd. v. Deutsche Bank Secs. Inc.*,
No. 09 Civ. 6205, 2010 WL 6864006 (S.D.N.Y. Dec. 14, 2010) ......................................... 23

*In re Tezos Secs. Litig.*,
No. 17-cv-06779, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) .................................... 13, 25

*United States v. Georgiou*,
777 F.3d 125 (3d Cir. 2015) .................................................................................................... 8

*United States v. Vilar*,
729 F.3d 62 (2d Cir. 2013) .................................................................................................... 11

*United States v. Zaslavskiy*,
No. 17 Cr. 647, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ............................................ 24

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
464 F. Supp. 3d 634 (S.D.N.Y. 2020) ..................................................................................... 5

*In re Veon Ltd. Sec. Litig.*,
No. 15-CV-08672 (ALC), 2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ............................ 34

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016) ..................... 10, 11

*Walck v. Am. Stock Exch., Inc.*,
687 F.2d 778 (3d Cir. 1982) .................................................................................................. 15

*Walden v. Fiore*,
571 U.S. 277 (2014) ................................................................................................................. 7

*Youngers v. Virtus Inv. Partners Inc.*,
195 F. Supp. 3d 499 (S.D.N.Y. 2016) .............................................................................. 13, 34-35

*Zola v. Gordon*,
   685 F. Supp. 354 (S.D.N.Y. 1988) ....................................................................... 23

## STATUTES & RULES

9 U.S.C. § 2 ..................................................................................................................... 27

15 U.S.C. § 77l .......................................................................................................... 12, 26

15 U.S.C. § 77m ........................................................................................................ 19, 20

15 U.S.C. § 77o ............................................................................................................... 34

15 U.S.C. § 77v ............................................................................................................... 33

15 U.S.C. § 78c ......................................................................................................... 8, 14, 18

15 U.S.C. § 78e ........................................................................................................... 8, 14

15 U.S.C. § 78o .......................................................................................................... 14, 18

15 U.S.C. § 78t ................................................................................................................ 34

15 U.S.C. § 78aa .............................................................................................................. 33

17 C.F.R. § 240.12b-2 ..................................................................................................... 34

Fed. R. Civ. P. 4 ............................................................................................................... 33

Fed. R. Civ. P. 12 ...................................................................................................... 1, 6, 7

N.Y. C.P.L.R. 302 ............................................................................................................ 33

## OTHER AUTHORITIES

*In re Munchee Inc.*,
   Securities Act Release No. 10445, 118 S.E.C. Docket 975, 2017 WL 10605969
   (Dec. 11, 2017) ............................................................................................................ 24

*In re Tokenlot, LLC*,
   Securities Act Release No. 10543, 2018 WL 4329662 (Sept. 11, 2018) ................. 24

Defendant Binance and Individual Defendants Changpeng Zhao, Yi He, and Roger Wang (together "defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Class Action Complaint (Dkt. No. 55) (the "SACAC") pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) and the doctrine of *forum non conveniens*, and/or to compel arbitration of plaintiffs' claims.

## PRELIMINARY STATEMENT

The federal securities laws do not apply to foreign securities transactions or authorize private damages remedies against those who neither buy nor sell securities. This lawsuit—one of a dozen cookie-cutter actions filed by the same plaintiffs' lawyers in this district—disregards these limitations. Plaintiffs seek to rescind their purchases of cryptocurrency tokens that they bought from third parties in transactions executed on Binance—a foreign cryptocurrency trading platform with no United States operations that is not alleged to have sold plaintiffs *anything*. Moreover, plaintiffs delayed well over a year before asserting their purported claims, several of which they base on provisions of the securities laws that do not afford private rights of action. Despite plaintiffs' efforts to assert 154 distinct causes of action under federal and state law, and even assuming (solely for purposes of this motion), as plaintiffs allege, that the tokens at issue are unregistered securities, plaintiffs do not and cannot state any viable claims. As set out below, the SACAC should be dismissed with prejudice because each cause of action it purports to assert fails for one or more of the following seven independent reasons.

*First*, it is well-established that the federal securities laws do not apply extraterritorially to foreign entities like Binance. Indeed, the *only* alleged connections between Binance's trading platform and the United States are twofold: (i) some U.S. residents purportedly used it to buy tokens from unidentified third parties, and (ii) plaintiffs *believe* that Binance may have contracted for web hosting services with an unrelated company that maintains some data centers

in California.  Such allegations, however, do not subject a foreign entity or foreign securities transactions to the securities laws of the United States.

*Second*, Binance is not a statutory "seller" subject to liability under Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act") because it is at most alleged to be an exchange that *lists* tokens.  Despite alleging hundreds of purchases *through* Binance, the SACAC does not allege a single purchase *from* Binance.  Nor do plaintiffs allege that Binance took any action to solicit their purchases.  The absence of such allegations is fatal to plaintiffs' Section 12 claim.

*Third*, plaintiffs cannot pursue their claims under the Securities Exchange Act of 1934 (the "Exchange Act"), which are premised on Binance's alleged failure to register with the Securities and Exchange Commission ("SEC") as a national securities exchange and broker-dealer.  Even assuming Binance *were* a broker-dealer, a proposition for which the SACAC alleges no factual support, the Exchange Act's registration provisions do not create private rights of action.  Nor can plaintiffs plead around this problem by asserting the registration provisions as a predicate for voiding their contracts with Binance under Section 29(b).  No court has *ever* authorized Section 29(b) claims against a securities exchange, even if Binance were one, as plaintiffs allege.  Section 29(b), moreover, permits rescission only if there is privity between the plaintiff and defendant on a contract that, on its face, *requires* an illegal act.  But the only contracts that plaintiffs allegedly had with Binance—agreements to abide by Binance's terms of use (the "Terms of Use")—did not require anyone to do anything illegal.  And while plaintiffs allege that Binance's contracts with *token issuers* purportedly violated the Exchange Act, the SACAC does not and cannot allege that *plaintiffs* were a party to any of those contracts.

*Fourth*, plaintiffs' federal claims—which are all subject to one-year statutes of limitations—are untimely on their face.  Plaintiffs allege they purchased only *two* tokens (EOS

and TRX) within one year of filing the original complaint, rendering their Securities Act claims untimely as to all other tokens.  Even as to EOS and TRX, the claims are time-barred because Section 12(a)(1)'s limitations period runs from the alleged *violation*—here, Binance's purported solicitation of plaintiffs' purchases.  But plaintiffs fail to allege that Binance *solicited* their purchases at all, much less within one year of the complaint's filing.  All the Exchange Act claims are likewise time-barred because plaintiffs filed this action well over one year after discovering the relevant alleged violation—i.e., that their contracts with Binance purportedly were unlawful due to Binance's failure to register with the SEC.  Plaintiffs "discovered" this information as soon as they agreed to Binance's Terms of Use; indeed, plaintiffs do not allege that they ever were unaware of Binance's lack of registration, or that Binance did anything to conceal it.  While plaintiffs allege they did not discover that their tokens were unregistered securities until April 2019—when the SEC staff published guidance for analyzing when tokens (but not specifically those at issue in this action) may be securities under a 73-year-old precedent—this SEC "Framework" is irrelevant.  There is no discovery rule for plaintiffs' Securities Act claims; their Exchange Act claims turn on *Binance*'s registration status, not that of the tokens; and the Framework did not tell plaintiffs *anything* the SEC and numerous courts had not already said in prior releases, enforcement actions, public statements, and reported decisions.

*Fifth*, plaintiffs lack Article III and class standing as to three tokens (BNT, SNT, and CVC) because the SACAC does not allege that any plaintiff actually purchased or sold them.

*Sixth*, plaintiffs' claims should all be dismissed under the doctrine of *forum non conveniens* because plaintiffs agreed to arbitrate them.  The SACAC alleges that plaintiffs' contracts with Binance are subject to Terms of Use, which incorporated a mandatory arbitration provision as of February 2019.  Plaintiffs agreed to accept any updates to the Terms of Use and

do not dispute that the arbitration clause applies to all their claims, regardless of when they transacted.  Under the Terms of Use, which are enforceable, plaintiffs must arbitrate their claims in Singapore or Switzerland and cannot pursue litigation in federal court or as a class action.

*Seventh*, plaintiffs' Blue Sky law claims fail for the same reasons as their federal claims. In addition, the SACAC does not allege any nexus between plaintiffs' alleged token transactions and approximately forty states and territories under whose laws plaintiffs purport to seek relief. This lack of connection dooms the Blue Sky law claims under well-settled law.

With no viable primary violations of the securities laws, plaintiffs' control person claims against the Individual Defendants cannot proceed.  The control person claims also fail for independent reasons.  The SACAC alleges only the Individual Defendants' titles, not any factual basis to infer that they exercised actual control with respect to conduct that allegedly violated the securities laws.  Moreover, this Court lacks personal jurisdiction over the Individual Defendants, who are not alleged to have availed themselves of this country's laws, engaged in any suit-related conduct here, or otherwise have any meaningful connection to the United States.

For these reasons, the SACAC should be dismissed in its entirety with prejudice. Plaintiffs already had two opportunities to amend and despite getting a preview of defendants' arguments for dismissal in their pre-motion letter (Dkt. No. 50), plaintiffs still have not pled any viable claims.  They plainly cannot do so, and further amendments would be futile.

## FACTUAL BACKGROUND

Binance is a foreign cryptocurrency trading platform with operations entirely outside the United States.  (¶¶ 23, 26-28.)[1]  The Individual Defendants are Binance executives with no U.S. connection.  (¶¶ 30-32.)  Other than titles, the SACAC does not allege their roles or conduct.

