**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JD ANDERSON, COREY HARDIN, ERIC LEE, BRETT MESSIEH, DAVID MUHAMMAD, RANJITH THIAGARAJAN, CHASE WILLIAMS, and TOKEN FUND I LLC, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>   v.<br><br>BINANCE, CHANGPENG ZHAO, YI HE, and ROGER WANG,<br><br>     Defendants. | Case No. 1:20-cv-02803-ALC<br>Honorable Andrew L. Carter, Jr.<br><br>**Oral Argument Requested** |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

Kyle W. Roche
Edward Normand
Velvel (Devin) Freedman (*pro hac vice*)
Alex T. Potter
Richard Cipolla
ROCHE FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
Tel: (646) 350-0527
kyle@rcfllp.com
tnormand@rcfllp.com
vel@rcfllp.com
apotter@rcfllp.com
rcipolla@rcfllp.com

Philippe Z. Selendy
Jordan A. Goldstein
Oscar Shine
Mitchell Nobel
SELENDY & GAY PLLC
1290 Sixth Avenue, 17th Floor
New York, NY 10104
Tel: (212) 390-9000
pselendy@selendygay.com
jgoldstein@selendygay.com
oshine@selendygay.com
mnobel@selendygay.com

*Co-Lead Counsel and Attorneys for Plaintiffs
and the Proposed Class*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND .......................................................................................................................3

ARGUMENT ............................................................................................................................5

I.     FEDERAL SECURITIES LAWS GOVERN PLAINTIFFS' CLAIMS ...........................5

       A.    Plaintiffs' Trades Were Connected With The Purchase Or Sale Of
             Securities On A National Exchange ...................................................................5

       B.    Plaintiffs' Trades Were Domestic Securities Transactions ..................................8

II.    DEFENDANTS ARE STATUTORY SELLERS............................................................10

III.   PLAINTIFFS HAVE ADEQUATELY PLEADED CLAIMS UNDER SECTION
       29(b) OF THE EXCHANGE ACT ...............................................................................13

       A.    Plaintiffs Properly Invoke Section 29(b) ..........................................................13

       B.    Plaintiffs Allege Facts Stating a Claim Under Section 29(b) ..............................14

       C.    Plaintiffs Adequately Allege That Binance Is a Broker-Dealer............................16

IV.    PLAINTIFFS' CLAIMS ARE TIMELY........................................................................17

       A.    Plaintiffs' Section 12(a)(1) Claims Are Timely...................................................17

             1.    Plaintiffs' Token Purchases On Or After April 3, 2019 ...........................17

             2.    Plaintiffs' Token Purchases Prior To April 3, 2019 ................................19

       B.    Plaintiffs' Section 29(b) Claims Are Also Timely ...............................................24

       C.    Plaintiffs' Blue Sky Claims Are Timely..............................................................25

       D.    Judge Cote's Recent Decision in *Bibox* Is Not Dispositive..................................26

V.     DEFENDANTS' REQUEST TO DIRECT THIS CASE TO ARBITRATION OR
       A FOREIGN FORUM SHOULD BE DENIED...............................................................27

VI.    PLAINTIFFS PLEAD VALID BLUE SKY LAW CLAIMS ..........................................32

VII.    PLAINTIFFS HAVE ADEQUATELY PLEADED CONTROL PERSON
      CLAIMS ................................................................................................................33

      A.     The Court Has Personal Jurisdiction Over Defendant Zhao...................................33

      B.     Plaintiffs Adequately Allege That Defendant Zhao Exercised Actual
           Control .................................................................................................................35

CONCLUSION.......................................................................................................................35

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012)..........................................................................8

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   175 F. Supp. 3d 44 (S.D.N.Y. 2016)..........................................................22

*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*,
   2018 WL 5118638 (S.D.N.Y. Oct. 22, 2018)..............................................33

*All S. Subcontractors, Inc. v. Amerigas Propane, Inc.*,
   206 So. 3d 77 (Fla. Dist. Ct. App. 2016) ...................................................32

*Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*,
   2020 WL 3318029 (S.D.N.Y. June 18, 2020) ............................................12

*In re Alstom SA*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)........................................................35

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013)...................................................................................31

*Antares Mgmt. LLC v. Galt Glob. Capital, Inc.*,
   2013 WL 1209799 (S.D.N.Y. Mar. 22, 2013) ............................................15

*Application of Chase Manhattan Bank*,
   191 F. Supp. 206 (S.D.N.Y. 1961).............................................................30

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018)........................................................................33

*Balestra v. ATBCOIN LLC*,
   380 F. Supp. 3d 340 (S.D.N.Y. 2019).........................................10, 22, 33, 35

*Barron v. Helbiz Inc.*,
   2021 WL 229609 (S.D.N.Y. Jan. 22, 2021) ................................................9

*Baskin v. Hawley*,
   807 F.2d 1120 (2d Cir. 1986).............................................................21, 24

*Berkson v. Gogo LLC*,
   97 F. Supp. 3d 359 (E.D.N.Y. 2015) .........................................................28

*In re Bibox Group Holding Ltd. Securities Litigation*,
No. 20-cv-2807 (S.D.N.Y. Apr. 16, 2021) ...............................................23, 26, 27

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015).......................................................35

*BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank,
N.A.*,
247 F. Supp. 3d 377 (S.D.N.Y. 2017).....................................................22

*Bodner v. Banque Paribas*,
114 F. Supp. 2d 117 (E.D.N.Y. 2000) .............................................22, 24

*Boguslavsky v. Kaplan*,
159 F.3d 715 (2d Cir. 1998)............................................................13, 14

*Cal. Pub. Emps. Ret. Sys. v. ANZ Secs., Inc.*,
137 S. Ct. 2042 (2017).................................................................19, 20

*Camilo v. Lyft, Inc.*,
384 F. Supp. 3d 435 (S.D.N.Y. 2019 .......................................................28

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)..........................................................8, 9, 18

*Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*,
2006 WL 2620985 (D. Neb. Sept. 12, 2006) ..........................................13

*Couldock & Bohan, Inc. v. Societe Generale Secs. Corp.*,
93 F. Supp. 2d 220 (D. Conn. 2000) ......................................................15

*Craftmatic Sec. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989)..................................................................12

*Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*,
2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ..........................................10

*DeAngelis v. Corzine*,
17 F. Supp. 3d 270 (S.D.N.Y. 2014)......................................................35

*Eisen v. Venulum Ltd.*,
244 F. Supp. 3d 324 (W.D.N.Y. 2017) ...................................................31

*Ellul v. Congregation of Christian Bros.*,
774 F.3d 791 (2d Cir. 2014).........................................................21, 24

*Ema Fin., LLC v. NFusz, Inc.*,
2020 WL 7629580 (S.D.N.Y. Dec. 22, 2020) ........................................14

iv

*Ema Fin., LLC v. Vystar Corp.*,
  2020 WL 4808650 (S.D.N.Y. Aug. 18, 2020) .............................................13, 15

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017) ................................................................8, 9, 33

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021) ...........................................................................34

*Frati v. Saltzstein*,
  2011 WL 1002417 (S.D.N.Y. Mar. 14, 2011) ...........................................16

*Gabelli v. SEC*,
  568 U.S. 442 (2013) ...................................................................19, 21, 22

*In re Gas Reclamation, Inc. Sec. Litig.*,
  659 F. Supp. 493 (S.D.N.Y. 1987) ..........................................................20

*Gingras v. Think Fin., Inc.*,
  922 F.3d 112 (2d Cir. 2019) ..................................................................31

*Hayes v. Delbert Servs. Corp.*,
  811 F.3d 666 (4th Cir. 2016) .................................................................31

*Holick v. Cellular Sales of N.Y., LLC*,
  802 F.3d 391 (2d Cir. 2015) ..................................................................32

*Holland v. Florida*,
  560 U.S. 631 (2010) ..............................................................................19

*Holsworth v. BProtocol Found.*,
  2021 WL 706549 (S.D.N.Y. Feb. 22, 2021) ......................................9, 11, 22

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011) ..............................................................................33

*Katz v. Amos Treat & Co.*,
  411 F.2d 1046 (2d Cir. 1969) .................................................................20

*Lack v. Mizuho Bank*,
  2019 WL 4239128 (C.D. Cal. Jun. 24, 2019) ...........................................34

*Langan v. Johnson & Johnson Consumer Cos.*,
  897 F.3d 88 (2d Cir. 2018) ....................................................................33

*Loginovskaya v. Batratchenko*,
  764 F.3d 266 (2d Cir. 2014) ....................................................................9

v

*In re Longfin Corp. Sec. Class Action Litig.*,
  2019 WL 1569792 (S.D.N.Y. Apr. 11, 2019) .......................................................12

*Marini v. Adamo*,
  995 F. Supp. 2d 155 (E.D.N.Y. 2014) ...............................................................21

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017)..............................................................................29

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985)........................................................................................31

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)............................................................................12

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010)........................................................................1, 5, 8, 9

*MTS Logistics, Inc. v. Innovative Commodities Grp., LLC*,
  442 F. Supp. 3d 738 (S.D.N.Y. 2020)...............................................................28

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
  504 F. Supp. 2d 287 (S.D. Ohio 2007) .............................................................33

*Newman v. Pershing & Co.*,
  412 F. Supp. 463 (S.D.N.Y. 1975)....................................................................15

*NovaFund Advisors, LLC v. Capitala Grp., LLC*,
  2020 WL 230089 (D. Conn. Jan. 14, 2020) ......................................................13

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
  933 F.3d 99 (2d Cir. 2019)..............................................................................16

*Park v. Bae*,
  2016 WL 1435715 (D.N.J. Apr. 12, 2016) ........................................................18

*Pasternack v. Shrader*,
  863 F.3d 162 (2d Cir. 2017)............................................................................23

*Pearlstein v. Scudder & German*,
  429 F.2d 1136 (2d Cir. 1970)..........................................................................15

*Pinter v. Dahl*,
  486 U.S. 622 (1988)...............................................................................2, 10, 12

*In re Poseidon Concepts Sec. Litig.*,
  2016 WL 3017395 (S.D.N.Y. May 24, 2016) .....................................................7, 8

*Ragone v. Atl. Video at Manhattan Ctr.*,
   595 F.3d 115 (2d Cir. 2010)..........................................................................31

*In re RAIT Fin. Tr. Sec. Litig.*,
   2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ...............................................12

*Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*,
   678 F.2d 552 (5th Cir. 1982) .......................................................................14

*Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*,
   825 F. Supp. 2d 1082 (D.N.M. 2011) ...........................................................33

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..........................................................................12

*Rotkiske v. Klemm*,
   140 S. Ct. 355 (2019) .............................................................................19, 20

*RSM Prod. Corp. v. Fridman*,
   2007 WL 2295907 (S.D.N.Y. Aug. 10, 2007) ..............................................30

*Rubenstein v. Cosmos Holdings, Inc.*,
   2020 WL 3893347 (S.D.N.Y. July 10, 2020) ..................................................5

