**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JD ANDERSON, CORY HARDIN, DAVID MUHAMMAD, RANJITH THIAGARAJAN, and CHASE WILLIAMS, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>   v.<br><br>BINANCE and CHANGPENG ZHAO,<br><br>     Defendants. | No. 20-cv-02803-ALC<br><br>**JURY DEMANDED** |

## THIRD AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION .................................................................................................... 1

II.   PARTIES .............................................................................................................. 6

      A.    Plaintiffs .................................................................................................... 6

      B.    Defendants ................................................................................................. 8

III.  JURISDICTION AND VENUE ............................................................................ 10

IV.   FACTUAL ALLEGATIONS ................................................................................ 15

      A.    The First Cryptocurrency: Bitcoin ......................................................... 15

      B.    Ethereum .................................................................................................. 18

      C.    ERC-20 Tokens ........................................................................................ 19

      D.    Crypto-Asset Exchanges ......................................................................... 20

      E.    The Advent Of The "ICO" ...................................................................... 22

      F.    Binance's Failure to Register as a Broker-Dealer ................................. 28

      G.    Binance Issued, Solicited, and Sold ERC-20 Tokens in the United States ........... 29

            a.    Binance Allowed and Targeted U.S. Investors on Its Exchange .............. 30

            b.    Binance Directly Sold the Tokens to Plaintiffs and Other Class Members ........... 34

            c.    Binance Solicited the Buying and Selling of the Tokens on Its Exchange ........... 35

      H.    The Tokens Are Securities ....................................................................... 47

            a.    ERC-20 Investors Invested Money .............................................. 48

            b.    ERC-20 Investors Participated In A Common Enterprise ........................ 49

            c.    Investors Purchased The Tokens With A Reasonable Expectation Of Profits From Owning Them ........... 50

            d.    Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers ........... 54

      I.    Each Token Is A Security .......................................................................... 59

            a.    EOS ................................................................................................ 59

            b.    Quantstamp (QSP) ........................................................................ 63

   c. TRON (TRX) ........................................................................................67

   d. FunFair (FUN) ..................................................................................71

   e. ICON (ICX) ......................................................................................74

   f. OmiseGO (OMG) .............................................................................77

   g. aelf (ELF) .........................................................................................81

 J. The Class Has Suffered Significant Damages From Defendants' Actions........... 84

V. CLASS ALLEGATIONS ................................................................................. 84

VI. CAUSES OF ACTION ..................................................................................... 87

 FIRST CAUSE OF ACTION (SECURITIES ACT – PRIMARY LIABILITY)............. 87

 SECOND CAUSE OF ACTION (SECURITIES ACT – ADDITIONAL
 LIABILITY) ........................................................................................................ 89

 THIRD CAUSE OF ACTION (CALIFORNIA STATE LAW – PRIMARY
 LIABILITY) ........................................................................................................ 91

 FOURTH CAUSE OF ACTION (CALIFORNIA STATE LAW – PRIMARY
 LIABILITY) ........................................................................................................ 94

 FIFTH CAUSE OF ACTION (CALIFORNIA STATE LAW – ADDITIONAL
 LIABILITY) ........................................................................................................ 98

 SIXTH CAUSE OF ACTION (NEVADA STATE LAW – PRIMARY LIABILITY) . 102

 SEVENTH CAUSE OF ACTION (NEVADA STATE LAW – PRIMARY
 LIABILITY) ...................................................................................................... 105

 EIGHTH CAUSE OF ACTION (NEVADA STATE LAW – ADDITIONAL
 LIABILITY) ...................................................................................................... 109

 NINTH CAUSE OF ACTION (TEXAS STATE LAW – PRIMARY LIABILITY)..... 113

 TENTH CAUSE OF ACTION (TEXAS STATE LAW – PRIMARY LIABILITY).... 116

 ELEVENTH CAUSE OF ACTION (TEXAS STATE LAW – ADDITIONAL
 LIABILITY) ...................................................................................................... 120

VII. PRAYER FOR RELIEF ................................................................................. 124

VIII. JURY TRIAL................................................................................................. 124

Plaintiffs JD Anderson, Cory Hardin, David Muhammad, Ranjith Thiagarajan, and Chase Williams, individually and on behalf of all others similarly situated, bring this action against Defendants Binance and Changpeng Zhao. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of whitepapers of the digital tokens at issue, press releases, media reports, and other publicly disclosed reports and information about Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiffs hereby allege as follows:

## I.    INTRODUCTION

1.    Within the Class Period, which is from July 1, 2017 through the present, Binance and Changpeng Zhao promoted, offered, and sold seven digital tokens, EOS, QSP, TRX, FUN, ICX, OMG, and ELF (together, the "Tokens") throughout the United States through its online exchange without a registration statement in effect for the securities it was selling, in violation of federal and state securities laws, and without registering as a broker-dealer, in violation of state securities laws. Individually and on behalf of investors who purchased on the Binance exchange any of the Tokens to the fullest extent subject to federal and state securities laws and continually hold Tokens or sold Tokens at a loss (the "Class"), Plaintiffs bring claims to recover the consideration paid for the Tokens, or damages, together with interest thereon, as well as attorneys' fees and costs.

2.    A digital token is a type of digital asset that exists on a "blockchain," which is essentially a decentralized digital ledger that records transactions; these blockchain-dependent assets are sometimes referred to as "crypto-assets." Various types of crypto-assets can reside on blockchains, including crypto-assets, such as Bitcoin and Ethereum, which are decentralized

digital commodities. For decentralized commodities such as Bitcoin and Ethereum, prices may rise or fall based upon supply and demand, but there is no centralized mechanism for creating more such commodities.

3.     There are also "smart contracts," which operate under a set of predetermined conditions agreed on by users. With smart contracts, the terms of the contract are automatically carried out by the software underlying the digital tokens (which, as relevant here, are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain) when the agreed conditions are met.

4.     Certain of these digital tokens are classified as "utility tokens" and are associated with particular projects. Their primary purpose is to allow the holder to use or access the associated project. For example, one private-jet company has adopted a business model based on issuing utility tokens to participants in its membership program, who can then use them to charter flights on the company's planes. A utility token presumes a functional network on which the token can be used.

5.     Other tokens are more speculative, are referred to as "security tokens," and like a traditional security essentially represent one's investment in a project that is to be undertaken with the funds raised through the sale of the tokens. Although these tokens derive their value from the startup behind the project, they are unlike traditional securities in that they do not give the holder ownership in any corporate entity. Rather, investors purchase these tokens with the hope that their value will increase in the future as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project.

6.     Because such "security tokens" are properly classified as securities under federal and state law, issuers of these Tokens (the "Issuers") were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC"). Binance was required to file a

registration statement in connection with the issuance of its own Token, known as "BNB." Neither the Issuers nor Binance—in its capacity as an issuer—filed any such registration statements. Instead, Binance and the Issuers entered into contracts to list these Tokens for sale on the Binance exchange in violation of federal and state law. As a result, Binance and the Issuers reaped billions of dollars in profits.

7.      The scheme worked as follows: working to capitalize on the enthusiasm for crypto-assets like bitcoin, an Issuer would announce a revolutionary digital token. This token would typically be billed as "better," "faster," "cheaper," "more connected," "more trustworthy," and "more secure." The Issuer would then sell some of its tokens in an initial coin offering ("ICO") to investors and then turn to Binance to list the new token, at which point Binance would undertake its own efforts to promote sales, and to solicit and encourage purchases, and to facilitate the consummation of these transactions, by a wide universe of investors. The Issuers would thereby raise hundreds of millions, even billions, of dollars from purchasers of the tokens. Binance would profit handsomely by receiving payments from Issuers to have their tokens listed and, more lucratively, by receiving a percentage of each trade. Binance also profited handsomely as an Issuer of the BNB Token—which it issued in an ICO in June and July 2017 in the lead up to the launch of its exchange.

8.      The Issuers were generally careful to describe these tokens both as providing some specific utility and as something other than "securities." But the vast majority of these new tokens turned out to be empty promises. They were not "better," "faster," "cheaper," "more connected," "more trustworthy," or "more secure" than what existed in the marketplace. In reality, they often had no utility at all. The promises of new products and markets went unfulfilled, with the networks never fully developed, while investors were left holding the bag when these tokens crashed.

Indeed, all of the Tokens are now trading at a fraction of their 2017–2018 highs. One of the Tokens at issue, TRX, is down nearly 40 percent from its 2018 high. QSP was trading at around 72 cents in January 2018; today, it trades at around 0.18 cents. After their ICOs, the prices of OMG and ELF tokens skyrocketed to more than $25 and $2.50 per token, respectively; today, they trade at around $0.67 and $0.55 per token. The EOS token reached a high of $22.89. Today, it is worth only $0.82.

9.      Investors were provided with scant information when deciding whether to purchase a token. The main offering materials available to investors were "whitepapers" that would describe, in highly technical terms, the supposed utility of a token. These whitepapers would often omit, however, the robust disclosures that securities laws and the SEC have long deemed essential to investor protections in initial public offerings, including use of "plain English" to describe the offering; a required list of key risk factors; a description of key information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow. Instead, these ICOs were the "Wild West"—with investors left to fend for themselves. Without the mandatory disclosures that would have been required had these ICOs been properly registered with the SEC, investors could not reliably assess the representations made or the risks of their investments.

10.     In 2017 and 2018, at the height of this frenzy of activity, hundreds of ICOs raised nearly $20 billion with virtually no regulatory oversight or guidance to investors. Issuers and exchanges like Binance, preying on the public's lack of familiarity with the technology underpinning these tokens, characterized these tokens as "utility tokens," even though they were

in effect bets that a particular project would develop into a successful venture. In truth, these tokens were securities under federal and state securities laws.

11.    The Tokens' status as securities has been confirmed by recent regulatory action by the SEC. On September 30, 2019—nearly six months after releasing its Framework, and more than two years after the Binance exchange launched—the SEC completed an investigation and found that a major issuer of one of the Tokens, Block.one, had violated the Securities Act of 1933 (the "Securities Act") by selling the digital token EOS, an unregistered security, to the public. As a result of this SEC enforcement action, Block.one was required to pay a $24 million fine.[1] The SEC's determination that EOS was an unregistered security applies with equal force to the other Tokens.

12.    Binance and the Issuers wrongfully engaged in millions of transactions—including the solicitation, offer, and sale of securities—without registering the Tokens as securities with the SEC and relevant state authorities, and without Binance registering with the relevant state authorities as a broker-dealer. As a result, investors were not informed of the significant risks inherent in these investments, as federal and state securities laws require.

13.    Binance participated in illegal solicitations and sales of securities for which no registration statement was in effect, and as to which no exemption from registration was available. Each ICO was a generalized solicitation made using statements posted on the Internet and distributed throughout the world, including throughout the United States, and the securities were offered and sold to Plaintiffs and the general public in the United States. Because these sales, as well as Binance's underlying contracts with the Issuers that facilitated these sales, violated the

---

[1] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

Securities Act, Plaintiffs and the Class are entitled to recover the consideration they paid for the Tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase, as well as the fees they paid Binance on such purchases.

14.    In addition, numerous Class members resided, and were present when they traded in the Tokens, in jurisdictions or territories with their own "Blue Sky" protections for investors.[2] Under these laws, investors in these jurisdictions who purchased unregistered Tokens are entitled to rescission, or damages, and generally interest thereon, attorneys' fees, and costs.

15.    Accordingly, individually and on behalf of the Class, Plaintiffs bring claims to recover the consideration paid for the Tokens, together with interest thereon, as well as attorneys' fees and costs.

## II.    **PARTIES**

### A.    **Plaintiffs**

16.    Plaintiff JD Anderson is a resident of Aubrey, Texas. Anderson and members of the Class purchased Tokens on Binance, and pursuant to contracts with and solicitations from Binance, from Texas during the Class Period. Anderson's transactions on Binance were therefore effected in Texas, and upon information and belief, title for the Tokens at issue in those transactions passed in whole or in part over servers located in California that host Binance's website. Anderson's purchases of Tokens on Binance occurred between December 16, 2017 and

---

[2] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky." *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted). Blue Sky statutes typically define "securities" to include "investment contracts," and the term "investment contracts" has been interpreted by state courts commensurate with the standard set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

July 1, 2018. A true and correct copy of Anderson's transactions is included in Exhibit A to the First Amended Class Action Complaint.

17.     Plaintiff Cory Hardin is a resident of Las Vegas, Nevada. Hardin and members of the Class purchased Tokens on Binance, and pursuant to contracts with and solicitations from Binance, from Nevada during the Class Period. Hardin's transactions on Binance were therefore effected in Nevada, and upon information and belief, title for the Tokens at issue in those transactions passed in whole or in part over servers located in California that host Binance's website. A true and correct copy of Hardin's transactions is included in Exhibit B to the First Amended Class Action Complaint.

18.     Plaintiff David Muhammad is a resident of Grand Prairie, Texas. Muhammad and members of the Class purchased Tokens on Binance, and pursuant to contracts with and solicitations from Binance, from Texas during the Class Period. Muhammad's transactions on Binance were therefore effected in Texas, and upon information and belief, title for the Tokens at issue in those transactions passed in whole or in part over servers located in California that host Binance's website. A true and correct copy of Muhammad's transactions is included in Exhibit E to the First Amended Class Action Complaint.

19.     Plaintiff Ranjith Thiagarajan is a resident of San Jose, California. Thiagarajan and members of the Class purchased Tokens on Binance, and pursuant to contracts with and solicitations from Binance, from California during the Class Period. Thiagarajan's transactions on Binance were therefore effected in California, and upon information and belief, title for the Tokens at issue in those transactions passed in whole or in part over servers located in California that host Binance's website. A true and correct copy of Thiagarajan's transactions is included in Exhibit F to the First Amended Class Action Complaint.

7

20.    Plaintiff Chase Williams is a resident of Houston, Texas. Williams and members of the Class purchased Tokens on Binance, and pursuant to contracts with and direct solicitation from Binance, from Texas during the Class Period. Willams's transactions on Binance were therefore effected in Texas, and upon information and belief, title for the Tokens at issue in those transactions passed in whole or in part over servers located in California that host Binance's website. A true and correct copy of Williams's transactions is included in Exhibit G to the First Amended Class Action Complaint.

**B.    Defendants**

21.    Defendant Binance issued its own token, BNB, in the BNB ICO from June 26 to July 3, 2017. Eleven days later, on July 14, 2017, Defendant Binance launched its digital asset exchange. By January 2018, it was reported to have become the largest cryptocurrency exchange in the world. As of September 1, 2020, Binance continued to represent itself as the world's largest crypto-asset exchange, claiming a trading volume of nearly $11 billion. Binance facilitates trades in digital assets, including the Tokens, by providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for Binance taking a fee for every transaction it facilitates.

22.    Although Binance claims not to have any physical headquarters, much of the infrastructure that enables it to exist and many of its employees are located in the United States. Binance is hosted on computer servers and data centers provided by Amazon Web Services ("AWS"), a cloud computing company that is located in the United States. Several of AWS's "Availability Zones," which contain one or more data centers and other hardware to support AWS's cloud services, are physically located in the United States. Upon information and belief, a significant portion, if not all, of the AWS servers and Availability Zones that host Binance are

located in California. Upon information and belief, most or all of Binance's digital data is stored on servers located in Santa Clara County, California.

23.　Binance employees reside in the United States. Binance's Vice President of Global Operations, Communications Director, Managing Director of the Binance X initiative, Senior Vice President of Charity, Senior Manager of User Acquisition, and at least one Risk Management employee all publicize that they reside in California. During the Class Period, Binance also issued job listings seeking California-based engineers to work on its blockchain, mobile, and security products.

24.　Defendant Changpeng Zhao is a citizen of Canada who served as Binance's Chief Executive Officer from 2017 until his resignation in November 2023 after he and Binance pled guilty to federal criminal violations. Binance admitted in connection with its guilty plea that Zhao, as Binance's CEO, made the strategic decisions for Binance and exercised day-to-day control over its operations and finances. Zhao founded Binance in China but shortly thereafter moved Binance's headquarters to Japan, in advance of the Chinese government's ban on crypto-asset trading. In March 2018, as a result of increasing regulatory scrutiny in Japan, Binance moved its headquarters to Malta.

25.　On February 21, 2020, the Malta Financial Services Authority ("MFSA") issued a statement responding to media reports referring to Binance as a "Malta-based cryptocurrency" company. The statement said that Binance "is not authorized by the MFSA to operate in the cryptocurrency sphere and is therefore not subject to regulatory oversight by the MFSA."

26.　Zhao stated the same day that "Binance.com is not headquartered or operated in Malta … There are misconceptions some people have on how the world must work a certain way, you must have offices, HQ, etc. But there is a new world with blockchain now … Binance.com

has always operated in a decentralized manner as we reach out to our users across more than 180 nations worldwide."

27.     Although it is thus unclear where Binance is physically headquartered, it is clear that since its founding Binance has regularly and intentionally engaged in numerous online securities transactions inside the United States, with U.S. residents, without complying with U.S. laws. In addition, Binance has promoted, inside the United States, the sale of digital assets on its exchange.

28.     On November 21, 2023, Binance and Zhao pled guilty to federal criminal charges filed in the United States District Court for the Western District of Washington. Binance pled guilty to three federal charges of anti-money laundering, unlicensed money transmitting, and sanctions violations. Zhao pled guilty to one charge of failing to maintain an effective anti-money laundering program, which carries a maximum term of imprisonment of up to 10 years.

29.     On February 23, 2024, Binance was sentenced to 3 years of probation, a fine of more than $1.8 billion, and forfeiture of more than $2.5 billion.  On April 30, 2024, Zhao was sentenced to a term of four months in federal prison, in addition to a $50 million fine Zhao paid pursuant to his plea agreement.

## III.    JURISDICTION AND VENUE

30.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant, and in which any member of a class of plaintiffs is a citizen of a State and any defendant is a citizen or subject of a foreign state.

31.     Jurisdiction of this Court is further founded upon 28 U.S.C. § 1331 because the Third Amended Complaint asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act,

15 U.S.C. §§ 77e, 77*l*(a)(1), 77o. This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

32.     This Court has jurisdiction over violations of State Blue Sky statutes pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

33.     This Court has personal jurisdiction over Defendants. Defendants purposefully availed themselves of the privilege of conducting activities in the United States in connection with their offer or sale of unregistered securities and failure to register with the relevant state authorities as a broker-dealer, including activities occurring in or aimed at the State of New York, by maintaining an interactive commercial website accessible and used by U.S. investors; marketing in the United States and New York to those investors, employing agents, employees, and vendors in the United States and New York; and participating, enabling, and directing those contacts from within the United States and New York.

34.     Binance has rejected the concept of having physical headquarters in any geographic jurisdiction and describes its operations as decentralized. Even though Binance is nominally headquartered in Malta, the Malta Financial Services Authority ("MFSA") has stated that Binance "is not authorized by the MFSA to operate in the cryptocurrency sphere and is therefore not subject to regulatory oversight by the MFSA." Binance has not conceded that it is subject to any regulatory regime.

35.     As explained above, however, much of the infrastructure Binance relies on to operate its exchange is located in the United States. Upon information and belief, many of the AWS servers that host Binance are located in California. Many of Binance's employees have indicated in online profiles that they work for Binance in California. Binance admitted in connection with its guilty plea to federal criminal charges that it intentionally maintained

substantial connections to the United States, from which it generated, among other things, web traffic, user base, transaction volume, and profit.

