UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JD ANDERSON, CORY HARDIN, DAVID MUHAMMAD, RANJITH THIAGARAJAN, and CHASE WILLIAMS, individually and on behalf of all others similarly situated,**<br><br>                              *Plaintiffs*,<br>         -against-<br><br>**BINANCE AND CHANGPENG ZHAO,**<br><br>                              *Defendants*. | 20-cv-02803 (ALC)<br><br>**OPINION & ORDER** |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs bring the instant class action against Defendants Binance and Changpeng Xiao alleging various claims under federal and state securities law in connection with Defendants' promotion, offering, and sale of digital tokens on the Binance.com platform. Pending before the Court are Defendants' motion to compel arbitration, ECF No. 112, and Defendants' letter motion to seal certain exhibits in their motion to compel arbitration, ECF No. 116.

After reviewing the Parties' submissions and all other relevant materials, the Court **GRANTS** in part and **DENIES** in part Defendants' motion to compel arbitration and **GRANTS** Defendants' motion to seal certain exhibits.

## BACKGROUND

The Court assumes the Parties' familiarity with the facts and procedural background of this case. The Court thereby focuses on the background as it relates to the instant motion.

**I.      Factual Background**

Defendant Binance is a cryptocurrency exchange that facilitates trades in digital assets— including the digital tokens cited in this action—on the platform Binance.com. Third Amended Complaint, ECF No. 10 ("TAC") ¶¶ 1, 12. Defendant Zhao founded Binance and served as its

1

Chief Executive Officer from 2017 to November 2023, when he and Defendant Binance pleaded guilty to federal criminal violations. *Id.* ¶ 24.  Defendant Zhao, a Canadian citizen, founded Binance in China, then moved the company's headquarters to Japan, and then later to Malta, before ultimately claiming that "Binance.com is not headquartered or operated in Malta . . . There are misconceptions some people have on how the world must work a certain way, you must have offices, HQ, etc.  But there is a new world with blockchain now . . . Binance.com has always operated in a decentralized manner as we reach out to our users across more than 180 nations worldwide." *Id.* ¶¶ 24–26 (internal quotation marks omitted).  However, "Binance has regularly and intentionally engaged in numerous online securities transactions inside the United States, with U.S. residents[.]" *Id.* ¶ 27.

Plaintiffs allege that Defendant Binance offered and sold digital tokens "without a registration statement in effect for these securities and without registering as a broker-dealer, in violation of federal and state securities laws." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration ("Pl. Opp."), ECF No. 104 at 1; *see also* TAC ¶ 1 104.  Plaintiffs "are residents of California, Nevada, and Texas who purchased tokens on Binance and now seek damages and other relief arising from Defendants' illegal offering and sale of securities." Pl. Opp. at 1 (citing TAC ¶¶ 16–20, 400).

Moreover, the Parties agree that "Plaintiffs all created their Binance accounts between September 27, 2017, and April 15, 2018." Pl's. Opp. at 2.  The record shows that Plaintiffs all used Binance to varying degrees after creating their accounts:  Plaintiff Hardin traded as recently as January 7, 2021; Plaintiff Muhammad traded as recently as December 31, 2020; Plaintiff Thiagarajan traded as recently as April 29, 2022; Plaintiff Williams traded as recently as February 7, 2020; and Plaintiff Anderson held assets in his account as of July 23, 2024.

2

Defendants' Memorandum of Law in Support of Their Motion to Compel Arbitration ("Def. Br."), ECF No. 141 at 5.