---

[1] Citations to (¶ __) refer to paragraph numbers in the SACAC (Dkt. No. 55).

Plaintiffs are cryptocurrency traders from Texas, Nevada, New York, Florida, Puerto Rico and California who opened trading accounts with Binance beginning in 2017.  (¶¶ 15-22; *see* ¶¶ 375, 386; Exs. A-H.)[2]  Plaintiffs acknowledge that their contracts with Binance are subject to Terms of Use, which have required plaintiffs to arbitrate any claims against Binance since at least February 2019.  (¶¶ 349, 375, 386.)  Plaintiffs agreed to abide by any updates to the Terms of Use, which also waived plaintiffs' rights to bring a class or representative action against Binance.[3]  Plaintiffs allege that they executed transactions on Binance with unidentified third parties to buy nine cryptocurrency Tokens.[4]  (¶¶ 1, 14.)  Plaintiffs' trading history demonstrates that no plaintiffs transacted in three Tokens identified in the SACAC:  BNT, SNT and CVC.  (Exs. A-H.)  Plaintiffs, moreover, do not allege that Binance sold them even a single Token.  The sum total of Binance's alleged conduct is that it (i) advertised its trading services; (ii) agreed to list tokens; (iii) announced listings via email and social media; (iv) re-published third-party research about Tokens on its website; and (v) provided trading services, including currency conversion and an FAQ.  (¶¶ 80, 92-95, 99-101.)  Nowhere does the SACAC allege that Binance urged plaintiffs (or anyone else) to purchase any particular Tokens, or managed the flow of material, Token-related information to potential investors.  Nor does the SACAC allege that any plaintiff was even aware of Binance's alleged advertisements, emails, social media activity, or

---

[2] Citations to "Exs. __" refer to the exhibits attached to the Amended Complaint (Dkt No. 43).  The SACAC incorporates these exhibits by reference.  (¶¶ 15-22.)

[3] *See, e.g.*, Declaration of James P. Rouhandeh (the "Rouhandeh Decl.") Ex. 1 ¶ 1 at 9, ¶ 14 at 20.  This Court may consider any documents that are incorporated in the SACAC by reference, integral to plaintiffs' claims, or otherwise subject to judicial notice (including governmental reports).  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47, 48 (2d Cir. 1991); *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 639 (S.D.N.Y. 2020).  Unless otherwise stated, citations in this brief omit internal citations, quotation marks, and brackets, and all emphasis is added.

[4] As used herein, "Tokens" refers to the twelve cryptocurrency tokens at issue in this case: EOS, BNT, SNT, QSP, KNC, TX, FUN, ICX, OMG, LEND, ELF, and CVC.

republication of third-party research.

Plaintiffs allege at great length that the Tokens are securities (¶¶ 120-335), and that they did not discover this until April 2019, when the SEC staff published non-authoritative guidance analyzing when digital assets (but not specifically the Tokens) may qualify as "investment contracts" under a 73-year-old Supreme Court precedent (¶¶ 9-10, 115-116, 120-140, 142-145, 149). Plaintiffs also allege that Binance did not register with the SEC as a broker-dealer or national securities exchange. (¶¶ 11, 37, 72.) Plaintiffs do not allege, however, that they believed that Binance was registered, or that Binance concealed its lack of registration.[5]

The original complaint was filed on April 3, 2020 (Dkt. No. 1), together with eleven other cryptocurrency actions brought by the same law firms and many of the same plaintiffs. An amended complaint (Dkt. No. 43), which added five new plaintiffs, was filed on September 11, 2020. In response to defendants' pre-motion conference letter (Dkt. No. 50) setting out the bases for their anticipated motion to dismiss, plaintiffs sought leave to amend again. They added certain new allegations to the SACAC, which they filed on December 16, 2020. The SACAC purports to assert 154 causes of action under the Securities Act, the Exchange Act and the Blue Sky statutes of 49 jurisdictions based on plaintiffs' Token purchases.

## LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege facts plausibly suggesting the defendant's liability. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). In ruling on a Rule 12(b)(6) motion, the court accepts as true all factual allegations in the pleading.

---

[5] Plaintiffs now allege that an October 29, 2020 article published in *Forbes* (the "Forbes Article") reveals that Binance intentionally structured itself to evade U.S. regulations. (¶¶ 83, 342.) The Forbes Article is irrelevant to this lawsuit. It does not support any of plaintiffs' allegations, nor does it suggest that Binance concealed anything about its operations or lack of registration from any plaintiff or any of its other users.

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  A court, however, is not "bound to accept as true [any] legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To be plausible, the complaint must contain "enough factual matter" to "raise [the] right to relief above the speculative level."  *Twombly*, 550 U.S. at 555-56.  Where, as here, the complaint fails to meet these standards and further amendment would be futile, dismissal should be with prejudice.  *Shreiber v. Synacor, Inc.*, 832 F. App'x 54, 58 (2d Cir. 2020).

To survive a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, plaintiffs bear the burden of establishing jurisdiction over each defendant.  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  The complaint "must make a prima facie showing that jurisdiction exists," which entails "making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018).  The inquiry is defendant-specific, *Rush v. Savchuk*, 444 U.S. 320, 332 (1980), and focuses on the contacts "that the 'defendant himself' creates with the forum State," *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

**ARGUMENT**

I.    **PLAINTIFFS' FEDERAL CLAIMS FAIL BECAUSE THE SECURITIES LAWS DO NOT APPLY TO EXTRATERRITORIAL CONDUCT**

Plaintiffs' federal claims should be dismissed because plaintiffs impermissibly seek to hold Binance—a foreign cryptocurrency trading platform—liable under securities laws that do not apply extraterritorially.  *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). Both the Securities Act and the Exchange Act reach only "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  *Id.* at 267 (Exchange Act); *see also id.* at 268 ("The same focus on domestic transactions is evident in the Securities Act of

1933."); *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 55-56 (S.D.N.Y. 2013)

("*Morrison*'s prohibition on extraterritoriality applies to Securities Act claims.").[6]

      Here, the SACAC admits that there is nothing "domestic" about Binance.  It alleges that

the vast majority of Binance's users are located *outside* the United States.  (¶ 329.)  More

importantly, an exchange is "domestic" only if it registers as a "national securities exchange."

*See Morrison*, 561 U.S. at 266-67.  But plaintiffs allege that Binance did *not* register as a

national securities exchange.  (¶ 72.)  Accordingly, trades on Binance's platform—by

definition—cannot be "transactions in securities listed on domestic exchanges."  *See United*

*States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015); *accord In re Poseidon Concepts Sec. Litig.*,

No. 13 Civ. 1213, 2016 WL 3017395, at *12 (S.D.N.Y. May 24, 2016).  Moreover, exchanges

need register only if their "facilit[ies]" are "within or subject to the jurisdiction of the United

States."  15 U.S.C. § 78e.  Plaintiffs, however, allege that Binance's "facilit[ies]"—i.e., its

"premises," "property" or the rights to use them for reporting or effecting transactions, 15 U.S.C.

§ 78c(a)(2)—are *not* within the United States.  The SACAC alleges that Binance is not now and

never has been headquartered in the United States—rather, its headquarters are alleged to be in

Malta—and it has "decentralized operations" that are not alleged to be in the United States.

(¶¶ 26-29, 326.)  There are no allegations that Binance currently has or ever had any U.S. trading

operations.  Instead, the SACAC alleges—in generic and conclusory terms—that Binance

"employ[ed] agents, employees and vendors" in the United States (¶ 37), and that "many of

Binance's employees have indicated in online profiles that they work for Binance in California"

(¶ 327.)  But such allegations lack any factual detail and "will not suffice to defeat a motion to

---

    [6] *Cf. In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 306-07 (S.D.N.Y. 2017) (*Morrison*'s presumption of extraterritoriality applies beyond Exchange Act).

dismiss." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006).  The only U.S. "employees" whom plaintiffs purport to identify (¶ 25)—six individuals with allegedly disparate functions including charity, communications, and risk—are not alleged to have had any involvement whatsoever in trading the Tokens giving rise to plaintiffs' claims.  In any event, the alleged location of a few Binance employees in the United States has nothing to do with where Binance's "facilities" are located and is irrelevant to whether Binance is a domestic exchange.[7]

Plaintiffs' other attempts to allege connections with the United States likewise cannot support any inference that Binance is a domestic exchange.  Uniformly, these allegations relate to third-party conduct or conduct having nothing to do with trading Tokens.  Plaintiffs' allegations, for example, that a Binance division "hosts a blockchain incubation program" and sent personnel to conferences in the United States (¶ 37), bear no relation to whether plaintiffs purchased Tokens listed on a domestic exchange.  Similarly unavailing are plaintiffs' allegations that "Binance is hosted on computer servers and data centers provided by Amazon Web Services," some of which, *upon information and belief*, "are physically located in" California (¶¶ 24, 327),[8] or that Binance, for some unspecified purpose, purportedly "availed itself of the benefits of . . . computers on the Ethereum blockchain network located in the United States" (¶ 328).  Each of these allegations relates to a *third party's* choice as to where to place its computers, not any decision by Binance to operate in the United States or to establish facilities in

---

[7] Plaintiffs' allegation that "Binance's hardware infrastructure . . . [is] located in the United States" is entirely conclusory.  (¶ 331.)  The only purported support for this assertion is an allegation that *third-party* servers are located in this country (¶¶ 24, 327)—a proposition that, even if true, has no bearing on *Binance*'s domesticity.