*Scotti v. Tough Mudder Inc.*,
   63 Misc. 3d 843 (Sup. Ct. Kings Cty. 2019) ................................................28

*Scottrade, Inc. v. BroCo Inv'rs, Inc.*,
   774 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................16

*SEC v. Alpine Sec. Corp.*,
   308 F. Supp. 3d 775 (S.D.N.Y. 2018)............................................................16

*SEC v. Hansen*,
   1984 WL 2413 (S.D.N.Y. Apr. 6, 1984).........................................................17

*SEC v. Martino*,
   255 F. Supp. 2d 268 (S.D.N.Y. 2003).....................................................16, 17

*SEC v. Nutra Pharma Corp.*,
   450 F. Supp. 3d 278 (E.D.N.Y. 2020) ...........................................................17

*SEC v. PlexCorps*,
   2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018)..................................................34

*Shron v. LendingClub Corp.*,
   2020 WL 3960249 (S.D.N.Y. July 13, 2020) ................................................28

*Slomiak v. Bear Stearns & Co.*,
    597 F. Supp. 676 (S.D.N.Y. 1984)....................................................................14

*Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17 (2d Cir. 2002)......................................................................28, 29

*Starke v. SquareTrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019)....................................................................29, 30

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
    2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001).........................................10

*Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*,
    2019 WL 1368570 (S.D.N.Y. Mar. 26, 2019) ........................................15

*Teva Pharm. Indus. Ltd. v. Deutsche Bank Sec. Inc.*
    2010 WL 6864006 (S.D.N.Y. Dec. 14, 2010) ........................................20

*In re Tezos Secs. Litig.*,
    2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) .........................................9, 12, 22, 33

*TradeComet.com LLC v. Google, Inc.*,
    435 Fed. App'x 31 (2d Cir. 2011)...........................................................32

*United States v. Drew*,
    259 F.R.D. 449 (C.D .Cal. 2009)...........................................................28

*United States v. Georgiou*,
    777 F.3d 125 (3d Cir. 2015).....................................................................7

*United States v. Kubrick*,
    444 U.S. 111 (1979)................................................................................19

*Urie v. Thompson*,
    337 U.S. 163 (1949)................................................................................19

*Veera v. Ambac Plan Admin. Order Commd.*,
    769 F. Supp. 2d 223 (S.D.N.Y. 2011).......................................................5

*Verragio, Ltd. v. S K Diamonds*,
    2017 WL 1750451 (S.D.N.Y. May 4, 2017) ........................................33

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011).......................................................8

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996).....................................................................12

*Youngers v. Virtus Inv. Partners., Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016)..................................................................12

*Zakinov v. Ripple Labs, Inc.*,
    2020 WL 922815 (N.D. Cal. Feb. 26, 2020) .......................................................10

**Statutes**

10 L.P.R.A. § 890(e) ...........................................................................................................25

15 U.S.C. § 77*l* ...................................................................................................10, 12, 18

15 U.S.C. § 77*l*(a) .......................................................................................................17, 18

15 U.S.C. § 77*l*(a)(1) ................................................................................................ *passim*

15 U.S.C. § 77*l*(a)(2) ...................................................................................................10, 12

15 U.S.C. § 77m .........................................................................................................17, 18

15 U.S.C. § 77v(a) ............................................................................................................33

15 U.S.C. § 78c(a)(4)(A) ..................................................................................................16

15 U.S.C. § 78c(a)(5)(A) ..................................................................................................16

15 U.S.C. § 78cc ...................................................................................................... *passim*

15 U.S.C. § 78cc(b) ..........................................................................................................24

15 U.S.C. § 78e ..............................................................................................2, 13, 14, 15

15 U.S.C. § 78*o* ...................................................................................................... *passim*

15 U.S.C. § 78*o*(a) ...........................................................................................................14

15 U.S.C. § 78*o*(a)(1) .................................................................................................13, 14

28 U.S.C. § 1332 .........................................................................................................17, 26

28 U.S.C. § 1367(a) .....................................................................................................17, 25

Ala. Code § 8-6-19(f) .......................................................................................................25

Ark. Stat. Ann. § 23-42-106(f) .........................................................................................25

AS § 45.55.930(f) .............................................................................................................25

Colo. Rev. Stat. § 11-51-604(8) .......................................................................................25

Conn. Gen. Stat. § 36b-29(f) ................................................................25

F.S.A. § 95.11(4)(e) ..........................................................................25

Ga. Code Ann. § 10-5-58(b) ..............................................................25

Ill. Comp. Stat. Ann. 5/13D ..............................................................25

Ind. Code § 23-19-5-9(a) ..................................................................25

Ky. Rev. Stat. Ann. § 292.480(5) ......................................................25

La. Stat. Ann. § 51:714(c)(1) .............................................................25

Mass. Gen. Laws Ann. ch. 110A, § 410(e) .......................................25

Me. Rev. Stat. tit. 32, § 16509(10) ....................................................25

Mont. Code Ann. § 30-10-307(5) .......................................................25

N.C. Gen. Stat. Ann. § 78A-56(f) ......................................................26

N.D.C.C. § 10-04-17(5) ....................................................................26

N.H. Rev. Stat. § 421-B:25(VII) ........................................................25

N.J. Stat. Ann. § 49:3-71(g) ..............................................................26

Neb. Rev. Stat. § 8-1118(4) ...............................................................25

Nev. Stat. § 90.670 ...........................................................................25

O.R.S. § 59:115(6) ............................................................................26

Ohio Rev. Code Ann. § 1707.41(D) ...................................................26

S.C. Code Ann. § 35-1-509(j) ............................................................26

Tenn. Code Ann. § 48-1-122(h) .........................................................26

Texas Civ. St. Art. 581-33H(1) .........................................................25

Utah Code § 61-1-22(7) .....................................................................26

Va. Code Ann. § 13.1-522D ...............................................................26

W. Va. Code Ann. § 32-4-410(e) .......................................................26

Wash. Rev. Code § 21.20.430(4)(b) ...................................................26

Wyo. Stat. Ann. § 17-4-122(e)......................................................................................26

**Rules**

Fed. R. Civ. P. 23 .....................................................................................................33

**Other Authorities**

Benjamin Bain *et al.*, *Binance Probed by CFTC Over Whether U.S. Residents Traded*, Bloomberg (Mar. 12, 2021), https://www.bloomberg.com/news/articles/ 2021-03-12/crypto-exchange-binance-investigated-by-u-s-over-who-s-trading......................................................1

*Binance Holdings Ltd. v. Forbes Media LLC*, No. 2:20-cv-16398-JMV-JAD (D.N.J.), ECF Nos. 1, 5-6 ...........................................................................................6

*Ethereum Mainnet Statistics* (Mar. 22, 2021), ethernodes.org, http://ethernodes.org/countries.....................................................................................7

SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1 ..................................................................................................20

SEC, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202 ...........................................................................................................21

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint (ECF No. 59, "MTD").[1]

## PRELIMINARY STATEMENT

This action arises from Defendants' unlawful promotion, offer, and sale of unregistered securities in connection with a wave of schemes devised to trick consumers into purchasing speculative crypto "tokens." As the operators of the largest crypto-asset exchange in the world, Defendants sold billions of dollars' worth of Tokens with the promise that they would have a utility similar to successful decentralized cryptocurrencies, such as Bitcoin. But Defendants concealed from investors that the Tokens derive value entirely from the managerial efforts of their issuers (the "Issuers"), co-founders, and development teams. The Tokens should have been registered as securities, as the U.S. Securities and Exchange Commission ("SEC") subsequently revealed, and Defendants' online exchange, Binance, should have registered as an exchange and broker-dealer.

In an attempt to evade responsibility for their wrongdoing, Defendants have moved to dismiss on eight bases, each of which is meritless. *First*, Defendants are subject to U.S. securities laws, having solicited U.S. investors, including Plaintiffs, to purchase the Tokens from within the U.S. Plaintiffs' claims are subject to the federal securities law under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), for two independent reasons: (i) because Plaintiffs purchased the Tokens from Binance, a domestic securities exchange, and (ii) because Plaintiffs placed and executed their orders from within the U.S.[2]

---

[1] All capitalized terms not otherwise defined have the meaning given in Plaintiffs' Second Amended Class Action Complaint (ECF No. 55, "SAC").

[2] Binance is reportedly under investigation by the Commodity Futures Trading Commission over allegations that it unlawfully allowed U.S. residents to buy and sell derivatives despite its failure to register with the agency. *See* Benjamin Bain *et al.*, *Binance Probed by CFTC Over Whether*

*Second*, Defendants are statutory sellers for purposes of Section 12(a)(1) of the Securities Act, because they are precisely whom the Supreme Court intended to cover in *Pinter v. Dahl*, 486 U.S. 622 (1988): entities and individuals that solicited the sale of securities because of their undisputed financial interests in doing so.

*Third*, Plaintiffs can bring claims under Section 29(b) of the Exchange Act based on Defendants' violations of Sections 5 and 15 of that Act. Defendants have violated these provisions by operating an unregistered exchange and acting as an unregistered broker-dealer selling unregistered securities, and Section 29(b) gives Plaintiffs recourse against those violations.

*Fourth*, Plaintiffs' claims are timely. Many of Plaintiffs' purchases are well within the limitations period; and the remaining purchases are timely for the independent reason that Defendants concealed that the Tokens were securities, such that reasonable investors could not have known before April 2019 that Binance was an unlawful exchange. In addition, Plaintiffs bring claims under the Blue Sky laws of several states with longer statutes of limitations than the federal claims. For example, Texas has a three-year statute of limitations, making each of Plaintiffs Anderson's, Muhammad's, and Williams' Blue Sky claims indisputably timely, given that all the ICOs at issue occurred after April 3, 2017 (and therefore within three years of the commencement of this action).

*Fifth*, for several independent reasons, Plaintiffs' claims are not subject to an enforceable arbitration clause or forum selection clause.

*Sixth*, as Court-appointed lead plaintiffs representing a putative class, Plaintiffs may bring Blue Sky claims based on the laws of states from which they personally did not purchase the

*U.S. Residents Traded*, Bloomberg (Mar. 12, 2021), https://www.bloomberg.com/news/articles/2021-03-12/crypto-exchange-binance-investigated-by-u-s-over-who-s-trading.

Tokens, based on settled principles of class standing that allow plaintiffs to bring representative claims.

*Finally*, Plaintiffs properly allege personal jurisdiction over, and control-person claims against, individual defendant Zhao.[3] This jurisdiction is based on Defendants' solicitations of Token sales, as courts routinely exercise specific jurisdiction over those who have solicited even a single digital token sale in the relevant forum. Moreover, Zhao, as Binance's CEO, was not a mere bystander to its misconduct, but rather personally directed and engaged in the solicitation and targeting of U.S. investors.

The Motion to Dismiss should accordingly be denied.