36.     To protect investors, a securities exchange cannot be allowed to operate free of any regulation. Binance is subject to U.S. jurisdiction and securities laws because it has availed itself of the benefits of (i) transacting with U.S. investors and (ii) computers on the Ethereum blockchain network located in the United States. Binance is further subject to U.S. jurisdiction and securities laws because, as explained above, it and its senior executives, including Zhao, reportedly planned an elaborate scheme to create a shell entity in the United States designed to distract U.S. regulators while simultaneously extracting significant service fees from U.S.-based customers.

37.     Defendants have both admitted, in connection with their November 21, 2023 guilty pleas in the Western District of Washington, facts establishing their contacts with the United States as a whole sufficient for this Court to exercise personal jurisdiction over them pursuant to 15 U.S.C. §§ 77v, 78aa(a) and consistent with due process. In the statement of facts supporting its guilty plea, Binance stipulated that, between at least August 2017 and October 2022, Binance "chose to do business wholly or in substantial part in the United States," "operated a cryptocurrency exchange wholly or in substantial part in the United States by serving a substantial number of U.S. users," "intentionally maintained substantial connections to the United States," "intentionally sought and served millions of customers located in the United States," and "tracked and monitored the status and growth of both its U.S.-registered users and its U.S.-based website visitors."

38.     A substantial plurality of investors on Binance during the Class Period traded from the United States during this period. Binance admitted in connection with its guilty plea that in or around August 2017, it created a graphic touting the exchange's "[r]apid user growth" in its first

forty-five days of operation, showing that more than 23% of Binance's 122,729 users were from the United States, a greater share than from any other country. Binance further admitted that (1) in or around March 2018, an employee confirmed Zhao's estimate that Defendant had approximately three million U.S. users—more than a third of Binance's eight million total users at the time, and (2) in or around June 2019, Zhao stated on a call among senior management that "at a high level ... 20 to 30% of [Binance's website] traffic comes from the U.S." and that the U.S. market represented "20 to 30%  [Binance's] potential revenue."

39.     Binance further stipulated that "U.S. users conducted trillions of dollars in transactions on the [Binance] platform between August 2017 and October 2022—transactions that generated approximately $1,612,031,763 in *profit* for Binance" (emphasis added). In the statement of facts supporting his guilty plea, Zhao stipulated that he understood that "Binance served a substantial number of U.S. users"; he "knew that U.S. users were essential for Binance to grow, were a significant source of revenue, and had a substantial network effect"; he "sought those benefits for the Company"; and "Binance relied on U.S. trading firms to make markets on the exchange and provide needed liquidity, thereby making various digital assets available to trade by other customers at competitive prices."

40.     Binance additionally consented to entry of a consent order to resolve an action brought against it by the Commodities Futures Trading Commission. That consent order stated that according to periodic revenue reports prepared for and sent to Zhao every month, as of January 2020 approximately 19.9% of Binance's customers were located in the United States, and as of June 2020 approximately 17.8% of Binance's customers were located in the United States— reflecting a U.S. user presence that persisted because Zhao and Binance deliberately allowed U.S. Customers to circumvent their superficial controls and purported KYC program. The consent order

further stated that Binance knowingly concealed the presence of U.S. customers, including when Zhao directed Binance personnel to replace the "U.S." value for certain data fields in Binance's internal database with the value "UNKWN," and that at Zhao's instruction, Binance's officers, agents and employees used communication applications with auto-delete functionality enabled to communicate concerning U.S. customers.

41.    In addition, Binance hosts a blockchain incubation program in San Francisco through Binance Labs, Binance's venture capital division, and has solicited via social media job applicants for the San Francisco chapter of Binance Labs. Binance has also participated in several conferences and events in the United States, including in New York City:

(a) January 2018: Binance offered its "Binancians" tickets to the Blockchain Connect Conference hosted in San Francisco.

(b) September 2018: Helen Haiyu, Head of Binance Charity, represented Binance at Blockchain for Social Good, held in New York City in September 2018.

(c) October 2018: Binance Labs gave presentations at Harvard University in Boston and Columbia University in New York City in October 2018 about blockchain startups.

(d) June 2018: Binance Labs represented Binance at the Blockchain Connect Conference in San Jose.

(e) February 2019: Binance Labs attended ETH Denver.

42.    Defendants engaged in conduct that had a foreseeable substantial effect in the United States connected with those offers and sales. Defendants also transacted business within New York pursuant to N.Y. C.P.L.R. 302(a)(1).

14

43.     Furthermore, this Court necessarily exercised personal jurisdiction over Defendants by adjudicating the merits of their Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint and/or Compel Arbitration, *see* ECF No. 77, and Defendants subsequently waived any objections to personal jurisdiction by representing to the United States Court of Appeals for the Second Circuit that both this Court and the Court of Appeals had jurisdiction over this action.

44.     Venue is proper pursuant to each of 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa(a) in that this is a district wherein one or more defendants is found or is an inhabitant or transacts business, or in the district where offers or sales at issue took place. For example, a Binance representative promoted Binance at a leading blockchain conference, Consensus, which was held in New York City. Although the New York State Department of Financial Services ("DFS") in 2023 ordered the approved issuer of Binance's U.S. Dollar-pegged stablecoin—the "BUSD"—to cease minting it, there is currently no restriction on the listing or exchange in New York of existing BUSD by DFS-licensed entities.

## IV.    FACTUAL ALLEGATIONS

### A.    The First Cryptocurrency: Bitcoin

45.     This case concerns crypto-assets. A crypto-asset is a digital asset designed to work as a medium of exchange or a store of value or both. Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

46.     Bitcoin was the world's first decentralized crypto-asset. It is also the largest and most popular crypto-asset, with a market capitalization of approximately $1.17 trillion. Bitcoin spawned a market of other crypto-assets that, together with Bitcoin, have a current market capitalization of $2.22 trillion. (The term "bitcoin" can refer to both a computer protocol and a

unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

47.     At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the blockchain.

48.     Blockchains act as the central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

49.     Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network. In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure. For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin. This process is colloquially referred to as "mining."

50.     The mining process creates a scarcity that underlies the value of Bitcoin. Bitcoin is designed so it gets harder and harder to mine. The more bitcoin produced, the more complex and resource-intensive the computations required for a miner to receive new bitcoin. This process ensures that the supply of bitcoin will not rise sharply or unpredictably, thus preventing a flood of new bitcoin that could undercut the value of the preexisting bitcoin. Likewise, the number of bitcoin that miners receive as a reward is halved roughly every four years. This will continue until all bitcoin have been mined, at which point miners will receive fees paid solely by network users.

51.     Bitcoin's distribution system thus roughly mirrors the availability of natural resources like gold or silver. While the supply of bitcoin continues to grow as more of it is mined, the growth rate of that supply is logarithmic and will eventually cease entirely, ensuring the market is not flooded and bitcoin is not devalued. This ensures market participants that their bitcoin will not diminish in value due to sudden inflation.

52.     Bitcoin's architecture ensures that it is entirely decentralized. The Bitcoin protocol was first released on October 31, 2008 through a whitepaper authored under the pseudonym Satoshi Nakamoto. That paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust." While the first 50 bitcoin were mined into existence by Satoshi Nakamoto three months after the release of the whitepaper, it has since attracted a community of many competing miners who work to ensure the decentralization of the network.

53.     Accordingly, there is no "Bitcoin Inc." that administers or manages Bitcoin as a whole. If Bitcoin were run on centralized servers, the underlying value of Bitcoin would rely on the trust that individuals had in those operating the centralized servers. If Bitcoin's creator could issue more Bitcoin at a whim, the value of Bitcoin would reflect that uncertainty. But because Bitcoin's cryptographic protocols are self-sustaining and cannot be affected by the originator, the success of Bitcoin does not hinge on any single entity.

54.     This decentralization distinguishes Bitcoin from other assets. The value of corporate stocks and bonds, regardless of their structure, is tied to the success of the issuing corporation. The value of government bonds is tied to the credit of the government that issues them. The value of a fiat currency is tied to the issuing nation, reflecting factors like its economy, political stability, and the practices of its central bank. None of this is true for Bitcoin.

55.     The controlled supply and decentralized nature of Bitcoin is shared with some other crypto-assets, including Ethereum. Because of their decentralized nature, Bitcoin and Ethereum have been recognized as commodities (rather than securities) by courts and regulators.[3]

**B.    Ethereum**

56.     Ethereum is the second-most popular crypto-asset, with a market capitalization of approximately $360 billion. The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network. Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether. (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem," that is, the overall network of individuals using Ethereum or participating in the development of its network. Ethereum, like Bitcoin, is a commodity rather than a security.)

57.     Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality. A smart contract is a program that verifies and enforces the negotiation or performance of a contract. Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

58.     As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract. They each put up $1,000 worth of ether. They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate

---

[3] *See, e.g.*, *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y.), *adhered to on denial of reconsideration,* 321 F. Supp. 3d 366 (E.D.N.Y. 2018) (recognizing that Bitcoin can be regulated as commodity). On August 14, 2021, CFTC Commissioner Brian Quintenz stated on Twitter that Ethereum was "a non-security commodity." Brian Quintenz (@CFTCquintenz), Twitter (Aug. 14, 2021), https://web.archive.org/web/20220311133718/https://twitter.com/CFTCquintenz/status/1426570174036168704.

at that time, while the other receives the rest of the ether. The rest of the ether may or may not be worth more than it was at the beginning of the month.

59.     A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action. The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met.

60.     In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the box smart contracts called Ethereum Request for Comments ("ERCs").

61.     An ERC is an application standard for a smart contract. Anyone can create an ERC and then seek support for that standard. Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes. The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

### C.    ERC-20 Tokens

62.     ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015. ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain, known as "ERC-20 tokens."

63.     ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it. Accordingly, ERC-20 tokens are functionally different than crypto-assets like Bitcoin and Ethereum because they do not operate on an independent blockchain.

64.     ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard. Some properties related to ERC-20 tokens are customizable, such as the total supply of tokens, the token's ticker symbol, and the token's name. All ERC-20

tokens transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

65.    ERC-20 tokens are simple and easy to deploy. Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then distribute and make available for purchase. Even people without any technical expertise can have their own ERC-20 token created for them, which can then be marketed to investors.

### D.    Crypto-Asset Exchanges

66.    While the blockchain allows for secure and non-duplicable transfers of digital assets, it does not connect users to each other or to automate both sides of a transfer. The desire for locations to enable the trading of digital assets led to the creation of crypto-asset exchanges. Crypto-asset exchanges emerged to enable smoother and faster trading by investors, just as stock and commodities exchanges emerged to enable easy trading of securities.

67.    There are two primary types of crypto-asset exchange: decentralized exchanges and centralized exchanges.

68.    Decentralized exchanges may use the blockchain itself to match and execute transactions for traders. There is no intermediary individual or corporation that matches or clears transactions; instead, they use a smart contract to automatically facilitate trading. While different decentralized exchanges use different approaches, what they have in common is that the crypto-assets are transferred between individual accounts. Thus, if Angela exchanges one bitcoin for 10 ether using a decentralized exchange, her one bitcoin will be sent to Brian, another user on the platform, and Brian's 10 ether will be sent to Angela.

69.    These decentralized exchanges resemble Craigslist in their operation. Just like a purchase of a collectible baseball card on Craigslist involves one user sending money and the other sending the card, so too do transactions on decentralized exchanges involve customers sending

each other the goods being transacted. These decentralized exchanges, like Craigslist, do not own or hold the assets in question—they simply provide a platform for exchanges between users, along with some features designed to facilitate trading (*e.g.*, Craigslist's creation and maintenance of message boards organized by product type or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee.

70.    The other type of crypto-asset exchange—which includes Binance, as detailed below—is the centralized exchange. When a customer wishes to trade crypto-assets on a centralized exchange, she must first create an account on that exchange. The exchange will then provide that customer with a deposit address that the exchange controls. When the customer deposits crypto-assets into that deposit address, the exchange will credit her trading account with the corresponding crypto-asset. The exchange will typically then transfer the crypto-assets into one of its other addresses for storage. Importantly, these trades do not in fact happen on the blockchain and do not actually involve the transfer of any assets between users.

71.    Thus, if Angela wishes to trade one bitcoin for 10 ether on the Binance exchange, Binance will update its internal records to debit Angela's account one bitcoin and credit it 10 ether; no actual crypto-assets are moved on the blockchain. Nor is there any sense in which Angela's bitcoin is transferred to anyone other than Binance: while Binance may match traders' orders to determine the relative prices of crypto-assets and the rate at which they are exchanged, the only actual transactions that occur are between (a) the buyer and Binance and (b) the seller and Binance. The buyer and seller are *not* in privity with one another.

72.    When a user wants to withdraw crypto-assets from Binance or another centralized exchange, she tells the exchange the address into which she would like her crypto-assets transferred. The exchange then debits the user's account and transfers a corresponding amount of

crypto-asset from the *exchange's* reserves to that address. The withdrawn assets come directly from the centralized exchange.

### E. The Advent Of The "ICO"

73. Unlike Bitcoin and Ethereum, some crypto-assets are not generated by mining or any other decentralized process. Stablecoins, for example, are intended to mirror real-world assets, such as the U.S. dollar or the price of gold. These stablecoins can be created and managed by a single entity that has the power to create new coins on demand; the value of these coins derives from the promise that the issuing entity will maintain a reserve of the asset to which the stablecoin is pegged and only issue new coins in response to new deposits into the reserve.

74. Another type of crypto-asset is the token or crypto-security. These crypto-assets are centralized and are not generated by mining or a similar decentralized process. Instead, they are generally created by a company, known as an issuer.

75. Often, a crypto-security will begin with an initial coin offering, or "ICO." This ICO will allow members of the public to buy tokens directly from the issuer. On other occasions, the issuer will distribute some tokens for free to users in an "airdrop" and then begin selling the tokens on the secondary market through one or more exchanges. Regardless, the tokens, which were generated by the issuer themselves, do not derive value through algorithmic scarcity (and are thus unlike Bitcoin and Ethereum) and are not backed by a reserve (and are thus unlike stablecoins).

76. Instead, the nominal value proposition of a token comes from the promise that the issuer will use the funds raised in the ICO to create an ecosystem in which the token is useful; the token would then become valuable because it could be sold to those who wish to engage with the new ecosystem. In reality, many tokens issued during an ICO never have an actual use case because the issuer never actually creates the relevant ecosystem; even for the tokens that eventually acquire a nominal use, those tokens are overwhelmingly used to trade and possessed by individuals who

will never interact with the ecosystem for which they are designed, but instead acquire the tokens to speculate on their future market value. In this way, they are similar to traditional securities, which entitle owners to voting rights for the board of directors but are often owned by those with no intention of casting such a vote and who hope to profit from the managerial efforts of those running the issuer.

77.    The tokens issued in these ICOs are therefore investment contracts and securities because they represent the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. Investors invest money by purchasing the tokens. The investors are participating in a common enterprise because their collective purchases fund the creation of the ecosystem that will supposedly give value to the tokens they have purchased. They expect profits by reselling the tokens to others at a higher price when the ecosystem is created. And they depend on the efforts of the issuer to create that ecosystem.

78.    Seeking to capitalize on the growing enthusiasm for crypto-assets, many entrepreneurs sought to raise funds through ICOs, including for newly created ERC-20 tokens, such as the Tokens. Many of these issuers improperly chose not to register their securities offerings with the SEC in order to save money and not "open their books" to the SEC, even though investors thereby were denied access to critical information they would have received from an SEC-registered offering. As a result investors, including investors in the Tokens, were denied access to important information before making their investment decision.

79.    Potential purchasers were reached through various crypto-asset exchanges and social media sites that published active and upcoming ICOs.

80.    Between 2017 and 2018, nearly $20 billion was raised through ICOs. None of these ICOs was registered with the SEC.

81.    Of the approximately 800 ICOs launched between 2017 and 2018, the vast majority were issued using the ERC-20 protocol. Around the same time Binance launched its ICO, for example, issuers such as EOS had raised at least one hundred million dollars from selling their ERC-20 tokens through ICOs.

82.    Like most ICOs, ERC-20 ICOs were typically announced and promoted through public online channels. Issuers typically released a "whitepaper" describing the project and terms of the ICO. These whitepapers advertised the sale of tokens or coins through the ICO. They typically advertised the creation of a "new blockchain architecture."

83.    The whitepapers typically contained vastly less information than a registration statement filed with the SEC would have included. For example, whitepapers did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

84.    When tokens were sold through an ERC-20 ICO, the issuer usually asserted that such tokens entitled their holders to certain rights related to a venture underlying the ICO, such as the right to use certain services provided by the issuer. In almost all cases, these tokens could also be traded, thereby giving investors a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others (that is, the people operating the issuer whose efforts will impact the value of those tokens on the secondary market).

85.     These tokens were frequently listed on crypto-asset exchanges, where they were bought and sold using other crypto-assets (such as Bitcoin or Ethereum) or traditional currencies such as the U.S. dollar.

86.     Even after an ICO, an issuer could receive a direct financial benefit from high prices of their tokens by selling them to customers on these exchanges. These subsequent offerings were not registered or flagged to customers; instead, they most often relied on the same whitepapers that had accompanied the sale of the tokens in the ICO, as well as continuing marketing efforts from the issuers seeking to increase the price of the tokens.

87.     As a result of the lack of information, trading of tokens on exchanges such as Binance was rife with manipulation. In fact, as Aries Wanlin Wang, the founder of a rival exchange, admitted, "the secondary market [for digital assets] can be rigged by manipulators. If you put major currencies such as Bitcoin and Ethereum aside, many of the tokens you'll find issued through ICOs are there to be manipulated. These tokens are similar to penny stocks. And everyone wants to believe they've discovered the next Bitcoin and Ethereum." Mr. Wang further conceded that "[t]he problems facing the secondary market in crypto are similar to the problems that were faced by American stock exchanges 100 years ago. When a market lacks certain regulations and oversights, predictable things happen. Pump and dumps are very common in the secondary market of cryptocurrency, just as they were on the US stock exchange so many years ago."

88.     Because these tokens are securities, the SEC has repeatedly both provided guidance and engaged in enforcement actions on that basis. The SEC first examined how digital assets could qualify as securities under existing law in the SEC's *Report of Investigation Pursuant to Section*

*21(a) of the Securities Exchange Act of 1934: The DAO* (the "2017 DAO Report").[4] In the 2017

DAO Report, the SEC examined the application of the Securities Act and the Securities Exchange

Act of 1934 (the "Exchange Act") to the issuance and trading of digital assets.

89.    With respect to the application of the Securities Act to digital assets, the SEC

concluded (1) that digital assets may qualify as securities pursuant to the Securities Act and the

test articulated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and that (2) issuers of digital assets

that fit within the definition of security under the *Howey* test are subject to the registration and

reporting requirements of the Securities Act.[5]

90.    Following an ICO boom in 2017, the SEC issued further guidance as to the

application of the *Howey* test to digital assets in a 2019 report entitled *Framework for "Investment*

*Contract" Analysis of Digital Assets* (the "Howey Framework Report").[6] The report reiterated that

whether a particular digital asset is an investment contract, and thus a security, requires an analysis

of the facts and circumstances surrounding the digital asset's creation and issuance.

91.    Following this guidance, the SEC has engaged in enforcement actions on the basis

that several different tokens are in fact securities. On September 30, 2019, Block.one, the issuer of

the EOS digital asset (one of the Tokens in this action), agreed to pay $24 million to settle charges

that it had raised several billion dollars through an unregistered securities offering when it

---

[4] *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, SECURITIES AND EXCHANGE COMMISSION (Jul. 25, 2017), https://web. archive.org/web/20220306215515/https://www.sec.gov/litigation/investreport/34-81207.pdf.