When creating their Binance.com accounts, Plaintiffs accepted to be bound by Binance's Terms of Use.[1] Def. Br. at 3. At the time that Plaintiffs created their accounts, the Terms of Use that were then in effect were dated July 6, 2017 (the "2017 Terms of Use") and the Parties do not dispute that Plaintiffs assented to the 2017 Terms of Use. *See* Declaration of Miles Wiley ("Wiley Decl.") Exs. D, F–J at 1, ECF Nos. 115-4, 115-6–115-10. The 2017 Terms of Use "did not contain an arbitration clause, a choice of law provision, or a class action waiver." Pl. Opp. at 2 (citing Wiley Decl. Ex. D, ECF No. 115-4). However, the 2017 Terms of Use included a change-of-terms provision stating:

> Binance may make or amend this agreement and various rules from time to time as needed, and announce the same on the website, without any individual notice to you. The amended agreement and rules shall come into effect immediately and automatically upon being announced on the website. If you do not agree to the relevant amendment, you shall immediately stop using Binance Service. If you continue using Binance Service you shall be deemed as having accepted the amended agreement and rules.

Def. Br. at 3 (citing Wiley Decl. Ex. D, ECF No. 115-4).

On February 20, 2019, Binance amended the Terms of Use (the "2019 Terms of Use") and an updated version of Binance's Terms of Use was posted on a web page with the following language placed near the top of the page:

---

[1] The Court may consider extrinsic declarations and documents in deciding a motion to compel arbitration. *See Meyer v. Uber Techs. Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (a court deciding a motion to compel arbitration applies a standard similar to summary judgment, where the court may consider "all relevant, admissible evidence submitted by the parties"). The Terms of Use are also incorporated by reference into the Complaint as "documents possessed by or known to [Plaintiffs] and upon which [they] relied in bringing suit." *Underwood v. Coinbase Glob., Inc.*, 654 F. Supp. 3d 224, 237 (S.D.N.Y. 2023) (finding terms of use incorporated by reference in action against cryptocurrency trading platform), *aff'd in part, rev'd in part and remanded sub nom. Oberlander v. Coinbase Glob. Inc.*, 2024 WL 1478773 (2d Cir. Apr. 5, 2024). In deciding such a motion, Courts "draw[ ] all reasonable inferences in favor of the non-moving party." *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 834 (2d Cir. 2021) (quoting *Meyer*, 868 F.3d at 74).

> PLEASE READ THESE TERMS CAREFULLY AS THEY GOVERN YOUR USE OF THE SERVICES.  THESE TERMS CONTAINS [sic] IMPORTANT PROVISIONS INCLUDING AN ARBITRATION PROVISION THAT REQUIRES ALL CLAIMS TO BE RESOLVED BY WAY OF BINDING ARBITRATION.  THE TERMS OF THE ARBITRATION PROVISION ARE SET FORTH IN SECTION 14 BELOW ENTITLED "RESOLVING DISPUTES: FORUM, ARBITRATION, CLASS ACTION WAIVER, GOVERNING LAW." . . . BY ACCESSING, USING OR ATTEMPTING TO USE THE SERVICES IN ANY CAPACITY, YOU ACKNOWLEDGE THAT YOU ACCEPT AND AGREE TO BE BOUND BY THESE TERMS. IF YOU DO NOT AGREE, DO NOT ACCESS OR USE THE SERVICES.

Wiley Decl. Ex. E, ECF No. 115-5.  The 2019 Terms of Use incorporated, among other things, an arbitration clause that stated:

> You and Binance agree to resolve any claims relating to this Agreement (including any question regarding its existence, validity, termination, or any services or products provided and any representations made by us) through final and binding arbitration[.]

Def. Br. at 3–4 (citing Wiley Decl. Ex. E ¶ 14(b), ECF No. 115-5).  The 2019 Terms of Use also set forth the rules for arbitration:

> Either you or Binance may submit a dispute (after having made good faith efforts to resolve such dispute in accordance with subsections (a) and (b) above) for final, binding resolution by arbitration under the arbitration rules of the Singapore International Arbitration Centre ("SIAC"), which are deemed to be incorporated by reference.  The arbitration tribunal shall consist of a sole arbitrator to be appointed by the President of SIAC.  The language of the arbitration hearings shall be English and the seat, or legal place, of arbitration shall be Singapore.  **Judgment on any arbitral award may be entered in any court having jurisdiction over the party (or the assets of the party) due and owing such award.**