[8] This allegation, based only on plaintiffs' "information and belief," is conclusory and should be accorded no weight.  *See Citizens United v. Schneiderman*, 882 F.3d 374, 384-85 (2d Cir. 2018) (allegations made "upon information and belief" are non-conclusory only where "the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible").

this country.  Such allegations cannot render Binance a domestic exchange as a matter of law.  *See Sonterra Capital Master Fund v. Credit Suisse AG*, 277 F. Supp. 3d 521, 582 (S.D.N.Y. 2017) (defendants' conduct carried out "abroad through servers that happened to route their communications in the United States" is insufficient for domesticity under *Morrison*).

    While the SACAC alleges that some Tokens were cross-listed on United States exchanges (¶ 332), the federal securities laws do not apply to transactions "on a foreign exchange simply because those [securities] are also listed on a domestic exchange." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 530 (S.D.N.Y. 2011) (securities laws do not apply to cross-listed securities "where the purchase and sale does not arise from the domestic listing"), *aff'd*, 838 F.3d 223 (2d Cir. 2016).[9]

    Nor can plaintiffs allege that the Token transactions themselves were "domestic."  A transaction is domestic only if "irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66, 67 (2d Cir. 2012).  Here, the SACAC does not allege a single fact showing that irrevocable liability or title passed *within* the United States.  Rather, it merely alleges that plaintiffs purchased Tokens "from" the states in which they respectively reside, and that "title" for the Tokens "passed in whole or in part *over* servers located in California that host Binance's website."  (¶¶ 15-22, 329.)  A transaction is not "domestic," however, merely because the purchaser is located within the United States and "place[s] a buy order in the United States for the purchase of foreign securities

_____

    [9] The SACAC also alleges that defendants "engaged in conduct that had a foreseeable substantial effect in the United States" (¶ 38), and that trades on Binance "affected" the price of Tokens on domestic exchanges (¶ 332), but this is just the Second Circuit's old "conduct-and-effects" test that the Supreme Court rejected in *Morrison*.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012).

on a foreign exchange." *See, e.g.*, *City of Pontiac*, 752 F.3d at 181; *Vivendi*, 765 F. Supp. 2d at 532 (rejecting "the argument that a transaction qualifies as a 'domestic transaction' . . . whenever the purchaser or seller resides in the United States, even if the transaction itself takes place entirely over a foreign exchange").  Nor does a foreign transaction become domestic by virtue of title passing in some sense "over" computers in the United States; such ministerial "actions needed to carry out the transactions" that were consummated someplace else are irrelevant. *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) ("The direction to wire transfer money to the United States is insufficient to demonstrate a domestic transaction.").[10]  The SACAC alleges nothing more, and what it alleges is legally insufficient.

Finally, plaintiffs' amendments based on the Forbes Article bring the SACAC no closer to satisfying *Morrison*'s requirements.  Allegations that Binance "created a shell entity designed to access U.S. markets while attempting to remain outside the power of U.S. securities laws and regulations" (¶¶ 83-84) have nothing to do with whether Binance is a national securities exchange or whether plaintiffs' transactions are domestic.  A party's alleged intent simply is irrelevant to whether the securities laws apply to foreign transactions.  *See United States v. Vilar*, 729 F.3d 62, 78 n.12 (2d Cir. 2013) ("When a securities transaction takes place in the United States, it is subject to regulation under Section 10(b), and when a securities transaction takes place abroad, it is not.");  *see also In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d 1305, 1317-18 (S.D. Fla. 2010) (considering subjective intent "is clearly contrary to Morrison"),

---

[10] *Accord Schentag v. Nebgen*, No. 17 Civ. 8734, 2018 WL 3104092, at *12 (S.D.N.Y. June 21, 2018) ("[A]llegations that investors transferred money to or between U.S. bank accounts, without more, are insufficient to satisfy *Morrison*."); *see also Banco Safra S.A. Cayman Islands Branch v. Samarco Mineracao S.A.*, No. 16 Civ. 8800, 2019 WL 2514056, at *5 (S.D.N.Y. June 18, 2019) (allegations that purchases and sales "were conducted 'through' bank accounts in New York are insufficient to demonstrate a domestic transaction").

*aff'd sub nom. Inversiones Mar Octava Limitada v. Banco Santander S.A.*, 439 F. App'x 840 (11th Cir. 2011).[11]

## II.   PLAINTIFFS' SECTION 12(A)(1) CLAIM FAILS

Plaintiffs' failure to allege that Binance is a statutory "seller" dooms their Section 12 claim.  Section 12(a)(1) of the Securities Act authorizes claims only against a defendant who "*offers or sells*" an unregistered security.  15 U.S.C. § 77l(a)(1).  An offer or sale occurs when a person either "(1) 'passed title or other interest in a security to a buyer for value,' or (2) 'successfully solicit[ed] the purchase.'"  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (citing *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)).  The SACAC does not allege that Binance did either.

*First*, the SACAC does not (and cannot) allege that Binance "passed title" to plaintiffs under *Pinter*'s first prong because the SACAC makes clear that Binance did not act as a *counterparty* to plaintiffs' transactions.  *See Pinter*, 486 U.S. at 644 n.21; *see also Credit Suisse First Bos. Corp. v. ARM Fin. Grp., Inc.*, No. 99 Civ. 12046, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001) (no Section 12 standing where plaintiffs "did not purchase directly from" defendant); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (defendant was not seller absent allegation that it "directly sold the Certificates to" plaintiff).  Plaintiffs allege that they purchased Tokens "*on*" and "*through*" Binance (¶¶ 15-22, 375, 386), not *from* Binance.  Binance thus did not "pass title" to plaintiffs— unidentified trading partners did.

---

[11] Plaintiffs' allegations that Binance referred to Binance.US, a separate entity, as its "partners," and that Mr. Zhao sits on the Binance.US board (¶ 84), do not change the *Morrison* analysis.  The SACAC, in fact, does not even suggest that Binance.US has anything to do with whether Binance is a domestic exchange or whether plaintiffs' trades were domestic transactions.

*Second*, while the SACAC uses the labels "solicited" and "solicitation" (¶¶ 74, 99), it fails to allege any support for this legal conclusion.  Solicitation occurs when a person "control[s] the flow of information to a potential purchaser," "disseminate[s] material information to investors," and "urge[s] the buyer to purchase."  *Pinter*, 486 U.S. at 644.  The SACAC, however, does not allege that Binance did anything of the sort.  To the contrary, the SACAC alleges that "the main offering materials available to investors were 'whitepapers'" (¶ 7) "released" by alleged Token "*[i]ssuers*" (*e.g.*, ¶ 66).  Tellingly, plaintiffs do *not* allege that Binance prepared, issued, disseminated or played any role in these whitepapers.

Rather, the SACAC alleges that Binance "listed" Tokens, announced the listings over Twitter, re-published third-party research and provided various trading services over its website. (¶¶ 85, 92-101, 150, 167, 183, 196, 212, 226, 258, 272, 300, 313.)  These alleged actions are legally insufficient for Section 12 liability.  *See, e.g.*, *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (allegation that defendants "distributed the marketing materials through their website and other channels" was not solicitation); *see also In re Tezos Secs. Litig.*, No. 17 Civ. 06779, 2018 WL 4293341, at *3 (N.D. Cal. Aug. 7, 2018) (providing services to cryptocurrency issuer such as "conversion of US dollars to Bitcoin and Ethereum" was not solicitation).  Allegations that Binance listed Tokens and announced their availability for trading do not suggest that Binance encouraged any particular purchaser to buy any particular Token.[12]  Such conduct is merely incidental to and preparatory for any sale and falls well short of

---

[12] With respect to a single Token (FUN), the SACAC alleges that Binance "offered and promoted" it by "commit[ing] a total of 3,000,000 FUN to reward customers worldwide" over three days in 2017.  (¶ 244.)  But even if this reward program could constitute a "solicitation" in theory, plaintiffs do not and cannot allege that they purchased FUN *as a result*.  The only plaintiff who claims to have traded FUN allegedly did so over a year *after* the reward program ended.  (Ex. E.)  Because no plaintiffs allege that the reward program "actually solicited their investment in" FUN, it "is not sufficient to cast" Binance "as a 'seller'" under Section 12.  *Capri* (....continued)

pleading a Section 12 claim.  *See, e.g.*, *Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*, No. 19 CV 9270, 2020 WL 3318029, at *4 (S.D.N.Y. June 18, 2020) ("preliminary" activities, including meeting with potential purchasers, are insufficient absent allegations of "actual[] … marketing").  At most, it could be argued that such conduct amounts to facilitating others' trades.  But alleged facilitation does not make Binance a statutory seller as a matter of law.  *Pinter*, 486 U.S. at 651 n.27 (rejecting suggestion that "those who merely assist in another's solicitation efforts" are statutory sellers).  Were it otherwise, *every* exchange would always be a statutory seller because an exchange, by definition, is "a market place . . . for *bringing together purchasers and sellers of securities*."  15 U.S.C. § 78c(a)(1).  Defendants, however, are not aware of *any* court that has allowed Section 12(a)(1) claims against an alleged exchange, or that has ever held that an alleged exchange solicits purchases merely by listing securities for trading.

## III.   **PLAINTIFFS' EXCHANGE ACT CLAIMS FAIL**

Plaintiffs do not plead any cognizable Exchange Act claims.  Sections 5 and 15 do not confer private rights of action, the SACAC does not allege valid Section 29(b) claims, and plaintiffs do not, in any event, plead an underlying violation of Section 15.