## BACKGROUND

Since July 2017, Defendants have promoted, offered, and sold the Tokens through their online exchange, Binance, without registering as an exchange or broker-dealer, and without a registration statement in effect for the securities it was selling. SAC ¶ 1. The Tokens are crypto-assets known as "ERC-20 tokens," which, like Bitcoin, can be exchanged digitally. *Id.* ¶¶ 56–59, 62, 73–74. But while Bitcoin is a decentralized currency, with no links to any single corporate or governmental entity driving its value, the Tokens are highly centralized, with their values derived entirely from the efforts of their Issuers. *Id.* ¶¶ 153–54, 172–73, 187–88, 201–02, 217–18, 233, 247–48, 261–62, 275–76, 289–90, 303–04, 319. Because of the Tokens' centralized nature, which was not clear to investors at issuance, the Tokens are securities and should have been registered with the SEC. *Id.* ¶¶ 120–325.

---

[3] Plaintiffs have voluntarily dismissed the claims against Defendants He and Wang (ECF No. 63). Plaintiffs also no longer pursue any claims arising from Binance's sale of the three Tokens that they did not purchase—BNT, CVC, and SNT.

The Issuers would sell some of the Tokens in an initial coin offering ("ICO") to investors and then enlist Defendants to sell the new Tokens on Binance. *Id*. ¶ 86. Defendants would then undertake to promote sales and solicit purchases of Tokens from investors, and they profited handsomely by receiving a percentage of each trade and substantial payments from Issuers for listing and selling their tokens. *Id*. ¶¶ 85–102. Defendants' effort to promote and advertise the Tokens in the U.S. included television appearances on U.S. stations, posts on their website, and use of their social media accounts. *Id*. The failure of the Issuers and Defendants to register the Tokens as securities with the SEC, or to register Binance as an exchange or a broker-dealer, permitted Defendants to evade regulatory oversight while profiting from sales of the Tokens. *Id*. ¶ 11.

The Issuers and Defendants sought to capitalize on informational asymmetries endemic to the crypto-asset industry. Issuers and Defendants knew the Tokens lacked inherent value, but a reasonable purchaser did not know and could not infer such facts until, at the earliest, April 3, 2019, when the SEC released a detailed analysis of digital assets ("Framework"), which indicated ERC-20 tokens, such as the Tokens, must be securities. *Id*. ¶¶ 120–49. Prior to the Framework, a reasonable consumer could not have properly assessed or determined whether the Tokens were securities and thus would not have known that the Tokens should have been registered with the SEC. *Id*. ¶¶ 103–19.

Plaintiffs purchased Tokens on the Binance exchange. *Id*. ¶¶ 15–22. Indeed, Plaintiffs Hardin, Muhammad, Thiagarajan, Token Fund I LLC, and Williams purchased Tokens on Binance within one year of filing suit. *See* ECF Nos. 43-2, 43-5, 43-6, 43-7, 43-8. In every transaction at issue, Binance entered into implied purchase contracts with Plaintiffs whereby Binance sold Tokens to Plaintiffs. *See* SAC ¶¶ 15-22, 58, 375, 386.

<u>**ARGUMENT**</u>

**I.     FEDERAL SECURITIES LAWS GOVERN PLAINTIFFS' CLAIMS**

The federal securities laws apply to (i) transactions "connect[ed] with the purchase or sale of any security registered on a national securities exchange" and (ii) "domestic transactions in other securities." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266–67 (2010) (internal quotation marks omitted). Plaintiffs allege that Binance is a "national securities exchange" and that their transactions were domestic, Compl. ¶¶ 326–32, and the facts underlying those allegations are presumed true, *see, e.g.*, *Veera v. Ambac Plan Admin. Order Commd.*, 769 F. Supp. 2d 223, 226 (S.D.N.Y. 2011). In arguing that Binance is not a domestic exchange, MTD at 7–12, Defendants ignore Plaintiffs' allegations and misapply caselaw.

**A.     Plaintiffs' Trades Were Connected With The Purchase Or Sale Of Securities On A National Exchange**

Under *Morrison*'s first prong, Plaintiffs' purchases of the Tokens were "connect[ed] with the purchase or sale of … securit[ies] registered on a national securities exchange." 561 U.S. at 267. For purposes of private claims arising under the federal securities laws, the phrase "national securities exchange" refers to a securities exchange with facilities and market makers in the U.S. *See, e.g.*, *Rubenstein v. Cosmos Holdings, Inc.*, 2020 WL 3893347, at *11 (S.D.N.Y. July 10, 2020) (allegation that stock is listed and traded "through domestic market makers and facilities" constitutes "an allegation that [it] is traded on a domestic exchange").

Binance is a national securities exchange, as evidenced from its operational structure and strategy to target the U.S. Much of Binance's infrastructure is in the U.S. SAC ¶ 24. Many of the Amazon Web Services ("<u>AWS</u>") servers that host Binance, as well as the servers hosting most or all of Binance's digital data, are in California. *Id.* Similarly, the Ethereum blockchain Binance needed for its ERC-20 token transactions is run from computers in the U.S. *Id.* ¶¶ 56–59, 328. On

5

the personnel side, several senior Binance employees, including Binance's Vice President of Global Operations, publicize that they reside in California. *Id.* ¶ 25. During the Class Period, Binance issued job listings seeking California-based engineers to work on its blockchain, mobile, and security products. *Id.*

Binance used this domestic operation to serve domestic users. As reported by Forbes, Binance and its senior executives, including Zhao, planned an elaborate scheme to create a shell entity in the U.S. to distract U.S. regulators while simultaneously extracting significant service fees from U.S.-based customers. *Id.* ¶¶ 328, 342.[4] And Binance and Zhao directed users in English to use VPN connections to circumvent Binance's nominal location-based restrictions. *Id.* Binance has promoted inside the U.S. the sale of digital assets on its exchange. *Id.* ¶ 29.

Unsurprisingly given its domestic operation and targeting, a substantial plurality of investors on Binance traded from the U.S. during the Class Period, making the U.S. Binance's most significant market. *Id.* ¶ 329. Indeed, publicly available data shows that at least 25 percent of Binance's users were located in the U.S. at this time, more than three times the number of users than in any other country. *Id.* Binance tracked this information and clearly designed its platform to service its extensive U.S. user base. *Id.* All of these allegations show that Binance is a domestic U.S. exchange and are more than sufficient to defeat Defendants' argument that Plaintiffs' trades on Binance were extraterritorial.

Defendants nevertheless argue that Binance's "premises" and "property" must not be domestic because its official headquarters is nominally in Malta, and Binance is "decentralized."

---

[4] On November 18, 2020, Binance filed a defamation suit against Forbes in the U.S. District Court for the District of New Jersey challenging these allegations. On February 4, 2021, Binance voluntarily dismissed all claims against Forbes. *See Binance Holdings Ltd. v. Forbes Media LLC*, No. 2:20-cv-16398-JMV-JAD (D.N.J.), ECF Nos. 1, 5–6.

MTD at 8; *see also* SAC ¶ 326 (alleging that Binance claims to be decentralized to avoid regulatory oversight). And even though Defendants chose to host Binance on AWS and use its domestic-based servers, data centers, and other hardware in the U.S., Defendants argue these choices are immaterial. Defendants instead argue that because these are "third-party servers," they have "no bearing on Binance's domesticity," MTD at 9 n.7, comparing them to "servers that happened to route their communications in the United States," *id.* at 10 (internal quotation marks omitted). But this feint ignores that Defendants took *affirmative steps* to avail themselves of U.S. infrastructure, both in terms of hosting their exchange through AWS and by relying on the Ethereum blockchain to sell the Tokens, given that more than 35% of the ethernodes that make up the Ethereum blockchain reside in the U.S. *See* SAC ¶ 24, 328; *Ethereum Mainnet Statistics*, ethernodes.org, http://ethernodes.org/countries (last accessed Apr. 19, 2021).

Defendants also seek refuge in the very fact of their unlawful nonregistration, suggesting that Binance's nonregistration means it cannot be a domestic exchange. MTD at 8. This nonsensical argument would immunize from liability all exchanges within the U.S. that ignore their obligations to register with the SEC. The two cases Defendants cite addressing nonregistration are inapposite because they involved over-the-counter markets that were not even securities exchanges. *See United States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015); *In re Poseidon Concepts Sec. Litig.*, 2016 WL 3017395, at *12 (S.D.N.Y. May 24, 2016). Moreover, the cited parts of those cases are dicta, as the courts ultimately held that the plaintiffs had alleged domestic transactions. *See Georgiou*, 777 F.3d at 135–36; *Poseidon*, 2016 WL 3017395, at *12.

Defendants are attempting, at bottom, to exist free from all regulation. They argue that having employees and infrastructure in the U.S. is insufficient to make Binance a domestic exchange because it does not have a physical headquarters. This would enable Binance, and any

other exchange that rents data from third parties, to escape all regulation even as it targets and profits from the U.S. as its largest market. The law does not permit this result.

### B.    Plaintiffs' Trades Were Domestic Securities Transactions

The federal securities laws also reach Plaintiffs' transactions independently under the second prong of *Morrison* because Plaintiffs "incurred irrevocable liability within the United States to take and pay for a security." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). Plaintiffs' trades in the Tokens were placed and executed from various U.S. states and territories. *See* SAC ¶¶ 15–22. This is sufficient to satisfy *Morrison*. *See, e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 156–58 (2d Cir. 2017) (trades occurred in states from which buyers placed purchase orders); *In re Poseidon*, 2016 WL 3017395, at *12 (declining to dismiss complaint on extraterritoriality grounds where plaintiff alleged that he "bought … stock in Florida through a local office of his broker"). Indeed, it does not matter whether (or where) the traded security was listed. *See Absolute Activist*, 677 F.3d at 68; *see also Morrison*, 561 U.S. at 269–70 (federal securities laws apply if "the purchase or sale is made in the United States").

Defendants' reliance on *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014), and *In re Vivendi Universal, S.A. Securities Litigation*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011), MTD at 10–11, is misplaced. Defendants argue that these cases require Plaintiffs to allege something more than having placed orders for the Tokens from the U.S. *Id.* But the UBS shares at stake in *Pontiac* could be acquired or traded only by placing orders on a Swiss exchange that were then processed, matched, and settled in Switzerland, even when "buy orders" for shares came from the U.S. *See* 752 F.3d at 181. Similarly, *Vivendi* analyzed claims based in "transactions that *necessarily* took place on foreign exchanges." 765 F. Supp. 2d at 527 (emphasis added). Defendants cannot show any such intermediate steps here. The Tokens

purchased by Plaintiffs in the U.S. are immutable crypto-assets immediately transferable to any person or crypto-asset exchange anywhere in the world. The Tokens were available to anyone in the U.S. with an internet connection, who could not just place "buy orders" but also execute trades in the Tokens from their U.S.-based computers. Accordingly, unlike in *Pontiac* and *Vivdendi*, the Tokens at issue in this case in fact traded within the U.S. The execution of Plaintiffs' purchases from the U.S. is therefore sufficient to establish that Plaintiff domestically incurred irrevocable liability to take and pay for the Tokens. *See, e.g.*, *Fed. Hous. Fin. Agency*, 873 F.3d at 156–58.