[5] The 2017 DAO report explained that "information about The DAO was 'crucial' to the DAO Token holders' investment decision." *Id.* at 16 (citing *SEC v. Murphy*, 626 F.2d 633, 643 (9th Cir. 1980)). "The DAO was 'responsible for the success or failure of the enterprise,' and accordingly was the entity about which the investors needed information material to their investment decision." *Id.* (quoting *Murphy*, 626 F.2d at 643–44).

[6] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

conducted the ICO for the EOS token.[7] Similarly, on December 22, 2020, the SEC brought charges against Ripple Labs Inc. and two of its executives, alleging that they had raised over $1.3 billion through an unregistered crypto-securities offering through the ICO of XRP (another of the Tokens in this action).[8] The case is ongoing.

92.    On July 21, 2021, speaking to the American Bar Association, SEC Chairman Gensler commented on the fact that digital asset trading platforms were offering tokens that are priced off of securities and resemble derivatives, stating:

> Make no mistake: It doesn't matter whether it's a stock token, a stable value token backed by securities, or any other virtual product that provides synthetic exposure to underlying securities. These platforms—whether in the decentralized or centralized finance space—are implicated by the securities laws and must work within our securities regime."[9]

93.    On August 3, 2021, SEC Chairman Gensler commented on the state of the digital asset market:

> [R]ight now, we just don't have enough investor protection in crypto … [f]rankly, at this time, it's more like the Wild West … I believe we have a crypto market now where many tokens may be unregistered securities, without required disclosures or market oversight … [t]his leaves prices open to manipulation. This leaves investors vulnerable …. ***While each token's legal status depends on its own facts and circumstances, the probability is quite remote***

---

[7] *See SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO*, U.S. SECURITIES AND EXCHANGE COMMISSION (Sept. 30, 2019), https://web.archive.org/web/20220311134238/https://www.sec.gov/news/press-release/2019-202.

[8] *See SEC Charges Ripple and Two Executives with Conducting $1.3 Billion Unregistered Securities Offering*, U.S. SECURITIES AND EXCHANGE COMMISSION (Dec. 22, 2020), https://web.archive.org/web/20220307145723/https://www.sec.gov/news/press-release/2020-338.

[9] Nikhilesh De, *SEC Chair Hints Some Stablecoins Are Securities,* NASDAQ (July 21, 2021), https://web.archive.org/web/20220311134752/https://www.nasdaq.com/articles/sec-chair-hints-some-stablecoins-are-securities-2021-07-21.

*that, with 50 or 100 tokens, any given platform has zero securities.*[10]

94.     As digital asset popularity exploded, Binance listed digital assets, including the Tokens, that qualify as investment contracts, and thus securities, in order to earn fees from user transactions in these assets. Binance listed these Tokens despite knowledge of their status as securities.

95.     The Issuers declined to register the Tokens with the SEC and relevant state authorities, and Binance declined to register itself with the relevant state authorities as a broker-dealer, which registrations would have provided crucial risk disclosure to investors, including members of the Class.

### F.    Binance's Failure to Register as a Broker-Dealer

96.     Binance is obligated to register as a broker-dealer. The Blue Sky statutes of California, Nevada, and Texas, among others, forbid any person from transacting business as a broker-dealer unless the person is registered or exempt from registration under state law.

97.     A broker-dealer is a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account.[11] Brokerage activity is typically evidenced by persons acting as agents on behalf of others in "key points in the chain of [securities] distribution."[12]

---

[10] Will Gottsegen, *SEC's Gensler: Crypto Market Filled With Unregistered Securities, Prices 'Open to Manipulation'*, DECRYPT (Aug. 3, 2021) (emphasis added), https://web.archive.org/web/20220311134929/https://decrypt.co/77574/gary-gensler-crypto-market-securities-aspen-institute.

[11] Cal Corp. Code § 25004; Nev. Stat. § 90.220; Tex. Gov't Code §§ 4001.054, .056.

[12] *See, e.g.*, *Mass. Fin. Servs., Inc. v. Sec. Inv't Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass.) *aff'd*. 545 F.2d 754 (1st Cir. 1976), *cert. denied*, 431 U.S. 904 (1977); *SEC v. Nat'l Exec. Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980).

98.    Brokers typically operate "in the business" of assisting issuers seeking to conduct securities offerings and/or investors seeking to buy or sell securities during either an initial offering or on the secondary market—frequently in exchange for transaction-based compensation.[13]

99.    Binance effects transactions in the Tokens for the accounts of its customers; it is thus obligated to register with state authorities as a broker-dealer but has failed to do so.

### G.    Binance Issued, Solicited, and Sold ERC-20 Tokens in the United States

100.    In June 2017, Binance issued an ICO of its own Token, "BNB," and it launched its crypto-asset exchange website on July 14, 2017.

101.    On its exchange, Binance solicited and facilitated the buying and selling of ERC-20 tokens, including the Tokens, on its unregistered exchange and reaped extraordinary profits as a result.

102.    In fact, Binance recently boasted on its website that it currently averaged approximately $65 billion in daily trading volume and facilitated approximately 300 billion spot transactions in 2022. Binance lists more than 400 crypto-assets for trading on its platform. In August 2023, Zhao announced that Binance had more than 150 million users worldwide. In the statement of facts supporting its November 21, 2023 guilty plea, Binance stipulated that it was "the largest cryptocurrency exchange in the world," and in the statement of facts supporting Zhao's November 21, 2023 guilty plea, Zhao stipulated that, "[b]etween June 2017 and into 2022, more than a million U.S. retail users [of Binance] conducted more than 20 million deposit and withdrawal transactions worth $65 billion," and "[t]hese users conducted more than 900 million spot trades worth more than $550 billion."

---

[13] *See, e.g.*, *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); *SEC v. Margolin*, No. 92-cv-6307, 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992).

### a.     Binance Allowed and Targeted U.S. Investors on Its Exchange

103.     In the statements of facts supporting their November 21, 2023 guilty pleas, both Binance and Zhao admitted that they allowed and encouraged U.S. investors to use the Binance exchange. Zhao stipulated that he "knew that U.S. users were essential for Binance to grow, were a significant source of revenue, and had a substantial network effect. As more customers conducted transactions on Binance, the exchange became increasingly attractive to other customers, generating additional revenue for Binance." Zhao further stipulated that he "sought those benefits for the Company." Binance stipulated that it "intentionally sought and served millions of customers located in the United States" and "tracked and monitored the status and growth of both its U.S.-registered users and its U.S.-based website visitors." Binance further stipulated that, "[a]ccording to Binance's own transaction data, U.S. users conducted trillions of dollars in transactions on the platform between August 2017 and October 2022—transactions that generated approximately $1,612,031,763 in profit for Binance."

104.     Binance targeted U.S. residents by, *inter alia*, marketing its interactive exchange website to U.S. users, allowing deposits from U.S.-based exchanges, hosting video tutorials on how to deposit crypto-assets into the Binance exchange on its website in English, allowing users to purchase crypto-assets and BNB on its exchange with credit cards and bank deposits, and helping users utilize the exchange through the website's Support Center.

105.     Binance was aware that U.S. residents were using its services to purchase Tokens because of its Know Your Customer (KYC) process. Whether to address purported "suspicious activity" or to exceed the relatively low withdrawal limits, Binance required most users to verify their account. This verification process required users to submit their full name, gender, country and territory, their passport or driver's license ID number, a copy of their passport or license, and a photo of the user holding their passport or license:





106.    In addition to providing customer service through the Support Center, Binance has publicly provided support to customers located in the United States on Twitter.

107.    Binance also created "lending products" that allowed users to "invest" in tokens and earn an annualized interest rate on their investment. Binance sent emails targeted to its U.S. users offering its "lending products," which would allow U.S. users to buy its BNB token and other tokens, such as EOS, and earn an annualized interest rate on their investment.

108.    In addition, as a security measure, when a user would attempt to log in to Binance's website exchange from a new device or location, Binance would send an "Authorize New Device" email to the user to authorize the new device. The email would include the user's location, listing the user's city and state, and the user's IP address. These are just a few ways in which U.S. users provided residency information, and these users were allowed to continue trading on the exchange until restrictions on U.S. residents were enacted in September 2019.

109.    Zhao has recognized that a lot of his "Twitter followers are US-centric and they ask a lot of questions," many of which are presumably about the Binance exchange. Zhao has also

appeared on Bloomberg to discuss Binance and crypto-assets and allows Forbes to profile him, interviewing in English.

110.    Binance has advocated for its users to purchase tokens on its website through virtual private networks ("VPNs"), software designed to enable purchasers to obscure their location from regulators. It is widely known that U.S-based purchasers commonly use VPNs to access cryptocurrency exchanges, like Binance, that may nominally restrict U.S. IP addresses from accessing their websites. Defendant Zhao garnered significant notoriety in 2019 for posting on Twitter that the use of VPNs is "a necessity, not optional" to trade tokens on Binance. Zhao appears to have recently deleted this post from Twitter, subsequent to the commencement of this litigation. Likewise, prior to the commencement of this litigation, Binance's website contained a guide to using VPNs. This guide listed "[p]ros and cons of using a VPN," and it listed as its first "[p]ro" that a VPN permits "[l]ocation spoofing," which "allows [a user] to bypass [the user's] country's restrictions on accessing certain sites or to circumvent geo-blocks that the site has in place." That information has now been deleted by Binance.

111.    It has also been reported that Binance created a shell entity designed to access U.S. markets while attempting to remain outside the power of U.S. securities laws and regulations. In October 2020, *Forbes* published an article describing a leaked 2018 document describing plans reviewed by senior Binance executives, including Zhao, to create a Binance division within the United States that would distract federal regulators from Binance's primary operations while funneling revenue from U.S.-based token purchasers back to Binance. Michael del Castillo, FORBES, *Leaked 'Tai Chi' Document Reveals Binance's Elaborate Scheme To Evade Bitcoin Regulators* (Oct. 29, 2020), https://bit.ly/3ngeA5p. The leaked plan "describes a detailed strategy for distracting the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN)

and Office of Foreign Assets Control (OFAC), the Securities and Exchange Commission (SEC), the Commodities Futures Trading Commission (CFTC), and the New York Department of Financial Services (NYDFS)" from focusing on Binance's parent entity. *Id.* The shell entity "would act as a magnet for regulatory inquiries, and should be willing 'to accept nominal fines in exchange for enforcement forbearance.'" *Id.* (citing to leaked document). The entity would operate in the United States and pay "[l]icense and service fees … to Binance," which would "functionally" operate as "US-sourced trading fees." *Id.* (citing to leaked document).

112.    In February 2019, Defendants incorporated BAM Trading Services, Inc. in Delaware. The alternative name for this entity is Binance.US. In the statement of facts supporting its guilty plea, Binance stipulated that Binance.US is wholly owned by Zhao.

### b.    Binance Directly Sold the Tokens to Plaintiffs and Other Class Members

113.    Unlike a decentralized exchange, which uses smart contracts to match end-users and execute trades on the blockchain itself, Binance operates as a centralized exchange.

114.    A customer wishing to trade crypto-assets, including the Tokens, on Binance must create a Binance account and deposit crypto-assets into a Binance-controlled deposit address, after which Binance will credit the customer's account with the corresponding crypto-assets.

115.    On information and belief, Binance will then transfer the deposited crypto-assets to another Binance-controlled centralized address for storage.

116.    As Binance has represented in this case, transactions on the Binance exchange are not recorded on the blockchain but are instead recorded "off-chain," "on the Binance platform," and "in Binance's records."[14]  Binance's representations—made in the course of this litigation—

---

[14] Brief for Defendants-Appellees 35, *Williams v. Binance*, No. 22-972 (2d Cir. Oct. 27, 2022), ECF No. 71.

thus confirm that transactions on Binance do not involve the transfer of any crypto-assets between users in privity with one another. Instead, Binance has revealed that transactions on its platform are effectuated by customers depositing crypto-assets to a centralized Binance address, Binance transferring the crypto-assets among its centralized addresses, and finally Binance transferring crypto-assets from its centralized assets to other customers' accounts.

117.    Thus, in each transaction, Binance faces—and is in privity with—both the buyer and the seller, who are not in privity with each other.

### c.    Binance Solicited the Buying and Selling of the Tokens on Its Exchange

118.    How did a company that was barely a year old generate such extraordinary profits? By building a platform that solicited and facilitated the buying and selling of unregistered securities on a historically unprecedented scale. Defendants did this by taking advantage of the market's lack of sophistication with digital tokens, particularly ERC-20 tokens, and the general market excitement for Bitcoin and Ethereum more generally.

119.    Fundamentally, Binance solicited each purchase and sale of Tokens by allowing users to place only market orders and providing real-time pricing information for the Tokens. That is, Binance users can place orders to buy, sell, or exchange the Tokens and other digital assets at the digital assets' market price as displayed on Binance at the time of placement of the order.

120.    Each of the Tokens was listed on Binance, pursuant to agreements with the Issuers, and each was traded by members of the Class. Binance's website served as a continuous form of solicitation, throughout the Class Period, that both promoted and enabled sales of the Tokens— displaying detailed real-time price and trading data of the Tokens.



121.    Each purchase of Tokens on Binance necessarily depends on, and was proximately caused by, the real-time price displayed by Binance. A user will purchase a Token if, and only if, the price displayed by Binance is acceptable.

122.    Binance also regularly republished on its website investor reports assigning a credit rating to each of the Tokens and encouraging users to purchase them. For example:

(a) Binance republished ratings reports recommending purchases of ELF on August 20, 2018, September 3, 2018, and January 8, 2019.

(b) Binance republished ratings reports recommending purchases of EOS on February 21, 2018, April 18, 2018, August 28, 2018, August 30, 2018, September 11, 2018, November 2, 2018, November 12, 2018, and November 26, 2018.

(c) Binance republished ratings reports recommending purchases of FUN on September 4, 2018, September 18, 2018, and September 19, 2018.

(d) Binance republished ratings reports recommending purchases of ICX on September 14, 2017, September 17, 2017, October 5, 2017, February 11, 2018, September 10, 2018, September 18, 2018, and November 12, 2018.

(e) Binance republished ratings reports recommending purchases of OMG on June 15, 2017, August 26, 2018, September 3, 2018, September 18, 2018, and November 13, 2018.

(f) Binance republished ratings reports recommending purchases of QSP on October 23, 2017, November 12, 2017, August 29, 2018, August 30, 2018, September 5, 2018, September 18, 2018, and January 24, 2019.

(g) Binance republished ratings reports recommending purchases of TRX on December 27, 2017, August 1, 2018, August 20, 2018, November 14, 2018, and February 27, 2019.

123.    Because Binance receives financial benefits, including through transaction fees, from each transaction in Tokens and other digital assets, Binance's displaying of real-time Token

prices and publication of investor reports are motivated at least in part by the desire to serve Binance's financial interests.

124.    In addition, Binance advertised and continues to advertise its exchange on crypto-asset related and other websites, actively soliciting new investors to transact on its exchange.

125.    Shortly after an issuer launched an ICO, the issuer would quickly seek to have their tokens listed on crypto-asset exchanges like Binance, in order to give the issuer access to millions of retail investors to whom it could market the tokens.

126.    On July 11, 2018, in an interview with CNBC, Defendant Zhao stated that there are three key fundamentals Binance considers before it lists a token: the whitepaper, the team, and the users. Zhao explained:

> If a project has a concept, that's good. But, Binance is presently too big to list concept coins. They advise that if you just have a concept, it is better to list on smaller exchanges first, and Binance can monitor the performance of the business.

127.    Zhao noted that the team behind a particular token is a fundamental factor to the success of a project: *"It's kind of hard to tell if they're going to do the right thing or the wrong thing. But a team with a good history tends to carry on."* Zhao explained that "if you have a good project, we will list it."

128.    Exchanges like Binance are crucial to the successful sale of unregistered securities to investors. In discussing Binance's role in crypto-assets, Zhao stated: "As the exchange, we are the liquidity provider. If you think about cryptocurrency as the blood of the economy, we are the heart, we are pumping the blood. Right, so we are making everything circulate." Indeed, after their ICOs, Issuers aggressively pursued "listing agreements" with crypto-asset exchanges such as Binance. The purpose of pursuing these listing agreements was to create secondary markets for the purchase, sale, and trading of their Tokens.

129.    Issuers entered into listing agreements with crypto-asset exchanges that targeted U.S. consumers with the intent of creating secondary trading markets for the purchase, sale, and trading of their Tokens in the United States.

130.    These listing agreements were critical to the Issuers' efforts to increase the trading price of their Tokens by increasing market demand and access to the Tokens, especially in the United States. Indeed, many of these trading agreements included "listing fees," whereby the Issuer paid the crypto-asset exchanges an upfront fee to get the exchange to list their Token.

131.    Defendants also engaged in steps necessary for the distribution of the Tokens throughout the Class Period by promoting them via email and on social media. For example, shortly after Binance agreed to list a new token on its crypto-asset exchange, it would advertise that listing to its user base, such as per the below:

## Binance Will Add OAX, DNT, MCO, ICN

 Binance
3 years ago

**Fellow Binancians,**

We will add OAX/ETH、 DNT/ETH, MCO/ETH、 ICN/ETH trading pairs on Binance exchange.

The trading time and date will be as follows:

1. OAX/ETH will be traded at 12pm, Aug 21, 2017 (Monday) Beijing Time.
2. DNT/ETH will be traded at 12pm, Aug 22, 2017 (Tuesday) Beijing Time.
3. MCO/ETH and ICN/ETH trading pairs will be traded at 3pm, Aug 23, 2017 (Wednesday) Beijing Time.

The deposits and withdrawals of OAX, DNT, MCO, ICN will open at Aug 18, 2017 (Friday) Beijing Time. Click here to start deposit and withdrawal your token.

1. About OpenANX (OAX), District0x (DNT), MONACO (MCO), ICONOMI (ICN)
2. Fees
3. Rule

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make best efforts to choose high quality coins, but will not be responsible for your investment losses.

Thank you for your support!

Binance Team

August  18, 2017

132.    In announcing a new token available for trading, Binance would sometimes run promotions to "celebrate the launch" of the token. On September 26, 2017, for example, when launching an ERC-20 token called "FUN," Binance "committed a total of 3,000,000 FUN tokens to reward customers worldwide."

**Fellow Binancians,**

Binance will add FUN/BTC and FUN/ETH trading pairs on 2017/09/28, 04:00 AM (UTC). You can start depositing FUN here now.

To celebrate the launch, Binance and FunFair have committed a total of 3,000,000 FUN to reward customers worldwide. The reward program will be made available as part of the listing of FUN on Binance, according to the following structure:

**Top FUN Holding Leaderboard Reward Program**

1. Bounty 1 (6 spots) -

| | |
|---|---|
| 1st Place | 300,000 FUN Token |
| 2nd Place | 200,000 FUN Token |
| 3rd Place | 200,000 FUN Token |
| 4th Place | 100,000 FUN Token |
| 5th Place | 100,000 FUN Token |
| 6th Place | 100,000 FUN Token |

2. Bounty 2 (200 spots) -

10,000 FUN tokens per user for the 7th to 206th users with the highest FUN balance at end of program .

3. Program Period:

Program ends  2017/10/01 04:00 AM (UTC).