Wiley Decl. Ex. E ¶ 14(c), ECF No. 115-5 (emphasis in original).  Additionally, the 2019 Terms of Use state that the "Agreement is governed by the law of Singapore except for its conflicts of laws principles, unless otherwise required by a mandatory law of any other jurisdiction."  Wiley Decl. Ex. E ¶ 14(f), ECF No. 115-5 (emphasis in original).  The 2019 Terms of Use also advise users to "PLEASE READ THIS SECTION CAREFULLY, AS IT INVOLVES A WAIVER OF

4

CERTAIN RIGHTS TO BRING LEGAL PROCEEDINGS, INCLUDING AS A CLASS ACTION FOR RESIDENTS OF THE U.S." Wiley Decl. Ex. E ¶ 14, ECF No. 115-5. However, there are no provisions in the 2019 Terms of Use that detail such a waiver.

## II.   **Procedural History**

The instant motion to compel arises out of Plaintiff's filing of its TAC.[2] On May 10, 2024, Plaintiffs filed the TAC in a class action in which they represent two Subclasses of claimants: (1) "[a]ll persons, including Plaintiff Anderson, who purchased on the Binance exchange any of the Tokens to the fullest extent subject to the U.S. securities laws, between July 1, 2017 and Binance's February 20, 2019 purported imposition of an arbitration clause for the first time and were harmed thereby" and (2) "[a]ll persons who purchased on the Binance exchange any of the Tokens to the fullest extent subject to the U.S. securities laws, on or after February 20, 2019, when Binance purported to impose an unenforceable arbitration clause and the present and were harmed thereby." TAC ¶ 280. Plaintiffs allege a number of claims under federal and state securities law against Defendants. *Id.* ¶¶ 293–399.

On July 23, 2024 Defendants filed a motion to compel arbitration and a memorandum in support of its motion. ECF Nos. 112, 113. Defendants allege that Plaintiffs were bound by the 2019 Terms of Use and its arbitration provision, thus the TAC should not proceed in federal

---

[2] For completeness, the Court provides herewith a summary of the procedural posture prior to the filing of the TAC. On April 3, 2020, Plaintiff Williams and a former named Plaintiff, Eric Lee, filed the initial Complaint in this case. ECF No. 1. On June 8, 2020, Plaintiffs Anderson, Hardin, Muhammad, Thiagarajan, and Williams (and other then-named Plaintiffs) filed a motion seeking appointment as Lead Plaintiffs in this action. ECF No. 23. The Court granted the motion and ordered that Plaintiffs (and other then-named Plaintiffs) be named Lead Plaintiffs in this action. ECF No. 40. On September 11, 2020, Plaintiffs (and other then-named Plaintiffs) filed an Amended Complaint. ECF No. 43. On December 15, 2020, Plaintiffs (and other then-named Plaintiffs) filed a Second Amended Complaint. ECF No. 55. On February 16, 2021, Defendants moved to dismiss the Second Amended Complaint and/or to compel arbitration. ECF No. 58. On March 31, 2022, the Court granted Defendants' motion to dismiss without needing to decide Defendants' prior motion to compel arbitration. ECF No. 77. On April 29, 2022, Plaintiffs filed a notice of appeal of the Court's grant of the motion to dismiss. ECF No. 79. On March 8, 2024, the Second Circuit reversed the Court's dismissal of Plaintiffs' claims. *Williams v. Binance*, 96 F.4th 129, 133 (2d Cir. 2024)

court.  *See* ECF No. 113.  On October 7, 2024, Plaintiffs filed their opposition contending that they were not bound by the 2019 Terms of Use because they received insufficient notice of the new terms and, further, that the agreement constitutes an impermissible waiver of their rights under federal securities law.  *See* ECF No. 122.  On November 13, 2024, Defendants filed their reply asserting, among other things, that Plaintiffs in fact assented to the 2019 Terms of Use through their continued use of Binance.  ECF No. 124.

## LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), which governs arbitration agreements, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The Supreme Court has held that the FAA established "a liberal federal policy favoring arbitration agreements" and that courts must "rigorously . . . enforce arbitration agreements."  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505–06 (2018) (citation omitted).  Parties may agree to have an arbitrator decide both "'gateway' questions of 'arbitrability'" and the merits of their contractual disputes.  *Rent-A-Ctr. West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.,* 568 U.S. 63, 64–65 (2019).  Questions of arbitrability include: "(1) 'whether the parties are bound by a given arbitration clause' and (2) 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'"  *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 45 (E.D.N.Y. 2017) (quoting *VRG Linhas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 n.2 (2d Cir. 2013)).

When determining whether the parties have entered a valid agreement to arbitrate, "courts should apply ordinary state-law principles that govern the formation of contracts," and evaluate the allegations "to determine whether they raise a genuine issue of material fact."

*Sacchi v. Verizon Online LLC*, No. 14-cv-00423, 2015 WL 765940, at *4 (S.D.N.Y. Feb. 23, 2015) (internal citations and quotation marks omitted). Indeed, when deciding a motion compel, courts must first determine "whether the parties agreed to arbitrate" in the first place. *Id.*

Courts must also decide "whether the issue of arbitrability is for the court or for the arbitrator." *Gringas v. Think Fin., Inc.*, 922 F.3d 112, 125 (2d Cir. 2019) (quoting *Bell*, 293 F.3d at 565). Courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Schein*, 139 U.S. at 72 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

The Supreme Court has "distinguished between 'questions of arbitrability,' which are to be resolved by the courts unless the parties have clearly agreed otherwise, and other 'gateway matters,' which are presumptively reserved for the arbitrator's resolution." *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38*, 351 F.3d 43, 45 (2d Cir. 2003) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–85 (2002)). Moreover, questions of arbitrability are subject to judicial resolution unless "there is clear and unmistakable evidence from the arbitration agreement . . . that the parties intended that [those issues were to] be decided by the arbitrator." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) (internal quotation marks omitted).

## DISCUSSION

The dispositive question in this case is whether there is an agreement to arbitrate. "While federal policy generally favors arbitration, the obligation to arbitrate nevertheless remains a *creature of contract*. Because arbitrators' authority arises only when the parties agree in advance to that forum, 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d

7

218, 224 (2d Cir. 2001) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)) (emphasis added).

Although Binance operates in the "new world," the contract issues in this case are familiar even with the advent of Internet-based contracts.[3] The Parties do not dispute whether Plaintiffs manifested their assent to the 2017 Terms of Use. Indeed, Plaintiffs were required to accept the 2017 Terms of Use to proceed with the creation of their accounts. *See* Wiley Decl. Ex. B, ECF No. 115-2. Such contracts have been deemed "clickwrap" agreements. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394–95 (E.D.N.Y. 2015) ("*Clickwrap* refers to the assent process by which a user must click 'I agree,' but not necessarily view the contract to which she is assenting.") (emphasis in original). But this case turns on whether Plaintiff assented to the arbitration provision incorporated in the 2019 Terms of Use, which were posted on the Binance website after Plaintiffs assented to the 2017 Terms of Use. *See* Wiley Decl. Ex. E, ECF No. 115-5. Such agreements have been called "browsewrap" contracts and bind users through their continued use of services without their affirmative or express agreement. *See id.* at 394 ("*Browsewrap* exists where the online host dictates that assent is given merely by using the site.") (emphasis in original).