### A.   **Sections 5 and 15 Do Not Permit Private Damages Claims**

Plaintiffs allege that Binance violated Sections 5 and 15 by operating as an unregistered securities exchange and broker-dealer, respectively (¶¶ 372-73, 382-85), but neither provision confers an express private right of action.  15 U.S.C. §§ 78e, 78o.  No court, moreover, has ever implied a private damages claim under Section 5,[13] and Section 15 decidedly does not create one.

---

(continued….)

*v. Murphy*, 856 F.2d 473, 478-79 (2d Cir. 1988); *Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292, 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) (requiring allegation that plaintiff "purchased securities *as a result of* [defendant's] solicitation.").

[13] Section 5 of the Exchange Act prohibits exchanges from effecting or reporting
(….continued)

*Goodman v. Shearson Lehman Bros.*, 698 F. Supp. 1078, 1086 (S.D.N.Y. 1988) (no private claims under Section 15(a)(1)); *see also Asch v. Philips, Appel & Walden, Inc.*, 867 F.2d 776, 777 (2d Cir. 1989) (no private claims under Section 15(c)(1)).

**B.     Plaintiffs' Section 29(b) Claims Fail Because They Do Not Allege a Facial Violation of the Exchange Act or Privity**

Nor can plaintiffs repackage their defective claims under Section 29(b).  Under some circumstances not present here, Section 29(b) permits a party to void an illegal contract that violates Exchange Act provisions.  But Section 29(b) does not fashion a private damages remedy that does not otherwise exist.  Indeed, no court has ever held that Section 29 authorizes private plaintiffs to assert alleged violations of Section 5.  Plaintiffs cannot bootstrap nonactionable claims under Sections 5 and 15 into valid ones under Section 29(b).

Even putting that aside, however, the SACAC does not and cannot allege Section 29(b)'s requisite elements.  To state a Section 29(b) claim, the plaintiff must "show that (1) the contract involved a prohibited transaction, [and] (2) [the plaintiff] is in contractual privity with the defendant."  *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992) (quoting *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982)).  Plaintiffs have not alleged either of these requirements.

---

(continued....)

transactions unless registered pursuant to Section 6, and courts in this district have explicitly held that there is no private right of action for violating the registration requirements of Section 6. *E.g.*, *Mihalakis v. Pac. Brokerage Servs. Corp.*, No. 91 Civ. 994, 1991 WL 280236, at *4 (S.D.N.Y. Dec. 23, 1991) ("[T]he greater weight of recent authority is that no private right of action may be implied under § 6 of the 1934 Act."); *see also Walck v. Am. Stock Exch., Inc.*, 687 F.2d 778, 786 (3d Cir. 1982) (finding "a clear congressional intent not to create a private damages remedy in § 6").  While the Second Circuit has not resolved whether Section 6 currently provides a private right of action against an exchange, it *has* held that if such a right existed, it would be limited to claims for not enforcing exchange rules against members and would require allegations of fraud or bad faith, *Brawer v. Options Clearing Corp.*, 807 F.2d 297, 299 n.2, 301 n.6, 301-02 (2d Cir. 1986)—none of which the SACAC pleads.

*First*, the SACAC fails to allege that any relevant contract necessarily involved a prohibited transaction.  "[C]ontracts can be held unenforceable under § 29(b) only when the contract '*on its face*' requires the performance of an illegal act."  *Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*, No. 18 Civ. 4201, 2019 WL 1368570 at *13 (S.D.N.Y. Mar. 26, 2019) (emphasis added) (citing *Dervan v. Gordian Grp. LLC,* No. 16 Civ. 1694, 2017 WL 819494, at *10 (S.D.N.Y. Feb. 28, 2017) (contract not voidable where it "d[id] not on its face require" unregistered individual "to act as a 'broker' or a 'dealer'")); *Antares Mgmt. LLC v. Galt Global Capital, Inc.*, No. 12 Civ. 6075, 2013 WL 1209799, at *9 (S.D.N.Y. Mar. 22, 2013) (similar).  But plaintiffs do not allege that Binance's Terms of Use—the only alleged contracts plaintiffs had with Binance (*see* ¶¶ 375, 386)—required an illegal performance *on their face* or otherwise.  In fact, other than the mandatory arbitration clause (¶ 349), plaintiffs do not allege *any* provisions of that agreement.  *See Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 109 (2d Cir. 2019) (no claim under analogous Investment Companies Act section where party failed to "identif[y] any provision of the [contract] whose performance would violate the ICA.").

While plaintiffs generically allege that they purchased Tokens and paid fees "*pursuant to*" the Terms of Use, they do not allege that the Terms of Use *required* them to buy securities over Binance or use its platform.  Similarly, plaintiffs do not allege that the Terms of Use would have violated the securities laws if plaintiffs had used the Binance platform to purchase only *non*-securities.  Section 29(b), however, voids only "unlawful contracts and not [allegedly] unlawful transactions made pursuant to lawful contracts."  *Omega Overseas Partners, Ltd. v. Griffith*, No. 13 Civ. 4202, 2014 WL 3907082, at *4-5 (S.D.N.Y. Aug. 7, 2014) (collecting cases).

*Second*, to the extent plaintiffs allege that any *other* contracts were illegal, they do not and cannot allege "contractual privity" with Binance on those contracts.  *Frati v. Saltzstein*, No.

16

10 CIV. 3255, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011) (dismissing claim where plaintiffs were "not in privity with . . . the defendants that [they] allege were required to register as broker-dealers"); *Scottrade, Inc. v. BroCo Invs, Inc.*, 774 F. Supp. 2d 573, 575, 583 (S.D.N.Y. 2011) (dismissing claim where plaintiff "neither formed nor was in privity with a party to a contract in violation of the securities laws"); *see also Oxford Univ. Bank*, 933 F.3d at 109 (no claim where allegedly illegal contracts were not what "[i]ntervenors seek to rescind, and the resellers from whom they acquired the notes are not parties to this action"). Plaintiffs, for example, attempt to allege that "*issuers of digital tokens*" entered into unlawful agreements with Binance to list their Tokens (¶¶ 374, 385), but the SACAC never alleges that *plaintiffs* were parties to those contracts. Nor do plaintiffs allege that they were parties with Binance to any contract to purchase Tokens; accordingly, plaintiffs cannot "rescind" any such contracts as against Binance or recover "damages with respect to purchases on Binance of any of the Tokens" (¶¶ 379, 390). *See, e.g.*, *Scottrade*, 774 F. Supp. 2d at 583.[14]

C.   **Plaintiffs Fail to Allege Any Underlying Violation of Section 15 Because They Do Not Allege That Binance Is a Broker Or Dealer**

Plaintiffs' Section 29(b) claims independently fail because the SACAC does not allege any factual support for their legal conclusion that Binance was a "broker" and "dealer." (¶¶ 383-84.) "[R]escission of a contract pursuant to Section 29(b) is not available without an underlying violation of the substantive provisions of the securities laws." *Pompano-Windy City Partners,*

---

[14] Furthermore, plaintiffs cannot rescind their contracts with Binance because they do not offer to restore Binance to its position prior to providing services to plaintiffs. *See, e.g.*, *Ferguson v. Lion Holding Inc.*, 312 F. Supp. 2d 484, 499 (S.D.N.Y. 2004) ("Generally a party seeking rescission of a contract must tender the return of consideration it received pursuant to the voidable contract . . . ."). Though plaintiffs generically offer to make "any necessary tender" (¶ 368), the services Binance provided cannot be returned, and plaintiffs received the tokens themselves from issuers or sellers on the secondary market—not from Binance.

*Ltd*, 794 F. Supp. at 1288.  Here, plaintiffs cannot plead any underlying violation of Section 15, which requires registration only of "broker[s]" and "dealer[s]."  15 U.S.C. § 78o(a)(1).

An exchange—as Binance at most is alleged to be—is markedly and undeniably different from a broker or dealer.  An exchange "constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities," or otherwise performs "functions commonly performed by a stock exchange."  *Id*. § 78c(a)(1).  A "broker," by contrast, is "engaged in the business of effecting transactions in securities for the account of others," while a "dealer" buys and sells securities for its "own account."  *Id*. § 78c(a)(4)(A), (a)(5)(A).  The SACAC, however, does not allege that Binance effected securities transactions for its own account or anyone else's.  Rather, it alleges that Binance facilitated "bringing issuers and investors together by listing the Tokens" and announcing those listings (¶ 101)—the very definition of an exchange.  The SACAC adds that Binance also (i) "allows investors to exchange traditional (or fiat) currencies for cryptoassets," (ii) "answers transaction-related questions through the website's FAQ section and support messaging center,"[15] (iii) republishes third-party research and (iv) "maintain[s] its Bitcoin reserves."  (¶¶ 100-01, 383.)  None of that has anything to do with buying or selling securities for anyone's account.  These allegations are a far cry from the type of conduct that could characterize Binance as a broker or dealer, which would require, at minimum, factual allegations that Binance was involved "in negotiations between the issuer and the investor," making "valuations as to the merits of [an] investment or giv[ing] advice," and

---

[15] For instance, the Support Center page of Binance's website referenced in the SACAC (¶ 101) contains FAQs focused on troubleshooting and "how-to" instructions, with sections such as "Account Functions," "Security," "Buy Crypto" etc.  (*See* Rouhandeh Decl. Ex. 2.)  The FAQ includes no reference to specific listings or recommendations.  (*Id.*)  The FAQ thus cannot constitute "advice" on the "merits" of plaintiffs' particular investments.  *See, e.g.*, *SEC. v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003).

being "an active rather than passive finder of investors." *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (quoting *SEC v. Hansen*, No. 83 CIV. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984)).[16]  Because the SACAC contains no such allegations—let alone with a factual basis—the Section 29(b) claim must be dismissed to the extent it is based on a supposed violation of Section 15.