In addition, unlike in *Loginovskaya v. Batratchenko*, 764 F.3d 266 (2d Cir. 2014), where "the direction to wire transfer money to the United States [was] insufficient to demonstrate a domestic transaction" because "[t]he[] transfers … were actions needed to carry out the transactions, and not the transactions themselves," *id.* at 275, title passing over the computers in the U.S. that make up the Ethereum blockchain is part and parcel of the transactions themselves— in other words, anything but ministerial. *See In re Tezos Secs. Litig.*, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018) (declining to dismiss unregistered securities claims against issuers of digital tokens on extraterritoriality grounds because website used to purchase tokens was "hosted on a server in Arizona" and "run primarily by [an individual] in California," and token purchase "became irrevocable only after it was validated by a network of global 'nodes' clustered more densely in the United States than any other country").[5]

---

[5] In addition, neither *Barron v. Helbiz Inc.*, 2021 WL 229609 (S.D.N.Y. Jan. 22, 2021), nor *Holsworth v. BProtocol Foundation*, 2021 WL 706549 (S.D.N.Y. Feb. 22, 2021), is persuasive contrary authority. In *Barron*, a case arising under state law, the court apparently considered extraterritoriality a question of federal jurisdiction rather than substantive federal law. 2021 WL 229609, at *4–6; *see Morrison*, 561 U.S. at 253–54 (holding the exact opposite). *Holsworth* confined its extraterritoriality discussion to a single sentence reciting the basic holding of *Morrison* (that the federal securities laws do not reach extraterritorial transactions) without any further analysis. 2021 WL 706549, at *3.

## II.    DEFENDANTS ARE STATUTORY SELLERS

Section 12(a) liability extends to any entity that "sells a security," 15 U.S.C. § 77*l*(a)(2), as well as one that "successfully solicits [a] purchase [of securities], motivated at least in part by a desire to serve [its] own financial interests or those of the securities owner," *Pinter v. Dahl*, 486 U.S. 622, 647 (1988); *accord Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019). In addition, Section 12 liability extends beyond those who "pass[] title of the security." *Balestra*, 380 F. Supp. 3d at 357, to "any person who engaged in steps necessary to the distribution of the unregistered security," *Zakinov v. Ripple Labs, Inc.*, 2020 WL 922815, at *12 (N.D. Cal. Feb. 26, 2020) (quoting *Balestra*, 380 F. Supp. 3d at 357–58).

Binance is a statutory seller under Section 12(a)(1), as it sold Plaintiffs the Tokens in the U.S. SAC ¶¶ 15–22. Defendants are flatly incorrect in stating that "the [SAC] does not … allege that Binance 'passed title' to plaintiffs under *Pinter*'s first prong because the [SAC] makes clear that Binance did not act as a *counterparty* to plaintiffs' transactions." MTD at 12. Online crypto-asset exchanges provide a marketplace to match buyers and sellers like traditional exchanges. SAC ¶ 23. But unlike traditional exchanges, for Binance users to sell crypto-assets, they must first transfer the desired crypto-assets to Binance's control by executing a transaction on the Ethereum blockchain. *See id.* ¶ 58. Thus, at all relevant times, Binance was in possession of the Tokens Plaintiffs traded in, and Binance therefore functioned as a counterparty to Plaintiffs, rendering Binance the assets' actual seller for purposes of Section 12. Plaintiffs have thus pleaded that they were in privity with Binance and purchased the Tokens directly from the Defendants. *See Pinter*, 486 U.S. at 644.[6]

---

[6] The cases cited by Defendants are inapposite. *See Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (plaintiff alleged only that the defendant was "part of the chain of title," rather than being in actual privity with the plaintiff); *Credit Suisse First*

Defendants are statutory sellers also because they successfully solicited Plaintiffs' purchases of the Tokens on the Binance exchange through their pervasive solicitation and marketing campaign. Defendants heavily promoted the Tokens via email, on social media, and through other means throughout the Class Period. SAC ¶ 92. For example, (i) Binance would advertise newly listed tokens to its user base; (ii) Binance would promote the launch of the newly listed token through reward programs; (iii) Binance and Zhao used their social media accounts to encourage users to purchase the Tokens through its exchange; and (iv) Zhao appeared on CNBC to promote Binance and vouch for the quality of crypto-assets listed thereon. *Id.* ¶¶ 87–89, 92–98.

Binance's website also served as a further continuous form of solicitation throughout the Class Period, which promoted and enabled sales of the Tokens by displaying detailed price and trading data of the Tokens for Defendants' financial gain. *Id.* ¶ 99. Binance regularly republished on its website investor reports assigning a credit rating to each of the Tokens and encouraging users to purchase them. *Id.* ¶ 100. In addition, Binance took, and continues to take, other steps necessary to the distribution of the Tokens, including maintaining custody of the crypto-assets in each investor's wallet. *Id.* ¶ 101. These acts were not, as Defendants suggest, "merely incidental to and preparatory for any sale" MTD at 13. They involved Defendants' direct and active

---

*Boston Corp. v. ARM Fin. Grp., Inc.*, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001) (officers were not statutory sellers of corporation's stock because the stock was purchased directly from the underwriters rather than from the corporation). The limited caselaw on this issue is unsurprising, as traditional securities exchanges, like the New York Stock Exchange, do not flout federal law by listing unregistered securities. This direct connection between Binance and Plaintiffs also distinguishes this case from *Holsworth*, *supra*, where the court found, in a single sentence without any detailed analysis, that "[n]o privity … [was] shown." 2021 WL 706549, at *3.

participation in the solicitation of the Tokens, SAC ¶¶ 92–101, which satisfies *Pinter*, 486 U.S. at 647.[7]

Defendants also improperly attempt to import a reliance requirement into Section 12. *See, e.g.*, *In re Longfin Corp. Sec. Class Action Litig.*, 2019 WL 1569792, at *5 (S.D.N.Y. Apr. 11, 2019) (plaintiff "need not plead scienter, reliance, or fraud") (citing *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004)); *see also Pinter*, 486 U.S. at 652 (finding "no congressional intent to incorporate tort law doctrines of reliance and causation into [Section 12(a)(1)]" and that "the strict liability nature of the statutory cause of action suggests the opposite"); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (same holding for Section 12(a)(2)). In any event, it is reasonable to infer from Plaintiffs' allegations that they and other Class member purchased the Tokens *as a result of* "solicitations from Binance" and Defendants' other widespread advertisements. SAC ¶¶ 15–22. That is sufficient to defeat Defendants' motion to dismiss. *See, e.g.*, *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 (3d Cir. 1996) (Alito, J) (complaint alleging that the defendants "solicited [the] plaintiff[]" survived motion to dismiss) (citing *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 637 (3d Cir. 1989)); *In re RAIT Fin. Tr. Sec. Litig.*, 2008 WL 5378164, at *9 (E.D. Pa. Dec. 22, 2008) (same). Thus, even if Plaintiffs were required to allege

---

[7] Defendants' cases on this issue involved plaintiffs who failed to allege even minimal connections between the defendants and their acts of solicitation and are thus off point. *See Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at *5 (S.D.N.Y. June 18, 2020) (complaint did not allege "that [the defendant] engaged in any marketing activities … or 'successfully solicited the purchase of a security'") (quoting *Pinter*, 486 U.S. at 647); *Tezos*, 2018 WL 4293341, at *9–10 (complaint alleged only that defendants "provid[ed] investors with virtual currency conversion services, and then contribut[ed] these virtual currencies to the … ICO"); *Youngers v. Virtus Inv. Partners., Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (complaint alleged only that defendants marketed the materials to brokers, not investors, and that such materials were "available on … website and other channels") (internal quotation marks omitted).

that they purchased the Tokens a result of Defendants' solicitations, they have pleaded facts sufficient to permit a reasonable inference that they did.

## III.  PLAINTIFFS HAVE ADEQUATELY PLEADED CLAIMS UNDER SECTION 29(b) OF THE EXCHANGE ACT

Plaintiffs adequately plead Section 29(b) claims premised on violations of Sections 5 and 15 of the Exchange Act.

### A.  Plaintiffs Properly Invoke Section 29(b)

Section 29(b) states that "[e]very contract made in violation of any provision of this chapter" and "every contract (including any contract for listing a security on an exchange) ... the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter ... shall be void." 15 U.S.C. § 78cc. Sections 5 and 15 are "provision[s]" of the chapter. Plaintiffs thus may sue, in sum, to void contracts made in violation of these provisions or whose performance involves a violation of them or the continuation of any relationship or practice in violation of them. *See, e.g.*, *Ema Fin., LLC v. Vystar Corp.*, 2020 WL 4808650, at *4 (S.D.N.Y. Aug. 18, 2020) (addressing Section 15).

Defendants assert no basis, and there is none, to exclude contracts made in violation of Section 5 or 15 from Section 29(b)'s scope. A claim for rescission under Section 29(b) can be predicated on a violation of the securities laws' registration requirements. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 722 n.6 (2d Cir. 1998); *accord NovaFund Advisors, LLC v. Capitala Grp., LLC*, 2020 WL 230089, at *13–14 (D. Conn. Jan. 14, 2020); *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, 2006 WL 2620985, at *7 (D. Neb. Sept. 12, 2006) (collecting cases from Circuit Courts). In *Boguslavsky*, for example, the plaintiff sought to rescind his customer contract with an alleged broker-dealer that was operating "without a director of compliance and thus was not properly registered as a securities broker-dealer as required by § 15(a)(1) of the [Exchange]

Act." 159 F.3d at 722. The court held that plaintiff had alleged "an identifiable claim under § 29(b) predicated on a violation of § 15(a)(1)." *Id.*

### B. Plaintiffs Allege Facts Stating a Claim Under Section 29(b)

Defendants incorrectly argue that the contracts parties enter into on Binance are not illegal. The Exchange Act prohibits effecting securities transactions on an unregistered exchange, 15 U.S.C. §§ 78cc, 78e, or as an unregistered broker-dealer, *id.* § 78*o*(a). Accordingly, every contract that is made for, or requires performance that involves, effecting securities transactions on an unregistered exchange or by an unregistered broker-dealer, or involves the continuance of any relationship or practice whereby such transactions are effected, shall be void. *Id.* § 78cc(b). This includes "any contract for listing a security on an exchange." *Id.*

Plaintiffs allege such contracts and performance, on two independent bases:

*First*, any Binance user that transacted in the Tokens, and thus paid a 0.1% commission on each such transaction, entered into a contract that "as in fact performed" involved effecting securities transactions on an unregistered exchange. *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984) (Section 29(b) voids "contracts that are either illegal when made or as in fact performed") (quoting *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 560 (5th Cir. 1982)); *see also Ema Fin., LLC v. NFusz, Inc.*, 2020 WL 7629580, at *14 n. 22 (S.D.N.Y. Dec. 22, 2020) (citing *Slomiak* with approval and endorsing *Regional Properties*). Contrary to Defendants' mischaracterization, MTD at 16, these Token purchase contracts are thus illegal and voidable under Section 29(b).