133.    Just a few months after this announcement, the price of FUN token went from about 2 cents per token up to 20 cents per token, a 10X increase in trading value. Unfortunately for many

investors, by January 2019, the price of a FUN token had collapsed to less than half a cent per token:



134.    Binance would also use its Twitter account to encourage users to purchase the Tokens through its exchange. For example, on July 26, 2017, Binance announced through its Twitter account that it would list EOS, among other digital tokens:



135.    Binance also announced through its Twitter account the launch of TRX and OMG:





136.    Binance would also use its Twitter account continuously to drive users to trade the

Tokens on its exchange after it listed them:







44



137.    Defendant Changpeng Zhao, Binance's CEO, also used his Twitter accounts to solicit users to purchase Tokens on the Binance exchange:





138.    In addition to bringing issuers and investors together by listing the Tokens and soliciting investors to transact in the Tokens, Binance took and takes other steps to facilitate trades in the Tokens. Binance: (i) allows investors to exchange traditional (or fiat) currencies for crypto-assets through their credit or debit cards or through supported third-party services, (ii) maintains custody of the crypto-assets in each investor's wallets, (iii) answers transaction-related questions through the website's FAQ section and support messaging center, (iv) suggests crypto-assets to explore transacting in via emails to investors and posts by Binance Research, its market-research arm, and (v) allow users to invest in Tokens and earn an annualized interest rate on their investment in such Tokens. Binance also buys and sells crypto-assets for its own account in order to maintain its Bitcoin reserves.

139.    Binance profited handsomely from listing the Tokens on its platform. In addition to receiving fees for each transaction performed on its exchange, Binance received large cash payments from Issuers seeking to have their tokens listed. These fees often exceeded $1 million per listing. These base listing fees, however, pale in comparison to the commissions Binance received: approximately 0.1% of the value of each transaction executed on its exchange from each

transacting party. Given that Binance's average daily trading volume in September 2020 is over $11 billion, of which over $7.4 billion was subject to Binance's percentage fee, this usage calculates to *daily* revenues for Binance of approximately $14.8 million.

### H.     The Tokens Are Securities

140.     In 2019, the SEC clarified, with the benefit of labor-intensive research and investigations, that the Tokens were securities. On April 3, 2019, the SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."

141.     Among the most significant statements therein is the SEC's description of how to analyze the various facts surrounding ICOs in determining whether a given digital asset (including an ERC-20 token) is a security. Under application of the Framework, the Tokens were securities at issuance.

142.     In the Framework, the SEC cautioned potential issuers: "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply." The SEC explained the basics of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution

of any digital asset will need to analyze the relevant transactions to
determine if the federal securities laws apply.

Investors who bought the Tokens invested money or other valuable consideration, such as bitcoin
and ether, in a common enterprise—the Issuers. Investors had a reasonable expectation of profit
based upon the efforts of the Issuers, including, among other things, the Issuers obtaining listing
of their ERC-20 tokens on crypto-asset exchanges such as Binance. Indeed, the SEC states in the
Framework, "Based on our experiences to date, investments in digital assets have constituted
investments in a common enterprise because the fortunes of digital asset purchasers have been
linked to each other or to the success of the promoter's efforts."

143.    In the Framework, the SEC expressly recognized that the purpose of the federal
securities laws is to reduce the significant information asymmetries that exist between sellers and
purchasers of securities, including digital assets. At the outset of its Framework, referring to the
promoter's efforts, the SEC observes:

> Absent the disclosures required by law about those efforts and the
> progress and prospects of the enterprise, significant informational
> asymmetries may exist between the management and promoters of
> the enterprise on the one hand and investors and prospective
> investors on the other hand. The reduction of these information
> asymmetries through required disclosures protects investors and is
> one of the primary purposes of the federal securities laws.

144.    Given these information asymmetries, the reasonable inference at the Tokens'
issuances was that the Tokens were not securities. However, the reasonable inference from the
SEC's more fully developed April 2019 Framework was that under the relevant facts (many of
which a reasonable investor did not possess, but was left to infer), the Tokens *are* securities.

### a. ERC-20 Investors Invested Money

145.    Investors in ERC-20 tokens made an investment of money or other valuable
consideration for purposes of *Howey*. The SEC Framework states: "The first prong of the *Howey*

test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

146.    Investors invested traditional and other digital currencies, such as bitcoin and ether, to purchase the Tokens. The Tokens were listed on Binance, and Binance permitted investors to purchase ICOs with bitcoin and ether.

### b. ERC-20 Investors Participated In A Common Enterprise

147.    The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

148.    The Tokens are no different. Investors were passive participants in the Tokens' ICOs and the profits of each investor were intertwined with those of the Issuers and of other investors. Issuers typically conceded in their whitepapers that they sold Tokens in order to fund their operations and promote their networks and thereby increase the value of the issued ERC-20 tokens. Issuers typically were responsible for supporting the Tokens, pooled investors' assets, and controlled those assets. Issuers would also typically hold a significant stake in the Tokens, and thus shared in the profits and risk of the project.

149.    For example, promoters of the EOS token described the proceeds of their ICO as "revenue" they would use to "offer[] developers and entrepreneurs the funding they need to create community driven business leveraging EOSIO software." That money, in return, "will be returned value for the network." For the other Tokens as well, investors participated in a common enterprise by purchasing the Tokens.

### c. Investors Purchased The Tokens With A Reasonable Expectation Of Profits From Owning Them

150.    As to "reasonable expectation of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

151.    Investors in the Tokens, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits. The Tokens were sold to investors prior to a network or "ecosystem" being fully developed on which they could be used. For pre-functional tokens, such as the Tokens at issue in this Third Amended Complaint, the primary purpose for purchasing such Tokens was to make a profit, rather than to utilize the Tokens themselves for a task.

152.    Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise"), the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security. In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets, thereby satisfy the *Howey* test:

> The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:
>
> - The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
>
>   o   The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.
>
>   o   This also can be the case where the digital asset gives the holder rights to dividends or distributions.

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

  o The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

  o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

  o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

51

- The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

- The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

- The ready transferability of the digital asset is a key selling feature.

- The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

- The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

153. The SEC Framework clarifies that investors purchased the Tokens with a reasonable expectation of profits.

154. For example, the "ready transferability of the" Tokens was promoted by Issuers as a "key selling feature." Indeed, the Issuer of the QSP token, Quantstamp, emphasized the transferability of QSP tokens on the secondary market of crypto-asset exchanges, for example retweeting when major exchanges announced the listing of QSP tokens just a day after the end of the QSP ICO:





155.    The Tokens also "emphasized" the "potential appreciation in the value of the digital asset" in their marketing materials. The Issuer of the TRX token, TRON, stated in its whitepaper: "Through TRON's official token, TRX, users can easily achieve value distribution, payment, and settlement of content." A whitepaper also stated that because of TRON's model "community members will be encouraged to hold TRX for a long term, which will maximize the long-term value of TRON. TRON echoed these promises of profit in its social media presence. On October 2, 2017, for example, TRON retweeted its founder Justin Sun's statement that TRX was now a top 57 cryptocurrency, adding that the token was headed "[t]o the moon!"

156.    The Tokens were not described as "delivering currently available goods or services for use on an existing network," but rather explained as raising capital necessary "to build a business or operation." The whitepaper for the aelf Token (ELF), for example, promised to bring about "the next phase" and a "new paradigm" of blockchain technology, and acknowledged that "[b]uilding an ecosystem requires a large amount of capital," including "the funds raised during

the Token sale." Under the SEC's April 2019 Framework, the Tokens were securities under federal and state securities laws.

### d. Investors Expected Profits From The Tokens To Be Derived From The Managerial Efforts Of Issuers

157.    The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

158.    Investors' profits in the Tokens were to be derived from the managerial efforts of others—specifically the Issuers, their co-founders, and their development teams. ERC-20 investors relied on the managerial and entrepreneurial efforts of the Issuers and their executive and development teams to manage and develop the projects funded by the Tokens' ICOs.

159.    Issuers' executive teams typically held themselves out to investors as experts in the blockchain and crypto field. Investors in the Tokens reasonably expected the Issuers' development teams to provide significant managerial efforts after the Tokens' launch.

160.    On July 11, 2018, for example, Zhao explained that the team behind a particular token is a fundamental factor to the success of a project and that Binance actually considers the team in determining which coins to list: "It's kind of hard to tell if they're going to do the right thing or the wrong thing. But a team with a good history tends to carry on."

161.    The SEC explained in its April 2019 Framework, further underlining the depth of study the agency had devoted to the matter over the years and the complexity of such legal analysis from the perspective of a reasonable investor, that the more of the following characteristics that

are present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An ["Active Participant" or "AP"] is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

  o Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

  o Determining who will receive additional digital assets and under what conditions.

  o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

  o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

  o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

  o The AP has the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

  o The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

  o The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

  o The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

162. Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further:

> Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  o This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

  o If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services. Relevant factors may include:

  o There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

  o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

  o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

57

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

163.    Purchasers of pre-functional tokens necessarily rely on the managerial efforts of others to realize value from their investments. The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens. Each of the Tokens was a security at issuance because profit from the Tokens would be derived primarily from the managerial efforts of the Issuer teams developing the associated networks on which the Tokens would function, rather than having their profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

164.    This dependency, however, on the managerial efforts of the Issuer was not apparent at issuance to a reasonable investor. Considering the limited available information about how these Tokens were designed and intended to operate, if such an investor were even able to discern which of the relevant facts about the Tokens mattered, a reasonable investor lacked sufficient bases to conclude whether the Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop. In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the tokens she had acquired were securities. It was only after the passage of some significant amount of time, and only with more information about the Issuer's intent, process of management, and lack of success in allowing decentralization

to arise, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

165.    The EOS Token is a prime example. At the time of the EOS ICO, EOS had no functional software product available—instead, EOS told its investors it would use the proceeds of the ICO to develop the promised software, which would in turn make the Tokens more valuable to investors.

166.    Under the Framework, notwithstanding the complexity of the issue to a reasonable investor, the Tokens satisfied most if not all of the factors the SEC described as relevant to its determination that a digital asset is a security.

**I.    Each Token Is A Security**

    **a.    EOS**

167.    The EOS ICO has been widely reported as the largest ICO to date, having raised over $4 billion assets from the sale of unregistered EOS tokens from June 2017 through July 2018. EOS tokens have been listed on Binance since at least April 2018.

168.    EOS tokens were advertised as being an improvement on Bitcoin, Ethereum, and other crypto-assets. In addition to claiming EOS's technical superiority over other crypto-assets, EOS's issuer, Block.one, publicly stated that it would use the funds raised through the ICO to continue to enhance the EOS software and support the growth of the platform.

169.    In the EOS Token Purchase Agreement, the issuers of EOS tokens made the following representations concerning the development of EOSIO:

- MATTERS RELATING TO EOS.IO SOFTWARE AND EOS PLATFORM:

    1. block.one is developing the EOS.IO software (the "EOS.IO Software") as further described in the EOS.IO Technical White Paper (as it may be amended from time to time) (the "White Paper");

    2. at the end of its development stage, block.one will be releasing the EOS.IO Software it has developed under an open source software license;

170.    At the time of the EOS ICO, Block.one took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked. With promises that EOS would be better than other crypto-assets, many individuals were unaware that EOS tokens had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum. One of these primary differences is that all EOS tokens were issued by Block.one at creation at very little economic cost—and enormous potential upside—to the Block.one founders.

171.    The creation of EOS tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum. This would not have been apparent at issuance, however, to a reasonable investor. Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that EOS was something other than a security, when it was a security.

172.    Investors purchased EOS tokens with the reasonable expectation that they would make a profit.

173.    EOS token holders stood to share in potential profits from the successful launch of the EOS token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the EOS ecosystem.

174.    EOS tokens were described as a technologically superior version of the Bitcoin and Ethereum blockchains. The issuers' statements fueled speculation that EOS was the next "Ethereum or Bitcoin," with one commentator referring to EOS as "The Ethereum Killer."

175.    Investors' profits were to be derived from the managerial efforts of others— Block.one, its co-founders, and the Block.one development team. Investors in EOS relied on the managerial and entrepreneurial efforts of Block.one and its executive and development team to manage and develop the EOS software.

176.    Investors in EOS reasonably expected Block.one and Block.one's development team to provide significant managerial efforts after EOS's launch.

177.    The expertise of the issuers was critical in monitoring the operation of EOS, promoting EOS, and deploying investor funds. Investors had little choice but to rely on their expertise. The EOS protocol and governance structure were predetermined before the ICO was launched.

178.    Accordingly, under the SEC's Framework, the EOS token was a security.

179.    Indeed, on September 30, 2019, the SEC found that Block.one had violated the Securities Act through its unregistered sale of EOS to U.S. investors. Among the SEC's conclusions were the following:

- "A number of US investors participated in Block.one's ICO."

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws."

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

Block.one consented to a settlement whereby it would pay $24 million to the SEC.

180.    The SEC's September 30, 2019, settlement with Block.one reflected the SEC's "Framework" for analyzing whether digital assets, and in particular ERC-20 tokens, constitute securities. Consistent with that Framework, the SEC determined that EOS tokens are securities and that Block.one had violated the Securities Act by failing to register them.

181.    The SEC's determination that EOS was and is a security applies not only to EOS, but also to each of the other Tokens discussed herein.

182.    A recently published scholarly article found that after the ICOs of EOS and two other highly traded tokens, Tezos (XTZ) and XRP, "a large portion of on-chain traffic, including payment-related transactions, does not result in actual value transfer." The research demonstrates that the tokens' advertised uses at the time of launch, when whitepapers touted tokens' utility in a fully decentralized network of value transfer, did not come to pass. Investors, however, would not have known about tokens' lack of utility at the time of purchase, as this analysis was performed on data from the fourth quarter of 2019 and was not published until March 2020.[15]

---

[15] Daniel Perez, Jiahua Xu & Benjamin Livshits, *We Know What They've Been Put Through: Revisiting High-scalability Blockchain Transactions* (Mar. 5, 2020), *available at* https://www.scribd.com/document/461209594/2003-02693#download&from_embed

183.    As of May 10, 2024, the EOS token traded for approximately $0.818.

      **b.  Quantstamp (QSP)**

184.    The QSP ICO raised over $31 million in assets from the sale of unregistered QSP tokens over a period of time that extended from November 17 to November 19, 2017.

185.    After being distributed through the ICO, the issuer of QSP, Quantstamp, listed QSP tokens on Binance since at least November 21, 2017.

## Binance Lists QSP



Binance
2 years ago

**Fellow Binancians,**

QSP/BNB, QSP/BTC and QSP/ETH trading pairs are now available on Binance. You can start depositing and trading QSP now.

Details:

1.  About Quantstamp (QSP)
2.  Fees
3.  Rules

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make best efforts to choose high quality coins, but will not be responsible for your investment losses.

Thanks for your support!

Binance Team

2017/11/21

186.    In the months following the Binance listing, the price of the QSP Token skyrocketed from less than 20 cents to more than 76 cents per token:



187.    As of May 10, 2024, the QSP token traded for approximately $0.0018.

188.    Quantstamp's stated "goal is to create a permissionless and decentralized network much like Ethereum and Bitcoin." And Quantstamp's co-founder Steven Stewart has compared QSP tokens to other crypto-assets: "Ether is used for fueling token transfers and other state changes. We are committed to exclusively using QSP to fuel our protocol." Indeed, in the QSP whitepaper, Quantstamp represented to investors that "we are extending Ethereum with technology designed to ensure the security of smart contracts."

189.    In addition to comparing QSP tokens to other crypto-assets and characterizing Quantstamp as "extending Ethereum," Quantstamp publicly stated that it would use the funds raised through the ICO to continue to develop the Quantstamp protocol software.

190.    At the time of the QSP ICO, Quantstamp took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked. With comparisons to other crypto-assets, many individuals were unaware that QSP tokens had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum. One

of these primary differences is that all QSP tokens were issued by Quantstamp at creation at very little economic cost—and enormous potential upside—to the Quantstamp founders.

191.    The creation of QSP tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which QSP tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that QSP was something other than a security, when it was a security.

192.    And the QSP whitepaper explicitly stated that the QSP tokens were "not intended to constitute securities in any jurisdiction"—investors thus reasonably understood that QSP was not subject, at issuance, to U.S. securities laws.

193.    Investors purchased QSP tokens with the reasonable expectation that they would make a profit.

194.    QSP token holders stood to share in potential profits from the successful launch of the QSP token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the Quantstamp ecosystem.

195.    The QSP whitepaper speculated that Quantstamp expected "every Ethereum smart contract to use the Quantstamp protocol to perform a security audit because security is essential." Quantstamp represented that since contract creators would "pay QSP tokens to get their smart contract verified," then as "the number of smart contracts grows exponentially, we expect demand from Contract Creators to grow commensurately." Quantstamp's statements fueled speculation

that "[t]here is a very large potential for [Quantstamp co-founder] Richard [Ma] to lead the product to a 9 or 10 figure value in a very short time frame …. The ICO valuation offers outstanding value given the massive and probable growth they have planned." And investors were participating in a common enterprise with Quantstamp, since any profits were intertwined with the success of Quantstamp and other investors.

196.    Investors' profits were to be derived from the managerial efforts of others—Quantstamp, its co-founders, and the Quantstamp development team. The QSP whitepaper advertises on its cover page that the Quantstamp "team is made of [sic] up of software testing experts who collectively have over 500 Google Scholar citations." Investors in QSP relied on the managerial and entrepreneurial efforts of Quantstamp and its executive and development team to manage and develop the Quantstamp protocol software.

197.    Investors in QSP reasonably expected Quantstamp and Quantstamp's development team to provide significant managerial efforts after QSP's launch.

198.    The expertise of the issuers was critical in monitoring the operation of QSP, promoting QSP, and deploying investor funds. Investors had little choice but to rely on their expertise.

199.    Accordingly, under the SEC's Framework, the QSP token was and is a security.

200.    Indeed, on July 31, 2023, the SEC found that Quantstamp violated the Securities Act through its unregistered sale of QSP to U.S. investors. Among the SEC's conclusions were the following:

- "Quantstamp sold the QSP tokens to U.S. and non-U.S. investors as part of the same offering and agreed to provide the same QSP tokens to all purchasers."

- "Quantstamp offered and sold the QSP tokens as investment contracts, and therefore securities, pursuant to *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and its progeny, including the cases discussed by the Commission in its *Report of*

*Investigation Pursuant To Section 21(a) of the Securities Exchange Act of 1934: The DAO* (Exchange Act Rel. No. 81207) (July 25, 2017)."

- Because "[n]o registration statement was in effect for Quantstamp's offers and sales of QSP, nor were any exemptions from registration available[,] … Quantstamp violated Sections 5(a) and 5(c) of the Securities Act."

Quantstamp consented to a settlement whereby it would approximately $3.5 million to the SEC.

201.    The SEC's determination that QSP was and is a security applies not only to QSP, but also to each of the other Tokens discussed herein.

### c. TRON (TRX)

202.    The TRX ICO was offered and promoted on Binance starting on August 24, 2017, and 35 percent of unregistered TRX tokens were sold through the ICO, raising $70 million over a three-day period.

203.    On August 24, 2017, TRX's issuer, TRON promoted the TRX ICO on Binance:

## Binance Will Launch 1.9 Billion TRX ICO Today (BTC and ETH Session)

 Binance
3 years ago

**Dear community,**

We will launch 1.9 billion TRX ICO ( BTC and ETH session) on Binance exchange at 8PM. Aug 24, 2017 (Beijing Time).