I.   **Contract Formation**

If all Plaintiffs assented to the 2019 Terms of Use, then Defendants' motion could be resolved straightforwardly in Defendants' favor given the incorporation of the choice-of-law and arbitration provisions. To evaluate whether Plaintiffs are bound to the 2019 Terms of Use—and thus the arbitration provision—the Court must first scrutinize the daylight between Plaintiff's

---

[3] Judge Weinstein thoroughly surveyed the various kinds of electronic adhesion contracts—including clickwrap and browsewrap agreements—when considering the validity of an arbitration agreement in *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394–403 (E.D.N.Y. 2015).

initial assent to the 2017 Terms of Use by clickwrap and their purported subsequent assent to the 2019 Terms of Use by browsewrap, all the while applying longstanding contract law.

### a. State Substantive Law Governs the Validity of the 2019 Terms of Use

Defendants contend that Singapore law governs the validity of the 2019 Terms of Use because the 2019 Terms of Use contain a choice-of-law provision imposing Singapore law. *See* Def. Br. at 8–9. But in so doing, Defendants put the proverbial cart before the horse: for the choice-of-law provision to apply to Plaintiffs—all of whom created their accounts prior to the 2019 Terms of Use—they must be found to in fact be bound by the 2019 Terms of Use. "Relying on a contractual provision before a contract has been found to have been accepted by the parties as binding is unacceptable." *Berkson*, 97 F. Supp. 3d 387–88.

It is clear and undisputed that Plaintiffs affirmatively assented to the 2017 Terms of Use by manifesting their assent to a clickwrap agreement. *See* Wiley Decl., Exs. F–J at 1, ECF Nos. 115-6–115-10. Plaintiffs, however, challenge whether they assented to the 2019 Terms of Use by way of the change-of-terms provision in the 2017 Terms of Use. *See* Def. Br. at 3 (citing Wiley Decl. Ex. D, ECF No. 115-4). The Court is thus required to consider the law governing the 2017 Terms of Use. But as stated previously, there is no choice-of-law provision in the 2017 Terms of Use, so the Court cannot apply the Singapore choice-of-law provision by default. *See Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 119, 126–27 (2d Cir. 2012) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.").

Where there is no choice-of-law provision in an arbitration agreement, the Court must turn to substantive state law to determine the agreement's validity. *See, e.g., Specht v. Netscape Communications Corp.*, 306 F.3d 17, 27 (2d Cir. 2002) ("[I]n deciding whether parties agreed to arbitrate a certain matter, a court should generally apply state-law principles to the issue of

9

contract formation."); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("[S]tate law, whether of legislative or judicial origin, is applicable [to the determination of whether the parties agreed to arbitrate] if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state").

Courts in this district apply an interest analysis test to determine the state law that governs questions of an agreement's formation. *See Meyer v. Kalanick*, 200 F. Supp. 3d 408, 413 (S.D.N.Y. 2016), *vacated sub nom. Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017). "According to that analysis, a court 'must consider five factors: (1) the place of contracting; (2) the place of the contract negotiations; (3) the place of the performance of the contract; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, places of incorporation, and places of business of the parties.'" *Id.* (quoting *Philips Credit Corp. v. Regent Health Grp., Inc.*, 953 F.Supp. 482, 502 (S.D.N.Y. 1997).

Applying the test to the facts of this case: (1) the contracts were entered into on the Internet; (2) the contracts were not negotiated; (3) there is no place where the contract will be performed; (4) there is no particular location of the subject matter of the contract; and (5) Binance is a decentralized company without any headquarters, but Plaintiffs are domiciled in California, Nevada, and Texas. *See* TAC ¶¶ 16–20, 24–26, 400. Consequently, the Court concludes that the substantive laws of California, Nevada, and Texas govern. Moreover, the laws of California, Nevada, and Texas are substantively similar with respect to contract formation. *See Alkutkar v. Bumble Inc.*, 2022 WL 4112360, at *5 (N.D. Cal. Sept. 8, 2022) ("[T]here is no conflict between Texas and California law for purposes of assent and enforceability of an

arbitration agreement."); *Augustine v. TLC Resorts Vacation Club, LLC*, 2018 WL 3913923, at *4 (S.D. Cal. Aug. 16, 2018) (agreeing with a party in the disposition of a motion to compel that the "outcome in this case is the same whether the Court applies Nevada or California law").