## IV.  PLAINTIFFS' FEDERAL CLAIMS ARE TIME-BARRED

Even if plaintiffs' claims were not impermissibly extraterritorial and insufficiently pled, the applicable one-year statutes of limitations would still bar all of plaintiffs' federal claims.  The alleged violations occurred and, to the extent relevant, were discovered more than one year before plaintiffs first asserted their claims, and no tolling saves those claims from dismissal.

### A.    The Securities Act Claims Are Time-Barred

Plaintiffs failed to timely assert Securities Act claims under Section 12.  Section 12(a)(1) claims must be brought "within one year after the violation upon which [they] are based."  15 U.S.C. § 77m.  Plaintiffs first raised their Section 12 claims on April 3, 2020, when they filed the original complaint.  But, plaintiffs allege that they last purchased seven of the Tokens (QSP, KNC, FUN, ICX, OMG, LEND, and ELF) in 2018—more than one year earlier.[17]  There can be

---

[16] *See also SEC v. Nutra Pharma Corp.*, No. 18 Civ. 5459, 2020 WL 1550661, at *8 (E.D.N.Y. Mar. 31, 2020) (defendant deemed broker where he "induced or attempted to induce the purchase or sale of securities by calling investors, mailing invitations to promotional events, and attending dinners and lunches and making promotional pitches," and was directly "involved in negotiations between Nutra Pharma and potential investors"); *Hansen*, 1984 WL 2413, at *11 (defendant deemed broker where he "was an active and aggressive finder of investors" and "frequently gave those investors extensive advice with regard to the merits of the [investments]").

[17] Plaintiffs' last alleged purchases of each of the Tokens are as follows: June 20, 2018 (QSP) (Ex. A. at 7-9); November 8, 2017 (KNC) (Ex. D at 14); October 3, 2018 (FUN) (Ex. E at 4); March 27, 2018 (ICX) (*id.* Ex. D at 4); April 6, 2018 (OMG) (Ex. A at 18); January 5, 2018 (LEND) (Ex. D at 11); and April 9, 2018 (ELF) (Ex. A at 18).  *See generally* Rouhandeh Decl. Ex. 3 (showing last purchase of each Token by each plaintiff).

no credible argument that these claims were "brought within one year after the violation upon which [they are] based," and they must be dismissed.[18]  *See, e.g.*, *Fragin v. Mezei*, No. 09 Civ. 10287, 2012 WL 3613813, at *7 (S.D.N.Y. Aug. 22, 2012) (courts interpret Section 13 "to bar [Section 12(a)(1)] claims filed more than one year after the purchase of the securities at issue") (citing *In re Merrill Lynch Auction Rate Sec. Litig.*, Nos. 09 MD 2030, 10 Civ. 0124, 2012 WL 1994707, at *4 (S.D.N.Y. June 4, 2012) (same)).

Plaintiffs allege that they bought two other Tokens (EOS and TRX) within one year before they filed the original complaint, but those claims also are time-barred.  The relevant "*violation*" that triggers the running of the statute of limitations for these claims is not plaintiffs' actual purchases of the Tokens, because, as demonstrated above, plaintiffs do not allege that Binance sold them any Tokens.  (*See supra* Point II.)  Rather, the only possible violation— inadequately alleged though it may be—is Binance's purported *solicitation* of such purchases. Plaintiffs, however, do not allege that Binance took any action to solicit *anyone's* purchase of EOS and TRX within one year of filing their original complaint—let alone *plaintiffs'* transactions.  To the contrary, the last act by Binance that the SACAC alleges with respect to EOS and TRX is the republication of third-party research in November 2018 and February 2019,

---

[18] Plaintiffs' Section 12 claim as to OMG is also barred by the three-year statute of repose running from September 9, 2017—the date OMG allegedly was first offered for sale (¶ 269).  *See* 15 U.S.C. § 77m; *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 106 (2d Cir. 2004).  The relevant date for measuring the repose period is September 11, 2020—when the amended complaint was filed (Dkt. No. 43).  Because neither plaintiff who filed the original complaint alleges that he purchased OMG (Exs. C, G), the original plaintiffs lacked standing to assert a Section 12 claim as to OMG, and the OMG claim in the amended complaint does not relate back to the original complaint for repose purposes.  *See Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 111-12 (2d Cir. 2013); *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 263-64 (S.D.N.Y. 2019).  Plaintiffs filed their amended complaint more than three years after OMG was first "bona fide offered to the public," thus the statute of repose bars their Section 12 claim as to that Token.  *See P. Stolz Family P'ship*, 355 F.3d at 106.

respectively (¶ 100(d), (l))—both well over a year before plaintiffs filed the original complaint in April 2020.  Thus, none of plaintiffs' Section 12 claims is timely.

### B.    The Exchange Act Claims Are Time-Barred

Plaintiffs' Exchange Act claims under Section 29(b) must also be dismissed as untimely. They, too, are subject to a one-year statute of limitations, *Alpha Capital Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 408 (S.D.N.Y. 2016) (citing *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 358-59 (2d Cir. 1990)), which "runs from the time when an individual could have, through the exercise of reasonable diligence, discovered the" violation, *id.*; *see also Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001) (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991)).  The basis for plaintiffs' Section 29(b) claims is the formation of their allegedly illegal contracts with Binance pursuant to its Terms of Use (which occurred more than one year before they filed suit), and the purported "violation" that allegedly made those contracts illegal was Binance's failure to register with the SEC as an exchange, broker, or dealer.  (*Supra* Point III.A.)

The "accrual-upon-discovery" rule therefore does not help plaintiffs because the SACAC makes clear that plaintiffs knew of this alleged violation before they ever transacted through Binance—which, for each plaintiff, was over a year before filing their original complaint.[19]  At that point, plaintiffs had discovered sufficient "facts that w[ould] form the basis for an action" on their Section 29(b) claims.  *See, e.g.*, *Merck & Co. v. Reynolds*, 559 U.S. 633, 646 (2010) (applying this definition of discovery rule to Exchange Act claims); *see also Gavin/Solmonese*

---

[19] The first date of plaintiffs' Token purchases are as follows: December 16, 2017 (Anderson) (Ex. A at 25); March 29, 2018 (Hardin) (Ex. B at 4); January 4, 2018 (Lee) (Ex. C at 3); October 17, 2017 (Messieh) (Ex. D at 14); April 23, 2018 (Muhammad) (Ex. E at 39); March 29, 2018 (Thiagarajan) (Ex. F at 3); November 21, 2017 (Williams) (Ex. G at 6); and March 29, 2018 (Token Fund I LLC) (Ex. H at 18).  *See generally* Rouhandeh Decl. Ex. 3.

*LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 667-68 (2d Cir. 2016) (dismissing plaintiff's claims

as time-barred where "[m]inimal [] effort" would have uncovered facts underlying plaintiff's

claims).  Indeed, the SACAC does not allege that there *ever* was a time when plaintiffs did not

know and could not have discovered that Binance was unregistered with the SEC.  To the

contrary, the SACAC admits that plaintiffs *did* know:  it affirmatively alleges that Binance

encouraged users to buy tokens through virtual private networks ("VPNs"), and that "[i]t is *well*

*known* that VPNs are necessary for U.S. purchasers to access *unregistered* crypto-asset

*exchanges, like Binance*."  (¶¶ 82, 330.)  Nor do plaintiffs allege that Binance ever concealed its

lack of registration.  Registration status for national exchanges and broker-dealers, moreover, is

readily available through the SEC's public website.[20]  As such, plaintiffs were on notice of their

Section 29(b) claims when they first signed up with Binance and accepted the Terms of Use

because they could, with even minimal diligence, have discovered that Binance was not

registered with the SEC and that any securities transactions through Binance would purportedly

be illegal as a result.  Accordingly, plaintiffs' Section 29 claims are also untimely in their

entirety.

### C.     Plaintiffs' Alleged Inability to Discover That the Tokens Purportedly Were Securities Does Not Toll Their Claims

In a doomed effort to evade the applicable statutes of limitations, plaintiffs lard the

SACAC with dozens of paragraphs alleging that they could not have discovered that the Tokens

were purportedly securities until April 3, 2019, when the SEC released a "Framework" for

analyzing digital currencies.  (*E.g.*, ¶¶ 9, 103-49.)  But even if this were correct, it would be

---

[20] *See* Rouhandeh Decl. Exs. 4-5; *see also* BrokerCheck by FINRA,
https://brokercheck.finra.org/ (last visited February 13, 2021) (FINRA-operated search engine to
determine SEC registration status and other relevant information about individuals and entities).

entirely irrelevant to the timeliness of plaintiffs' claims. The Section 12 claims do not accrue upon discovery. *Teva Pharms. Indus. Ltd. v. Deutsche Bank Secs. Inc.*, No. 09 Civ. 6205, 2010 WL 6864006, at *2 (S.D.N.Y. Dec. 14, 2010) ("[Section] 12(a)(1) is not subject to a discovery rule."); *Zola v. Gordon*, 685 F. Supp. 354, 362 n.8 (S.D.N.Y. 1988) ("[Section] 12[(a)](1)'s one-year limitations period is an absolute one."). And, as established above, the discovery that is relevant to the Section 29(b) claims is plaintiffs' discovery of their own contracts with Binance and *Binance*'s registration status, which they do not allege was ever in doubt.