*Second*, every Token purchase contract is void because it involved Binance effecting securities transactions pursuant to its contracts with the relevant Token Issuer "for listing a security on an exchange." 15 U.S.C. § 78cc; *see* SAC ¶¶ 374–76. The purchase contracts are illegal on this basis because "there could be no performance" of them *without* Binance performing as an

unregistered exchange pursuant to illegal Token listing contracts, and thereby continuing a practice of operating as an unlicensed exchange in violation of the Exchange Act. *Ema Fin.*, 2020 WL 4808650, at *4 (quotations omitted). Defendants' conduct was thus "inextricably intertwined with the violations of the Act." *Couldock & Bohan, Inc. v. Societe Generale Secs. Corp.*, 93 F. Supp. 2d 220, 231 (D. Conn. 2000).[8]

Defendants' cited authorities are off-point. In *Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*, 2019 WL 1368570 (S.D.N.Y. Mar. 26, 2019), the complaint failed to identify "any specific provision or violation" supporting the allegation that the relevant contracts were voidable. *Id*. at *13. No such issue arises here, where Plaintiffs cite Sections 5 and 15. SAC ¶¶ 371–75, 381–86. In *Antares Management LLC v. Galt Global Capital, Inc.*, 2013 WL 1209799 (S.D.N.Y. Mar. 22, 2013), the court found insufficient the allegations that plaintiffs were operating as broker-dealers, because their "main role involved stimulating general investment interest," rather than helping "consummate transactions." *Id*. at *9. That does not in any way undercut the interpretation of Section 29(b) set forth above, and as shown below, Plaintiffs here adequately allege that Binance facilitated and was involved in "consummating transactions" in violation of Sections 5 and 15.

---

[8] The fact that a Binance user could have entered into *different* contracts to purchase "non-securities" does not make the listing or purchase contracts relating to the Tokens, which are securities, any less voidable. MTD at 16. Plaintiffs' purchase contracts, as shown, could *not* have been performed without a violation of the Exchange Act because they necessarily required Binance to act as an unregistered securities exchange. For this reason, Section 29(b) cases involving contracts that the parties *could* have performed without violating the Exchange Act or regulations thereunder are therefore irrelevant. *See, e.g.*, *Newman v. Pershing & Co.*, 412 F. Supp. 463, 466–69 (S.D.N.Y. 1975); *see also Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970) (Friendly, J., dissenting) (a contract is not void under Section 29(b) where the contract's performance "would not have involved any violation if [the plaintiff] had done as he was obligated; and the court [was not] asked to enforce anything that constitutes a violation").

Defendants are also wrong in disputing Plaintiffs' contractual privity with Binance beyond the Terms of Use Agreements. MTD at 16. Plaintiffs, as explained above, "purchased Tokens on Binance, and pursuant to contracts with and solicitations from Binance." SAC ¶¶ 15–22; *see also id.* ¶¶ 375, 386. This privity is inherent: A customer purchasing Tokens and the exchange brokering that transaction are necessarily in privity through that transaction.[9]

### C. Plaintiffs Adequately Allege That Binance Is a Broker-Dealer

Separately, Defendants are wrong in contending that Plaintiffs' Section 29(b) claims rely entirely on Binance's operating as an unregistered exchange. MTD at 18. Plaintiffs also plead liability under Section 29(b) because they have alleged facts sufficient to show that their contracts involved performance by Binance as a broker "engaged in the business of effecting transactions in securities for the account of others," 15 U.S.C. § 78c(a)(4)(A), and as a dealer who "buy[s] and sell[s] securities for such person's own account," *id.* § 78c(a)(5)(A); *see* SAC ¶¶ 383, 384.

The Exchange Act defines broker and dealer "broadly." *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); *see SEC v. Alpine Sec. Corp.*, 308 F. Supp. 3d 775, 789 (S.D.N.Y. 2018) (quoting 15 U.S.C. §§ 78c(a)(4)(A), 78c(a)(5)(A)). Binance fits both of those descriptions, as it has received commissions and has sold the securities of other issuers, and "may be characterized by a certain regularity of participation in securities transactions at key points in the chain of distribution." *Martino*, 255 F. Supp. 2d at 283 (internal quotations marks omitted). Indeed, Binance, like the parties in Defendants' cited case, "plainly acted as [an] unregistered broker[]" because it "regularly participated in securities transactions," received commissions for its services

---

[9] Defendants' cases here, too, are inapposite. *See Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 109 (2d Cir. 2019) (no discussion of privity); *Scottrade, Inc. v. BroCo Inv'rs, Inc.*, 774 F. Supp. 2d 573, 583 (S.D.N.Y. 2011) ("no contract was ever made"); *Frati v. Saltzstein*, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011) (defendants were not broker-dealers).

and solicited purchases. *Martino*, 255 F. Supp. 2d at 283–84; *see, e.g.*, SAC ¶¶ 74, 85, 383–84; *accord SEC v. Nutra Pharma Corp.*, 450 F. Supp. 3d 278, 291 (E.D.N.Y. 2020) (broker attempted to induce the purchase or sale of securities); *SEC v. Hansen*, 1984 WL 2413, at *11 (S.D.N.Y. Apr. 6, 1984) (broker received commissions and actively sought out investors, including through advertisements). Plaintiffs thus have adequately pleaded an underlying violation of Section 15 sufficient to invoke Section 29(b).

## IV.    PLAINTIFFS' CLAIMS ARE TIMELY

The federal securities claims brought by Plaintiffs Hardin, Muhammad, Thiagarajan, Token Fund I LLC, and Williams are indisputably timely because they were commenced within one year of these Plaintiffs' purchases of the Tokens. With respect to the remaining claims, those are timely because the limitations period on those claims did not begin to run until April 3, 2019, when the SEC published its Framework.[10] Further, Defendants do not even bother to contest the timeliness of Plaintiffs' Blue Sky claims under Florida, Nevada, Puerto Rico, and Texas law, each of which has two- or three-year statutes of limitations.[11]

### A.    Plaintiffs' Section 12(a)(1) Claims Are Timely

#### 1.    Plaintiffs' Token Purchases On Or After April 3, 2019

Sections 12(a)(1) claims must be brought within one year after they accrue. 15 U.S.C. § 77m. A claim does not accrue until a plaintiff can bring a well-pleaded complaint asserting a valid cause of action, which, for a Section 12(a)(1) claim, requires the purchaser to plead, among other things, a "purchas[e]" of the "security from" a party that offered or sold it. *Id.* § 77*l*(a).

---

[10] Even if this Court were to disagree (which it, respectfully, should not), Plaintiffs remaining federal claims and Blue Sky claims are timely for the reasons set forth in Sections IV.A.1., IV.B., and IV.C., *infra*.

[11] Independent of its supplemental jurisdiction under 28 U.S.C. § 1367(a), this Court has jurisdiction over Plaintiffs' Blue Sky claims under 28 U.S.C. § 1332.

Defendants violated Section 12(a)(1) upon effecting a sale of the Tokens to Plaintiffs. Plaintiffs Hardin, Muhammad, Thiagarajan, Token Fund I LLC, and Williams plead that they each purchased Tokens on the Binance exchange within one year of filing suit. SAC ¶¶ 16, 19–22; *see also* ECF Nos. 43-2, 43-5, 43-6, 43-7, 43-8 . Plaintiffs' Section 12(a)(1) claims premised on those purchases are therefore unquestionably timely, given they arise from Token purchases made within one year before the filing of this action. *See Park v. Bae*, 2016 WL 1435715, at *3 n.5 (D.N.J. Apr. 12, 2016) (assessing timeliness of each plaintiff's Section 12 claims separately).

Defendants tellingly cite no authority for their argument that Plaintiffs' Section 12(a)(1) claims accrued when Binance first solicited Token purchases. MTD at 20. That argument confuses the one-year statute of limitations (which runs from the sale to Plaintiffs) with the three-year statute of repose (which runs from the date the security was first bona fide offered to the public). *See* 15 U.S.C. § 77m. Plaintiffs' claims could not have accrued before the violation on which they are based, and that violation did not occur until Plaintiffs "purchas[ed]" unregistered securities. *Id.* § 77*l*(a). As the Second Circuit explain in *City of Pontiac*, "[s]ince the purpose [of the statute of limitations] is to prevent stale claims, it would make no sense for a statute of limitations to begin to run before the plaintiff even has a claim: A claim that has not yet accrued could never be considered stale." 637 F.3d at 175. Until Plaintiffs purchased the Tokens, they could not bring a lawsuit over them, therefore, the statute of limitations cannot begin to run until that purchase occurred. *See id.* ("Only after a plaintiff can adequately plead his claim can that claim be said to have accrued, and only after a claim has accrued can the statute of limitations on that claim begin to run."). Plaintiffs Hardin, Muhammad, Thiagarajan, Token Fund I LLC, and Williams have therefore brought timely claims, because this action was commenced less than one year from their purchases of the Tokens.

## 2. Plaintiffs' Token Purchases Prior To April 3, 2019

Plaintiffs' claims based on earlier Token purchases are likewise timely because the limitations period on those claims did not begin to run until April 3, 2019, when the SEC published its Framework. Prior to the Framework, a reasonable consumer lacked the facts needed properly to assess or determine whether the Tokens were securities and thus would not have known that they should have been registered. SAC ¶¶ 103–19. Nor would a reasonable investor have had a sufficient basis prior to that date to question the veracity of the statement from Binance that the Tokens were "digital assets that are not securities." *Id.* ¶¶ 114, 341.

While Section 12(a)(1) does not have an express discovery rule governing its one-year statute of limitations, the equitable doctrines of injury evading discovery and the fraud-based discovery rule may delay the accrual of a Section 12(a)(1) claim even without a statutory discovery rule. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 361 & n.3 (2019) (limitations period may be subject to the "application of equitable doctrines" even without a general "discovery rule" set out in the statute); *Holland v. Florida*, 560 U.S. 631, 650 (2010) ("flexibility" to delay the start of a limitations period "enables courts to meet new situations that demand equitable intervention") (internal quotation marks and alterations omitted).