**The details for TRX ICO session:**

1. Token name: TRX;
2. ICO ammount of BNB session: 1,900,000,000 TRX;
3. Support market: BTC(1 billion), ETH (900 million);
4. Exchange rate: 1 TRX = 0.00000038 BTC; 1 TRX ≈ 0.00000488 ETH;
5. ICO time: 8PM. 2017/08/24 - 8PM. 2017/08/31 (Beijing Time);
6. Sale type: first come first served basis. at the Bitcoin Price and Ethereum Price stated on page at the time.

204.    In the months following the Binance listing, the price of the TRX token skyrocketed from less than 5 cents to more than 20 cents per token:



205.    As of May 10, 2024, the TRX token traded for approximately $0.126.

206.    In June 2017, TRON published the first version of the "TRON whitepaper." Casting the TRON protocol as an attempt to "heal the Internet," the whitepaper described the protocol as "the blockchain's entertainment system of free content, in which TRX, TRON's coin, is circulated." The whitepaper asserted that, through TRX, content providers would no longer need to pay high fees to centralized platforms such as Google Play and Apple's App Store.

207.    The TRON whitepaper stated that "TRX is not a security" and that "owning TRX does not mean that its owner has been afforded with the proprietary right, controlling right, and/or policy-making right regarding the TRON platform." The whitepaper identified potential "risks after supervisory regulations are formed." This disclaimer merely contemplated potential future regulations that could impact the status of the TRX offering, indicating the regulations did not apply at the time:

> Risks after supervisory regulations are formed: It cannot be denied that in the near future, supervisory regulations will be formed to restrain the fields of blockchain and electronic tokens. If supervisory and regulatory bodies perform a standard management over these fields, the electronic tokens purchased during the ICO period may be affected. The impacts include, but are not limited to, price and stability fluctuations and restraints.

On this basis, and the others described below, investors reasonably understood that TRX was not subject, at issuance, to U.S. securities laws.

208.    TRON promoted TRX as being similar to Bitcoin. The TRON whitepaper asserted, as examples, that its "distributed user registration mechanism is as secure as Bitcoin"; "the number of blocks generated per hour is automatically set by the system, which is similar to the Bitcoin network"; and "[s]imilar to Bitcoin," "[t]he [TRON] market is based on blockchain and trade in virtual currency." By contrast, TRON issued nearly all of the TRX tokens up front, at very little economic cost—and enormous potential upside—to TRON's founders.

209.    The creation of TRX tokens thus occurred through a centralized process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which TRX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that TRX was something other than a security, when it was a security.

210.    Investors purchased TRX tokens with the reasonable expectation that they would make a profit.

211.    TRX token holders stood to share in potential profits from the successful launch of the TRX token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the TRX ecosystem.

212.    Investors' profits were to be derived from the managerial efforts of others—the TRON Foundation, its co-founders, and the development team. Investors in TRX relied on the managerial and entrepreneurial efforts of the TRON Foundation and its executive and development team to manage and develop the TRX software.

213.    Investors in TRX reasonably expected the TRON Foundation and the TRON Foundation's development team to provide significant managerial efforts after TRX's launch.

214.    The expertise of the TRON Foundation was critical in monitoring the operation of TRX, promoting TRX, and deploying investor funds. Investors had little choice but to rely on their expertise. The TRX protocol and governance structure were predetermined before the ICO was launched.

215.    Accordingly, under the SEC's Framework, the TRX token was and is a security.

216.    Indeed, on March 22, 2023, the SEC filed an enforcement action, *SEC v. Sun et al.*, No. 23-cv-2433 (S.D.N.Y.), against the TRON Foundation and others for offering and selling TRX and another crypto-asset in violation of the Securities Act and Exchange Act. Among the SEC's allegations were the following:

- The defendants "offered and sold TRX … as [a] security[y] and were thus required to register those offers and sales with the SEC …. But they never did so."

- "TRX was offered and sold as a security, specifically as an investment contract."

- The defendants "offered and sold TRX in three types of unregistered securities transactions[.]"

217.    The SEC's determination that TRX was and is a security applies not only to TRX, but also to each of the other Tokens discussed herein.

### d. FunFair (FUN)

218.    The FunFair team sold approximately 33 percent of its unregistered FUN tokens to investors through its ICO beginning on September 26, 2017, raising $20 million over a two-day period.

219.    In June 2017, the "FunFair Team" published the "FunFair whitepaper." The FunFair team promoted itself as "revolutionizing the gaming industry by harnessing the power of the blockchain in the online gaming market." In its whitepaper, the FunFair Team announced that "FunFair's token, FUN, is the coin of the realm on the FunFair platform. It is the fundamental method of interacting with FunFair smart contracts: players make wagers, game makers and affiliates get paid and operators will receive profits, all in FUN."

220.    The FunFair whitepaper was silent as to the regulatory nature of FUN tokens. Instead, in its disclaimer, the FunFair whitepaper merely contemplated future regulatory action that could impact the tokens:

> The token economy is exciting and also incredibly innovative. Any tokens could be impacted by regulatory action, including restrictions on ownership, use or possession. Regulators or other circumstances may demand that the FUN mechanics be altered, in all or part. Therefore, we may revise mechanics to comply with regulatory requirements or other governmental or business obligations. Nevertheless, we believe our planned mechanics to be proper and likely in final version.

221.    In the same disclaimer, the FunFair Team wrote that "FUN tokens have no known potential uses outside of the FunFair platform ecosystem and are not permitted to be sold or otherwise traded on third-party exchanges."

222.    Notwithstanding the above, the FUN token ICO was offered and promoted on Binance:



223.   In the months following the Binance listing, the price of the FUN token skyrocketed from less than 4 cents to more than 17 cents per token:



224.    As of May 10, 2024, the FUN token traded for approximately $0.0052.

225.    At the time of the FUN ICO, FunFair took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked. Many individuals were unaware that FUN had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum. One of these primary differences is that all FUN were issued by FunFair at creation at very little economic cost—and enormous potential upside—to the FunFair founders.

226.    The creation of FUN tokens thus occurred through a centralized process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which FUN tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that FUN was something other than a security, when it was a security.

227.    Investors purchased FUN tokens with the reasonable expectation that they would make a profit.

228.    FUN token holders stood to share in potential profits from the successful launch of the FUN token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the FUN ecosystem.

229.    Investors' profits were to be derived from the managerial efforts of others—the FunFair Team, its co-founders, and its development team. Investors in FUN relied on the

managerial and entrepreneurial efforts of the FunFair Team and its executive and development team to manage and develop the FUN software.

230.    Investors in FUN reasonably expected the FunFair Team and its development team to provide significant managerial efforts after FUN's launch.

231.    The expertise of the FunFair Team was critical in monitoring the operation of FUN, promoting FUN, and deploying investor funds. Investors had little choice but to rely on their expertise. The FUN protocol and governance structure were predetermined before the ICO was launched.

232.    Accordingly, under the SEC's Framework, the FUN token was and is a security.

### e.  ICON (ICX)

233.    The ICON Foundation sold approximately 50 percent of its unregistered ICX Tokens to investors through its ICO, raising $42.7 million over a one-day period:



6.2.  Allocation



TOKEN ALLOCATION

- Expected allocation of the ICX Token are Token Sale 50%, Foundation 14%, Community Group & Strategy Partners 10%, Team, Advisors & Early Contributors 10%, and Reserve 16%.

234.    In August 2017, the ICON Foundation published the "ICON whitepaper." The whitepaper outlined the "vision and philosophy of the ICON Project," which was to "to introduce the new era of decentralization by redefining the meaning of communities and creating a new

world by connecting such communities." The whitepaper elaborated that "ICON is not limited to the real world, but it directly connects and communicates with the crypto world creating the most robust network that can scale without limits." As part of this system, the ICON Foundation announced the "ICT Token," which it described as "a loopchain-based smart contract digital protocol that facilitates, verifies, and enacts a negotiated agreement between consenting parties within ICON."

235.    The ICON whitepaper was silent as to the regulatory nature of ICX tokens. Instead, the whitepaper asserted that the ICON network was comprised of different "communities," just like "governments, schools, e-commerce platform, healthcare, Bitcoin, and Ethereum." Investors thus reasonably understood that ICX was not subject, at issuance, to U.S. securities laws.

236.    On December 18, 2017, Binance listed the ICX token:

## Binance Lists ICON (ICX)

 Binance
2 years ago

**Fellow Binancians,**

ICX/BNB, ICX/BTC and ICX/ETH trading pairs are now available on Binance. You can start depositing ICX now. We will open the trading of all pairs at 2017/12/18 5:10 AM (UTC).

Details:

1. About ICON (ICX)
2. Fees
3. Rules

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make best efforts to choose high quality coins, but will not be responsible for your investment losses.

Thanks for your support!

Binance Team

2017/12/18

237.    Less than a month after the Binance listing, the price of the ICX Token skyrocketed from less than $2 to more than $12 per token:



238.    As of May 10, 2024, the ICX token traded for approximately $0.23.

239.    At the time of the ICX ICO, ICON took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked. Many individuals were unaware that ICX had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum. One of these primary differences is that all ICX were issued by ICON at creation at very little economic cost—and enormous potential upside—to the ICON founders.

240.    The creation of ICX tokens thus occurred through a centralized process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which ICX tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that ICX was something other than a security, when it was a security.

241.    Investors purchased ICX tokens with the reasonable expectation that they would make a profit.

242.    ICX token holders stood to share in potential profits from the successful launch of the ICX token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the ICX ecosystem.

243.    Investors' profits were to be derived from the managerial efforts of others—the ICON Foundation, its co-founders, and the ICON development team. Investors in ICX relied on the managerial and entrepreneurial efforts of the ICON Foundation and its executive and development team to manage and develop the ICX software.

244.    Investors in ICX reasonably expected the ICON Foundation and its development team to provide significant managerial efforts after ICX's launch.

245.    The expertise of the ICON Foundation was critical in monitoring the operation of ICX, promoting ICX, and deploying investor funds. Investors had little choice but to rely on their expertise. The ICX protocol and governance structure were predetermined before the ICO was launched.

246.    Accordingly, under the SEC's Framework, the ICX token was and is a security.

### f.    OmiseGO (OMG)

247.    OmiseGO sold approximately 65 percent of its unregistered OMG Tokens to investors through its ICO on September 9, 2017, raising $25 million over a one-day period.

248.    In June 2017, OmiseGO published the "OmiseGO whitepaper." The OMG whitepaper asserted that OmiseGO was building a "decentralized exchange, liquidity provider mechanism, clearinghouse messaging network, and asset-backed blockchain gateway." As part of this system, OmiseGO announced the OMG token. According to the whitepaper, "[o]wning OMG tokens buys the right to validate this blockchain, within its consensus rules."

249.    The OMG whitepaper was silent as to the regulatory nature of OMG tokens. Instead, the whitepaper discussed, at length, "Bitcoin and Bitcoin-like systems" and how OMG would serve as a "clearinghouse" for these type of assets. The whitepaper provided an example of this use case where "Alice sells [bitcoin] for [ether] and Bob buys [bitcoin] for [ether], the trade is now cleared on the OMG chain."

250.    On September 9, 2017, Binance listed the OMG token:

## Binance Will List OMG Market


Binance
3 years ago

**Fellow Binancians,**

We will add OMG/BTC, OMG/ETH trading pairs on Binance exchange on 2017/09/12 12:00 (Beijing Time).  You can start to deposit OMG here.

Details:

1. About OmiseGO (OMG)
2. Fees
3. Rule

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make our best effort to choose high quality coins, but will not be responsible for your investment losses.

Thank you for your support!

Binance Team

2017/09/09

251.    In the months following the Binance listing, the price of the OMG Token skyrocketed from less than $10 to more than $25 per token:



252.    As of May 10, 2024, the OMG token traded for approximately $0.674.

253.    At the time of the OMG ICO, OmiseGO took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked. Many individuals were unaware that OMG had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum. One of these primary differences is that all OMG were issued by OmiseGO at creation at very little economic cost—and enormous potential upside—to the OmiseGO founders.

254.    The creation of OMG tokens thus occurred through a centralized process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which OMG tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were

79

thereby misled into believing that OMG was something other than a security, when it was a security.

255.    Investors purchased OMG tokens with the reasonable expectation that they would make a profit.

256.    OmiseGO token holders stood to share in potential profits from the successful launch of the OMG token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the OMG ecosystem.

257.    Investors' profits were to be derived from the managerial efforts of others—OmiseGO, its co-founders, and OmiseGO development team. Investors in OMG relied on the managerial and entrepreneurial efforts of OmiseGO and its executive and development team to manage and develop the OMG software.

258.    Investors in OMG reasonably expected OmiseGO and its development team to provide significant managerial efforts after OMG's launch.

259.    The expertise of OmiseGO was critical in monitoring the operation of OMG, promoting OMG, and deploying investor funds. Investors had little choice but to rely on their expertise. The OMG protocol and governance structure were predetermined before OMG was launched.

260.    Accordingly, under the SEC's Framework, the OMG token was and is a security.

261.    Indeed, on November 20, 2023, the SEC filed an enforcement action, *SEC v. Payward, Inc. et al.*, No. 23-cv-6003 (N.D. Cal.), against a group of defendants collectively doing business under the name "Kraken" for operating an unregistered broker-dealer of crypto assets in violation of the Exchange Act. The SEC alleged that Kraken made available on its platform crypto assets that were offered as investment contracts and were thus securities. One such crypto asset

was OMG. The SEC's complaint alleged "[f]rom the time of its offering and continuing throughout the Relevant Period, OMG was offered and sold as an investment contract and is therefore a security."

262.    The SEC's determination that OMG was and is a security applies not only to OMG, but also to each of the other Tokens discussed herein.

### g.  aelf (ELF)

263.    In December 2017, aelf sold 25 percent of its unregistered ELF tokens to investors through private placement, raising $25 million.

264.    In November 2017, aelf published the "aelf whitepaper." The whitepaper "envision[ed] aelf as a highly efficient and customizable OS and [that would] l become the 'Linux system' in [the] Blockchain community." As part of this system, alef announced the ELF token. According to the whitepaper, "[ELF] Token holders have the greatest right in the future of aelf, and token holders' interests are linked with the destiny of aelf, in particular those with long-term locked-in tokens in particular."

265.    The aelf whitepaper was silent as to the regulatory nature of ELF tokens. Instead, the whitepaper discussed, at length, how governance structures for crypto-assets like Bitcoin were "not well defined when [they were] created." aelf insisted that its governance structure represented an improvement over cryptocurrencies like Bitcoin and Ethereum because "vital decisions [in aelf] will be carried out through a mechanism that resembles *representative democracy*." (Emphasis added.)

266.    On December 21, 2017, Binance listed the ELF token:

## Binance Lists ælf (ELF)

 Binance
2 years ago

**Fellow Binancians,**

ELF/BTC and ELF/ETH trading pairs are now available on Binance for trading. You can start depositing and trading ELF now.

Details:

1. About ælf (ELF)
2. Fees
3. Rules

Risk warning: cryptocurrency investment is subject to high market risk. Please make your investments cautiously. Binance will make best efforts to choose high quality coins, but will not be responsible for your investment losses.

Thanks for your support!

Binance Team

2017/12/21

267.    In the month following the Binance listing, the price of the ELF Token skyrocketed from less than $1 to more than $2.50 per token:



268.    As of May 10, 2024, the ELF token traded for approximately $0.552.

269.    At the time of the ELF ICO, aelf took advantage of the market's lack of understanding and awareness concerning how crypto-assets worked. Many individuals were unaware that ELF had fundamentally different features than other crypto-assets, including being more centralized than Bitcoin or Ethereum. One of these primary differences is that all ELF were issued by aelf at creation at very little economic cost—and enormous potential upside—to the aelf founders.

270.    The creation of ELF tokens thus occurred through a centralized process, in contrast to Bitcoin and Ethereum, which increase through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Although the centralized process by which ELF tokens were created is relevant for determining that they are securities, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success, or lack thereof, in allowing decentralization in its network to arise that a reasonable purchaser could know that he or she had acquired a security. Purchasers were thereby misled into believing that ELF was something other than a security, when it was a security.

271.    Investors purchased ELF tokens with the reasonable expectation that they would make a profit.

272.    The aelf token holders stood to share in potential profits from the successful launch of the ELF token. A reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the ELF ecosystem.

273.    Investors' profits were to be derived from the managerial efforts of others—aelf, its co-founders, and aelf's development team. Investors in ELF relied on the managerial and entrepreneurial efforts of aelf and its executive and development team to manage and develop the ELF software.

274.    Investors in ELF reasonably expected aelf and its development team to provide significant managerial efforts after ELF's launch.

275.    The expertise of aelf was critical in monitoring the operation of ELF, promoting ELF, and deploying investor funds. Investors had little choice but to rely on their expertise. The ELF protocol and governance structure were predetermined before ELF was launched.

276.    Accordingly, under the SEC's Framework, the ELF token was and is a security.

**J.    The Class Has Suffered Significant Damages From Defendants' Actions**

277.    As a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiffs and members of the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the Tokens—have suffered significant damages in an amount to be proven at trial.

278.    The Tokens today are worth far less than the price Plaintiffs and members of the Class paid for them.

279.    To the extent Plaintiffs and members of the Class still hold any Tokens, they hereby demand rescission and make any necessary tender of the Tokens.

**V.    CLASS ALLEGATIONS**

280.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the following two Subclasses (together, the "Class"):

- Subclass 1: All persons, including Plaintiff Anderson, who purchased on the Binance exchange any of the Tokens to the fullest extent subject to the U.S. securities laws, between July 1, 2017 and Binance's February 20, 2019 purported imposition of an arbitration clause for the first time and were harmed thereby.

- Subclass 2: All persons who purchased on the Binance exchange any of the Tokens to the fullest extent subject to the U.S. securities laws, on or after February 20, 2019, when Binance purported to impose an unenforceable arbitration clause and the present and were harmed thereby.

281.    Accordingly, the Class Period is July 1, 2017 through the present.

282.    Excluded from the Class and Subclasses are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

283.    Plaintiffs reserve the right to amend the Class and Subclass definitions if investigation or discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

284.    The members of the Class and Subclasses are so numerous that joinder of all members is impracticable. The precise number of Class and Subclass members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

285.    Members of the Class and Subclasses are readily ascertainable and identifiable. Members of the Class and Subclasses may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or its agents. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

286.    Plaintiffs' claims are typical of the claims of the Class and Subclass members as all Class and Subclass members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein. Plaintiffs do not have any interest that is in conflict with the interests of the members of the Class or the Subclasses.

287.    Plaintiffs and members of the Class and Subclasses sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

288.    Plaintiffs have fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and Subclasses and have retained

counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to those of the Class and Subclasses.

289.    Plaintiffs seek declaratory relief for themselves and the Class and Subclasses, asking the Court to declare their purchase agreements with Binance void, such that prosecuting separate actions by or against individual members of the Class and Subclasses would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and Subclasses that would establish incompatible standards of conduct for Binance; and Binance has acted on grounds that apply generally to the Class and Subclasses, so that the declaratory relief is appropriate respecting the class as a whole.

290.    Common questions and answers of law and fact exist as to all members of the Class and Subclasses and predominate over any questions solely affecting individual members of the Class and Subclasses, including but not limited to the following:

- Whether the Tokens are securities under federal and state law;

- Whether Binance operated as an unregistered broker-dealer;

- Whether Binance offered or sold the Tokens to members of the Class and Subclasses;

- Whether the members of the Class and Subclasses suffered damages as a result of Defendants' conduct in violation of federal and state law; and

- Whether the Class and Subclass members are entitled to rescissory damages.