### b. Plaintiffs Had Some Reasonable Notice of the Arbitration Provision

"Where the assent to terms of a contract is 'largely passive,' as is often the case with electronic contracts of adhesion . . . 'the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the terms at issue.'" *Berkson*, 97 F. Supp. 3d at 393 (citing *Schnabel*, 697 F.3d, at 120 126–27). Under California law, contract formation requires mutual assent. *See Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014) ("We agree with the district court that Barnes & Noble did not provide reasonable notice of its Terms of Use, and that Nguyen therefore did not unambiguously manifest assent to the arbitration provision contained therein."). Reasonable notice requires that a user have either constructive or actual notice of an agreement's terms. *See Metter v. Uber Tech., Inc.*, No. 16-cv-06652, 2017 WL 1374579, at *2 (E.D. Cal. Apr. 17, 2017). (citing *Nguyen*, 763 F.3d at 1176–79).

### i. Plaintiffs Did Not Have Constructive Notice of the Arbitration Agreement

To support their contention that Plaintiffs had constructive notice of the 2019 Terms of Use, Defendants cite *Needleman v. Golden 1 Credit Union*, 474 F. Supp. 3d 1097. (N.D. Cal. 2020); Defendants' Reply Memorandum of Law in Support of Their Motion to Compel Arbitration ("Def. Reply"), ECF No. 124 at 7. Like the instant case, *Needleman* implicates the question of whether a defendant provided constructive notice of an arbitration provision to a user who previously agreed to an agreement containing a change-of-terms provision that was later amended to include an arbitration agreement. *Id.* at 1103–05.

But the similarities end there: the plaintiff in *Needleman* was a member of a credit union who enrolled in an online banking program and who indisputably entered into an agreement to receive electronic communications (including account disclosures) through the credit union's online banking platform. *Id.* at 1100–02. An account disclosure regarding arbitration with an opt-out clause was included in the June 2019 statements for online banking users and the plaintiff received an email alerting him that the statement was available for review, although the email lacked any indication that the statement enclosed a disclosure arbitration agreement.[4] *Id.* at 1100–01.

The plaintiff never checked his June statement, but "[i]f he had, once on the 'View Statements' page, visible without scrolling under a bold 'Statement Inserts' heading would have been blue, hyperlinked, underlined text reading 'Arbitration Provision.' Clicking on this link would have brought [the plaintiff] to a PDF of the same one-page 'IMPORTANT NOTICE' that had been inserted in the June monthly statement mailings for customers receiving statements by mail." *Id.* at 1102. The court held that the defendant provided constructive notice because a "reasonable user in [the plaintiff's] situation would have understood [their] obligation to utilize the 'View Statements' page to stay apprised of important disclosures. Because [the plaintiff] explicitly accepted the terms of Golden 1''s online statements program, he was 'on notice' that critical information would be conveyed to him online rather than through the mail." *Id.* at 1104.

The constructive notice in *Needleman* stands in stark contrast to the obligation imposed on Plaintiffs in the instant case. Notably, the *Needleman* defendant issued individual communications to its users containing the disclosure that advised them of the arbitration

---

[4] Additionally, "[f]or Golden 1 account holders who still received paper statements, this information was conveyed through a one-page insert mailed with the customers' monthly statements. The page reads 'IMPORTANT NOTICE' at the top, with key provisions in bold.'" *Needleman*, 474 F. Supp. 3d at 1101.