But even if the Tokens' registration status were somehow relevant to when plaintiffs discovered their Exchange Act claims, the Framework would still be unavailing. It is apparent that plaintiffs readily could have "discovered" that Tokens purportedly were securities well before the SEC released the Framework on April 3, 2019. The drafters of the Framework, members of a "strategic hub" within the SEC, expressly stated in the Framework itself that it does not represent official views of the SEC (which did not approve it), that it does not "replace or supersede" existing case law and SEC statements, and that its purpose is instead to "provide additional guidance in [] areas the [SEC] and staff has *previously* addressed." (Rouhandeh Decl Ex. 6 at 1 n.1.) Consistent with this purpose, the Framework—which is incorporated by reference into the SACAC—did not say anything plaintiffs did not already know. It relied exclusively on the well-established "investment contract" test articulated in *SEC v. W.J. Howey*, 328 U.S. 293 (1946), and its progeny to determine when a digital asset may be a security. (Rouhandeh Decl. Ex. 6 at 1-7.) The SACAC does not say why plaintiffs could not have alleged that the Tokens were unregistered securities long before April 2019, especially in light of this 73-year-old precedent. The Framework, moreover, did not conclude that any Tokens are, in fact, securities; it was a pure *legal* analysis that did not even mention the Tokens, let alone divulge

new *facts* necessary for plaintiffs to plead any of their claims.  *See, e.g., City of Pontiac General Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) (emphasizing that discovery rule turns on discovery of *facts* sufficient to plead claims).

Nor was the Framework the first time that the SEC had taken the legal position that digital assets could be securities.  The SEC *had already applied the Howey test to* "*determine[]*" that a digital currency utilizing the Ethereum blockchain—allegedly just like the Tokens (¶¶ 56-57)—"are securities" in an earlier report of an investigation from July 2017, *which the Framework itself cited*.[21]  The SEC repeatedly did so throughout 2018 in enforcement actions[22] and in public statements by the commissioners and division heads.[23]  Similarly, numerous private

_____

[21] *See* Rouhandeh Decl., Ex. 7 (Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Release No. 81207, 117 S.E.C. Docket 745 (July 25, 2017)) at 1 (stating that "the Commission has determined that DAO Tokens are securities under the Securities Act of 1933"); *id.* at 4-5 (discussing that DAO tokens used the Etherium blockchain); *id.* at 11-15 (applying *Howey* test to find that DAO tokens were securities); *id.* at 2 (reiterating that securities law applies to "virtual organizations or capital raising entities that use distributed ledger or blockchain technology to facilitate capital raising and/or investment and the related offer and sale of securities.").  The SEC's Framework repeatedly cited the DAO Report.  Rouhandeh Decl., Ex. 6 at 1 nn.1, 8; 2 n.9; 3 n.16.

[22] *See, e.g.*, *In re Tokenlot, LLC*, Securities Act Release No. 10543, 2018 WL 4329662 (Sept. 11, 2018), at *1 ("Respondents advertised and sold securities, in the form of digital tokens, to retail investors using TokenLot's website platform"); *In re Munchee Inc.*, Securities Act Release No. 10445, 118 S.E.C. Docket 975, 2017 WL 10605969 (Dec. 11, 2017), at *1 ("MUN tokens were securities pursuant to Section 2(a)(1) of the Securities Act" because "MUN tokens are 'investment contracts' under *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946) and its progeny"); Complaint ¶ 3, *SEC v. REcoin Grp. Foundation, LLC*, No. 17 CV 5725, 2017 WL 4329876 (E.D.N.Y. filed Sept. 29, 2017) ("The ICOs for these supposed 'tokens' or 'coins' were illegal offerings of securities for which no registration statement was filed or then in effect, and as to which no exemption from registration was available."); *see also United States v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018) (noting "abundance of caselaw interpreting and applying *Howey*" and "related guidance [including DAO report] issued by the SEC" in finding defendant had notice that tokens might be securities).

[23] Rouhandeh Decl., Ex. 8 (Statement on Potentially Unlawful Online Platforms for Trading Digital Assets by SEC Divisions of Enforcement and Trading Markets (March 7, 2018)) at 1 ("A number of these platforms provide a mechanism for trading assets that meet the (….continued)

plaintiffs asserted that various cryptocurrency tokens were "unregistered securities" under the federal securities laws well before April 3, 2019—a position that survived a motion to dismiss on at least one occasion.  *See, e.g.*, *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 346, 352-53 (S.D.N.Y. 2019) (denying motion to dismiss "on the ground that the ATB Coin is not a security within the meaning of § 2(a)(1) of the Securities Act"); *In re Tezos Sec. Litig.*, No. 17 Civ. 06779, 2018 WL 4293341, at *1 (N.D. Cal. Aug. 7, 2018) (noting complaint's allegation that tokens were "unregistered securities").  Because it plainly was possible to allege that digital tokens were securities before April 2019 (and the SEC and other private plaintiffs had in fact done so), the release of the Framework cannot delay the accrual of any of plaintiffs' claims.

## V.   PLAINTIFFS LACK STANDING TO ASSERT CLAIMS CONCERNING BNT, CVC, AND SNT

Plaintiffs' claims as to three Tokens—BNT, CVC and SNT—fail for the additional and independent reason that plaintiffs did not transact in these Tokens and therefore have no standing to assert claims relating to their purchase.  To establish Article III standing, plaintiffs must allege (1) an injury in fact (2) fairly traceable to defendants' actions that is (3) redressable by the requested relief.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Class standing requires plaintiffs to "plausibly allege[] (1) that [they] personally ha[ve] suffered some *actual injury* as a result of the putatively illegal conduct of the defendant," and "(2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other

---

(continued….)

definition of a 'security' under the federal securities laws."); Rouhandeh Decl., Ex. 9 (Kate Rooney, "SEC chief says agency won't change securities laws to cater to cryptocurrencies," CNBC (June 6, 2018)), at 3 (quoting Jay Clayton, then-SEC Chairman, as saying, "[a] token, a digital asset . . . that is a security and we regulate that. . . . We regulate the offering of that security and regulate the trading of that security."); Rouhandeh Decl., Ex. 10 (William Hinman, Director, SEC Division of Corporation Finance, Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018)) at 3 ("The digital asset itself is simply code. But the way it is sold . . . can be, and, in that context, most often is, a security.").

members of the putative class by the same defendants." *See Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014). The SACAC reveals that plaintiffs lack both types of standing as to BNT, CVC, and SNT. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 158, 162 (2d Cir. 2012) (holding that both Article III and class standing require actual allegation of injury).

    *First*, the SACAC does not allege that any plaintiff purchased any of those Tokens, and so plaintiffs could not possibly have suffered any injury as a result of any defendant's alleged conduct as to those Tokens. Indeed, because Section 12(a)(1) claims can be asserted only by the "person purchasing such security," 15 U.S.C. § 77l(a)(1), it is plain that plaintiffs cannot plead a required element of their Securities Act claims as to these Tokens either. *Second*, the SACAC makes clear that the Tokens were issued by different, unrelated companies and all have unique characteristics that differentiate them from each other. (¶¶ 148, 174-80, 186-93, 318-24.) Binance's alleged conduct with respect to listing the different Tokens therefore no more "implicates the same set of concerns" than would the decision to list the stocks of two different, unrelated companies. Plaintiffs, accordingly, lack standing to assert any claims related to these three Tokens. *See NECA-IBEW*, 693 F.3d at 164 (dismissing plaintiffs' claims related to securities in which they did not invest and which were unrelated to securities in which they did invest); *see also Merryman v. J.P. Morgan Chase Bank, N.A.*, No. 15 Civ. 9188, 2016 WL 5477776, at *14 (S.D.N.Y. Sept. 29, 2016) (dismissing claims for lack of class standing because "plaintiffs have not explained how they have a personal and concrete stake in proving this case relative to ADRs that they do not own").

## VI.     ALL OF PLAINTIFFS' CLAIMS ARE SUBJECT TO ARBITRATION AND SHOULD BE DISMISSED

    All of plaintiffs' claims should be dismissed in favor of arbitration in the contractually

agreed fora of Singapore or Switzerland.  Plaintiffs allege in the SACAC that they entered into Terms of Use with Binance that, beginning in February 2019, contained a mandatory arbitration clause.  (¶¶ 349, 375, 386.)  Plaintiffs even purport to define two subclasses to distinguish among putative class members who purchased after February 20, 2019, and whose claims therefore are subject to arbitration, and those whose claims may not be because they purchased earlier.  (*Id*.)

The Federal Arbitration Act dictates that arbitration provisions are "valid, irrevocable, and enforceable."  9 U.S.C. § 2.  Under well-established federal law, there is a "federal policy favoring arbitration agreements," and a strong presumption of arbitrability pursuant to which "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  A court's "duty to enforce arbitration agreements is not diminished" simply because a party to an agreement asserts a claim "founded on statutory rights."  *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 225-26 (1987).  It is "well-settled" that Securities Act and Exchange Act claims are arbitrable.  *See First Eagle Sogen Funds, Inc. v. Bank for Int'l Settlements*, No. 01 Civ. 0087, 2001 WL 1150323, at *2 (S.D.N.Y. Sept. 28, 2001) (Exchange Act); *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 483 (1989) (Securities Act).  "Absent a well-founded claim" that the arbitration agreement *itself* resulted from "fraud or excessive economic power" that would warrant its revocation—which plaintiffs do not allege here even in conclusory fashion—the Federal Arbitration Act "provides no basis for disfavoring agreements to arbitrate statutory claims."  *Shearson/Am. Exp.*, 482 U.S. at 225-26.