The doctrine of injury evading discovery holds that where the facts critical to identifying injury "may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain," a limitations period should not begin to run until the injury could have been discovered. *United States v. Kubrick*, 444 U.S. 111, 122 (1979); *see, e.g.*, *Urie v. Thompson*, 337 U.S. 163, 169–71 (1949). The securities laws are particularly amenable to this doctrine because investors' injuries often are "not evident," *Cal. Pub. Emps. Ret. Sys. v. ANZ Secs., Inc.*, 137 S. Ct. 2042, 2055 (2017), or are "self-concealing," *Gabelli v. SEC*, 568 U.S. 442, 450 (2013). There is "obvious utility" in equitable timeliness doctrines to private litigants "in the securities market,

where complex transactions and events can be obscure and difficult for a market participant to analyze or apprehend." *ANZ*, 137 S. Ct. at 2055. That is even more true here, as "significant informational asymmetries may exist" between issuers of digital assets and investors, and the securities laws are directed at "reduction of these information asymmetries through required disclosures" which "protect[] investors." SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

A separate "equity-based doctrine" that may delay commencement of a limitations period is the fraud-based discovery rule. *Rotkiske*, 140 S. Ct. at 361. Under this doctrine, the limitations period does not begin until the plaintiff reasonably could have discovered fraudulent statements or material omissions by the defendant that concealed the plaintiff's injury. *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1055 (2d Cir. 1969); *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493, 507–08 (S.D.N.Y. 1987); *Teva Pharm. Indus. Ltd. v. Deutsche Bank Sec. Inc.* 2010 WL 6864006, at *2 (S.D.N.Y. Dec. 14, 2010). Defendants' failure to make the substantial disclosures required by the securities laws denied investors adequate information to determine that the Tokens were securities. As a result, whether the Tokens were securities would not have been apparent at issuance, because how the Issuers and their promoters would use the proceeds of the Token sales and to what extent the Tokens would generate profits for Issuers were not disclosed. SAC ¶¶ 337–48. It was only after time had elapsed that it became clear to investors like Plaintiffs that the Tokens were not, in fact, like Bitcoin (contrary to several Issuers' representations) but rather were *centralized* assets. The value of these Tokens was derived solely from the Issuers' abilities to develop their plans and make the Tokens valuable. *Id.* ¶¶ 138–49.

Plaintiffs could not have discovered these facts on their own because Defendants and the Issuers possessed information that investors did not possess and could not reasonably obtain, and because Defendants and the Issuers made various public statements and omissions that prevented Plaintiffs from discovering the nature of their claim. *Id.* ¶¶ 336–48. TRON falsely stated that "TRX is not a security." *Id.* ¶ 338. Block.one stated that EOS tokens were not securities, a position later rejected by the SEC. *Id.* ¶ 339; SEC, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202. Binance has stated that it "provide[s] quality analysis on cryptocurrencies and the blockchain projects they represent" but purports not to "report[] on companies that issue securities or on securities generally; rather its reports relate[] solely to digital assets that are not securities." *Id.* ¶ 341. Yet, as noted, Binance has republished reports on each of the Tokens, which, as Plaintiffs learned for the first time on April 3, 2019 at the earliest, are in fact securities. *Id.*

As a result of this deception, the limited information available to investors at the Tokens' issuances and for years thereafter provided no basis for a reasonable investor reliably to determine when and how the Tokens would become securities. *See, e.g.*, *Marini v. Adamo*, 995 F. Supp. 2d 155, 185 (E.D.N.Y. 2014) (whether an asset is a "security" is a fact-intensive question that may go beyond the issuing documents). The securities laws do not obligate private parties to spend their days attempting to discover information that has been concealed from them. *Gabelli*, 568 U.S. at 450–51. In light of Defendants' "active concealment," Plaintiffs need only show for purposes of their purchases before April 3, 2019, that they could not have discovered Defendants' fraud through due diligence, which they could not have. *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014); *accord Baskin v. Hawley*, 807 F.2d 1120, 1130–31 (2d Cir. 1986);

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 66–67 (S.D.N.Y. 2016);

*Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 135 (E.D.N.Y. 2000).[12]

The SEC's treatment of digital assets before April 2019 contributed to Plaintiffs' lack of information about the nature of the Tokens. A reasonable purchaser would conclude that, given its enforcement authority and investigative tools, the SEC has the requisite information to state publicly whether an instrument is a security. *See, e.g.*, *Gabelli*, 568 U.S. at 450–51. But there were no clear statements from the SEC prior to April 3, 2019, that conveyed that, despite Issuers' assertions in connection with their ICOs that they were *not* issuing securities, the Tokens or any other similarly situated ERC-20 tokens possessed the characteristics of securities. SAC ¶ 104. To the contrary, on May 2, 2018—well *after* the applicable ICOs—SEC Commissioner Hester Peirce identified numerous open questions in making such a determination. *Id.* ¶ 117. On June 14, 2018, the Director of the SEC's Division of Corporate Finance, William Hinman, stated that in "the ICOs [he was] seeing, strictly speaking, the token … all by itself is not a security." *Id.*[13]

---

[12] *Holsworth*, *supra*, is unpersuasive on this point as well. The court devoted two sentences of analysis to the timeliness of plaintiffs' claims in that case, and held, without citation to any authority, that "some form of fiduciary relationship" was required to invoke the fraudulent concealment doctrine. *Holsworth*, 2021 WL 706549, at *3. That misreads the caselaw—even Defendants here have not asserted that a fiduciary relationship was necessary to invoke the fraudulent concealment doctrine.

[13] The SEC's various other statements, MTD at 23–24 & n.23, merely illustrate the muddled factual waters confronting investors prior to April 3, 2019. Defendants also cite the SEC's prior legal guidance and other SEC token actions. MTD at 24–25. These varying viewpoints underscore that precisely when a reasonable investor could have reasonably inferred that the Tokens were securities is a disputed issue of fact. *See, e.g.*, *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, N.A.*, 247 F. Supp. 3d 377, 394 (S.D.N.Y. 2017). The two private suits, MTD at 25, are similarly red herrings. These cases did not result in any rulings before April 3, 2019, about when a digital asset is a security; did not involve ERC-20 Tokens; and, unlike the Tokens here, presented facts and timelines that made it straightforward to determine whether the asset was a security. *See Balestra*, 380 F. Supp. 3d at 355–58 (defendants promoted the token as an investment opportunity with potential for large returns based on their efforts); *Tezos*, 2018 WL 4293341 (whitepaper released in 2014).

That changed on April 3, 2019, when the SEC published its Framework. This document did more than address the legal test for determining whether a digital token is a security, as Defendants claim. MTD at 23–24. Contrary to Judge Cote's decision in *In re Bibox Group Holding Ltd. Securities Litigation*, Opinion & Order 29, No. 20-cv-2807 (S.D.N.Y. Apr. 16, 2021), the point is *not* that Plaintiffs were unable to bring suit until the SEC clarified the relevant *law*. Rather, in the Framework the SEC revealed its new *factual conclusion* that certain digital tokens it analyzed constituted investments in a common enterprise "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts." SAC ¶ 122. Whereas a reasonable investor would infer from information available *before* April 3, 2019, that an ERC-20 digital assets like the Tokens were *not* securities, it was reasonable *after* the SEC published its Framework for investors to infer that Issuers of digital assets like the Tokens had misrepresented relevant facts when they issued the Tokens and that, *in fact*, the Tokens and other similarly situated assets *are* securities. Plaintiffs thus allege that the Framework operated to imply *facts* that the SEC must possess (and that Plaintiffs still did not possess) regarding these Tokens—not to clarify the law.[14]

---

[14] Defendants also assert in a footnote that Plaintiffs' OMG-based claims are barred by the three-year statute of repose because OMG was first offered for sale on September 9, 2017, and "[t]he relevant date for measuring the repose period is September 11, 2020—when the amended [class action] complaint [in this case] was filed." MTD at 20 n.18. Defendants are simply wrong about the "relevant date": "[F]or purposes of a statute of repose," new claims are deemed filed when the "plaintiff moves for leave to amend to add claims … and attaches a proposed amended complaint to the motion." *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017). Plaintiffs moved to amend their complaint in this case, and attached a proposed amended complaint containing OMG-based claims, on July 1, 2020, ECF No. 31, months before Defendants assert the repose period ran. Thus, the statute of repose does not bar Plaintiffs' OMG-based claims.

## B. Plaintiffs' Section 29(b) Claims Are Also Timely

Plaintiffs' claims are timely under the one-year discovery rule that governs the accrual of Plaintiffs' Section 29(b) claims. *See* 15 U.S.C. § 78cc(b). Defendants maintained an illegal unregistered exchange within one year prior to the filing of this action on April 3, 2020. SAC ¶¶ 372, 382. Accordingly, as explained above, Plaintiffs need not rely on any discovery rule to assert their Section 29(b) claims to the extent they arise, as they do for Plaintiffs Hardin, Muhammad, Thiagarajan, Token Fund I LLC, and Williams, from transactions on or after April 3, 2019. *See supra* Section IV.A.1.

As for Defendants' pre-April 3, 2019 conduct, Defendants operated an unregistered securities exchange and entered into contracts with the Issuers to list and sell the Tokens to members of the Class. SAC ¶¶ 1, 274–75. Defendants argue that consumers should have known that Binance had failed to register with the SEC from the moment they signed up with Binance. MTD at 21–22. But this argument fails for the reasons discussed above: A reasonable investor could not have known that Binance was an illegal securities exchange or illegal broker-dealer until the SEC published the Framework. *See supra* Section IV.A.2.

Moreover, Plaintiffs allege that that Defendants actively concealed their misconduct, which absolves Plaintiffs of any requirement to plead diligence in attempting to discover their cause of action. *Ellul*, 774 F.3d at 801; *Baskin*, 807 F.2d at 1130–31; *Bodner*, 114 F. Supp. 2d at 135. Defendants misrepresented that Binance Research reported solely on "digital assets that are not securities," when in fact it reported on (and Binance listed and sold) the Tokens, which *were* securities. SAC ¶¶ 114, 341. Defendants also directed investors using the Binance platform to the Issuers' websites and white papers, where the Issuers misrepresented that their Tokens were not securities, *id*. ¶¶ 107–08, and misleadingly compared their Tokens to Bitcoin (which is a commodity, rather than a security), *id*. ¶¶ 232, 275, 288, 299. In any event, Plaintiffs Hardin,

Muhammad, Thiagarajan, Token Fund I LLC, and Williams are timely without the need to rely on any equitable theories, which in any event cannot be resolved on a motion to dismiss. *See supra* Section IV.A.1.