291.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by some of the individual Class and Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class and Subclasses to individually redress the wrongs done to them.

292.    There will be no difficulty in the management of this action as a class action.

## VI.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION
(SECURITIES ACT – PRIMARY LIABILITY)
Unregistered Offer and Sale of Securities
Sections 5 and 12(a)(1) of the Securities Act
(Binance)**

293.    Plaintiffs reallege the allegations above.

294.    Plaintiffs bring this Cause of Action as to EOS and TRX (each a "Federal Claim Token").

295.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

296.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id*. § 77e(c).

297.    All Federal Claims Tokens are, and at all relevant times have been, securities within the meaning of Section 2(a)(1) of the Securities Act. *Id.* § 77b(a)(1). No registration statements

have been filed with the SEC or have been in effect with respect to any of the Federal Claims Tokens listed on the Binance exchange.

298.    Throughout the Class Period, Binance promoted, solicited and sold Federal Claims Tokens to Plaintiffs and members of the Class. Because of the structure of the Binance exchange, Binance in privity in every sale of a Federal Claims Token, including those by Plaintiffs and Class members. Customers on Binance transact solely with Binance itself, and Binance is thus a seller of the Federal Claims Tokens.

299.    In addition, by offering Federal Claims Tokens to Plaintiffs and members of the Class, Binance solicited these purchases by providing real-time pricing information, and in doing so was motivated at least in part by a desire to serve its own financial interests or the financial interests of owners of Federal Claims Tokens for sale on the Binance exchange. Binance received a direct financial benefit, in the form of transaction fees, from each purchase of Federal Claims Tokens on the Binance exchange. Binance further benefit from purchases of Federal Claims Tokens on Binance because such purchases support a liquid trading market for Federal Claims Tokens, which in turn makes the Binance exchange more attractive to investors and issuers.

300.    Binance thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

301.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title … shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security

with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id*. § 77*l*(a)(1).

302.    Accordingly, Binance has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id*. §§ 77e(a), 77e(c), and 77*l*(a)(1).

303.    Plaintiffs and Class members who own the Federal Claims Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Federal Claims Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest. *Id*. § 77m.

304.    Plaintiffs and Class members who no longer own the Federal Claims Tokens seek damages for any Federal Claims Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest. *Id*.

**SECOND CAUSE OF ACTION**
**(SECURITIES ACT – ADDITIONAL LIABILITY)**
**Control Person Liability for Violations of the Securities Act**
**Section 15 of the Securities Act**
**(Changpeng Zhao)**

305.    Plaintiffs reallege the allegations above.

306.    This Count is asserted against Changpeng Zhao for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

307.    Section 15 of the Securities Act provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable

ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." Id. § 77o(a).

308.    As CEO and founder of Binance, Zhao had the power and authority to direct the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Zhao, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Binance.

309.    Zhao purposefully exercised his power and influence to cause Binance to violate the Securities Act as described herein, including by directing Binance to sell unregistered Federal Claims Tokens to Plaintiffs and members of the Class in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), 77*l*(a)(1). Binance is liable under section 12(a)(1) of the Securities Act, *id.* § 77*l*(a)(1), for its violations of the Securities Act.

310.    At the time of the wrongs alleged herein, Zhao had sufficient influence to cause Binance to refrain from promoting, soliciting, offering, and selling unregistered securities in violation of the Securities Act. Zhao purposefully decided not to do so.

311.    Zhao knowingly and culpably participated in, and/or aided and abetted, Binance's violations of the Securities Act alleged herein. Zhao had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Binance's liability under Section 12(a)(1) of the Securities Act.

312.    Accordingly, Zhao is jointly and severally liable for the violations of the Securities Act by Binance complained of herein and is liable to Plaintiffs and the Class for damages, inclusive of transaction fees, as to each transaction in which any Federal Claims Token purchased in the Class Period was subsequently sold at a loss. *See id.* § 77*l*(a)(1).

### THIRD CAUSE OF ACTION
### (CALIFORNIA STATE LAW – PRIMARY LIABILITY)
### Unqualified Offer or Sale of Securities
### Cal. Corp. Code § 25503
### (Binance)

313.    Plaintiffs reallege the allegations above.

314.    This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in California.

315.    The California Corporate Securities Law of 1968 ("California Securities Act") forbids the offer or sale of unqualified securities. Cal Corp. Code §§ 25110, 25130. Any person who offers or sells a security in violation of Sections 25110 or 25130 are "liable to any person acquiring from him the security sold in violation of such section, who may sue to recover the consideration he paid for such security with interest thereon at the legal rate, less the amount of any income received therefrom, upon the tender of such security, or for damages, if he no longer owns the security, or if the consideration given for the security is not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) his purchase price plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id.* § 25503.

316.    When issued, the Tokens were securities within the meaning of the California Securities Act. *Id.* § 25019. Binance offered or sold the Tokens to at least one Plaintiff in California. The Tokens were neither qualified under, nor subject to exemption from qualification under the California Securities Act. *Id.* §§ 25110, 25130.

317.    The Tokens were offered or sold in California, including without limitation through solicitations directed by Binance to California and received in California.

318.    Accordingly, Binance has violated the California Securities Act through Binance's sale of unqualified securities.

319.    The practices discussed above additionally constitute violations of at least the following state Blue Sky statutes:[16]

(a) **Alabama Securities Act**, Ala. Code § 8-6-19;

(b) **Alaska Securities Act**, AS § 45.56.710;

(c) **Arizona Securities Act**, A.R.S. § 44-2001;

(d) **Arkansas Securities Act**, Ark. Stat. Ann. § 23-42-106;

(e) **Colorado Securities Act**, Colo. Rev. Stat. § 11-51-604;

(f) **Connecticut Uniform Securities Act**, Conn. Gen. Stat. § 39b-29;

(g) **Delaware Securities Act**, Del. Code tit. 6, § 73-605;

(h) **District of Columbia Securities and Investor Protection Act**, D.C. Code Ann. § 31-5603.01;

(i) **Florida Securities and Investor Protection Act**, Fla. Stat. § 571.211;

(j) **Georgia Uniform Securities Act**, Ga. Code Ann. § 10-5-58;

(k) **Hawaii Uniform Securities Act**, HRS § 485A-509(d);

(l) **Idaho Uniform Securities Act**, I.C. § 30-14-509(b);

(m) **Illinois Securities Law of 1953**, 815 Ill. Comp. Stat. Ann. 5/13;

(n) **Indiana Uniform Securities Act**, Ind. Code § 23-19-5-9(a);

(o) **Iowa Uniform Securities Act**, I.C.A. § 502.509(2);

(p) **Kansas Uniform Securities Act**, Kan. Stat. Ann. § 17-12a509;

(q) **Securities Act of Kentucky**, Ky. Rev. Stat. Ann. § 292.480;

---

[16] There is no material conflict between these state statutes and the California Securities Act.

(r) **Louisiana Securities Law**, La. Stat. Ann. § 51:714;

(s) **Maine Uniform Securities Act**, Me. Rev. Stat. tit. 32, § 16509;

(t) **Maryland Securities Act**, Md. Code Ann., Corps. & Ass'ns § 11-703;

(u) **Massachusetts Securities Act**, Mass. Gen. Laws Ann. Ch. 110A, § 410(a);

(v) **Michigan Securities Act**, Mich. Comp. Laws Ann. § 451.2509;

(w) **Minnesota Securities Act**, Minn. Stat. § 80A.76(b);

(x) **Mississippi Securities Act**, Miss. Code Ann. § 75-71-509(b);

(y) **Missouri Securities Act**, Mo. Rev. Stat. § 409.509(b);

(z) **Montana Securities Act**, Mont. Code Ann. § 30-10-307(1);

(aa)    **Nebraska Securities Act**, Neb. Rev. Stat. § 8-1118(1);

(bb)    **New Hampshire Uniform Securities Act**, N.H. Rev. Stat. § 421-B:5-509(b);

(cc)    **New Jersey Uniform Securities Act**, NJ Stat. Ann. § 49:3-71(a), (c);

(dd)    **New Mexico Uniform Securities Act**, N.M. Stat. Ann. § 58-13C-509;

(ee)    **North Carolina Securities Act**, N.C. Gen. State. Ann. § 78A-56(a);

(ff) **North Dakota Securities Act**, N.D.C.C. § 10-04-17;

(gg)    **Ohio Securities Act**, Ohio Rev. Code Ann. § 1707.43;

(hh)    **Oklahoma Securities Act**, Okla. Stat. Ann. Tit. 71, § 1-509(C);

(ii) **Oregon Securities Act**, O.R.S. § 59:115;

(jj) **Pennsylvania Securities Act**, 70 Pa. Stat. Ann. § 1-502;

(kk)    **Puerto Rico Securities Act**, 10 L.P.R.A. § 890;

(ll) **Rhode Island Securities Act**, 7 R.I. Gen. Laws Ann. § 7-11-605;

(mm)   **South Carolina Securities Act**, S.C. Code Ann. § 35-1-509;

(nn)    **South Dakota Securities Act**, S.D. Codified Laws § 47-31B-509(b);

(oo)    **Tennessee Securities Act**, Tenn. Code Ann. § 48-1-122;

(pp)    **Utah Securities Act**, Utah Code § 61-1-22;

(qq)    **Vermont Securities Act**, Vt. Stat. Ann. Tit. 9, § 5509;

(rr) **Virginia Securities Act**, Va. Code Ann. § 13.1-522-A;

(ss) **Securities Act of Washington**, Wash. Rev. Code § 21.20.430(1);

(tt) **West Virginia Uniform Securities Act**, W. Va. Code Ann. § 32-4-410(a);

(uu)    **Wisconsin Uniform Securities Law**, Wis. Stat. § 551.509; and

(vv)    **Wyoming Uniform Securities Act**, Wyo. Stat. Ann. § 17-4-509(b).

320.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

321.    Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FOURTH CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unlicensed Broker-Dealer**
**Cal. Corp. Code § 25501.5(a)**
**(Binance)**

322.    Plaintiffs reallege the allegations above.

323.    This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in California.

324.    The California Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law. *Id*. § 25210. Any person who offers or sells a security in violation of Section 25210 is liable to the

purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. *Id.* § 25501.5(a)(1). Upon recission and tender of the Tokens, such purchaser is entitled to recover the consideration paid for the Tokens plus interest at the legal rate, less the amount of any income received on the Tokens. *Id.* § 25501.5(a)(2). A purchaser who no longer owns the Tokens is entitled to damages in an amount equal to the difference between: (i) the price at which the security was brought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the Tokens by the purchaser. *Id.* § 25501.5(a)(4).

325.    When issued, the Tokens were securities within the meaning of the California Securities Act. *Id.* § 25019. Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to at least one Plaintiff in California. *Id.* § 25004.

326.    Binance transacted business as a broker-dealer or agent in California, including without limitation through solicitations directed by Binance to California and received in California.

327.    Binance was not licensed as a broker-dealer or agent in California, nor was it subject to any exemption from licensing.

328.    Accordingly, Binance has violated the California Securities Act by transacting business as an unlicensed broker-dealer or agent in the sale of securities.

329.    The practices discussed above additionally constitute violations of at least the following state Blue Sky statutes: [17]

      (a) **Alabama Securities Act**, Ala. Code § 8-6-19;

      (b) **Alaska Securities Act**, AS § 45.56.710;

---

[17] There is no material conflict between these state statutes and the California Securities Act.

(c) **Arizona Securities Act**, A.R.S. §44-2001 ;

(d) **Arkansas Securities Act**, Ark. Stat. Ann. § 23-42-106;

(e) **Colorado Securities Act**, Colo Rev. Stat. § 11-51-604;

(f) **Connecticut Uniform Securities Act**, Conn. Gen. Stat. § 36b-29;

(g) **Delaware Securities Act**, Del. Code tit. 6, § 73-605;

(h) **District of Columbia Securities and Investor Protection Act**, D.C. Code Ann. § 31-5606.05;

(i) **Florida Securities and Investor Protection Act**, Fla. Stat. § 517.211

(j) **Georgia Uniform Securities Act**, Ga. Code Ann. § 10-5-58;

(k) **Hawaii Uniform Securities Act**, HRS § 485A-509(d);

(l) **Idaho Uniform Securities Act**, I.C. § 30-14-509(b);

(m) **Illinois Securities Law of 1953**, 815 Ill. Comp. Stat. Ann. 5/13;

(n) **Indiana Uniform Securities Act**, Ind. Code § 23-19-5-9(a);

(o) **Iowa Uniform Securities Act**, I.C.A. § 502.509(4);

(p) **Kansas Uniform Securities Act**, Kan. Stat. Ann. § 17-12a509;

(q) **Securities Act of Kentucky**, Ky. Rev. Stat. Ann. § 292.480;

(r) **Louisiana Securities Law**, La. Stat. Ann. § 51:714;

(s) **Maine Uniform Securities Act**, Me. Rev. Stat. tit. 32, § 16509;

(t) **Maryland Securities Act**, Md. Code Ann., Corps. & Ass'ns § 11-703;

(u) **Massachusetts Securities Act**, Mass. Gen. Laws Ann. Ch. 110A, § 401(a);

(v) **Michigan Securities Act**, Mich. Comp. Laws Ann. § 451.2509;

(w) **Minnesota Securities Act**, Minn. Stat. § 80A.76(d);

(x) **Mississippi Securities Act**, Miss. Code Ann. § 75-71-509(d);

(y) **Missouri Securities Act**, Mo. Rev. Stat. § 409.5-509(d);

(z) **Montana Securities Act**, Mont. Code Ann. § 30-10-307(1);

(aa)    **Nebraska Securities Act**, Neb. Rev. Stat. § 8-1118(1);

(bb)    **New Hampshire Uniform Securities Act**, N.H. Rev. Stat. § 421-B:5-509(d);

(cc)    **New Jersey Uniform Securities Act**, NJ Stat. Ann. § 49:3-71(a);

(dd)    **New Mexico Uniform Securities Act**, N.M. Stat. Ann. § 58-13C-509;

(ee)    **North Carolina Securities Act**, N.C. Gen. State. Ann. § 78A-36;

(ff) **North Dakota Securities Act**, N.D.C.C. § 10-04-17;

(gg)    **Ohio Securities Act**, Ohio Rev. Code Ann. § 1707.43;

(hh)    **Oklahoma Securities Act**, Okla. Stat. Ann. Tit. 71, § 1-509 (D);

(ii) **Oregon Securities Act**, O.R.S. § 59:115;

(jj) **Pennsylvania Securities Act**, 70 Pa. Stat. Ann. § 1-501(a);

(kk)    **Puerto Rico Securities Act**, 10 L.P.R.A. § 890;

(ll) **Rhode Island Securities Act**, 7 R.I. Gen. Laws Ann. § 7-11-605;

(mm)    **South Carolina Securities Act**, S.C. Code Ann. § 35-1-509;

(nn)    **South Dakota Securities Act**, S.D. Codified Laws § 47-31B-509(d);

(oo)    **Tennessee Securities Act**, Tenn. Code Ann. § 48-1-122;

(pp)    **Utah Securities Act**, Utah Code § 61-1-22;

(qq)    **Vermont Securities Act**, Vt. Stat. Ann. Tit. 9, § 5509;

(rr) **Virginia Securities Act**, Va. Code Ann. § 13.1-522 A;

(ss) **Securities Act of Washington**, Wash. Rev. Code § 21.20.430;

(tt) **West Virginia Uniform Securities Act**, W. Va. Code Ann. § 32-2-201;

(uu)    **Wisconsin Uniform Securities Law**, Wis. Stat. § 551.509; and

(vv)    **Wyoming Uniform Securities Act**, Wyo. Stat. Ann. § 17-4-509(d).

330.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

331.    Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTH CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Cal. Corp. Code § 25504**
**(Changpeng Zhao)**

332.    Plaintiffs reallege the allegations above.

333.    This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in California.

334.    Every person who directly or indirectly controls an entity liable under the California Securities Act for unlawfully selling unqualified securities, as well as "every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 25504.

335.    When issued, the Tokens were securities within the meaning of the California Securities Act. *Id.* § 25019. Binance offered and sold the Tokens to at least one Plaintiff in California. The Tokens were neither qualified under, nor subject to exemption from qualification

under the California Securities Act, and Binance was not licensed or exempt from licensing as a broker-dealer or agent under California law. *Id.* § 25210.

336.    Binance offered and sold the Tokens in California, including without limitation through solicitations directed by Binance to California and received in California.

337.    Changpeng Zhao, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Changpeng Zhao caused the unlawful offers or sales of unqualified securities.

338.    Accordingly, Changpeng Zhao, who directly or indirectly controlled Binance, has violated the California Securities Act through Binance's offer or sale of unqualified securities.

339.    The practices discussed above additionally constitute violations of at least the following state Blue Sky statutes: [18]

    (a) **Alabama Securities Act**, Ala. Code § 8-6-19;

    (b) **Alaska Securities Act**, AS § 45.56.710(g);

    (c) **Arizona Securities Act**, A.R.S. § 44-2003;

    (d) **Arkansas Securities Act**, Ark. Stat. Ann. § 23-42-106;

    (e) **Colorado Securities Act**, Colo. Rev. Stat. § 11-51-604;

    (f) **Connecticut Uniform Securities Act**, Conn. Gen. Stat. § 36b-29;

    (g) **Delaware Securities Act**, Del. Code tit. 6, § 73-605;

    (h) **District of Columbia Securities and Investor Protection Act**, D.C. Code Ann. § 31-5606.05;

---

[18] There is no material conflict between these state statutes and the California Securities Act.