12

provision and allowed them to opt out.  Here, Plaintiffs received no contemporaneous individual notice of the enactment of the 2019 Terms of Use.  There is also no evidence in the record that an arbitration provision was "announced" as set out in the 2017 Terms of Use and no indication on the face of the agreement as to where Plaintiffs should look for the amendments to the terms.  *See* Wiley Decl. Exs. D, O, ECF No. 115-4, 115-15.  Here—and despite the change-of-terms provision in the 2017 Terms of Use—Plaintiffs would "would have had no reason to look at the contract posted" on the Binance website (even if they use the website) because "[p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side."  *See Douglas v. United States District Court for the Central District of California*, 495 F.3d 1062, 1066 (9th Cir. 2007) (per curiam).

Indeed, to hold otherwise "would lead to absurd results:  contract drafters who included a change-of-terms provision would be permitted to bind individuals daily, or even hourly, to subsequent changes in the terms.  The absence of limits on the frequency or substance of changes in terms subverts the basic rule of contract law that '[a] contract exists where the parties assent to the same thing in the same sense, so that their minds meet.'"  *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020) (quoting 17A Am. Jur. 2d Contracts § 30 (August 2020 Update)).  Whereas the plaintiff in *Needleman* was reasonably put "on notice of the need to check online statements when new ones are available[,]" Plaintiffs in the instant case did not have a need to do so and therefore they did not receive sufficient constructive notice of the changed terms.  *See Needleman*, 474 F. Supp 3d at 1105.

### ii. Plaintiffs Had Actual Notice of the Arbitration Clause as Early as Their Involvement in the Litigation

However, Defendants also argue that all Plaintiffs had actual notice of the arbitration provision at least as of April 3, 2020, when the original Complaint in this case was filed.  *See*

Complaint ("Compl."), ECF No. 1; Def. Reply at 7.  Indeed, the Complaint splits subclasses into (1) a group of people who purchased tokens on Binance between April 1, 2017 and February 20, 2019 (the date of "Binance's imposition of an arbitration clause") and (2) a group of people who purchased tokens on Binance after Binance imposed the clause.  Compl. ¶ 284.

"Courts have held that plaintiffs will be bound by a product's terms of use if they learn of the terms' existence during pending litigation and continue to use the product—'conduct that a reasonable person would understand to constitute assent.'"  *In re Ring LLC Priv. Litig.*, No. 19-cv-10899, 2021 WL 2621197, at *7 (C.D. Cal. June 24, 2021) (holding that "[p]laintiffs' continued use of the [services in question] after being on constructive notice of the [arbitration provision] through th[e] lawsuit constitutes assenting conduct) (quoting *Nicosia v. Amazon.com, Inc.*, 815 F. App'x 612, 614 (2d Cir. 2020)).

The procedural timeline of this case warrants some nuance:  Plaintiff Williams is the only remaining Plaintiff named in the initial Complaint, so he had actual notice of the arbitration agreement at least as early as April 3, 2020.  *See* Compl. ¶ 14.  For the rest of the Plaintiffs, the earliest date of possible actual notice in the record is June 8, 2020, the date when Plaintiffs Williams, Anderson, Hardin, Muhammed, and Thiagarajan moved jointly to be appointed lead plaintiffs in this case.  *See* ECF No. 23.  Consequently, the record shows that Plaintiffs Anderson, Hardin, Muhammed, and Thiagarajan were aware of Defendants' imposition of the arbitration agreement in the 2019 Terms of Use as early as June 8, 2020, giving way to a finding that all Plaintiffs had reasonable notice of the 2019 Terms of Use, albeit approximately a year after the terms were enacted.