Plaintiffs expressly allege that Binance entered into contracts with them "pursuant to and consistent with its Terms of Use," and that plaintiffs purchased Tokens on Binance "pursuant to those terms.  (¶¶ 375, 386.)  Plaintiffs do not dispute that they are bound by Binance's Terms of

Use, which specifically provide that plaintiffs will become subject to any updates and amendments that Binance may make to its Terms of Use over time:

> Binance may make or amend this agreement and various rules from time to time as needed, and announce the same on the website, without any individual notice to you.  The amended agreement and rules shall come into effect immediately and automatically upon being announced on the website.  If you do not agree to the amendment, you shall immediately stop using Binance Service.  If you continue using Binance Service, you shall be deemed as having accepted the amended agreement and rules.

Rouhandeh Decl. Ex. 11 (July 2017 Terms of Use) ¶ 1 at 6.[24]  Plaintiffs admit that since February 2019, those Terms of Use have contained a clear and conspicuous mandatory arbitration provision, which is binding on all Binance users (like plaintiffs) and which requires that all claims against Binance be arbitrated, regardless of when such claims accrued.[25]  The Terms of Use also waive plaintiffs' right to bring claims against Binance as a class,[26] which also is an enforceable provision.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344, 352 (2011); *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 733 (E.D.N.Y. 2017) (collecting cases).  Moreover, the Terms of Use contain a prominent notice in all capital letters to alert users to the presence of the arbitration provision in the document:

> PLEASE READ THESE TERMS CAREFULLY AS THEY GOVERN YOUR USE OF THE SERVICES. THESE TERMS CONTAIN[] IMPORTANT PROVISIONS INCLUDING AN ARBITRATION PROVISION THAT REQUIRES ALL CLAIMS TO BE RESOLVED BY WAY OF BINDING ARBITRATION. THE TERMS OF THE ARBITRATION PROVISION ARE SET FORTH IN SECTION 14 BELOW ENTITLED "RESOLVING DISPUTES:

---

[24] Each plaintiff transacted on Binance when these Terms of Use were in effect.  *See* Rouhandeh Decl. Ex 3.

[25] Agreements to arbitrate "any" claim apply even to claims that accrued prior to the agreement.  *Smith/Enron Cogeneration Ltd. P'Ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98-99 (2d Cir. 1999).  The arbitration clause in Binance's February 2019 and current Terms of Use provide that Binance's users "agree to resolve *any* claims . . . through final and binding arbitration."  (Rouhandeh Decl. Ex. 1 ¶ 14(b) at 20; *id.* Ex. 12 § X(2) at 19-20.)

[26] Rouhandeh Decl. Decl. Ex. 1 ¶ 14 at 20; *id.* Ex. 12 § X(3) at 21.

FORUM, ARBITRATION, CLASS ACTION WAIVER.[27]

Plaintiffs must be held to their agreement to arbitrate and these claims should be dismissed.

The Terms of Use also contain an exclusive choice-of-forum clause, which in February 2019 selected Singapore as the site of arbitration, and which today requires arbitration in Switzerland.[28]  Like an arbitration clause, this type of "forum-selection clause is presumptively enforceable," where, as here, it "'was reasonably communicated to the party resisting enforcement,' has 'mandatory force,' and 'covers the claims and parties involved in the dispute.'" *Du Quenoy v. Am. Univ. of Beirut*, 828 F. App'x 769, 771 (2d Cir. 2020) (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007)).  The forum selection clause in the Terms of Use therefore must be enforced through a dismissal of plaintiffs' claims pursuant to the doctrine of *forum non conveniens*.  *See Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 60 (2013) (holding that "the appropriate way to enforce a forum-selection clause pointing to a . . . foreign forum is through the doctrine of *forum non conveniens*," the "traditional remedy" for which is "outright dismissal").[29]

Because plaintiffs concede that they agreed to Binance's Terms of Use and do not allege

---

[27] Rouhandeh Decl. Ex. 1 at 8-9; *id.* Ex. 12 at 1.

[28] Rouhandeh Decl. Ex. 1 ¶ 14(b)-(c) at 17; *id.* Ex. 12 § X(2) at 20.

[29] Courts throughout the country routinely grant motions to compel arbitration in Singapore and in Switzerland, including in securities and complex commercial cases.  *See, e.g.*, *Mullen Techs., Inc. v. Qiantu Motor (Suzhou) LTD.*, No. 3:19 Civ. 1979 W, 2020 WL 3573371, at *3 (S.D. Cal. July 1, 2020); *Singapore Techs. Marine, Ltd. v. Pac. Princess P'ship Ltd.*, No. 14 Civ. 1734-H, 2014 WL 12577599, at *7 (S.D. Cal. Dec. 8, 2014); *Indus. Servs. of Am., Inc. v. Abcom Trading Pte. Ltd.*, 869 F. Supp. 2d 807, 808 (W.D. Ky. 2012); *Olympus Capital KEB Cards, Ltd. v. Lone Star Mgmt. Co. IV*, No. 3:06 Civ. 2020-B, 2007 WL 9712192, at *5 (N.D. Tex. Sept. 24, 2007); *Solymar Investments, Ltd. v. Banco Santander S.A.*, No. 10-20695 Civ. 2011 WL 1790116, at *15 (S.D. Fla. Mar. 14, 2011), *report and recommendation adopted*, No. 10 Civ. 20695, 2011 WL 1791290 (S.D. Fla. May 10, 2011), *aff'd*, 672 F.3d 981 (11th Cir. 2012); *Invista N. Am., S.a.r.l. v. Rhodia Polyamide Intermediates S.A.S.*, 503 F. Supp. 2d 195, 207 (D.D.C. 2007); *Mitsui & Co. v. Delta Brands, Inc.*, No. 3:04 Civ. 1070-L, 2005 WL 1214603, at *12 (N.D. Tex. May 20, 2005).

that they ever stopped using Binance (and thus agreed to each update to the Terms of Use), they are bound by the arbitration, class action waiver, and forum-selection clauses contained therein.

## VII.   PLAINTIFFS' BLUE SKY LAW CLAIMS FAIL

Although plaintiffs purport to bring claims under the Blue Sky laws of 49 states and territories,[30] plaintiffs claim to have placed trades over Binance from only six jurisdictions: Texas, New York, Nevada, Florida, California, and Puerto Rico.  (¶¶ 15-22.)  New York has no privately enforceable Blue Sky law, *see Kerusa Co. v. W10Z/515 R.E. Ltd. P'ship*, 12 N.Y.3d 236, 244 (2009), and plaintiffs do not purport to state any claim under New York law.  And the Blue Sky claims for the other five jurisdictions (California, Florida, Nevada, Puerto Rico, and Texas) fail for precisely the reasons as plaintiffs' analogous federal claims.[31]

---

[30] These states and territories are Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

[31] Claims under these jurisdictions' Blue Sky laws are similar to the federal claims (*see* SACAC, ¶¶ 509-534 (California); ¶¶ 631-656 (Florida); ¶¶ 1110-135 (Nevada); ¶¶ 1370-195 (Puerto Rico); ¶¶ 1501-526 (Texas)), and courts routinely interpret them in light of their federal analogs.  *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co.*, No. 13 Civ. 6705, 2014 WL 241739, at *12-13 (S.D.N.Y. Jan. 22, 2014) (holding that "Texas courts have generally adopted federal securities law when analyzing" Texas Securities Act, which was modeled after federal Securities Act); *Rushing v. Wells Fargo Bank, N.A.*, 752 F. Supp. 2d 1254, 1260 (M.D. Fla. 2010) (noting that "Florida courts look to [federal Securities Act] laws when interpreting [Florida Blue Sky laws]"); *SDM Holdings, Inc. v. UBS Fin. Servs., Inc. of Puerto Rico*, No. 12 Civ. 1663, 2016 WL 9461324, at *6 (D.P.R. Mar. 1, 2016) (noting that Puerto Rico Uniform Securities Act claims are "for all practical purposes a verbatim repetition of [Exchange Act] claim"), *report and recommendation adopted sub nom. Roman v. UBS Fin. Servs., Inc. of Puerto Rico*, 2016 WL 9460664 (D.P.R. Sept. 30, 2016); *Konopasek v. Ten Assocs., LLC.*, No. SACV 18 Civ. 00272, 2018 WL 6177249, at *5 (C.D. Cal. Oct. 22, 2018) (considering Exchange Act definitions in dismissing California Blue Sky claims based on alleged sales by unregistered broker-dealers, where, as here, no defendant was alleged "to have engaged in any securities transactions as broker-dealers"); *Shepherd v. S3 Partners, LLC*, No. 09 Civ. 01405, 2011 WL (....continued)

Plaintiffs cannot assert claims under the remaining Blue Sky statutes because they have not alleged any nexus with the remaining states whose laws they purport to invoke.  A prerequisite to the application of *any* Blue Sky law is an allegedly illegal purchase or sale that took place within the state.[32]  Here, the SACAC contains no non-conclusory allegations of plaintiffs or Binance doing anything relating to the trading of Tokens in those jurisdictions.  Absent allegations of such a connection with a given state, plaintiffs' Blue Sky law claims fail.  *See, e.g.*, *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 156 (2d Cir. 2017) (noting that Blue Sky laws "only regulate[] transactions occurring within the regulating States."); *see also In re Nat'l Century Fin. Enterprises, Inc., Investment Litig.*, 504 F. Supp. 2d 287, 309 (S.D. Ohio 2007) (holding that where "[o]n the face of the complaint, there is no connection between [the state] and the [defendant's] actionable conduct," the Blue Sky claims must be dismissed).[33]  This rule applies to putative class actions like this one.  *See In re Nat'l Century Fin.*, 504 F. Supp. 2d at 309; *Genesee Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1224-25 (D.N.M. 2011) (granting motion to dismiss Blue Sky law claim for lack of allegations creating nexus with the state).