### C.     Plaintiffs' Blue Sky Claims Are Timely

In addition to being timely for the reasons above, Plaintiffs' Blue Sky claims survive independent of their federal claims because the limitations periods for the vast majority of the relevant Blue Sky laws are two-years or longer, and many are subject to statutory discovery rules. Indeed, Plaintiffs Anderson, Muhammad, and Williams bring Texas Blue Sky claims, which are subject to a limitations period that extends for three years after the sale of an unregistered security. Texas Civ. St. Art. 581-33H(1). Given that each ICO at issue occurred after April 3, 2017 (*i.e.*, the date that is three years prior to commencement of this action), all claims under the Texas Blue Sky law are necessarily timely. SAC ¶¶ 150, 195, 211, 226, 240, 255, 269, 283, 297. Similarly, Plaintiff Hardin brings Nevada Blue Sky claims, and Plaintiff Messieh brings Florida Blue Sky claims, both of which are subject to a limitations period that extends for two years after discovery of a violation. Nev. Stat. § 90.670; F.S.A. § 95.11(4)(e). And Plaintiff Token Fund I LLC brings Puerto Rico Blue Sky claims, which are subject to a limitations period that extends for two years after the sale of an unregistered security (and where nearly all of its purchases were within two years of the commencement of this action), making those claims necessarily timely as well. 10 L.P.R.A. § 890(e); SAC ¶ 22.[15] Independent of its supplemental jurisdiction under 28 U.S.C. § 1367(a), this

---

[15] Many of the Blue Sky claims Plaintiffs bring in their representative capacities likewise have statutes of limitations of two years or longer. *See* Ala. Code § 8-6-19(f); AS § 45.55.930(f); Ark. Stat. Ann. § 23-42-106(f); Colo. Rev. Stat. § 11-51-604(8); Conn. Gen. Stat. § 36b-29(f); Ga. Code Ann. § 10-5-58(b); 815 Ill. Comp. Stat. Ann. 5/13D; Ind. Code § 23-19-5-9(a); Ky. Rev. Stat. Ann. § 292.480(5); La. Stat. Ann. § 51:714(c)(1); Mass. Gen. Laws Ann. ch. 110A, § 410(e); Me. Rev. Stat. tit. 32, § 16509(10); Mont. Code Ann. § 30-10-307(5); Neb. Rev. Stat. § 8-1118(4); N.H.

Court has jurisdiction over Plaintiffs' Blue Sky claims under 28 U.S.C. § 1332. SAC ¶ 33. Accordingly, even if Plaintiffs' claims were not subject to any equitable tolling doctrine (which they are), their Blue Sky claims are timely because Defendants have not challenged their timeliness, and because this suit was commenced within the applicable statutes of limitations, many of which exceed the federal limits.

**D.    Judge Cote's Recent Decision in *Bibox* Is Not Dispositive**

In a separate action involving a different crypto-asset exchange, Judge Cote recently ordered dismissal of claims as to that exchange. *Bibox*, Opinion & Order 2. Although Plaintiffs respectfully disagree with that court's ruling for the reasons set forth above, that ruling is not dispositive of the present action. *First*, Judge Cote's holding on standing (dismissing claims related to sale of tokens not purchased by plaintiff, *id.* at 14–23) is not relevant here because Plaintiffs no longer pursue any claims arising from Binance's sale of the three Tokens that they did not purchase—BNT, CVC, and SNT. The remaining Tokens at issue in this action (ELF, EOS, FUN, ICX, KNC, LEND, OMG, QSP, and TRX) were purchased by the named Plaintiffs. *Second*, even if Judge Cote were correct to reject application of the injury evading discovery and fraudulent concealment doctrines (and Plaintiffs respectfully disagree with her conclusion), *id.* at 23–31, Plaintiffs still bring timely Federal and Blue Sky claims. Specifically, Plaintiffs Hardin, Muhammad, Thiagarajan, Token Fund I LLC, and Williams each plead purchases of Tokens on the Binance exchange within the federal one-year limitations period. SAC ¶¶ 16, 19–22; *see also* ECF Nos. 43-2, 43-5, 43-6, 43-7, 43-8. Moreover, as discussed in Section IV.C., *supra*, Plaintiffs

Rev. Stat. § 421-B:25(VII); N.J. Stat. Ann. § 49:3-71(g); N.C. Gen. Stat. Ann. § 78A-56(f); N.D.C.C. § 10-04-17(5); O.R.S. § 59:115(6); Ohio Rev. Code Ann. § 1707.41(D); S.C. Code Ann. § 35-1-509(j); Tenn. Code Ann. § 48-1-122(h); Utah Code § 61-1-22(7); Va. Code Ann. § 13.1-522D; Wash. Rev. Code § 21.20.430(4)(b); W. Va. Code Ann. § 32-4-410(e); Wyo. Stat. Ann. § 17-4-122(e).

Anderson, Hardin, Muhammad, Messieh, Token Fund I and Williams have timely Blue Sky claims without any need to rely on equitable tolling doctrines. *Finally*, with respect to Defendants' motion to compel arbitration, discussed in Section V, *infra*, even if Judge Cote's ruling in *Bibox* controlled (and it does not), Plaintiffs Anderson's and Williams's Texas Blue Sky claims are both timely and cannot be directed to arbitration, given that (i) all their purchases occurred within three years of suit (and therefore within the Texas limitations period), and (ii) all their purchases pre-dated Binance's purported imposition of an arbitration clause.

## V. DEFENDANTS' REQUEST TO DIRECT THIS CASE TO ARBITRATION OR A FOREIGN FORUM SHOULD BE DENIED

Defendants' arguments for forcing this action into arbitration or into a foreign forum fail for five independently sufficient reasons.

*First*, all trades of two of the Plaintiffs pre-date the purported imposition of an arbitration clause by Defendants. Defendants do not cite to any arbitration clause prior to February 20, 2019. *See* ECF No. 60-1. Specifically, Plaintiff Anderson and Plaintiff Williams made all their purchases prior to July 2, 2018 and June 13, 2018, respectively—long before Defendants claim an arbitration clause was imposed. SAC ¶¶ 15, 21; ECF Nos. 43-1, 43-7. Therefore, none of Plaintiff Anderson's or Williams's claims is subject to arbitration.

*Second*, Defendants have provided no evidence that Plaintiffs executed or had reasonable notice of the purported Terms of Use that contain the arbitration and forum selection clauses Defendants invoke. Such clauses are valid only if preceded by reasonable notice. Courts will deny a motion to compel arbitration based on an alleged clickwrap agreement,[16] where the

---

[16] In a clickwrap agreement, a user must click "I agree," but not necessarily view the contract to which she is assenting.

"[d]efendant's interface does not provide to a consumer inquiry notice of the arbitration terms contained within the [a]rbitration [a]greement[]." *Shron v. LendingClub Corp.*, 2020 WL 3960249, at *5 (S.D.N.Y. July 13, 2020); *see also MTS Logistics, Inc. v. Innovative Commodities Grp., LLC*, 442 F. Supp. 3d 738, 747 (S.D.N.Y. 2020) (forum selection clause unenforceable when not "reasonably communicated" to counterparty); *Scotti v. Tough Mudder Inc.*, 63 Misc. 3d 843, 854 (Sup. Ct. Kings Cty. 2019) (denying motion to compel arbitration where defendant "failed to set forth sufficiently detailed evidence as to how its on-line registration webpage appeared to the plaintiffs, or other users/registrants"). Such notice is a prerequisite to showing *agreement*: "Mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (Sotomayor, J.). "This principle of knowing consent applies with particular force to provisions for arbitration." *Id.* at 30. "[T]he factual circumstances surrounding a consumer's use" of a browsewrap agreement are even more closely scrutinized "[b]ecause of the passive nature of acceptance" in such agreements. *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 395 (E.D.N.Y. 2015).[17] "[U]nambiguous manifestation of assent" to a browsewrap agreement is "essential if electronic bargaining is to have integrity and credibility." *Specht*, 306 F.3d at 35.[18]

---

[17] "Browsewraps can take various forms but basically the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." *Id.* (quoting *United States v. Drew*, 259 F.R.D. 449, 462 n.22 (C.D .Cal. 2009)).

[18] This case is distinct from *Camilo v. Lyft, Inc.*, for example, in which this Court upheld a clickwrap arbitration provision because the defendant's platform provided users with an opportunity to scroll through the terms of service agreement before accepting the terms, the agreement provided for an opt-out procedure, users were unable to use the defendant's services without clicking the "I ACCEPT" button, and the plaintiff actually clicked the "I ACCEPT" button. 384 F. Supp. 3d 435, 439–40 (S.D.N.Y. 2019). Defendants offer no such evidence here.

Defendants provide no *evidence* on whether any arbitration, forum selection, or delegation terms were prominently displayed to would-be purchasers, or on the design and content of webpages that prospective purchasers would have visited, to show the requisite "inquiry notice." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019); *see also Specht*, 306 F.3d at 31–32 (reviewing evidence of webpage design and ruling that plaintiff was not "on inquiry or constructive notice of," and therefore "did not manifest assent to," the terms of a license agreement). Instead, Defendants offer only an *ipse dixit* assertion that these agreements were enforceable. The fact-intensive nature of this inquiry is further underscored here, where Binance's user interface and its Terms of Use have changed over time. For example, Binance has made no showing as to whether only *new* users were provided reasonable notice for the February 2019 and January 2021 Terms of Use, or if its earlier users (such as Plaintiffs) were also provided reasonable notice.[19] Accordingly, "[i]nsofar as it turns on the reasonableness of notice, the enforceability of a web-based agreement is clearly a fact-intensive inquiry" and therefore not suitable for resolution on a motion to dismiss. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017).

Because Defendants have failed to establish their burden on the existence of an enforceable arbitration agreement, the Court cannot resolve this threshold issue on a motion to dismiss, compelling denial of the request to arbitrate. *See Starke*, 913 F.3d at 288 (courts, not arbitrators, "must still decide whether the parties to a contract have agreed to arbitrate disputes"); *Specht*, 306

---

[19] Indeed, a prospective Binance user today is directed to a page where the clickwrap button is *preselected* to acceptance, requiring the user to "uncheck" the box manually, which prompts a notice that they must agree to "Binance's Terms" before continuing. Roche Decl. Ex. 1. In this way, even for new users, Binance's Terms behave much like the browsewrap agreements courts have routinely scrutinized where there is no evidence to demonstrate a user's "unambiguous manifestation of assent" to be bound by the terms. *E.g.*, *Specht*, 306 F.3d at 35.

F.3d at 26 ("[A] court may not compel arbitration until it has resolved the question of the very existence of the contract embodying the arbitration clause.") (internal quotation marks omitted).[20]

*Third*, Defendants rely on the *wrong law* in seeking to enforce their claimed arbitration clause. Whether parties have agreed to arbitrate is a question of law "governed by … principles of contract formation." *Starke*, 913 F.3d at 288. Binance's February 2019 Terms of Use agreement states that it is governed by Singaporean law, ECF Nos. 60-1, at 22, and Binance's January 2021 Terms of Use agreement states that it is governed by the law as "shall be determined in accordance with the ICC Rules," ECF No. 60-12, at 21. Regardless, Defendants make no argument as to whether such agreements are enforceable or applicable under the laws of either Singapore or any other jurisdiction—they rely exclusively, and incorrectly, on U.S. federal law. MTD at 26–30. Defendants have therefore failed to show the enforceability of their claimed arbitration clauses against Plaintiffs under the appropriate legal principles. *See Application of Chase Manhattan Bank*, 191 F. Supp. 206, 209 (S.D.N.Y. 1961) ("The party relying on foreign law has the burden of proof. It must establish precisely what that law is and how it is interpreted.").[21] In addition, having failed to address the laws of either Singapore or any other foreign jurisdiction, Defendants have waived any such arguments now. *RSM Prod. Corp. v. Fridman*, 2007 WL 2295907, at *5 (S.D.N.Y. Aug. 10, 2007) ("An argument first raised in reply may be ignored.").