(i)  **Florida Securities and Investor Protection Act**, Fla. Stat. § 517.211;

(j)  **Georgia Uniform Securities Act**, Ga. Code Ann. § 10-5-58;

(k)  **Hawaii Uniform Securities Act**, HRS § 485A-509(g);

(l)  **Idaho Uniform Securities Act**, I.C. § 30-14-509(g);

(m) **Illinois Securities Law of 1953**, 815 Ill. Comp. Stat. Ann. 5/13;

(n)  **Indiana Uniform Securities Act**, Ind. Code § 23-19-9(d);

(o)  **Iowa Uniform Securities Act**, I.C.A. § 502.509(7);

(p)  **Kansas Uniform Securities Act**, Kan. Stat. Ann. § 17-12a509;

(q)  **Securities Act of Kentucky**, Ky. Rev. Stat. Ann. § 292.480;

(r)  **Louisiana Securities Law**, La. Stat. Ann. § 51:714;

(s)  **Maine Uniform Securities Act**, Me. Rev. Stat. tit. 32, § 16509;

(t)  **Maryland Securities Act**, Md. Code Ann., Corps. & Ass'ns § 11-703;

(u)  **Massachusetts Securities Act**, Mass. Gen. Laws Ann. Ch. 110A, § 410(b);

(v)  **Michigan Securities Act**, Mich. Comp. Laws Ann. § 451.2509;

(w) **Minnesota Securities Act**, Minn. Stat. § 80A.76(g);

(x)  **Mississippi Securities Act**, Miss. Code Ann. § 75-71-509(g);

(y)  **Missouri Securities Act**, Mo. Rev. Stat. § 409.5-509(g);

(z)  **Montana Securities Act**, Mont. Code Ann. § 30-10-307(2);

(aa)   **Nebraska Securities Act**, Neb. Rev. Stat. § 8-1118(3);

(bb)   **New Hampshire Uniform Securities Act**, N.H. Rev. Stat. § 421-B:5-509(g);

(cc)   **New Jersey Uniform Securities Act**, NJ Stat. Ann. § 49:3-71(d);

(dd)   **New Mexico Uniform Securities Act**, N.M. Stat. Ann. § 58-13C-509;

(ee)     **North Carolina Securities Act**, N.C. Gen. State. Ann. § 78A-56(c);

(ff) **North Dakota Securities Act**, N.D.C.C. § 10-04-17;

(gg)     **Ohio Securities Act**, Ohio Rev. Code Ann. § 1707.43;

(hh)     **Oklahoma Securities Act**, Okla. Stat. Ann. Tit. 71, § 1-509 (G);

(ii) **Oregon Securities Act**, O.R.S. § 59:115 (3);

(jj) **Pennsylvania Securities Act**, 70 Pa. Stat. Ann. § 1-503;

(kk)     **Puerto Rico Securities Act**, 10 L.P.R.A. § 890;

(ll) **Rhode Island Securities Act**, 7 R.I. Gen. Laws Ann. § 7-11-605(d);

(mm)  **South Carolina Securities Act**, S.C. Code Ann. § 31-1-509;

(nn)     **South Dakota Securities Act**, S.D. Codified Laws § 47-31B-509;

(oo)     **Tennessee Securities Act**, Tenn. Code Ann. § 48-1-122(g);

(pp)     **Utah Securities Act**, Utah Code § 61-1-22;

(qq)     **Vermont Securities Act**, Vt. Stat. Ann. Tit. 9, § 5509;

(rr) **Virginia Securities Act**, Va. Code Ann. § 13.1-522 C;

(ss)**Securities Act of Washington**, Wash. Rev. Code § 21.20.430;

(tt) **West Virginia Uniform Securities Act**, W. Va. Code Ann. § 32-4-410;

(uu)     **Wisconsin Uniform Securities Law**, Wis. Stat. § 551.509; and

(vv)     **Wyoming Uniform Securities Act**, Wyo. Stat. Ann. § 17-4-509(g).

340.     Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

341.     Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTH CAUSE OF ACTION**
**(NEVADA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Nev. Stat. § 90.660(1)(b)**
**(Binance)**

342.    Plaintiffs reallege the allegations above.

343.    This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Nevada.

344.    The Nevada Securities Act forbids the offer or sale of unregistered securities. Nev. Stat. § 90.460. "A person who offers or sells a security in violation of" Neb. Rev. Stat. § 90.460 "is liable to the person purchasing the security." *Id.* § 90.660. "Upon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of [Nevada] from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security. A purchaser who no longer owns the security may recover damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of [Nevada] from the date of disposition of the security, costs and reasonable attorney's fees determined by the court." *Id.*

345.    When issued, the Tokens were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295. Binance offered or sold the Tokens to a Plaintiff in Nevada. The Tokens were neither registered under, nor subject to exemption from registration under the Nevada Securities Act. *Id.* § 90.460.

346.    The Tokens were offered or sold in Nevada, including without limitation through solicitations directed by Binance to Nevada and received in Nevada.

347.    Accordingly, Binance has violated the Nevada Securities Act through Binance's sale of unregistered securities.

348.    The practices discussed above additionally constitute violations of at least the following state Blue Sky statutes:[19]

(a) **Alabama Securities Act**, Ala. Code § 8-6-19;

(b) **Alaska Securities Act**, AS § 45.56.710;

(c) **Arizona Securities Act**, A.R.S. § 44-2001;

(d) **Arkansas Securities Act**, Ark. Stat. Ann. § 23-42-106;

(e) **Colorado Securities Act**, Colo. Rev. Stat. § 11-51-604;

(f) **Connecticut Uniform Securities Act**, Conn. Gen. Stat. § 39b-29;

(g) **Delaware Securities Act**, Del. Code tit. 6, § 73-605;

(h) **District of Columbia Securities and Investor Protection Act**, D.C. Code Ann. § 31-5603.01;

(i) **Florida Securities and Investor Protection Act**, Fla. Stat. § 571.211;

(j) **Georgia Uniform Securities Act**, Ga. Code Ann. § 10-5-58;

(k) **Hawaii Uniform Securities Act**, HRS § 485A-509(d);

(l) **Idaho Uniform Securities Act**, I.C. § 30-14-509(b);

(m) **Illinois Securities Law of 1953**, 815 Ill. Comp. Stat. Ann. 5/13;

(n) **Indiana Uniform Securities Act**, Ind. Code § 23-19-5-9(a);

(o) **Iowa Uniform Securities Act**, I.C.A. § 502.509(2);

(p) **Kansas Uniform Securities Act**, Kan. Stat. Ann. § 17-12a509;

(q) **Securities Act of Kentucky**, Ky. Rev. Stat. Ann. § 292.480;

(r) **Louisiana Securities Law**, La. Stat. Ann. § 51:714;

(s) **Maine Uniform Securities Act**, Me. Rev. Stat. tit. 32, § 16509;

---

[19] There is no material conflict between these state statutes and the California Securities Act.

(t)  **Maryland Securities Act**, Md. Code Ann., Corps. & Ass'ns § 11-703;

(u) **Massachusetts Securities Act**, Mass. Gen. Laws Ann. Ch. 110A, § 410(a);

(v) **Michigan Securities Act**, Mich. Comp. Laws Ann. § 451.2509;

(w) **Minnesota Securities Act**, Minn. Stat. § 80A.76(b);

(x) **Mississippi Securities Act**, Miss. Code Ann. § 75-71-509(b);

(y) **Missouri Securities Act**, Mo. Rev. Stat. § 409.509(b);

(z) **Montana Securities Act**, Mont. Code Ann. § 30-10-307(1);

(aa)  **Nebraska Securities Act**, Neb. Rev. Stat. § 8-1118(1);

(bb)  **New Hampshire Uniform Securities Act**, N.H. Rev. Stat. § 421-B:5-509(b);

(cc)  **New Jersey Uniform Securities Act**, NJ Stat. Ann. § 49:3-71(a), (c);

(dd)  **New Mexico Uniform Securities Act**, N.M. Stat. Ann. § 58-13C-509;

(ee)  **North Carolina Securities Act**, N.C. Gen. State. Ann. § 78A-56(a);

(ff) **North Dakota Securities Act**, N.D.C.C. § 10-04-17;

(gg)  **Ohio Securities Act**, Ohio Rev. Code Ann. § 1707.43;

(hh)  **Oklahoma Securities Act**, Okla. Stat. Ann. Tit. 71, § 1-509(C);

(ii) **Oregon Securities Act**, O.R.S. § 59:115;

(jj) **Pennsylvania Securities Act**, 70 Pa. Stat. Ann. § 1-502;

(kk)  **Puerto Rico Securities Act**, 10 L.P.R.A. § 890;

(ll) **Rhode Island Securities Act**, 7 R.I. Gen. Laws Ann. § 7-11-605;

(mm)  **South Carolina Securities Act**, S.C. Code Ann. § 35-1-509;

(nn)  **South Dakota Securities Act**, S.D. Codified Laws § 47-31B-509(b);

(oo)  **Tennessee Securities Act**, Tenn. Code Ann. § 48-1-122;

(pp)     **Utah Securities Act**, Utah Code § 61-1-22;

(qq)     **Vermont Securities Act**, Vt. Stat. Ann. Tit. 9, § 5509;

(rr) **Virginia Securities Act**, Va. Code Ann. § 13.1-522-A;

(ss)**Securities Act of Washington**, Wash. Rev. Code § 21.20.430(1);

(tt) **West Virginia Uniform Securities Act**, W. Va. Code Ann. § 32-4-410(a);

(uu)     **Wisconsin Uniform Securities Law**, Wis. Stat. § 551.509; and

(vv)     **Wyoming Uniform Securities Act**, Wyo. Stat. Ann. § 17-4-509(b).

349.     Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

350.     Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTH CAUSE OF ACTION**
**(NEVADA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Nev. Stat. § 90.660(1)(a)**
**(Binance)**

351.     Plaintiffs reallege the allegations above.

352.     This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Nevada.

353.     The Nevada Securities Act forbids any person from transacting business as a broker-dealer or sales representative unless the person is registered or exempt from registration under Nevada law. Nev. Stat. § 90.310(1). "A person who offers or sells a security in violation of … Subsection 1 of [Nevada Securities Act Section] 90.310 … is liable to the person purchasing the security," who "may recover the consideration paid for the security and interest at the legal

rate of [Nevada] from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security" or "[d]amages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of [Nevada] from the date of disposition of the security, costs and reasonable attorney's fees determined by the court." *Id.* § 90.660(1)(a).

354. When issued, the Tokens were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295. Binance transacted business as a broker-dealer or agent when it sold the Tokens to a Plaintiff in the state of Nevada. *Id.* §§ 90.220, 90.285.

355. Binance transacted business as a broker-dealer or agent in Nevada, including without limitation through solicitations directed by Binance to Nevada and received in Nevada.

356. Binance was not registered as a broker-dealer or agent in Nevada, nor was it subject to any exemption from registration.

357. Accordingly, Binance has violated the Nevada Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

358. The practices discussed above additionally constitute violations of at least the following state Blue Sky statutes: [20]

      (a) **Alabama Securities Act**, Ala. Code § 8-6-19;

      (b) **Alaska Securities Act**, AS § 45.56.710;

      (c) **Arizona Securities Act**, A.R.S. §44-2001 ;

      (d) **Arkansas Securities Act**, Ark. Stat. Ann. § 23-42-106;

      (e) **Colorado Securities Act**, Colo Rev. Stat. § 11-51-604;

      (f) **Connecticut Uniform Securities Act**, Conn. Gen. Stat. § 36b-29;

---

[20] There is no material conflict between these state statutes and the California Securities Act.

(g) **Delaware Securities Act**, Del. Code tit. 6, § 73-605;

(h) **District of Columbia Securities and Investor Protection Act**, D.C. Code Ann. § 31-5606.05;

(i) **Florida Securities and Investor Protection Act**, Fla. Stat. § 517.211

(j) **Georgia Uniform Securities Act**, Ga. Code Ann. § 10-5-58;

(k) **Hawaii Uniform Securities Act**, HRS § 485A-509(d);

(l) **Idaho Uniform Securities Act**, I.C. § 30-14-509(b);

(m) **Illinois Securities Law of 1953**, 815 Ill. Comp. Stat. Ann. 5/13;

(n) **Indiana Uniform Securities Act**, Ind. Code § 23-19-5-9(a);

(o) **Iowa Uniform Securities Act**, I.C.A. § 502.509(4);

(p) **Kansas Uniform Securities Act**, Kan. Stat. Ann. § 17-12a509;

(q) **Securities Act of Kentucky**, Ky. Rev. Stat. Ann. § 292.480;

(r) **Louisiana Securities Law**, La. Stat. Ann. § 51:714;

(s) **Maine Uniform Securities Act**, Me. Rev. Stat. tit. 32, § 16509;

(t) **Maryland Securities Act**, Md. Code Ann., Corps. & Ass'ns § 11-703;

(u) **Massachusetts Securities Act**, Mass. Gen. Laws Ann. Ch. 110A, § 401(a);

(v) **Michigan Securities Act**, Mich. Comp. Laws Ann. § 451.2509;

(w) **Minnesota Securities Act**, Minn. Stat. § 80A.76(d);

(x) **Mississippi Securities Act**, Miss. Code Ann. § 75-71-509(d);

(y) **Missouri Securities Act**, Mo. Rev. Stat. § 409.5-509(d);

(z) **Montana Securities Act**, Mont. Code Ann. § 30-10-307(1);

(aa) **Nebraska Securities Act**, Neb. Rev. Stat. § 8-1118(1);

(bb)   **New Hampshire Uniform Securities Act**, N.H. Rev. Stat. § 421-B:5-509(d);

(cc)   **New Jersey Uniform Securities Act**, NJ Stat. Ann. § 49:3-71(a);

(dd)   **New Mexico Uniform Securities Act**, N.M. Stat. Ann. § 58-13C-509;

(ee)   **North Carolina Securities Act**, N.C. Gen. State. Ann. § 78A-36;

(ff)   **North Dakota Securities Act**, N.D.C.C. § 10-04-17;

(gg)   **Ohio Securities Act**, Ohio Rev. Code Ann. § 1707.43;

(hh)   **Oklahoma Securities Act**, Okla. Stat. Ann. Tit. 71, § 1-509 (D);

(ii)   **Oregon Securities Act**, O.R.S. § 59:115;

(jj)   **Pennsylvania Securities Act**, 70 Pa. Stat. Ann. § 1-501(a);

(kk)   **Puerto Rico Securities Act**, 10 L.P.R.A. § 890;

(ll)   **Rhode Island Securities Act**, 7 R.I. Gen. Laws Ann. § 7-11-605;

(mm)   **South Carolina Securities Act**, S.C. Code Ann. § 35-1-509;

(nn)   **South Dakota Securities Act**, S.D. Codified Laws § 47-31B-509(d);

(oo)   **Tennessee Securities Act**, Tenn. Code Ann. § 48-1-122;

(pp)   **Utah Securities Act**, Utah Code § 61-1-22;

(qq)   **Vermont Securities Act**, Vt. Stat. Ann. Tit. 9, § 5509;

(rr)   **Virginia Securities Act**, Va. Code Ann. § 13.1-522 A;

(ss)   **Securities Act of Washington**, Wash. Rev. Code § 21.20.430;

(tt)   **West Virginia Uniform Securities Act**, W. Va. Code Ann. § 32-2-201;

(uu)   **Wisconsin Uniform Securities Law**, Wis. Stat. § 551.509; and

(vv)   **Wyoming Uniform Securities Act**, Wyo. Stat. Ann. § 17-4-509(d).

359.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

360.    Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTH CAUSE OF ACTION**
**(NEVADA STATE LAW – ADDITIONAL LIABILITY)**
Control Person Liability
Nev. Stat. § 90.660(4)
(Changpeng Zhao)

361.    Plaintiffs reallege the allegations above.

362.    This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Nevada.

363.    Every person who directly or indirectly controls an entity liable under the Nevada Securities Act for unlawfully selling unregistered securities, as well as any "partner, officer or director of the [entity] liable, a person occupying a similar status or performing similar functions, any agent of the [entity] liable, an employee of the [entity] liable if the employee materially aids in the act, omission or transaction constituting the violation," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by which the liability is alleged to exist. Nev. Stat. § 90.660(4).

364.    When issued, the Tokens were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295. Binance offered or sold the Tokens to a Plaintiff in Nevada. The Tokens were neither registered under, nor subject to exemption from registration under the Nevada Securities Act. *Id.* § 90.460.

365.    Binance offered or sold the Tokens and acted as a broker-dealer or agent in Nevada, including without limitation through solicitations directed by Binance to Nevada and received in Nevada.

366.    Changpeng Zhao, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Changpeng Zhao caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

367.    Accordingly, Changpeng Zhao, who directly or indirectly controlled Binance, has violated the Nevada Securities Act through Binance's offer or sale of unregistered securities.

368.    The practices discussed above additionally constitute violations of at least the following state Blue Sky statutes: [21]

(a) **Alabama Securities Act**, Ala. Code § 8-6-19;

(b) **Alaska Securities Act**, AS § 45.56.710(g);

(c) **Arizona Securities Act**, A.R.S. § 44-2003;

(d) **Arkansas Securities Act**, Ark. Stat. Ann. § 23-42-106;

(e) **Colorado Securities Act**, Colo. Rev. Stat. § 11-51-604;

(f) **Connecticut Uniform Securities Act**, Conn. Gen. Stat. § 36b-29;

(g) **Delaware Securities Act**, Del. Code tit. 6, § 73-605;

(h) **District of Columbia Securities and Investor Protection Act**, D.C. Code Ann. § 31-5606.05;

---

[21] There is no material conflict between these state statutes and the California Securities Act.

(i)  **Florida Securities and Investor Protection Act**, Fla. Stat. § 517.211;

(j)  **Georgia Uniform Securities Act**, Ga. Code Ann. § 10-5-58;

(k)  **Hawaii Uniform Securities Act**, HRS § 485A-509(g);

(l)  **Idaho Uniform Securities Act**, I.C. § 30-14-509(g);

(m) **Illinois Securities Law of 1953**, 815 Ill. Comp. Stat. Ann. 5/13;

(n)  **Indiana Uniform Securities Act**, Ind. Code § 23-19-9(d);

(o)  **Iowa Uniform Securities Act**, I.C.A. § 502.509(7);

(p)  **Kansas Uniform Securities Act**, Kan. Stat. Ann. § 17-12a509;

(q)  **Securities Act of Kentucky**, Ky. Rev. Stat. Ann. § 292.480;

(r)  **Louisiana Securities Law**, La. Stat. Ann. § 51:714;

(s)  **Maine Uniform Securities Act**, Me. Rev. Stat. tit. 32, § 16509;

(t)  **Maryland Securities Act**, Md. Code Ann., Corps. & Ass'ns § 11-703;

(u)  **Massachusetts Securities Act**, Mass. Gen. Laws Ann. Ch. 110A, § 410(b);

(v)  **Michigan Securities Act**, Mich. Comp. Laws Ann. § 451.2509;

(w) **Minnesota Securities Act**, Minn. Stat. § 80A.76(g);

(x)  **Mississippi Securities Act**, Miss. Code Ann. § 75-71-509(g);

(y)  **Missouri Securities Act**, Mo. Rev. Stat. § 409.5-509(g);

(z)  **Montana Securities Act**, Mont. Code Ann. § 30-10-307(2);

(aa)  **Nebraska Securities Act**, Neb. Rev. Stat. § 8-1118(3);

(bb)  **New Hampshire Uniform Securities Act**, N.H. Rev. Stat. § 421-B:5-509(g);

(cc)  **New Jersey Uniform Securities Act**, NJ Stat. Ann. § 49:3-71(d);

(dd)  **New Mexico Uniform Securities Act**, N.M. Stat. Ann. § 58-13C-509;

(ee)    **North Carolina Securities Act**, N.C. Gen. State. Ann. § 78A-56(c);

(ff) **North Dakota Securities Act**, N.D.C.C. § 10-04-17;

(gg)    **Ohio Securities Act**, Ohio Rev. Code Ann. § 1707.43;

(hh)    **Oklahoma Securities Act**, Okla. Stat. Ann. Tit. 71, § 1-509 (G);

(ii) **Oregon Securities Act**, O.R.S. § 59:115 (3);

(jj) **Pennsylvania Securities Act**, 70 Pa. Stat. Ann. § 1-503;

(kk)    **Puerto Rico Securities Act**, 10 L.P.R.A. § 890;

(ll) **Rhode Island Securities Act**, 7 R.I. Gen. Laws Ann. § 7-11-605(d);

(mm)    **South Carolina Securities Act**, S.C. Code Ann. § 31-1-509;

(nn)    **South Dakota Securities Act**, S.D. Codified Laws § 47-31B-509;

(oo)    **Tennessee Securities Act**, Tenn. Code Ann. § 48-1-122(g);

(pp)    **Utah Securities Act**, Utah Code § 61-1-22;

(qq)    **Vermont Securities Act**, Vt. Stat. Ann. Tit. 9, § 5509;

(rr) **Virginia Securities Act**, Va. Code Ann. § 13.1-522 C;

(ss)**Securities Act of Washington**, Wash. Rev. Code § 21.20.430;

(tt) **West Virginia Uniform Securities Act**, W. Va. Code Ann. § 32-4-410;

(uu)    **Wisconsin Uniform Securities Law**, Wis. Stat. § 551.509; and

(vv)    **Wyoming Uniform Securities Act**, Wyo. Stat. Ann. § 17-4-509(g).