### c. There Are Open Questions as to the Retroactivity of the 2019 Terms of Use

The next question is whether the 2019 Terms of Use apply retroactively.  Assuming that Plaintiffs had actual notice of the arbitration agreement, the Court is not satisfied with the

conclusion that *all* of their claims that predate their actual notice are subject to arbitration. The arbitration provision states that users agree to resolve *any* claims against Binance. *See* Def. Br. at 3–4 (citing Wiley Decl. Ex. E ¶ 14(b), ECF No. 115-5). But under California law, provisions that "allow[] modifications to apply to claims that had already accrued at the time of the modification" render the contract illusory. *See Moua v. Optum Servs., Inc.*, 320 F. Supp. 3d 1109, 1114 (C.D. Cal. 2018). In the Court's view, the 2019 Terms of Use do not provide any temporal limitation or bifurcation of accrual pre- and post-amendment claims. Indeed, agreements that are "silent on the issue [of whether a modification would apply to accrued or known claims] are not rendered illusory because the implied covenant of good faith and fair dealing restricts modifications from applying to accrued or known claims." *Id.*

The Court DENIES the motion to compel arbitration for the group of people who purchased tokens between April 1, 2017 and February 20, 2019. As to the second group, the Court does not yet make any determinations as to whether the 2019 Terms of Use can apply to claims accrued after the date of the 2019 arbitration clause, but before the plaintiffs had actual notice in the context of this litigation.

The Court encourages the Parties to think further about the downstream effects of such a determination on the pendency of this litigation and, if necessary, to provide the Court with supplemental briefing as outlined in the conclusion of this opinion.

## II.    Class-Action Waiver

Another unresolved question is the enforceability of the putative class-action waiver in the arbitration provision. As the Court detailed previously, the 2019 Terms of Use contains a section titled "RESOLVING DISPUTES:  FORUM, ARBITRATION, CLASS ACTION WAIVER, GOVERNING LAW" under which users are advised to "PLEASE READ THIS SECTION CAREFULLY, AS IT INVOLVES A WAIVER OF CERTAIN RIGHTS TO BRING

15

LEGAL PROCEEDINGS, INCLUDING AS A CLASS ACTION FOR RESIDENTS OF THE U.S." Wiley Decl. Ex. E ¶ 14, ECF No. 115-5. But the 2019 Terms of Use are otherwise silent as to the imposition of such a waiver and there are no provisions in the 2019 Terms of Use that detail such a waiver.

Plaintiffs object to the passing reference to the waiver and Defendants argue that the waiver is valid under the principles of contract law. The Court also wishes further elucidation from the Parties as to the waiver's enforceability.

### III.    Sealed Exhibits

Defendants' moved to file under seal certain exhibits they submitted to the Court as proposed exhibits to their motion. ECF No. 116. These exhibits contain "exhibits contain sensitive personal data of BHL users, including information pertaining to individuals' asset holdings and financial transactions. They also contain individuals' email and IP addresses." *Id.* at 1. The Court agrees that such material can be appropriately sealed. *See Tyson Foods, Inc. v. Keystone Foods Holdings, Ltd.*, 2020 WL 5819864, at *2 (S.D.N.Y. Sept. 30, 2020) (granting request to seal exhibit containing "customer information, including their identities and purchases").

## CONCLUSION

For the reasons set forth by the Court, Defendants' motion to compel arbitration is hereby **DENIED** to the extent that Plaintiffs make claims that accrued before the 2019 Terms of Use were enacted. As to any other claims, Defendant's motion to compel is **DENIED** without prejudice in light of the issues raised by the Court.

The Parties are **ORDERED** to provide a joint status report fourteen (14) days following the entry of this order with their positions on the Court's discussion as to (1) the applicability of the 2019 Terms of Use to claims that accrued prior to the dates that the plaintiffs had actual

notice of the clause in the context of this litigation and (2) the viability of the class action waiver as referenced in the 2019 Terms of Use.  The Parties should inform the Court if their positions in this litigation have changed or, if not, whether they would like to file supplemental briefing

Defendants' motion to seal is **GRANTED**.  The Clerk of Court is respectfully directed to file under seal in ECF No. 115 the proposed exhibits attached to ECF No. 117.  The Clerk of Court is also requested to terminate ECF Nos. 112 and 116.

**SO ORDERED.**

**Dated: March 28, 2025**
    **New York, New York**　　　　　　　　　　　**ANDREW L. CARTER, JR.**
　　　　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**