## VIII.   PLAINTIFFS' CONTROL PERSON CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION AND BECAUSE THEY ARE INSUFFICIENTLY ALLEGED

---

(continued….)

4831194, at *8 (N.D. Cal. Oct. 12, 2011) (stating that California Blue Sky claim based on sales of allegedly unregistered securities runs "from a seller to a buyer" and incorporates privity requirement, just like Section 12).

[32] The Blue Sky laws of each of the other jurisdictions contain a statutory nexus requirement.  *See* Rouhandeh Decl. Ex. 13.

[33] *Barnebey v. E.F. Hutton & Co*., 715 F. Supp. 1512, 1536 (M.D. Fla 1989) ("[T]he issue is whether the plaintiffs' allegations show a sufficient nexus between the parties and the particular state law pleaded to justify applying that law."); *Garland v. Advanced Med. Fund, L.P. II*, 86 F. Supp. 2d 1195, 1204 (N.D. Ga. 2000) (noting that the relevant question is "whether there was a sufficient territorial nexus between the state at issue and the transaction.").

Plaintiffs' control-person claims against the Individual Defendants should be dismissed because the SACAC fails to plausibly allege any federal or state claims for primary liability.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206-07 (2d Cir. 2009) (dismissing control-person claims under Securities Act and Exchange Act "for want of a primary violation"); *In re Micro Focus Int'l Plc Sec. Litig.*, No. 18 Civ. 06763 (ALC), 2020 WL 5817275, at *16 (S.D.N.Y. Sept. 29, 2020) (same).

The control-person claims should be dismissed against the Individual Defendants for two additional, independent reasons:  *First*, the Court lacks personal jurisdiction over the Individual Defendants.  *Second*, the SACAC does not allege any factual support for its assertion that the Individual Defendants exercised actual control over the relevant conduct that purportedly constitutes the violations for which plaintiffs seek to recover.

## A.    The Court Lacks Personal Jurisdiction over the Individual Defendants

Plaintiffs bear the burden of making "a prima facie showing that jurisdiction exists" over each defendant through "legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010).  "Due process considerations require that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169 (2d Cir. 2013).[34]  These constitutional standards require plaintiffs to establish general or specific jurisdiction over each

---

[34] Even where (unlike here) "a defendant purposefully established minimum contacts within the forum State," the court must still determine whether exercising "personal jurisdiction would comport with fair play and substantial justice" in light of (1) the burden on the defendant; (2) the interests of the forum state; and (3) the plaintiff's interest in "obtaining convenient and effective relief."  *Licci*, 732 F.3d at 170.

defendant for each claim.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).[35]  The SACAC establishes neither as to the Individual Defendants.

"Where the claim arises out of, or relates to, the defendant's contacts with the forum—i.e., specific jurisdiction is asserted—minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *Licci*, 732 F.3d at 170.  The SACAC concedes that the Individual Defendants reside abroad (¶¶ 30-32), and does not allege *any* conduct at all by Ms. He or Mr. Wang.  *See, e.g.*, *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 801 (S.D.N.Y. 2018) (Carter, J.) (dismissing Exchange Act claims for lack of personal jurisdiction against individual defendant who "lived in the United Kingdom, worked for a company headquartered in the United Kingdom" and where "the allegedly unlawful payment was made with Guinea").  As to Mr. Zhao, the SACAC alleges only that he posted on Twitter about cryptocurrencies in general and about Binance, without alleging that such posts were either made from the United States or targeted towards Binance users in the United States.  (¶¶ 28, 81, 87-89, 98, 141.)  Such allegations—which have nothing to do with plaintiffs' alleged Token purchases—are insufficient to confer personal jurisdiction over the Individual Defendants.  *See Reliance First Capital, LLC v. Mid Am. Mortg., Inc.*, No. 18 Civ. 3528, 2019 WL 2504039, at *10 (E.D.N.Y. June 17, 2019)

---

[35] Personal jurisdiction may be established under Fed. R. Civ. P. 4(k)(1)(A), (C) in two ways.  The first way is if the defendant is subject to jurisdiction under the law of the state where the district court is located, here New York.  *See* CPLR § 302(a); *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt. LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (holding that CPLR 302 requires showing both that defendant transacted business in New York and that asserted claim arises from such business activity).  The second way is if personal jurisdiction is "authorized by federal statute," here the Securities Act and Exchange Act.  *See* 15 U.S.C. §§ 77v(a), 78aa(a).  Either way, the exercise of personal jurisdiction must comport with constitutional due process standards.  As discussed below, the SACAC fails to allege *any* suit-related contacts with New York, or even the United States as a whole, by the Individual Defendants that could satisfy these standards.

("Twitter (a world-wide, on-line news and social networking site) posts are akin to advertising on-line or in national publications, and do not create claim-related contacts with the forum, even if people within the forum state can see them."); *Minholz v. Lockheed Martin Corp.*, 227 F. Supp. 3d 249, 268 (N.D.N.Y. 2016) (holding that company was not subject to personal jurisdiction in New York though it maintained Twitter and other social media accounts accessible to New York residents); *see also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 251 (2d Cir. 2007) (holding that non-resident's Internet posts were insufficient basis for personal jurisdiction under New York law, though they could be viewed by New York residents, where "nature of [the] comments" did not suggest they were "purposely directed" to the forum); *Bakken Resources, Inc. v. Edington*, No. 15 CIV. 8686 (ALC), 2019 WL 1437273, at *5 (S.D.N.Y. Mar. 29, 2019) (holding that jurisdictional forum contacts must be "with respect to the[] transactions" at issue).

### B.   "Control Person" Liability Claims Should Be Dismissed

"In order to state a claim for control person liability under [the Securities Act and the Exchange Act], a plaintiff must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *Balestra*, 380 F. Supp. 3d at 359; *see* 15 U.S.C. § 77o; 15 U.S.C. § 78t(a). "Control" is the "'the power to direct or cause the direction of the management and policies of [the primary violators].'" *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (quoting 17 C.F.R. § 240.12b-2). "In this analysis, courts have held that officer or director status alone does not constitute control for the purposes of Section 20(a) liability." *In re Veon Ltd. Sec. Litig.*, No. 15 Civ. 08672 (ALC), 2018 WL 4168958, at *21 (S.D.N.Y. Aug. 30, 2018).

Here, the SACAC alleges almost nothing about the Individual Defendants other than their titles, which is plainly insufficient to support a control person claim. *See Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 524 (S.D.N.Y. 2016) ("[B]oilerplate allegations that a party

34

controlled another based on officer or director status are insufficient."). Plaintiffs allege that the Individual Defendants co-founded Binance; that Mr. Zhao is its Chief Executive Officer; Ms. He its Chief Marketing Officer; and Mr. Wang its Chief Technology Officer. (¶¶ 26, 31-32.) Tellingly, the SACAC fails to allege any facts about any of the Individual Defendants' responsibilities at Binance in general or their specific roles with respect to any of the conduct underlying plaintiffs' claims including, for example, their roles in deciding to list the Tokens for sale on Binance and whether to cause Binance to register with the SEC as an exchange. *See In re Alstom SA*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (plaintiff must allege that the defendant had "[a]ctual control over the wrongdoer and the *transactions in question*" (emphasis in original)); *Grupo Verzatec S.A. de C.V. v. RFE Inv. Partners*, No. 17 Civ. 9887 (ALC), 2019 WL 1437617, at *6 (S.D.N.Y. Mar. 29, 2019) (same); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 122 (S.D.N.Y. 2013) ("[T]he defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person.").

The SACAC alleges certain purported statements by Mr. Zhao about Binance's general policies and practices (¶¶ 28, 81, 87-89, 98, 141)—the only specific facts alleged about Zhao at all in the SACAC—but these likewise have no relation to the facts underlying plaintiffs' causes of action. The SACAC utterly fails to allege any other facts about either Ms. He or Mr. Wang (and certainly does not allege that either of them had anything to do with plaintiffs' allegations). The SACAC therefore fails to sufficiently allege control person liability as to the Individual Defendants, and the Court should dismiss Counts 4 and 5 and the analogous state law claims.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the SACAC be dismissed with prejudice in its entirety and/or that the Court compel arbitration of plaintiffs' claims in Singapore or Switzerland.

Dated:   February 16, 2021
          New York, New York

                              DAVIS POLK & WARDWELL LLP

                              By:   */s/ James P. Rouhandeh*
                                       James P. Rouhandeh

                              James P. Rouhandeh
                              Daniel J. Schwartz
                              M. Nick Sage
                              Davis Polk & Wardwell LLP
                              450 Lexington Avenue
                              New York, New York  10017
                              Telephone: (212) 450-4835
                              Facsimile: (212) 701-5835
                              rouhandeh@davispolk.com
                              daniel.schwartz@davispolk.com
                              m.nick.sage@davispolk.com

                              *Counsel for Defendants Binance, Changpeng*
                              *Zhao, Yi He, and Roger Wang*

36