---

[20] Having failed to show that the parties entered into an arbitration agreement, Defendants have *a fortiori* failed to establish that Plaintiffs assented to, or can be bound by, any delegation provisions within such an agreement. Any such delegation provisions are thus similarly unenforceable.

[21] Defendants also misconstrue the designation of a seat of arbitration as an "exclusive choice-of-forum clause" which they contend warrants enforcement "pursuant to the doctrine of *forum non conveniens*." MTD at 29. The designation of a seat of arbitration in an arbitration clause is plainly not a forum selection clause separately enforceable from the arbitration clause itself, and Defendants cite no authority for treating it as such.

*Fourth*, the arbitration and any purported delegation clauses Defendants cite, which supposedly require Plaintiffs to litigate their U.S. statutory securities claims under foreign law before a Swiss or Singaporean arbitrator, are unenforceable. Like their gambit, reported by *Forbes*, "to evade U.S. regulation through fraud while extracting fees from U.S. users," SAC ¶ 342, these arbitration and purported delegation clauses are blatant attempts by Defendants to profit from U.S. investors while evading the U.S. securities laws. Arbitration agreements designed to avoid federal statutes, such as these, are routinely held unenforceable. *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 127 (2d Cir. 2019), *cert. denied sub nom. Sequoia Cap. Operations, LLC v. Gingras*, 140 S. Ct. 856 (2020); *see also Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 125 (2d Cir. 2010) ("[I]f certain terms of an arbitration agreement served to act as a prospective waiver of a party's right to pursue statutory remedies ..., we would have little hesitation in condemning the agreement as against public policy.") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)) (internal quotation marks omitted) (ellipses in original); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673–74 (4th Cir. 2016) (same); *Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324, 344 (W.D.N.Y. 2017) (same) (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013)).[22] Otherwise, "[d]efendants[] who have … repeatedly run afoul of federal and state securities laws … could nonetheless insulate themselves from the protections and remedies provided by these securities laws for their conduct in the United States with a U.S. investor by compelling arbitration in [a foreign country] applying [foreign] … law." *Eisen*, 244 F. Supp. 3d at 345. The Court should not allow Binance to do so here.

---

[22] Like the contracts at issue in *Eisen*, Defendants deployed the February 2019 and January 2021 Terms of Use in an attempt to "insulate themselves from" federal and state securities laws. *Id.*

*Fifth*, the purported arbitration and forum selection clauses on which Defendants rely appear to have been added to Binance's Terms of Use on February 20, 2019, and revised on January 13, 2021. *See* ECF Nos. 60-1, 60-11, 60-12. Each Plaintiff purchased the Tokens on Binance prior to February 20, 2019. ECF Nos. 43-1, 43-2, 43-3, 43-4, 43-5, 43-6, 43-7, 43-8. Defendants thus cannot apply the purported arbitration and forum selection clauses on these claims or the claims of members of the proposed Subclass 1, who likewise purchased the Tokens on the Binance exchange prior to February 20, 2019. SAC ¶ 349. Moreover, *none* of Plaintiffs Anderson's and Williams's claims can be directed to arbitration, given that all their purchases pre-date Binance's purported imposition of an arbitration clause.

Nor have Defendants demonstrated that the parties could have intended these provisions, which are confined to "any claims relating to this Agreement," ECF No. 60-1, at 21, to apply retroactively. "Courts construing arbitration clauses have refused to subject claims to arbitration where the claims arise from or relate to conduct occurring prior to the effective date of the agreement, and where the clause is limited to claims under '*this* Agreement.'" *TradeComet.com LLC v. Google, Inc.*, 435 Fed. App'x 31, 34 (2d Cir. 2011) (collecting authority); *see also Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 398 (2d Cir. 2015) (context of arbitration agreement made retroactive application unreasonable); *All S. Subcontractors, Inc. v. Amerigas Propane, Inc.*, 206 So. 3d 77, 85 (Fla. Dist. Ct. App. 2016) ("Appellant's mere receipt of the 'Terms and Conditions' in 2012 did not evidence a mutual intent that they be applied retroactively….").

## VI. PLAINTIFFS PLEAD VALID BLUE SKY LAW CLAIMS

Contrary to Defendants' argument, MTD at 30–31, Plaintiffs may pursue on behalf of the proposed Class claims brought under the Blue Sky law of any state or territory other than the six jurisdictions from which Plaintiffs have placed trades over Binance. "[A]s long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a

class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance" under Rule 23, not a motion to dismiss. *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 93 (2d Cir. 2018); *accord In re Asacol Antitrust Litig.*, 907 F.3d 42, 47–51 (1st Cir. 2018) (reaching the same conclusion under state antitrust laws). Because Plaintiffs have standing to sue, they have standing to bring the highly similar Blue Sky claims on behalf of the absent class members.

Defendants rely almost exclusively on irrelevant cases that did not involve plaintiffs bringing actions on behalf of absent class members from the jurisdictions at issue. *See Fed. Hous. Fin. Agency.*, 873 F.3d at 156 (upholding Blue Sky claims in a non-class action case); *Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1224–25 (D.N.M. 2011) (dismissing New Mexico Blue Sky claims brought on behalf of lead plaintiffs, not absent class members); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 504 F. Supp. 2d 287, 309 (S.D. Ohio 2007) (dismissing *individual* plaintiff's Blue Sky claims).

## VII.   PLAINTIFFS HAVE ADEQUATELY PLEADED CONTROL PERSON CLAIMS

### A.   The Court Has Personal Jurisdiction Over Defendant Zhao

Courts may exercise jurisdiction over defendants who solicited even a single digital token sale in the relevant forum. *See Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, 2018 WL 5118638, at *3–4 (S.D.N.Y. Oct. 22, 2018); *Tezos*, 2018 WL 4293341, at *6. The relevant forum here is the U.S. because the securities laws permit nationwide service of process. 15 U.S.C. § 77v(a); *see, e.g.*, *Balestra*, 380 F. Supp. 3d at 350. Advertising in the U.S. further supports the exercise of personal jurisdiction where there is even just a "single, isolated sale" and evidence that the defendant "purposefully availed itself of the privilege of conducting activities within the forum." *Verragio, Ltd. v. S K Diamonds*, 2017 WL 1750451, at *3 (S.D.N.Y. May 4, 2017) (quoting *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 888–89 (2011)) (cleaned up); *see also*

*SEC v. PlexCorps*, 2018 WL 4299983, at *9, *15–16 (E.D.N.Y. Aug. 9, 2018) (jurisdiction based in part on advertising on social media where domestic purchasers "learned about the [digital asset] sale from" those ads). Defendants stress an alleged lack of causal relationship between Defendant Zhao's conduct and Plaintiffs' Token purchases, MTD at 33–34, but personal jurisdiction does not require "a strict causal relationship between the defendant's in-state activity and the litigation." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).

Defendants sensibly concede jurisdiction over Binance: They have undertaken substantial activity in and affecting the U.S. and this District. Binance moved all of its cloud operations to AWS, headquartered in the U.S.; Binance stores a substantial portion of its cryptocurrency reserve in hardware facilities in the U.S.; and a majority of Binance's employees are based in the U.S. SAC ¶¶ 24–25. Binance advertised in the U.S. at conferences its representatives attended here, *see* SAC ¶ 37, and operated an interactive commercial website where 38% of the traffic came from U.S. users. *See* Roche Decl. Ex. 2.

The Court likewise has personal jurisdiction over Defendant Zhao, who runs Binance. Zhao is the founder and chief executive officer of a crypto-asset exchange with no purpose *other than* profiting from the listing and trading of digital assets, including the Tokens. *See, e.g.*, SAC ¶¶ 19–26. His leadership position is listed in Binance's Whitepaper, and while Defendants say that he only posted on "Twitter about cryptocurrencies in general and about Binance," he regularly promoted the sale of cryptocurrencies, including Tokens, through his personal Twitter account and in person in the U.S. SAC ¶ 98; Roche Decl. Ex. 3. When Binance faced withdrawal delays, Zhao issued statements through his personal Twitter account on behalf of Binance assuring users that the withdrawal delays were temporary, their funds were safe, and that the technical difficulties would be resolved soon. *See Lack v. Mizuho Bank*, 2019 WL 4239128, at *4 (C.D. Cal. Jun. 24,

2019) (finding jurisdiction, in part, over defendant, a foreign CEO, where defendant issued statements on behalf of company assuring users that withdrawal delays were temporary, or that the security system was secure, because those statements reached users accessing the website in the U.S.); Roche Decl. Exs. 4–6. Moreover, Zhao was responsible for deciding which tokens were listed on Binance. *Id.* ¶¶ 81–83, 87–88.

### B.     Plaintiffs Adequately Allege That Defendant Zhao Exercised Actual Control

Plaintiffs' allegations of Zhao's control go far beyond merely citing his title. Zhao was responsible for promoting, offering, and selling digital assets on Binance, as well as making and communicating strategic decisions on behalf of Binance. SAC ¶¶ 1, 26–30, 82–84. Such allegations meet the low pleading hurdle of Section 15 control person claims, where culpable participation is not required. *Balestra*, 38s0 F. Supp. 3d at 359; *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) ("[G]roup-published documents … are attributable to individuals with direct involvement in the everyday business of the company.") (internal quotation marks omitted); *In re Alstom SA*, 406 F. Supp. 2d 433, 488 n.51 (S.D.N.Y. 2005) (noting the unique role executives like CEOs play). In addition, determining control-person status is a "fact-intensive inquiry that generally should not be resolved on a motion to dismiss." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 746 (S.D.N.Y. 2015) (alterations and internal quotation marks omitted).

## CONCLUSION

For the reasons above, Defendants' motion to dismiss should be denied in its entirety. However, if the Court dismisses any part of the complaint, Plaintiffs respectfully seek leave to replead. If the Court dismisses Defendant Zhao for lack of jurisdiction, Plaintiffs respectfully seek jurisdictional discovery and to replead based thereon. *See* Roche Decl. ¶¶ 4–5.

Dated:   April 19, 2021                    Respectfully submitted,
         New York, NY


/s/ Kyle W. Roche                          /s/ Jordan A. Goldstein
Kyle W. Roche                              Philippe Z. Selendy
Edward Normand                             Jordan A. Goldstein
Velvel (Devin) Freedman                    Oscar Shine
     (*pro hac vice*)                      Mitchell Nobel
Alex T. Potter                             SELENDY & GAY PLLC
Richard Cipolla                            1290 Sixth Avenue, 17th Floor
ROCHE FREEDMAN LLP                         New York, NY 10104
99 Park Avenue, 19th Floor                 Tel: (212) 390-9000
New York, NY 10016                         pselendy@selendygay.com
Tel: (646) 350-0527                        jgoldstein@selendygay.com
kyle@rcfllp.com                            oshine@selendygay.com
tnormand@rcfllp.com                        mnobel@selendygay.com
vel@rcfllp.com
apotter@rcfllp.com
rcipolla@rcfllp.com


                                           *Co-Lead Counsel and Attorneys for*
                                           *Plaintiffs and the Proposed Class*