369.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

370.    Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**NINTH CAUSE OF ACTION**
**(TEXAS STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Tex. Gov't Code § 4008.051**
**(Binance)**

371.    Plaintiffs reallege the allegations above.

372.    This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Texas.

373.    The Texas Securities Act forbids the offer or sale of unregistered securities. Tex. Gov't Code § 4003.001. Any person who offers or sells a security in violation of Section 4003.001 "is liable to the person who buys the security from the offeror or seller," who "may sue for (1) rescission; or (2) damages if the buyer no longer owns the security." *Id.* § 4008.051. Damages are defined as "(a) the consideration the buyer paid for the security plus interest on the consideration at the legal rate from the date the buyer made the payment, less the greater of:(1) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (2) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security." *Id.* § 4008.057(a).

374.    When issued, the Tokens were securities within the meaning of the Texas Securities Act. *Id.* § 4001.068. Binance offered or sold the Tokens to three Plaintiffs in Texas. The Tokens were neither registered under, nor subject to exemption from registration under the Texas Securities Act. *See id.* §§ 4005.051–.058.

375.    The Tokens were offered or sold in Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

376.    Accordingly, Binance has violated the Texas Securities Act through Binance's sale of unregistered securities.

377.    The practices discussed above additionally constitute violations of at least the following state Blue Sky statutes:[22]

(a) **Alabama Securities Act**, Ala. Code § 8-6-19;

(b) **Alaska Securities Act**, AS § 45.56.710;

(c) **Arizona Securities Act**, A.R.S. § 44-2001;

(d) **Arkansas Securities Act**, Ark. Stat. Ann. § 23-42-106;

(e) **Colorado Securities Act**, Colo. Rev. Stat. § 11-51-604;

(f) **Connecticut Uniform Securities Act**, Conn. Gen. Stat. § 39b-29;

(g) **Delaware Securities Act**, Del. Code tit. 6, § 73-605;

(h) **District of Columbia Securities and Investor Protection Act**, D.C. Code Ann. § 31-5603.01;

(i) **Florida Securities and Investor Protection Act**, Fla. Stat. § 571.211;

(j) **Georgia Uniform Securities Act**, Ga. Code Ann. § 10-5-58;

(k) **Hawaii Uniform Securities Act**, HRS § 485A-509(d);

(l) **Idaho Uniform Securities Act**, I.C. § 30-14-509(b);

(m) **Illinois Securities Law of 1953**, 815 Ill. Comp. Stat. Ann. 5/13;

(n) **Indiana Uniform Securities Act**, Ind. Code § 23-19-5-9(a);

(o) **Iowa Uniform Securities Act**, I.C.A. § 502.509(2);

(p) **Kansas Uniform Securities Act**, Kan. Stat. Ann. § 17-12a509;

(q) **Securities Act of Kentucky**, Ky. Rev. Stat. Ann. § 292.480;

---

[22] There is no material conflict between these state statutes and the California Securities Act.

(r)  **Louisiana Securities Law**, La. Stat. Ann. § 51:714;

(s)  **Maine Uniform Securities Act**, Me. Rev. Stat. tit. 32, § 16509;

(t)  **Maryland Securities Act**, Md. Code Ann., Corps. & Ass'ns § 11-703;

(u)  **Massachusetts Securities Act**, Mass. Gen. Laws Ann. Ch. 110A, § 410(a);

(v)  **Michigan Securities Act**, Mich. Comp. Laws Ann. § 451.2509;

(w) **Minnesota Securities Act**, Minn. Stat. § 80A.76(b);

(x)  **Mississippi Securities Act**, Miss. Code Ann. § 75-71-509(b);

(y)  **Missouri Securities Act**, Mo. Rev. Stat. § 409.509(b);

(z)  **Montana Securities Act**, Mont. Code Ann. § 30-10-307(1);

(aa)    **Nebraska Securities Act**, Neb. Rev. Stat. § 8-1118(1);

(bb)    **New Hampshire Uniform Securities Act**, N.H. Rev. Stat. § 421-B:5-509(b);

(cc)    **New Jersey Uniform Securities Act**, NJ Stat. Ann. § 49:3-71(a), (c);

(dd)    **New Mexico Uniform Securities Act**, N.M. Stat. Ann. § 58-13C-509;

(ee)    **North Carolina Securities Act**, N.C. Gen. State. Ann. § 78A-56(a);

(ff) **North Dakota Securities Act**, N.D.C.C. § 10-04-17;

(gg)    **Ohio Securities Act**, Ohio Rev. Code Ann. § 1707.43;

(hh)    **Oklahoma Securities Act**, Okla. Stat. Ann. Tit. 71, § 1-509(C);

(ii) **Oregon Securities Act**, O.R.S. § 59:115;

(jj) **Pennsylvania Securities Act**, 70 Pa. Stat. Ann. § 1-502;

(kk)    **Puerto Rico Securities Act**, 10 L.P.R.A. § 890;

(ll) **Rhode Island Securities Act**, 7 R.I. Gen. Laws Ann. § 7-11-605;

(mm)    **South Carolina Securities Act**, S.C. Code Ann. § 35-1-509;

(nn) **South Dakota Securities Act**, S.D. Codified Laws § 47-31B-509(b);

(oo) **Tennessee Securities Act**, Tenn. Code Ann. § 48-1-122;

(pp) **Utah Securities Act**, Utah Code § 61-1-22;

(qq) **Vermont Securities Act**, Vt. Stat. Ann. Tit. 9, § 5509;

(rr) **Virginia Securities Act**, Va. Code Ann. § 13.1-522-A;

(ss) **Securities Act of Washington**, Wash. Rev. Code § 21.20.430(1);

(tt) **West Virginia Uniform Securities Act**, W. Va. Code Ann. § 32-4-410(a);

(uu) **Wisconsin Uniform Securities Law**, Wis. Stat. § 551.509; and

(vv) **Wyoming Uniform Securities Act**, Wyo. Stat. Ann. § 17-4-509(b).

378.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

379.    Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TENTH CAUSE OF ACTION**
**(TEXAS STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Dealer**
**Tex. Gov't Code § 4008.051**
**(Binance)**

380.    Plaintiffs reallege the allegations above.

381.    This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Texas.

382.    The Texas Securities Act forbids any person from transacting business as a dealer or agent unless he is registered or exempt from registration under Texas law. Tex. Gov't Code § 4004.051. Any person who offers or sells a security in violation of Section 4004.051 "is liable

to a person who buys the security from the offeror or seller," who "may sue for: (1) rescission; or (2) damages if the buyer no longer owns the security." *Id.* § 4008.051. Damages are defined as "(a) the consideration the buyer paid for the security plus interest on the consideration at the legal rate from the date the buyer made the payment, less the greater of:(1) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (2) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security." *Id.* § 4008.057(a).

383.    When issued, the Tokens were securities within the meaning of the Texas Securities Act. *Id.* § 4001.068. Binance offered or sold the Tokens to three Plaintiffs in Texas. The Tokens were neither registered under, nor subject to exemption from registration under the Texas Securities Act. *See id.* §§ 4005.051–.058.

384.    Binance transacted business as a dealer or agent in Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

385.    Binance was not registered as a dealer or agent in Texas, nor was it subject to any exemption from registration.

386.    Accordingly, Binance has violated the Texas Securities Act by transacting business as an unregistered dealer or agent in the sale of securities.

387.    The practices discussed above additionally constitute violations of at least the following state Blue Sky statutes: [23]

(a) **Alabama Securities Act**, Ala. Code § 8-6-19;

(b) **Alaska Securities Act**, AS § 45.56.710;

(c) **Arizona Securities Act**, A.R.S. §44-2001 ;

---

[23] There is no material conflict between these state statutes and the California Securities Act.

(d) **Arkansas Securities Act**, Ark. Stat. Ann. § 23-42-106;

(e) **Colorado Securities Act**, Colo Rev. Stat. § 11-51-604;

(f) **Connecticut Uniform Securities Act**, Conn. Gen. Stat. § 36b-29;

(g) **Delaware Securities Act**, Del. Code tit. 6, § 73-605;

(h) **District of Columbia Securities and Investor Protection Act**, D.C. Code
Ann. § 31-5606.05;

(i) **Florida Securities and Investor Protection Act**, Fla. Stat. § 517.211

(j) **Georgia Uniform Securities Act**, Ga. Code Ann. § 10-5-58;

(k) **Hawaii Uniform Securities Act**, HRS § 485A-509(d);

(l) **Idaho Uniform Securities Act**, I.C. § 30-14-509(b);

(m) **Illinois Securities Law of 1953**, 815 Ill. Comp. Stat. Ann. 5/13;

(n) **Indiana Uniform Securities Act**, Ind. Code § 23-19-5-9(a);

(o) **Iowa Uniform Securities Act**, I.C.A. § 502.509(4);

(p) **Kansas Uniform Securities Act**, Kan. Stat. Ann. § 17-12a509;

(q) **Securities Act of Kentucky**, Ky. Rev. Stat. Ann. § 292.480;

(r) **Louisiana Securities Law**, La. Stat. Ann. § 51:714;

(s) **Maine Uniform Securities Act**, Me. Rev. Stat. tit. 32, § 16509;

(t) **Maryland Securities Act**, Md. Code Ann., Corps. & Ass'ns § 11-703;

(u) **Massachusetts Securities Act**, Mass. Gen. Laws Ann. Ch. 110A, § 401(a);

(v) **Michigan Securities Act**, Mich. Comp. Laws Ann. § 451.2509;

(w) **Minnesota Securities Act**, Minn. Stat. § 80A.76(d);

(x) **Mississippi Securities Act**, Miss. Code Ann. § 75-71-509(d);

(y) **Missouri Securities Act**, Mo. Rev. Stat. § 409.5-509(d);

118

(z) **Montana Securities Act**, Mont. Code Ann. § 30-10-307(1);

(aa)     **Nebraska Securities Act**, Neb. Rev. Stat. § 8-1118(1);

(bb)     **New Hampshire Uniform Securities Act**, N.H. Rev. Stat. § 421-B:5-509(d);

(cc)     **New Jersey Uniform Securities Act**, NJ Stat. Ann. § 49:3-71(a);

(dd)     **New Mexico Uniform Securities Act**, N.M. Stat. Ann. § 58-13C-509;

(ee)     **North Carolina Securities Act**, N.C. Gen. State. Ann. § 78A-36;

(ff) **North Dakota Securities Act**, N.D.C.C. § 10-04-17;

(gg)     **Ohio Securities Act**, Ohio Rev. Code Ann. § 1707.43;

(hh)     **Oklahoma Securities Act**, Okla. Stat. Ann. Tit. 71, § 1-509 (D);

(ii) **Oregon Securities Act**, O.R.S. § 59:115;

(jj) **Pennsylvania Securities Act**, 70 Pa. Stat. Ann. § 1-501(a);

(kk)     **Puerto Rico Securities Act**, 10 L.P.R.A. § 890;

(ll) **Rhode Island Securities Act**, 7 R.I. Gen. Laws Ann. § 7-11-605;

(mm)     **South Carolina Securities Act**, S.C. Code Ann. § 35-1-509;

(nn)     **South Dakota Securities Act**, S.D. Codified Laws § 47-31B-509(d);

(oo)     **Tennessee Securities Act**, Tenn. Code Ann. § 48-1-122;

(pp)     **Utah Securities Act**, Utah Code § 61-1-22;

(qq)     **Vermont Securities Act**, Vt. Stat. Ann. Tit. 9, § 5509;

(rr) **Virginia Securities Act**, Va. Code Ann. § 13.1-522 A;

(ss) **Securities Act of Washington**, Wash. Rev. Code § 21.20.430;

(tt) **West Virginia Uniform Securities Act**, W. Va. Code Ann. § 32-2-201;

(uu)     **Wisconsin Uniform Securities Law**, Wis. Stat. § 551.509; and

(vv)     **Wyoming Uniform Securities Act**, Wyo. Stat. Ann. § 17-4-509(d).

388.     Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

389.     Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ELEVENTH CAUSE OF ACTION**
**(TEXAS STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Tex. Gov't Code § 4008.055**
**(Changpeng Zhao)**

390.     Plaintiffs reallege the allegations above.

391.     This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Texas.

392.     Every person who directly or indirectly controls an entity liable under the Texas Securities Act for unlawfully selling unregistered securities is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. Tex. Gov't Code § 4008.05(a)-(b).

393.     When issued, the Tokens were securities within the meaning of the Texas Securities Act. *Id.* § 4001.068. Binance offered or sold the Tokens to three Plaintiffs in Texas. The Tokens were neither registered under, nor subject to exemption from registration under the Texas Securities Act. *See id.* §§ 4005.051–.058.

394.    Binance offered and sold the Tokens and acted as a dealer or agent in Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

395.    Changpeng Zhao, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Changpeng Zhao caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer or agent as described herein.

396.    Accordingly, Changpeng Zhao, who directly or indirectly controlled Binance, has violated the Texas Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

397.    The practices discussed above additionally constitute violations of at least the following state Blue Sky statutes: [24]

> (a) **Alabama Securities Act**, Ala. Code § 8-6-19;
>
> (b) **Alaska Securities Act**, AS § 45.56.710(g);
>
> (c) **Arizona Securities Act**, A.R.S. § 44-2003;
>
> (d) **Arkansas Securities Act**, Ark. Stat. Ann. § 23-42-106;
>
> (e) **Colorado Securities Act**, Colo. Rev. Stat. § 11-51-604;
>
> (f) **Connecticut Uniform Securities Act**, Conn. Gen. Stat. § 36b-29;
>
> (g) **Delaware Securities Act**, Del. Code tit. 6, § 73-605;

---

[24] There is no material conflict between these state statutes and the California Securities Act.

(h) **District of Columbia Securities and Investor Protection Act**, D.C. Code Ann. § 31-5606.05;

(i) **Florida Securities and Investor Protection Act**, Fla. Stat. § 517.211;

(j) **Georgia Uniform Securities Act**, Ga. Code Ann. § 10-5-58;

(k) **Hawaii Uniform Securities Act**, HRS § 485A-509(g);

(l) **Idaho Uniform Securities Act**, I.C. § 30-14-509(g);

(m) **Illinois Securities Law of 1953**, 815 Ill. Comp. Stat. Ann. 5/13;

(n) **Indiana Uniform Securities Act**, Ind. Code § 23-19-9(d);

(o) **Iowa Uniform Securities Act**, I.C.A. § 502.509(7);

(p) **Kansas Uniform Securities Act**, Kan. Stat. Ann. § 17-12a509;

(q) **Securities Act of Kentucky**, Ky. Rev. Stat. Ann. § 292.480;

(r) **Louisiana Securities Law**, La. Stat. Ann. § 51:714;

(s) **Maine Uniform Securities Act**, Me. Rev. Stat. tit. 32, § 16509;

(t) **Maryland Securities Act**, Md. Code Ann., Corps. & Ass'ns § 11-703;

(u) **Massachusetts Securities Act**, Mass. Gen. Laws Ann. Ch. 110A, § 410(b);

(v) **Michigan Securities Act**, Mich. Comp. Laws Ann. § 451.2509;

(w) **Minnesota Securities Act**, Minn. Stat. § 80A.76(g);

(x) **Mississippi Securities Act**, Miss. Code Ann. § 75-71-509(g);

(y) **Missouri Securities Act**, Mo. Rev. Stat. § 409.5-509(g);

(z) **Montana Securities Act**, Mont. Code Ann. § 30-10-307(2);

(aa) **Nebraska Securities Act**, Neb. Rev. Stat. § 8-1118(3);

(bb) **New Hampshire Uniform Securities Act**, N.H. Rev. Stat. § 421-B:5-509(g);

122

(cc)    **New Jersey Uniform Securities Act**, NJ Stat. Ann. § 49:3-71(d);

(dd)    **New Mexico Uniform Securities Act**, N.M. Stat. Ann. § 58-13C-509;

(ee)    **North Carolina Securities Act**, N.C. Gen. State. Ann. § 78A-56(c);

(ff) **North Dakota Securities Act**, N.D.C.C. § 10-04-17;

(gg)    **Ohio Securities Act**, Ohio Rev. Code Ann. § 1707.43;

(hh)    **Oklahoma Securities Act**, Okla. Stat. Ann. Tit. 71, § 1-509 (G);

(ii) **Oregon Securities Act**, O.R.S. § 59:115 (3);

(jj) **Pennsylvania Securities Act**, 70 Pa. Stat. Ann. § 1-503;

(kk)    **Puerto Rico Securities Act**, 10 L.P.R.A. § 890;

(ll) **Rhode Island Securities Act**, 7 R.I. Gen. Laws Ann. § 7-11-605(d);

(mm)   **South Carolina Securities Act**, S.C. Code Ann. § 31-1-509;

(nn)    **South Dakota Securities Act**, S.D. Codified Laws § 47-31B-509;

(oo)    **Tennessee Securities Act**, Tenn. Code Ann. § 48-1-122(g);

(pp)    **Utah Securities Act**, Utah Code § 61-1-22;

(qq)    **Vermont Securities Act**, Vt. Stat. Ann. Tit. 9, § 5509;

(rr) **Virginia Securities Act**, Va. Code Ann. § 13.1-522 C;

(ss) **Securities Act of Washington**, Wash. Rev. Code § 21.20.430;

(tt) **West Virginia Uniform Securities Act**, W. Va. Code Ann. § 32-4-410;

(uu)    **Wisconsin Uniform Securities Law**, Wis. Stat. § 551.509; and

(vv)    **Wyoming Uniform Securities Act**, Wyo. Stat. Ann. § 17-4-509(g).

398.    Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

399.     Plaintiffs and Class members who no longer own the Tokens seek damages for any

Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## VII.     PRAYER FOR RELIEF

400.     On behalf of themselves and the Class, Plaintiffs request relief as follows:

a.   That the Court determines that this action may be maintained as a class action,
that Plaintiffs be named as Class Representatives of the Class, that the
undersigned be named as Lead Class Counsel of the Class, and directs that
notice of this action be given to Class members;

b.   That the Court enter an order declaring that Defendants' actions, as set forth in
this Third Amended Complaint, violate the federal and state laws set forth
above;

c.   That the Court award Plaintiffs and the Class damages in an amount to be
determined at trial;

d.   That the Court issue appropriate equitable and any other relief against
Defendants to which Plaintiffs and the Class are entitled;

e.   That the Court award Plaintiffs and the Class pre- and post-judgment interest
(including pursuant to statutory rates of interest set under State law);

f.   That the Court award Plaintiffs and the Class their reasonable attorneys' fees
and costs of suit; and

g.   That the Court award any and all other such relief as the Court may deem just
and proper under the circumstances.

## VIII.     JURY TRIAL

401.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a

trial by jury for all claims.

Dated:    May 10, 2024
          New York, New York

          Respectfully submitted,

          */s/ Jordan A. Goldstein*
          Jordan A. Goldstein
          Oscar Shine
          David A. Coon
          SELENDY GAY PLLC
          1290 Avenue of the Americas
          17th Floor
          New York, NY 10104
          jgoldstein@selendygay.com
          oshine@selendygay.com
          dcoon@selendygay.com

          *Lead Counsel and Attorneys for*
          *Plaintiffs and the Proposed Class*